JUDGE HOLWELL

11 CIV 6690

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- x   Case No.

BROOKLYN CENTER FOR
INDEPENDENCE OF THE DISABLED, a
nonprofit organization, CENTER FOR
INDEPENDENCE OF THE DISABLED,
NEW YORK, a nonprofit organization, and
TANIA MORALES

               Plaintiffs,

          -against-

MICHAEL R. BLOOMBERG, in his official
capacity as Mayor of the City of New York,
and the CITY OF NEW YORK

              Defendants.

------------------------------------------------- x

:   **CLASS ACTION COMPLAINT
FOR DISCRIMINATION;
INJUNCTIVE AND
DECLARATORY RELIEF**

RECEIVED
SEP 26 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

1.   This class action lawsuit challenges the long-term, multiple and serious failures by Mayor Bloomberg and the City of New York to address the critical needs of men, women, and children with disabilities during emergencies and disasters. Although the Mayor and the City have created emergency plans for the general population, they have failed to plan appropriately for the nearly 900,000 disabled persons within New York City who are especially vulnerable during disasters.

2.   Hurricanes, terrorist attacks, floods, fires, and winter storms are a few of the many potential emergencies that New York City and its residents must face. The failure of Mayor Bloomberg (hereafter sometimes the "Mayor") and the City of New York (hereafter sometimes the "City") to plan for the unique needs of New Yorkers with disabilities creates severe hardships for people with disabilities and can be life threatening to them during these emergencies.

3. Defendants' failures to respond to disability needs in emergency planning were made painfully evident by Hurricane Irene. As the hurricane approached, New Yorkers with disabilities had no idea how they could be evacuated, what shelters, if any, were accessible, how they would obtain life-sustaining medications, or how they could be transported when buses and subways stopped running.

4. During Hurricane Irene, despite assurances from the City that shelters would be accessible, many of the shelters that were open to the public were not accessible to persons with disabilities. Ramps into shelters were often makeshift or too steep and dangerous to use. Other ramps that should have been usable led to locked doors for which shelter volunteers did not have keys. Signage for persons with vision disabilities also led to locked doors. Bathrooms in the shelters were inaccessible. Only 26% of the shelters opened, which were located in public schools, were listed on New York City's Department of Education website as somewhat or completely accessible. This did not include the shelters which had ramps that led to locked doors.

5. As a result, disabled New Yorkers, such as Tania Morales, were turned away from shelters. For Ms. Morales, this was because the gate for the ramp was locked and the shelter staff could not find the key, forcing her to return home and remain there during the hurricane.

6. Also during Hurricane Irene, emergency notifications were often inaccessible to persons with vision disabilities. Evacuation maps from the City included text that was too small and colors with poor contrast. Televised emergency announcements from City officials did not include American Sign Language interpreters.

7. In anticipation of Hurricane Irene, Mayor Bloomberg shut down bus, subway and paratransit services at noon on Saturday August 27, 2011, hours before the hurricane was expected to hit. He noted that if evacuating after that time "you'll have to walk, or you're going to find some way to use a car or taxi." The Mayor stated later that a number of cabs had been directed to go to evacuation zones, and liveries and commuter vans had been authorized to pick up street hails anywhere in the City. However, because only 1.8% of all yellow taxicabs and

only .02% of other for-hire vehicles are accessible to persons using wheelchairs, disabled people could not use cabs or other for higher vehicles for evacuation. The Mayor also pointed to the availability of school buses for evacuation. However, these school buses had no lifts or accessible seating areas for persons with mobility disabilities.

8.   The City of New York has been on notice for at least ten years that emergency preparedness for persons with disabilities is lacking. During and following the September 11th terrorist attack, men, women and children with disabilities were disproportionately harmed. Persons with mobility disabilities who wanted to evacuate the World Trade Center buildings were unable to do so because there were no evacuation chairs or other evacuation assistance provided for persons with mobility disabilities. These individuals did not even have the choice of whether to leave and were essentially trapped and left to die.

9.   During recovery efforts after September 11th, the City paid little attention to the unique needs of persons with disabilities. Personal attendants and aides for persons with disabilities were not allowed into the "frozen zone," leaving many persons with disabilities who lived in the frozen zone without assistance to perform daily life activities such as dressing, eating, and toileting. Many shelters and disaster assistance centers serving people evacuated from the frozen zone could not be accessed by residents with mobility disabilities, and the centers did not have signs and printed materials that were readable by men and women with vision disabilities. No plans were made for providing replacement medical equipment or supplies for persons with disabilities. Transportation was interrupted, leaving persons with disabilities without accessible transportation to vital emergency services being offered to the general public.

10. Specific emergencies such as Hurricane Irene and September 11th highlight the glaring deficiencies in New York City's emergency preparedness efforts for persons with disabilities. Yet these specific events are merely a symptom of the current underlying problem: Mayor Bloomberg and the City of New York's ongoing failure to prepare for the unique needs of

3

persons with disabilities during emergencies. This failure to plan puts the lives of persons with disabilities in unnecessary danger.

11. Effective emergency preparedness and planning must include certain essential components, such as provision for shelter and care for people forced to evacuate their homes, public notification and communication before and during emergencies, as well as assistance with evacuation and transportation from affected areas. The City of New York has made and continues to make substantial efforts and has spent and continues to spend considerable resources addressing such components for the general public.

12. However, with respect to each of these essential components, the Mayor and the City have failed to consider and address the different, yet critical, needs of persons with disabilities.

13. Defendants' emergency preparedness efforts for persons with disabilities are woefully deficient in that they do not adequately plan for notifying persons with sensory disabilities before and during emergencies, for evacuating persons with mobility disabilities from their homes, for providing accessible transportation to shelters and back, for providing shelters that are architecturally accessible and identifying these to persons with disabilities, and for providing assistance to persons with disabilities during recovery after an emergency.

14. Mayor Bloomberg and New York City have discriminated against men, women, and children with disabilities by failing to address their unique needs during emergencies. This suit challenges this ongoing failure and seeks to ensure that vulnerable New Yorkers with disabilities are included in the City's emergency preparedness and planning.

//

## JURISDICTION

15. This is an action for declaratory and injunctive relief brought pursuant to Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-101 *et seq.* This Court has subject

matter jurisdiction over the Rehabilitation Act and ADA claims pursuant to 28 U.S.C. §§ 1331
and 1343 and supplemental jurisdiction over the NYCHRL claim pursuant to 28 U.S.C. § 1367.

16. This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201
and 2202.

//

## VENUE

17. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District in which this
Complaint is filed, because Defendants are located within this District and a substantial part of
the events or omissions giving rise to the claims alleged herein occurred in this District.

//

## PARTIES

18. Organizational Plaintiff Brooklyn Center for Independence of the Disabled ("BCID")
is an independent living center based in Brooklyn. Founded in 1956, BCID is a consumer-based,
non-profit, membership organization, providing services and advocacy toward independent
living for individuals with disabilities.

19. BCID is dedicated to guaranteeing the civil rights of people with disabilities. BCID
seeks to improve the quality of life of Brooklyn residents with disabilities through programs that
empower them to gain greater control of their lives and achieve full and equal integration into
society. BCID accomplishes this goal through its services, its advocacy for systems change to
remove physical, attitudinal and communication barriers to people with disabilities, and through
its education and awareness programs. Accordingly, the interests that BCID seeks to protect
through this litigation are germane to its mission and purpose.

20. BCID's advocacy and direct service work is based on a close association with its
constituents. The majority of BCID's staff, board members, and volunteers have disabilities
themselves. In addition, BCID is a membership organization in which persons with disabilities
may participate through committees, board meetings, and direct advocacy. As persons with
disabilities, one or more members of BCID are suffering injury due to the City's failure to

include persons with disabilities in its emergency preparedness and planning efforts. Accordingly, one or more BCID members have standing to sue in their own right. Moreover, since only injunctive and declaratory relief are requested, the participation of individual members in the lawsuit is not required.

21. Furthermore, BCID is directly harmed by New York City's and the Mayor's failure to adequately plan for the needs of persons with disabilities during emergencies. Because of such failures, BCID is forced to expend time and resources advocating for its constituents whose needs are not being met. BCID is forced to provide direct assistance to those individuals when government entities are unable to do so. A favorable decision in this case would directly redress these injuries.

22. Center for Independence of the Disabled, New York ("CIDNY") is an independent living center serving persons with disabilities throughout New York City. Founded in 1976, CIDNY is a consumer-based, non-profit organization, providing services and advocacy toward independent living for individuals with disabilities. CIDNY's goal is to ensure full integration, independence and equal opportunity for all people with disabilities by removing barriers to the social, economic, cultural, and civic life of the community. Over half of CIDNY's board members and over seventy percent of CIDNY's staff are persons with disabilities.

23. CIDNY has expended extensive time and resources in addressing emergency preparedness for persons with disabilities. Immediately following the September 11th attack, CIDNY stepped into the role the City should have already been prepared to play. CIDNY rapidly developed a Disaster Relief Services program which provided (1) direct services to persons with disabilities personally affected by the emergency, (2) education, training and technical assistance to relief and other service providing agencies and (3) outreach to persons with disabilities who did not come forward seeking help in the first weeks after the attack.

24. Three years after September 11th, CIDNY issued a report entitled "Lessons Learned from the World Trade Center: Emergency Preparedness for People with Disabilities in New York." The report reached several key conclusions:

6

- Emergency responders, as well as relief and other service agencies, must incorporate into their planning and operations an appropriate strategy for ensuring equitable access to response and recovery services for people with disabilities;

- Relief agencies cannot wait until they are in the middle of a disaster to start training their staff in disability awareness;

- The day after a disaster is too late for agencies to start doing outreach to make their services known to people with disabilities; and

- During the recovery phase, there must be a priority to restore or address those services and needs most critical to people with disabilities, especially related to access to home attendants, assistive equipment, medication, accessible transportation and temporary shelter, and food delivery.

These lessons have been ignored by the City of New York and its Mayor.

25. CIDNY continues today to advocate for persons with disabilities during emergencies through direct services, such as special outreach to consumers to alert them to emergencies and resources, and through advocacy, such as participating on committees and in meetings with government officials, representing the disability community.

26. CIDNY is directly harmed by New York City's and Mayor's Bloomberg's failure to adequately plan for the needs of persons with disabilities during emergencies. Because of the discriminatory emergency preparations by New York City and Mayor Bloomberg, CIDNY must expend time and resources preparing its constituents for emergencies and advocating for its constituents before, during and after emergencies. CIDNY is forced to provide direct assistance to individuals with disabilities when government entities fail to do so. A favorable decision in this case would directly redress these injuries.

27. Plaintiff Tania Morales is a resident of New York City and a masters candidate in public administration. She has a mobility disability that causes her to rely on a wheelchair. She

is a qualified individual with a disability within the meaning of all applicable statutes and a member of the proposed class.

28. Ms. Morales currently does not know which, if any, emergency shelters designated by the City of New York are accessible to persons using wheelchairs. During Hurricane Irene, Ms. Morales located her nearest emergency shelter using the City's website. Ms. Morales could find no information on the website as to whether the shelter was accessible to persons using wheelchairs. Ms. Morales knew that the shelter was a public school and remembered seeing a ramp leading into the building. Ms. Morales traveled in her motorized wheelchair to the shelter, but when she reached the main entrance, she discovered that the gates to the ramp leading into the building were locked. The volunteers at the shelter tried to locate the keys for the gates. However, after waiting ten minutes for the volunteers to search, the wind was picking up and Ms. Morales was afraid to continue to wait outside on the sidewalk. Ms. Morales returned home and remained there for the duration of the hurricane.

29. Ms. Morales also does not have information about whether evacuation transportation will be accessible to persons with disabilities during emergencies or disasters. During Hurricane Irene, for instance, Ms. Morales could not go to another shelter to see if it was accessible because there was no available accessible transportation. Subways, buses and paratransit were shut down. Ms. Morales had no other option but to return home.

30. The Plaintiff class consists of all persons with disabilities in the City of New York who have been and are being denied the benefits and advantages of New York City's emergency preparedness program because of Mayor Bloomberg and New York City's continuing failure to address the unique need of this population in the City's emergency planning and preparations.

31. Defendant City of New York is, according to New York State Executive Law Article 2-B, "the first line of defense in times of disaster." (N.Y. Exc. Law § 20.1(a)). The City of New York is the first level of response for meeting the emergency needs of persons in its jurisdiction. New York City's emergency services include the Police Department (NYPD), Fire Department (FDNY), Fire Department Emergency Medical Services (FDNY-EMS), and Office of

Emergency Management (OEM).  A number of other City agencies, including the Department of Health and Mental Hygiene (DOHMH), Department of Environmental Protection (DEP), and Department of Buildings (DOB) also have emergency response functions.

32. Defendant Mayor Bloomberg, in his official capacity, is the chief executive as defined in New York State Executive Law Article 2-B. (N.Y. Exc. Law § 20.2(f)).  As the local chief executive, Mayor Bloomberg is required to "take an active and personal role in the development and implementation of disaster preparedness programs and be vested with authority and responsibility in order to insure the success of such programs." (N.Y. Exc. Law § 20.1(b)). Moreover, as the local chief executive, only Mayor Bloomberg can declare a local state of emergency covering all or any part of his jurisdiction. (N.Y. Exc. Law § 24.1).

33. Hereafter, reference to "Defendants" shall be deemed to include all named Defendants, and each of them, unless otherwise indicated.

//

## FACTUAL ALLEGATIONS

### New York City Faces a Variety of Potential Emergencies and Is Extremely Susceptible to the Effects of these Emergencies

34. With more than 8.2 million people, New York City is the most populous city in the United States and ranks among the largest urban areas in the world.  It is also one of the most densely populated cities in the United States with an area of just 305 square miles.

35. New York City has developed a complex and interconnected network of transportation and infrastructure systems.  However, New York City's defining characteristics – its dense population and complex infrastructure – also increase the potential significance of emergencies and disasters, making it more susceptible to their effects than many other cities.

36. New York City's Office of Emergency Management ("OEM") is an agency charged with preparing for natural disasters such as coastal storms, earthquakes, extreme temperatures, flooding, windstorms, and winter storms.  New York City must also be prepared to deal with

man-made disasters such as utility interruptions, hazardous spills or toxic releases caused by transportation or industrial accidents, civil disturbances, and terrorist incidents.

37. Over the past 20 years, New York City has endured numerous emergencies and disasters, ranging from hurricanes (e.g., Hurricanes Irene, Isabel and Floyd) to power outages (e.g., Northeast Blackout of 2003) to terrorist attacks (e.g., February 1993 and September 2001) and winter storms (e.g., Blizzard of 1996, President's Day Storm 2003 and blizzards in 2010-11).
//

**An Effective Emergency Preparedness Program Must Include Nine Essential Components.**

38. An effective emergency preparedness program must include at least nine essential components. The City of New York attempts to make preparations for the general public for each of these components.

39. First, an emergency preparedness program must include the development of comprehensive emergency plans. Such plans must address both specific types of emergencies (e.g., hurricanes) and/or address specific procedures (e.g., evacuation) during emergencies.

40. The City of New York has developed such emergency plans. For instance, New York City has emergency plans for coastal storms, winter weather, and heat emergencies. New York City also relies on the Citywide Incident Management System (CIMS) which sets forth roles and responsibilities during emergencies.

41. Second, an emergency preparedness program must include assessments of the efficacy of emergency plans. This requires exercises and drills simulating various emergencies and may require public participants.

42. New York City's OEM has held at least one exercise and/or drill each year since 2002 to test the efficacy of various emergency plans.

43. Third, an emergency preparedness program must include advanced identification of the needs that will arise and resources available to meet those needs during an emergency.

44. The City of New York uses the Citywide Asset and Logistics Management System (CALMS) to manage the City's emergency resources and essential skills. CALMS integrates

multiple resource management systems and provides a single view of the resources managed or accessible to response agencies.

45. Fourth, an emergency preparedness program must provide plans for public notification and communication prior to, during and after emergencies.

46. New York City's OEM has a public information plan to undertake such communications. In addition, emergency responders communicate emergency information via bullhorn and door-to-door notifications.

47. Fifth, an emergency preparedness program must provide policies or procedures concerning the concept of "sheltering in place." When evacuation to shelters is either inappropriate or impossible, New York City residents and visitors may be asked to stay where they are (e.g., their own apartment or house) and "shelter in place."

48. New York City has a policy in which persons in its jurisdiction should be prepared to shelter in place for up to three days. This means that persons should have enough food, water, medicine, and other supplies to survive on their own for three days.

49. Sixth, an emergency preparedness program must include plans to provide shelter and care for individuals forced to evacuate their homes during emergencies. Public schools are commonly used as shelters. Care at such shelters includes food, water, sleeping areas, bathroom facilities and medical attention, if necessary.

50. The City of New York offers shelter and care for individuals forced to evacuate their homes during emergencies.

51. Seventh, an emergency preparedness program must plan to provide assistance with evacuation and transportation.

52. New York City has an urban search and rescue team that assists in evacuation. In addition, New York City offers transportation for residents and visitors who must evacuate from affected areas during an emergency.

53. Eighth, an emergency preparedness program must include plans for provision of temporary housing when evacuees cannot return to their homes.

54. In the City of New York, the Department of Housing Preservation and Development's Emergency Housing Services Bureau provides emergency relocation services when individuals are not able to reoccupy their residences after evacuation.

55. Ninth, an emergency preparedness program must have plans for the provision of assistance in recovery and remediation efforts after an emergency or disaster.

56. New York City provides disaster recovery assistance in cooperation with federal and state agencies.

//

## The Unique Needs of Persons with Disabilities Must Be Addressed for Each of The Essential Components But New York City Fails To Do So.

57. While New York City provides each of these nine essential components of emergency preparedness for the general population, it fails to do so for the almost 900,000 New Yorkers with disabilities. New York City's emergency preparedness efforts do not address the unique needs of persons with disabilities during emergencies.

58. In developing its comprehensive emergency plans, a city must include the input of the disability community.

59. However, the City of New York has failed to consistently engage and affirmatively respond to the disability community. OEM, for instance, has involved the disability community on only certain issues, piece-meal and out of context. OEM has never provided a draft of a plan for which the disability community can provide input. OEM has failed to act on a grant request from the New York State Independent Living Centers intended to fund efforts relating to emergency preparedness for persons with disabilities.

60. As a result, persons with disabilities know very little or nothing of the City's emergency plans. They do not know, for instance, how they will be notified, how and if they will be evacuated, which shelters are accessible, how and if they will be transported and what assistance, if any, they will receive.

61. In assessing the efficacy of its emergency plans, a city must test its plans with regards to persons with disabilities.

62. The City of New York has held no drills or exercises to test the efficacy of its plans for persons with disabilities. Indeed New York City has turned away persons with disabilities from participating in emergency drills which are open to the general public.

63. In identifying needs and resources in advance of an emergency, a city must plan for the needs of, and provide the resources specifically for, persons with disabilities. This requirement includes, for instance, planning for replacement life-sustaining mediations, consumable medical supplies, and durable medical equipment for persons with disabilities and determining the number of accessible seats available on evacuation buses.

64. New York City has made no such plans to assess the emergency needs of persons with disabilities let alone made plans to ensure that these needs will be met.

65. In notifying and communicating with persons with disabilities prior to and during an emergency, a city must ensure that communications are accessible. This requires, among other accommodations, having plans that provide for captioning or American Sign Language interpreters for persons who are deaf or hard of hearing and that avoid bullhorn type announcements to inform persons of imminent emergencies. This further requires ensuring that websites with emergency information are accessible to screen readers used by persons with no or low vision.

66. New York City has no adequate or effective plans for ensuring accessible notification and communication prior to and during emergencies.

67. When sheltering in place is required, persons with disabilities may need assistance. For example, persons with disabilities may need help in daily life activities (e.g., eating, dressing) which normally would be provided by an aide or caretaker. Persons with disabilities may also be dependent on electricity for respirators, wheelchairs or other assistive technologies which, during power-outages, means persons with disabilities may require immediate assistance.

13

A city must develop specific policies as to how it will address these and other scenarios when persons with disabilities are forced to remain in their homes or apartments during emergencies.

68. New York City has failed to develop such policies. New York City does not, for instance, offer in-home assistance or sheltering options for persons with disabilities whose survival depends on electrically powered equipment when electrical power is disrupted for extended periods of time.

69. When a city provides shelter and mass care to persons forced to evacuate their homes, a city must have plans to ensure that the shelters are free of architectural barriers to persons with disabilities. For example, there must be useable ramps instead of stairs, paths of travel throughout the shelter which are wide enough for wheelchairs and bathrooms which are useable by persons with mobility disabilities. A city must conduct surveys of its shelters so it knows which of its shelters are architecturally accessible to persons with disabilities.

70. There must also be programmatic access, ensuring that the mass care offered is equally available to persons with disabilities. For instance, there must be plans to ensure cots usable by men and women with disabilities (allowing persons using wheelchairs to safely transfer to the cot), refrigeration for medications that must be refrigerated (e.g., insulin) and back-up medications, consumable medical supplies and durable medical equipment for persons with disabilities who need these items.

71. The City of New York has not adequately surveyed its shelters to ensure that they will be architecturally barrier free during emergencies and fails to identify which of its shelters, if any, are accessible during emergencies. Nor has New York City taken responsibility for ensuring that its shelters are equipped with accessible cots, accessible bathrooms, life-sustaining medications and replacement medical equipment. As a result, shelters have not been and continue not to be accessible to persons with disabilities.

72. If evacuation and transportation from affected areas is necessary, a city must make plans for assisting those who cannot evacuate on their own. For example, persons in wheelchairs or scooters may not be able to leave their building without electricity to operate the elevators. If

the physical environment has changed (e.g., rubble, barricades), persons with vision disabilities may have greater difficulty navigating out of the affected areas. A city must also make plans to provide a sufficient amount of transportation that is accessible.

73. New York City has made no such plans to ensure that persons with disabilities will have assistance evacuating or that accessible transportation from affected areas will be provided.

74. A city must also make plans to ensure that any temporary housing provided to those who cannot return to their homes following an emergency is architecturally accessible to persons with disabilities.

75. New York City has made no such plans that specify how it will ensure that temporary housing is accessible to persons with disabilities.

76. In providing assistance in recovery and remediation efforts after an emergency or disaster, a city must plan for the specific needs of persons with disabilities who may require, for instance, transportation back to their homes from shelters and assistance to restore accessible features (e.g., removing rubble, repairing ramps).

77. The City of New York has made no plans as to how it will specifically assist persons with disabilities during the recovery and remediation phase following an emergency.

78. Because Defendants have failed to provide for the unique needs of persons with disabilities in its emergency preparedness program, Mayor Bloomberg and New York City are denying persons with disabilities meaningful access to New York City's emergency preparedness program and are discriminating against men, women, and children with disabilities.

//

## CLASS ACTION ALLEGATIONS

79. Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs bring this action for injunctive and declaratory relief on their own behalf, on behalf of their members, and on behalf of all persons similarly situated. The class that the named Plaintiffs seek to represent consists of all persons with disabilities in New York City who have

been and are being denied the benefits and advantages of New York City's emergency preparedness program.

80. The persons in the class are so numerous that joinder of all members of the class is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.

81. Data from the United States Census American Community Survey conducted in 2008 indicate that almost 900,000 non-institutionalized New York City residents have a disability. Such data further show that more than 180,000 non-institutionalized New York City residents have a hearing disability, more than 210,000 non-institutionalized New York City residents have a vision disability and over 535,000 non-institutionalized New York City residents have a mobility disability.

82. There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented, in that named Plaintiffs, members of organizational Plaintiffs and individuals in the class have been and continue to be denied their civil rights of access to, and use and enjoyment of, the City of New York's emergency preparedness program due to Defendants' discriminatory implementation of this program, resulting not only a denial of meaningful access to that program for persons with disabilities but also an extreme and unacceptable risk of death or serious injury to such persons.

83. Common questions of law and fact predominate, including questions raised by Plaintiffs' allegations that Defendants have failed to address the unique needs of persons with disabilities in their emergency planning and that, as a result, key components of Defendants' emergency preparedness program exclude and discriminate against persons with disabilities.

84. The claims of the named Plaintiffs, and their members, are typical and are not in conflict with the interests of the class as a whole. Defendants' omissions and violation of the law as alleged herein has caused named Plaintiffs, Plaintiffs' members and class members to be deprived of the opportunity to effectively utilize Defendants' emergency preparedness program. Therefore, all class members will suffer the same or similar injuries for the purposes of the

injunctive and declaratory relief sought. Plaintiffs' claims are thereby representative of and co-extensive with the claims of the class.

85. The named Plaintiffs are adequate class representatives because they and their members are directly affected by Defendants' discriminatory implementation of their emergency preparedness program. The interests of the named Plaintiffs are not antagonistic to, or in conflict with, the interests of the class as a whole.

86. The attorneys representing the class are experienced both in disability law and in class action institutional litigation. Counsel representing the plaintiff class is qualified to fully prosecute this litigation and possesses adequate resources to see this matter through to resolution. Plaintiffs will fairly and adequately represent and protect the interests of the class.

87. Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

//

### FIRST CAUSE OF ACTION
### FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
### 42 U.S.C. § 12131, ET SEQ.

88. Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

89. Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in or denying the benefits of a program of the public entity to a person with a disability or otherwise discriminating against a person on the basis of disability. Title II provides, in pertinent part, that

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

90. The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2). A "qualified individual with a

disability" means an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C § 12131(2).

91. The named Plaintiffs, members of organizational Plaintiffs, and the class are persons with disabilities within the meaning of the statute in that they have impairments which substantially limit one or more major life activities (e.g., walking, hearing, seeing). They are also qualified in that they are located in New York City and thus, are eligible for the benefits of the City's emergency preparedness program. Thus, named Plaintiffs, members of organizational Plaintiffs, and the class are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12102, 42 U.S.C. § 12131, and 28 C.F.R. § 35.104.

92. A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1). Defendant New York City is a public entity within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104. Mayor Bloomberg is being sued in his official capacity as the chief executive of New York City.

93. By failing to plan to meet the unique needs of persons with disabilities during an emergency, Defendants have excluded them from participation in, denied them the benefits of, and discriminated against them in an emergency preparedness program offered by a public entity, in violation of 42 U.S.C.§ 12132.

94. Congress directed the Department of Justice ("DOJ") to promulgate regulations implementing Title II's prohibition against discrimination. 42 U.S.C. § 12134. Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA. 28 C.F.R. § 35.101 *et. seq.*

95. Pursuant to 28 C.F.R. § 35.130(b)(1)(i), (ii) and (vii), a public entity, in providing any aid, benefit, or service, may not directly or through contractual, licensing, or other arrangements, on the basis of disability (1) deny qualified individuals with disabilities the opportunity to

participate in or benefit from the aid, benefit, or service; (2) afford qualified individuals with disabilities an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others or (3) otherwise limit qualified individuals with disabilities in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

96. Defendants provide an aid, benefit, or service in the form of an emergency preparedness program. However, they do so in an unequal manner which denies or limits the ability of disabled men, women, and children to enjoy the benefits as others can. For instance, because New York City's emergency plans do not ensure shelters are architecturally accessible, persons using wheelchairs may be turned away and because New York City's plans do not ensure accessible communication, persons with vision disabilities may be limited in how they are notified about imminent emergencies and the incident services available to them.

97. Pursuant to 28 C.F.R. § 35.130(b)(3)(i), a public entity may not, directly or through contractual or other arrangements, utilize methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.

98. Defendants may not avoid their responsibility to address the unique needs of persons with disabilities during emergencies by delegating responsibility to other agencies or organizations such as the American Red Cross. That is, even if the American Red Cross is charged with managing shelters, it is New York City's ultimate responsibility to ensure, for instance, that refrigeration, life-sustaining medications, durable medical equipment, and service animal facilities are provided at its shelters.

99. Pursuant to 28 C.F.R. § 35.130(b)(4), a public entity may not, in determining the site or location of a facility, make selections that have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination.

100. Defendants claim to know which shelters are accessible to persons with disabilities. However, there is no evidence that New York City hired any trained professionals to ensure that shelters are indeed architecturally and programmatically accessible. Indeed during

the most recent emergency, Hurricane Irene, New York City opened several shelters that were not architecturally accessible to persons using wheelchairs.

101.   Pursuant to 28 C.F.R. § 35.130(b)(7), a public entity shall make reasonable modifications in policies, practices or procedures when modifications are necessary to avoid discrimination on the basis of disability.

102.   Defendants have utterly failed to provide reasonable modifications.  For example, Defendants have not modified their policy of sheltering in place for three days in order to assist persons with disabilities who may not, because of their disability, be able to remain in their homes for three days without any assistance.

103.   As a proximate result of Defendants' violations of Title II of the ADA, Plaintiffs have been injured as set forth herein.

104.   Defendants' conduct constitutes an ongoing and continuous violation of the ADA and unless restrained from doing so, Defendants will continue to violate said law.  This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.  Plaintiffs will suffer irreparable harm in that they will continue to be discriminated against and denied access to New York City's emergency preparedness program.  Consequently, Plaintiffs are entitled to injunctive relief pursuant to section 308 of the ADA (42 U.S.C. § 12188), as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

//

## SECOND CAUSE OF ACTION
## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
## (29 U.S.C. § 794, ET SEQ.)

105.   Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

106.   Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations, prohibit discrimination against persons with disabilities by recipients of federal funding.  Section 504 of the Rehabilitation Act provides, in pertinent part, that

> no otherwise qualified individual with a disability . . . shall, solely
> by reason of his or her disability, be excluded from the
> participation in, be denied the benefits of, or be subjected to
> discrimination under any program or activity receiving Federal
> financial assistance . . .

107.    An "individual with a disability" is defined under the statute, in pertinent part, as "an individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102). "Otherwise qualified" means a person who "meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity." 28 C.F.R. § 39.103.

108.    The named Plaintiffs, members of organizational Plaintiffs, and the class are individuals with disabilities within the meaning of the statute as they have impairments which limit one or more major life activities (e.g., walking, hearing, seeing). Such individuals are otherwise qualified as they are located in New York City and thus, eligible for the benefits for the City's emergency preparedness program. Hence, named Plaintiffs, members of organizational Plaintiffs, and the class are otherwise qualified individuals with disabilities within the meaning of 29 U.S.C. § 705(20)(B) and the implementing regulations.

109.    The City of New York and the Office of the Mayor receive federal financial assistance to provide New York City's emergency preparedness program.

110.    By failing to plan to meet the unique needs of persons with disabilities during an emergency, Defendants have excluded them from participation in, denied them the benefits of, and discriminated against them in an emergency preparedness program that receives federal financial assistance, solely by reason of their disabilities, in violation of 29 U.S.C. § 794 and its implementing regulations.

111.    As a proximate result of Defendants' violations of Section 504 of the Rehabilitation Act, Plaintiffs have been injured as set forth herein.

112.    Defendants' conduct constitutes an ongoing and continuous violation of Section 504 of the Rehabilitation Act and unless restrained from doing so, Defendants will continue to

violate said law. This conduct, unless enjoined, will continue to inflict injuries for which

Plaintiffs have no adequate remedy at law. Plaintiffs will suffer irreparable harm in that they

will continue to be discriminated against and denied access to New York City's emergency

preparedness program. Consequently, Plaintiffs are entitled to injunctive relief, as well as

reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

//

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**
**(N.Y.C. ADMIN. CODE § 8-101 ET. SEQ.)**

113.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the

Complaint.

114.    The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-

107(4)(a), provides that "[i]t shall be an unlawful discriminatory practice for any person, being

the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or

provider of public accommodation because of the actual or perceived . . . disability . . . status of

any person directly or indirectly, to refuse, withhold from or deny to such person any of the

accommodations, advantages, facilities or privileges thereof . . ."

115.    The term "person" includes governmental bodies or agencies. N.Y.C. Admin.

Code § 8-102(1). New York City is a governmental body or agency and thus is a person within

the meaning of N.Y.C. Admin. Code § 8-102(1). Mayor Bloomberg is being sued in his official

capacity as the chief executive of a governmental body or agency.

116.    The term "place or provider of public accommodation" includes "providers,

whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or

privileges of any kind, and places whether licensed or unlicensed, where goods, services,

facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or

otherwise made available." N.Y.C. Admin Code § 8-102(9). The City's emergency

preparedness program constitutes a public accommodation as it is a service, accommodation,

advantage, or privilege offered to the general public and thus falls within the meaning of N.Y.C. Admin Code § 8-102(9).

117.     Defendants, as persons under the statute, act as the "managers" of the City's emergency preparedness program, a public accommodation.  In so doing, the City of New York and Mayor Bloomberg directly and indirectly deny to persons with disabilities the accommodations, advantages, facilities or privileges of the emergency preparedness program for the reasons set forth herein.

118.     The NYCHRL additionally requires that any person prohibited from discriminating under Section 8-107 on the basis of disability "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15).  The term "covered entity" is defined as a person required to comply with any provision of Section 8-107 which includes Defendants under N.Y.C. Admin. Code § 8-102(1).

119.     The City of New York and Mayor Bloomberg in his official capacity qualify as covered entities and must make the reasonable accommodations necessary to allow persons with disabilities the opportunity to enjoy the right of benefiting from the City's emergency preparedness program pursuant to N.Y.C. Admin. Code § 8-107(15).  Defendants have made inadequate or no reasonable accommodations to allow persons with disabilities the opportunity to enjoy the right of benefiting from the City's emergency preparedness program.

120.     As a proximate result of Defendants' violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

121.     Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL and unless restrained from doing so, Defendants will continue to violate said law. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.  Plaintiffs will suffer irreparable harm in that they will continue to be discriminated against and denied the accommodations, advantages, facilities or privileges of the

City's emergency preparedness program as well as reasonable accommodations which would provide the opportunity to benefit from the City's emergency preparedness program. Consequently, Plaintiffs are entitled to injunctive relief and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

//

## FOURTH CAUSE OF ACTION
## DECLARATORY RELIEF

122.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

123.    Plaintiffs contend that Defendants have failed and are failing to comply with applicable laws prohibiting discrimination against persons with disabilities in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq.*, and the NYCHRL, N.Y.C. Admin. Code §8-101 *et. seq.*

124.    Defendants disagree with Plaintiffs' contention.

125.    A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

WHEREFORE, Plaintiff prays for relief as set forth below.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows, including but not limited to:

126.    A declaration that Defendants' failure to adequately plan to meet the emergency preparedness needs of persons with disabilities violates the Americans with Disabilities Act, Section 504 of the Rehabilitation Act and the NYCHRL.

127.    An order and judgment enjoining Defendants from violating the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the NYCHRL, and requiring Defendants to develop and implement a emergency preparedness program that addresses the unique needs of people with disabilities during emergencies.

128.    Plaintiffs' reasonable attorneys' fees and costs.

129.    Such other and further relief as the Court deems just and proper.

//

//

//

Dated: New York, NY
September 26, 2011

DISABILITY RIGHTS ADVOCATES

By:

JULIA PINOVER (JMP333)
Disability Rights Advocates
1560 Broadway, 10th Floor
New York, NY 10036
Telephone:    (212) 644-8644
Facsimile:    (212) 644-8636
Email:    general@dralegal.org

SID WOLINSKY (CA Bar No. 33716)*
MARY-LEE K. SMITH (CA Bar No. 239086)*
Disability Rights Advocates
2001 Center Street, Fourth Floor
Berkeley, CA 94704
Telephone:    (510) 665-8644
Facsimile:    (510) 665-8511
TTY:    (510) 665-8716
Email:    general@dralegal.org

*Motions for admission *pro hac vice* forthcoming.
Attorneys for Plaintiffs.