UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          x
------------------------------------------------------   :  Case No. 11-cv-6690 (JMF)
BROOKLYN CENTER FOR                       :
INDEPENDENCE OF THE DISABLED, a
nonprofit organization, CENTER FOR        :
INDEPENDENCE OF THE DISABLED,
NEW YORK, a nonprofit organization,       :
GREGORY D. BELL and TANIA                    **CLASS ACTION FIRST**
MORALES                                   :  **AMENDED COMPLAINT FOR**
                                             **DISCRIMINATION;**
                                          .  **INJUNCTIVE AND**
                    Plaintiffs,           :  **DECLARATORY RELIEF**

                                          :

          -against-                       :

MICHAEL R. BLOOMBERG, in his official     :
capacity as Mayor of the City of New York,
and the CITY OF NEW YORK                  :

                    Defendants.           :
                                          x
------------------------------------------------------



## INTRODUCTION

1.    This class action lawsuit challenges the long-term, multiple and serious failures by
Mayor Bloomberg and the City of New York to address the critical needs of men, women, and
children with disabilities in planning for emergencies and disasters. Although the Mayor and the
City have created emergency plans for the general population, they have failed to plan
appropriately for the nearly 900,000 disabled persons within New York City who are especially
vulnerable during disasters.

2.    Hurricanes, terrorist attacks, floods, fires, and winter storms are a few of the many
potential emergencies that New York City and its residents must face. The failure of Mayor
Bloomberg (hereafter sometimes the "Mayor") and the City of New York (hereafter sometimes
the "City") to plan for the unique needs of New Yorkers with disabilities creates severe

1

hardships for people with disabilities and can be life threatening to them during these emergencies.

3.  Effective emergency preparedness and planning must include certain essential components, such as provision for shelter and care for people forced to evacuate their homes, public notification and communication before and during emergencies, and assistance with evacuation and transportation from affected areas. The City of New York has made and continues to make substantial efforts and has spent and continues to spend considerable resources addressing such components for the general public.

4.  However, with respect to each of these essential components, the Mayor and the City have failed to consider and address the different, yet critical, needs of persons with disabilities.

5.  Specific emergencies such as Hurricane Irene and September 11th highlight the glaring deficiencies in New York City's emergency preparedness efforts for persons with disabilities. Yet these specific events are merely a symptom of the current underlying problem: Mayor Bloomberg and the City of New York's ongoing failure to prepare for the unique needs of persons with disabilities during emergencies. This failure to plan puts the lives and health of persons with disabilities in unnecessary danger.

6.  The City of New York has been on notice for at least ten years that emergency preparedness for persons with disabilities is lacking. During and following the September 11th terrorist attack, men, women and children with disabilities were disproportionately harmed. Persons with mobility disabilities who wanted to evacuate the World Trade Center buildings were unable to do so because there were no evacuation chairs or other evacuation assistance or planning provided for persons with mobility disabilities. These individuals did not even have the choice of whether or not to leave and were essentially trapped and left to die.

7.  During recovery efforts after September 11th, the City paid little attention to the unique needs of persons with disabilities. Personal attendants and aides for persons with disabilities were not allowed into the "frozen zone," leaving many persons with disabilities who lived in the frozen zone without assistance to perform daily life activities such as dressing,

eating, and toileting. Many shelters and disaster assistance centers serving people evacuated from the frozen zone could not be accessed by residents with mobility disabilities, and the centers did not have signs and printed materials that were readable by men and women with vision disabilities. No plans were made for providing replacement medical equipment or supplies for persons with disabilities. Transportation was interrupted, leaving persons with disabilities without accessible transportation to vital emergency services being offered to the general public.

8. One other illustration of New York City's failure to plan for disability needs in emergencies was made painfully evident by Hurricane Irene. During that disaster, New Yorkers with disabilities had no idea if or how they could be evacuated, what shelters, if any, were accessible, how they would obtain life-sustaining medications, or how they could be transported when buses and subways stopped running.

9. New York's failure to plan for physically accessible shelters was also illustrated during Irene. In fact, despite assurances from the City that shelters would be accessible, many of the shelters that were open to the public were not accessible to persons with disabilities. Ramps into shelters were often makeshift or too steep and dangerous to use. Other ramps that should have been usable led to locked doors for which shelter volunteers did not have keys. Signage for persons with vision disabilities also led to locked doors. Bathrooms in the shelters were inaccessible. Only 26% of the shelters opened, which were located in public schools, were listed on New York City's Department of Education website as somewhat or completely accessible. This did not include the shelters which had ramps that led to locked doors.

10. Hurricane Irene also illustrated the City's failure to provide for accessible emergency notifications. In fact, emergency hurricaine notifications were often inaccessible to persons with vision and hearing disabilities. Evacuation maps from the City included text that was too small and colors with poor contrast. Evacuation zone maps were also not accessible to screen readers. Televised emergency announcements from City officials did not include American Sign Language interpreters.

11. New York's emergency plans rely heavily on the City's largely inaccessible public transportation systems. These systems however do not work for evacuation of persons with disabilities before or during an emergency. In fact, in anticipation of Hurricane Irene, Mayor Bloomberg shut down bus, subway and paratransit services. He noted that if evacuating after that time "you'll have to walk, or you're going to find some way to use a car or taxi." The Mayor stated later that a number of cabs had been directed to go to evacuation zones, and liveries and commuter vans had been authorized to pick up street hails anywhere in the City. However, because only 1.8% of all yellow taxicabs and only .02% of for-hire vehicles are accessible to persons using wheelchairs, disabled people could not use cabs for evacuation. The Mayor also pointed to the availability of school buses for evacuation. However, these school buses had no lifts or accessible seating areas for persons with mobility disabilities.

12. Defendants' emergency preparedness efforts for persons with disabilities are woefully deficient in that they do not adequately plan for notifying persons with sensory disabilities before and during emergencies, for evacuating persons with mobility disabilities from their homes, for providing accessible transportation to shelters and back, for providing shelters that are architecturally accessible and identifying these to persons with disabilities, and for providing assistance to persons with disabilities during recovery after an emergency.

13. Mayor Bloomberg and New York City have discriminated against men, women, and children with disabilities by failing to address their unique needs during emergencies. This suit challenges this ongoing failure and seeks to ensure that vulnerable New Yorkers with disabilities are included in the City's emergency preparedness and planning.

## JURISDICTION

14. This is an action for declaratory and injunctive relief brought pursuant to Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq.*, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-101 *et seq.* This Court has subject

4

matter jurisdiction over the Rehabilitation Act and ADA claims pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over the NYCHRL claim pursuant to 28 U.S.C. § 1367.

15. This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

16. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the District in which this Complaint is filed, because Defendants are located within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

17. Organizational Plaintiff Brooklyn Center for Independence of the Disabled ("BCID") is an independent living center based in Brooklyn. Founded in 1956, BCID is a consumer-based, non-profit, membership organization, providing services and advocacy toward independent living for individuals with disabilities.

18. BCID is dedicated to guaranteeing the civil rights of people with disabilities. BCID seeks to improve the quality of life of Brooklyn residents with disabilities through programs that empower them to gain greater control of their lives and achieve full and equal integration into society. BCID accomplishes this goal through its services, its advocacy for systems change to remove physical, attitudinal and communication barriers to people with disabilities, and through its education and awareness programs. Accordingly, the interests that BCID seeks to protect through this litigation are germane to its mission and purpose.

19. BCID has about 50 dues paying members. Direct assistance to members and consumers is a central purpose of BCID's existence. BCID has been a membership organization from its inception which is now over half a century ago. Members, in addition to donors and BCID Board officers, are sent a BCID newsletter periodically.

20. BCID's staff regularly interacts with members at formal groups that meet regularly. These groups are part of BCID fulfilling its mission, and the members in these groups influence

decision-making within BCID and how BCID performs its mission. Both these groups are considered to be part of the organizational structure of BCID.

21. The *Support Group* is a group of BCID members which meets weekly. The *Support Group* is chaired by BCID's Program Director. BCID's *Support Group* consists of 20 persons with disabilities. Virtually all of the *Support Group* members are also members of BCID. BCID *Support Group* members maintain an active dialogue with BCID staff, and the BCID executive director about individual concerns and issues they wish to see the organization address.

22. BCID's *Brooklyn Assistance Change Network* meets monthly and is also a group where BCID staff and BCID members and consumers communicate about organizational goals. The *Brooklyn Assistance Change Network* deals specifically with removing barriers to full participation in the community. This group has a number of specific projects, and meets at BCID monthly for several hours to discuss these projects. There are 15 to 20 persons in this group. This group is made up of members and consumers.

23. In addition to identifying concerns and issues during meetings, the *Brooklyn Assistance Change Network* members and consumers regularly communicate with the Executive Director expressing concerns about various issues. These concerns inform the advocacy issues that BCID decides to advocate for or against.

24. The executive director reports directly to BCID's board of directors and is responsible for implementing the vision of the board of directors, supervising employees, and making sure that the programs and activities undertaken by BCID were consistent with the board of directors' decisions and instructions. BCID's executive director from 2007 to 2011, Marvin Wasserman, has authored several articles on emergency preparedness for persons with disabilities. He is a person with a disability. For several years, Mr. Wasserman has actively advocated and lobbied for enhanced high rise evacuation techniques for persons with disabilities. Mr. Wasserman has been a disability advocate for over thirty five years. Mr. Wasserman reported to the BCID board of directors during his tenure, he sat on the board prior to his tenure, and sits on the board again today.

25. Individuals on BCID's board of directors are also all members of the organization. The BCID board of directors is the group of BCID members that directly controls the organizations objectives and activities. BCID's board of directors was advised about this lawsuit. Before this lawsuit was filed, BCID's board of directors was advised by the executive director about BCID's concerns about New York's emergency preparedness for persons with disabilities.

26. There are 15 members to BCID's board of directors. BCID's board meets monthly. BCID's board has elected officers including a President, Vice President, and Secretary. There is a membership subcommittee of the board of directors focused on BCID members. There are monthly board member meeting minutes which are sent to the board after meetings, and approved by the board.

27. BCID's organizational advocacy and direct service work is based on a close association with its constituents. BCID serves about 1,400 persons with disabilities every year. The majority of BCID's staff, board members, and volunteers have disabilities themselves.

28. BCID has been concerned for many years about how the City plans to meet the needs of persons with disabilities during emergencies. BCID has participated in OEM's special needs advisory group for many years, but believes litigation is necessary due to the lack of progress made by the City on this issue to date. For example, although BCID raised concerned about evacuation from high rise buildings at the special needs advisory committee meetings, their suggestions about high rise evacuations were never incorporated into any plan.

29. BCID engages specifically in advocacy around emergency planning for New Yorkers with disabilities. For example, directly before Hurricane Irene, BCID released a press release regarding the lack of information that people with disabilities, and BCID members, were getting about access to the City's emergency preparations.

30. BCID offered direct assistance to its members and constituents in preparation for Hurricane Irene. For example, directly before Irene, BCID attempted to call all of their 1,400 consumers. BCID's priority was personally calling members and constituents in evacuation

zones to advise them on evacuation procedures and preparedness for the pending emergency. During those calls, BCID relayed information from the OEM website on the locations of evacuation zones and shelters. Although BCID tried to reach all 1,400 of their consumers, they were not able to reach everyone. BCID was not able to reach everyone because it had limited time and resources with which to conduct this outreach and notification.

31. Prior to Hurricane Irene's landfall, BCID's executive director called OEM to get information on which shelters were accessible. OEM's disability outreach coordinator told Mr. Wasserman that he did not know which shelters were accessible.

32. As persons with disabilities, one or more members of BCID are suffering injury due to the City's failure to include persons with disabilities in its emergency preparedness and planning efforts. Accordingly, one or more BCID members have standing to sue in their own right. Moreover, since only injunctive and declaratory relief are requested, the participation of individual members in the lawsuit is not required.

33. BCID members, as well as the persons with disabilities who they serve, are presently being harmed by New York City's failure to address the needs of people with disabilities in its emergency plans. Because BCID members and constituents are persons with disabilities – including mobility, sensory, and intellectual disabilities – BCID's members and constituents are denied meaningful access to New York's emergency planning and preparedness program and thus are uniquely burdened by New York's failure to address their needs in this program. The failure to make emergency preparedness services accessible harms each member and constituent with a disability.

34. Furthermore, BCID is directly harmed by New York City's and the Mayor's failure to adequately plan for the needs of persons with disabilities during emergencies. Because of such failures, BCID is forced to expend time and resources advocating for its constituents whose needs are not being met. BCID is forced to provide direct assistance to those individuals when government entities are unable to do so. A favorable decision in this case would directly redress these injuries.

8

35. Center for Independence of the Disabled, New York ("CIDNY") is an independent living center serving persons with disabilities throughout New York City. Founded in 1976, CIDNY is a consumer-based, non-profit organization, providing services and advocacy toward independent living for individuals with disabilities. Currently CIDNY serves about 14,000 persons who have disabilities, as well as families and partners of persons with disabilities in New York City. CIDNY's goal is to ensure full integration, independence and equal opportunity for all people with disabilities by removing barriers to the social, economic, cultural, and civic life of the community. Over half of CIDNY's board members and over seventy percent of CIDNY's staff are persons with disabilities.

36. CIDNY has expended extensive time and resources in addressing emergency preparedness for persons with disabilities. CIDNY helps persons with disabilities prepare themselves for emergencies, including emergencies like Irene, in many ways including educating New Yorkers with disabilities about what they might need in an emergency, helping persons with disabilities to copy essential documents and assemble go-kits, participating in community meetings, and holding worships on emergency preparation for the persons with disabilities that CIDNY serves.

37. CIDNY has worked with OEM on the Special Needs Advisory Committee which OEM convenes at regular intervals. CIDNY representatives participating in the committee have consistently felt that their concerns about disability emergency planning have been ignored. CIDNY personnel on this committee were never shown any of the City's emergency plans and were never given an opportunity to comment on the adequacy of specific plans.

38. CIDNY continues today to advocate for persons with disabilities during emergencies through direct services, such as special outreach to consumers to alert them to emergencies and resources, and through advocacy, such as participating on committees and in meetings with government officials, representing the disability community. CIDNY helps to recruit participants for emergency plan drills and practice exercises. Persons with disabilities have reported to

CIDNY personnel that they have been turned away from emergency preparation drills held by the City.

39. Immediately following the September 11th attack, CIDNY stepped into the role the City should have already been prepared to play. CIDNY rapidly developed a Disaster Relief Services program which provided (1) direct services to persons with disabilities directly affected by the emergency, (2) education, training and technical assistance to relief and other service providing agencies and (3) outreach to persons with disabilities who did not come forward seeking help in the first weeks after the attack.

40. During and directly after 9/11, CIDNY observed that people with disabilities were not able to evacuate the high-rise buildings, were unable to obtain accessible transportation, and were unable to obtain accessible shelter. CIDNY observed that during and after 9/11 persons with disabilities had difficulty due to lost medical equipment, medications, hearing aids, glasses and other such equipment and that they had great difficulty finding replacements for these items. CIDNY also observed that the shelters used during 9/11 had signs and materials that were not readable by people with limited vision, there were no American Sign Language interpreters for people with hearing loss, and people whose aids and attendants did not come back for them were left behind without assistance.

41. Three years after September 11th, CIDNY issued a report entitled "Lessons Learned from the World Trade Center: Emergency Preparedness for People with Disabilities in New York." The report reached several key conclusions:

- Emergency responders, as well as relief and other service agencies, must incorporate into their planning and operations an appropriate strategy for ensuring equitable access to response and recovery services for people with disabilities;

- Relief agencies cannot wait until they are in the middle of a disaster to start training their staff in disability awareness;

- The day after a disaster is too late for agencies to start doing outreach to make their services known to people with disabilities; and

- During the recovery phase, there must be a priority to restore or address those services and needs most critical to people with disabilities, especially related to access to home attendants, assistive equipment, medication, accessible transportation and temporary shelter, and food delivery.

These lessons have been ignored by the City of New York and its Mayor.

42. CIDNY was very active in advising persons with disabilities in New York during Irene. For example, CIDNY's executive director, Susan Dooha, participated in telephone calls with OEM at 1:00pm on Friday, Saturday, and Sunday August $26^{th} – 28^{th}$, 2011 to get information on how to serve the disability community during Irene. CIDNY personnel also visited shelter sites, and made individual outreach calls to advise persons with disabilities on how to stay safe during the emergency.

43. During Hurricane Irene, CIDNY staff members, under the direction of Margi Trapani, called persons with disabilities they identified as residents of evacuation zones. During these phone calls, CIDNY staff asked if these New Yorkers with disabilities knew where to evacuate and many did not. CIDNY also discovered from individuals with disabilities that persons with vision loss or blindness were not able to use a screen reader to read the website where shelters were listed because that website was not screen reader accessible.

44. During Hurricane Irene, CIDNY personnel, including CIDNY's Susan Dooha, observed locked gates, locked doors, and inaccessible ramps at the shelters used by the City during that emergency. Ms. Dooha visited six shelters on Saturday the 27th of August, 2011. She visited shelters in Manhattan, Brooklyn, and Queens. Ms. Dooha found that the ramps at several of these locations were dangerous, and several lead to locked doors. Ms. Dooha also found debris in the curb cut on the block of one of these shelters making the path of travel to the shelter inaccessible. Ms. Dooha also found that at more than one shelter food and cots had been set up downstairs such that they were inaccessible to a person using a wheelchair. Ms. Dooha

also took photographs of several of these barriers including shelter entrances that were inaccessible, universal access signage leading to an inaccessible entrance, and transportation offered by the city which was not accessible.

45. Ms. Dooha also found shelter volunteers to lack fundamental knowledge about accessibility. Volunteers did not know that they needed to advise people that they could request accommodations. They did not know that they might have to communicate with people who are deaf. They did not know that food distribution and sleeping areas should be in accessible places in the building and not up a flight of stairs. They did not know how to request accessible equipment if they did not have it. For example, one shelter worker told Ms. Dooha that they did not know how to get accessible cots.

46. When Ms. Dooha spoke to shelter volunteers at the shelters with locked doors volunteers responded in a variety of ways. One told her the door was locked because the volunteers had not thought about the accessible entrance. Another said that they did not know where the key to the accessible entrance was located, or who had the key. Yet another said that the volunteers did not want to unlock the accessible entrance because they did not want people to come in that door.

47. Through its extensive work on emergency preparedness issues for persons with disabilities, and through its active participation in serving the disability community during disasters, CIDNY has experienced various problems with the City's emergency plans. These include, but are not limited to: the methods of notification are not fully accessible, live public announcements are not live captioned or presented with an ASL interpreter, people who use screen readers are not able to access the office of emergency management website to find shelter locations, public transportation is relied on heavily for evacuations and public transportation is overwhelmingly inaccessible, shelters are physically inaccessible because the ramps at many of the buildings used as shelters are too steep, unstable, or lead to locked doors, there are sometimes no curb cuts in front of shelter buildings making getting to the shelter building impossible for a wheelchair user, signage to accessible entrances is often missing or inadequate, bathrooms inside

shelters are sometimes not accessible, and sheltering services like food distribution or a sleeping area are often administered on multiple levels of a non-elevator building.

48. Every day persons with disabilities contact CIDNY by telephone, in person, and over email, to seek CIDNY's help, advice, and/or advocacy on disability related issues. CIDNY's purpose as an organization is to respond to these requests and serve this community of New Yorkers with Disabilities. The hardships faced by New Yorkers with disabilities directly determine what advocacy actions CIDNY undertakes.

49. CIDNY board members, as well as the persons with disabilities that CIDNY serves, are presently being harmed by New York City's incomplete emergency plans. Because CIDNY board members and constituents are persons with disabilities – including mobility, sensory, and intellectual and other disabilities – CIDNY's board members and constituents are denied meaningful access to New York's emergency planning and preparedness program and thus are uniquely burdened by New York's failure to address their needs in this program.   The failure to address the needs of people with disabilities in emergency planning harms each board member and constituent with a disability.

50. CIDNY's executive director is accountable to this board of directors for the management of the organization including: implementing the board's policies and decisions, aiding it with strategic planning, stewardship of resources, obtaining funding, oversight of personnel, quality assurance, contract compliance, advocacy, and public policy development.

51. CIDNY is directly harmed by New York City's and Mayor's Bloomberg's failure to adequately plan for the needs of persons with disabilities during emergencies. Because of the discriminatory emergency preparations by New York City and Mayor Bloomberg, CIDNY must expend time and resources preparing its constituents for emergencies and advocating for its constituents before, during and after emergencies. CIDNY is forced to provide direct assistance to individuals with disabilities when government entities fail to do so. A favorable decision in this case would directly redress these injuries.

52. Plaintiff Tania Morales is a resident of New York City with a mobility disability that causes her to rely on a wheelchair. She is a qualified individual with a disability within the meaning of all applicable statutes and a member of the proposed class.

53. Ms. Morales currently does not know which, if any, emergency shelters designated by the City of New York are accessible to persons using wheelchairs. During Hurricane Irene, Ms. Morales located her nearest emergency shelter using the City's website. Ms. Morales could find no information on the website as to whether the shelter was accessible to persons using wheelchairs. Ms. Morales knew that the shelter was a public school and remembered seeing a ramp leading into the building. Ms. Morales traveled in her motorized wheelchair to the nearest shelter. Ms. Morales was accompanied by her father, Eugenio Morales. The main entrance to the shelter was not accessible. The accessible entrance was at the back of the school. When Ms. Morales and her father reached the accessible entrance at the back of the school, they discovered that the gates to the ramp leading into the building were locked. There were no shelter volunteers at the locked accessible entrance, and Ms. Morales was growing more frightened by the increasingly strong wind and rain. Because she was scared, and the shelter was inaccessible Ms. Morales and her father returned home and remained there for the duration of the hurricane.

54. Ms. Morales also does not have information about whether evacuation transportation will be accessible to persons with disabilities during emergencies or disasters. During Hurricane Irene, for instance, Ms. Morales could not go to another shelter to see if it was accessible because there was no available accessible transportation. Subways, buses and paratransit were shut down. Ms. Morales had no other option but to return home.

55. As a person who uses a wheelchair, Ms. Morales could not, and cannot, access the key components of the City's emergency program. As a result, Ms. Morales, like all people with disabilities in the City of New York, suffer fear and apprehension as a result of New York's failure to plan for their needs, and are currently exposed to increased risk on a daily basis.

56. Plaintiff Gregory D. Bell, Sr. is a resident of the Bronx, New York City who is blind. He is a qualified individual with a disability within the meaning of all applicable statutes and a member of the proposed class.

57. Mr. Bell is a Vietnam Veteran and a long time public servant. He is the founder of Insight For New Housing which aids persons with disabilities in finding housing in New York City. He has been honored by various New York State Assembly members as well as the Bronx Borough President. He serves on his local housing and land use committee as well as the economic development comittee and is in charge of the disability ministry at the Church of God of Prophesy. Mr. Bell is also the primary caregiver for his great-grandson.

58. In the event of a future emergency, Mr. Bell is at great risk of suffering because of Defendants' failure to plan for a variety of needs. Moreover, Mr. Bell suffers fear and apprehension as a result of New York's failure to plan for his needs, and is currently exposed to increased risk on a daily basis. These include but are not limited to orientation during evacuation and at shelters and temporary housing, receiving information about emergencies in accessible formats, and recovery and remediation efforts such as debris removal at his home.

59. The Plaintiff class consists of all persons with disabilities in the City of New York who have been and are being denied the benefits and advantages of New York City's emergency preparedness program because of Mayor Bloomberg and New York City's continuing failure to address the unique need of this population in the City's emergency planning and preparations.

60. Defendant City of New York is, according to New York State Executive Law Article 2-B, "the first line of defense in times of disaster." (N.Y. Exc. Law § 20.1(a)). The City of New York is the first level of response for meeting the emergency needs of persons in its jurisdiction. New York City's emergency services include the Police Department (NYPD), Fire Department (FDNY), Fire Department Emergency Medical Services (FDNY-EMS), and Office of Emergency Management (OEM). A number of other City agencies, including the Department of Health and Mental Hygiene (DOHMH), Department of Environmental Protection (DEP), and Department of Buildings (DOB) also have emergency response functions.

61. Defendant Mayor Bloomberg, in his official capacity, is the chief executive as defined in New York State Executive Law Article 2-B. (N.Y. Exc. Law § 20.2(f)).  As the local chief executive, Mayor Bloomberg is required to "take an active and personal role in the development and implementation of disaster preparedness programs and be vested with authority and responsibility in order to insure the success of such programs." (N.Y. Exc. Law § 20.1(b)). Moreover, as the local chief executive, only Mayor Bloomberg can declare a local state of emergency covering all or any part of his jurisdiction. (N.Y. Exc. Law § 24.1).

62. Hereafter, reference to "Defendants" shall be deemed to include all named Defendants, and each of them, unless otherwise indicated.

## FACTUAL ALLEGATIONS

**New York City Faces a Variety of Potential Emergencies and Is Extremely Susceptible to the Effects of these Emergencies**

63. With more than 8.2 million people, New York City is the most populous city in the United States and ranks among the largest urban areas in the world.  It is also one of the most densely populated cities in the United States with an area of just 305 square miles.

64. New York City has developed a complex and interconnected network of transportation and infrastructure systems.  However, New York City's defining characteristics – its dense population and complex infrastructure – also increase the potential significance of emergencies and disasters, making it more susceptible to their effects than many other cities.

65. New York City's Office of Emergency Management ("OEM") is an agency charged with preparing for natural disasters such as coastal storms, earthquakes, extreme temperatures, flooding, windstorms, and winter storms.  New York City must also be prepared to deal with man-made disasters such as utility interruptions, hazardous spills or toxic releases caused by transportation or industrial accidents, civil disturbances, and terrorist incidents.

66. Over the past 20 years, New York City has endured numerous emergencies and disasters, ranging from hurricanes (e.g., Hurricanes Irene, Isabel and Floyd) to power outages

(e.g., Northeast Blackout of 2003) to terrorist attacks (e.g., February 1993 and September 2001) and winter storms (e.g., Blizzard of 1996, President's Day Storm 2003 and blizzards in 2010-11).

**An Effective Emergency Preparedness Program Must Include Nine Essential Components.**

67. An effective emergency preparedness program must include at least nine essential components. The City of New York attempts to make preparations for the general public for each of these components.

68. First, an emergency preparedness program must include the development of comprehensive emergency plans. Such plans must address both specific types of emergencies (e.g., hurricanes) and/or address specific procedures (e.g., evacuation) during emergencies.

69. The City of New York has developed such emergency plans. For instance, New York City has emergency plans for coastal storms, winter weather, and heat emergencies. New York City also relies on the Citywide Incident Management System (CIMS) which sets forth roles and responsibilities during emergencies.

70. Second, an emergency preparedness program must include assessments of the efficacy of emergency plans. This requires exercises and drills simulating various emergencies and may require public participants.

71. New York City's OEM has held at least one exercise and/or drill each year since 2002 to test the efficacy of various emergency plans.

72. Third, an emergency preparedness program must include advanced identification of the needs that will arise and resources available to meet those needs during an emergency.

73. The City of New York uses the Citywide Asset and Logistics Management System (CALMS) to manage the City's emergency resources and essential skills. CALMS integrates multiple resource management systems and provides a single view of the resources managed or accessible to response agencies.

74. Fourth, an emergency preparedness program must provide plans for public notification and communication prior to, during and after emergencies.

75. New York City's OEM has a public information plan to undertake such communications. In addition, emergency responders communicate emergency information via bullhorn and door-to-door notifications.

76. Fifth, an emergency preparedness program must provide policies or procedures concerning the concept of "sheltering in place." When evacuation to shelters is either inappropriate or impossible, New York City residents and visitors may be asked to stay where they are (e.g., their own apartment or house) and "shelter in place."

77. New York City has a policy in which persons in its jurisdiction should be prepared to shelter in place for up to three days. This means that persons should have enough food, water, medicine, and other supplies to survive on their own for three days.

78. Sixth, an emergency preparedness program must include plans to provide shelter and care for individuals forced to evacuate their homes during emergencies. Public schools are commonly used as shelters. Care at such shelters includes food, water, sleeping areas, bathroom facilities and medical attention, if necessary.

79. The City of New York offers shelter and care for individuals forced to evacuate their homes during emergencies.

80. Seventh, an emergency preparedness program must plan to provide assistance with evacuation and transportation.

81. New York City has an urban search and rescue team that assists in evacuation. In addition, New York City offers transportation for residents and visitors who must evacuate from affected areas during an emergency.

82. Eighth, an emergency preparedness program must include plans for provision of temporary housing when evacuees cannot return to their homes.

83. In the City of New York, the Department of Housing Preservation and Development's Emergency Housing Services Bureau provides emergency relocation services when individuals are not able to reoccupy their residences after evacuation.

84. Ninth, an emergency preparedness program must have plans for the provision of assistance in recovery and remediation efforts after an emergency or disaster.

85. New York City provides disaster recovery assistance in cooperation with federal and state agencies.

## The Unique Needs of Persons with Disabilities Must Be Addressed for Each of The Essential Components But New York City Fails To Do So.

86. While New York City provides each of these nine essential components of emergency preparedness for the general population, it fails to do so for the almost 900,000 New Yorkers with disabilities. New York City's emergency preparedness efforts do not address the unique needs of persons with disabilities during emergencies.

87. In developing its comprehensive emergency plans, a city must include the input of the disability community.

88. However, the City of New York has failed to consistently engage and affirmatively respond to the disability community. OEM, for instance, has involved the disability community on only certain issues, piece-meal and out of context. OEM has never provided a draft of a plan for which the disability community can provide input.

89. As a result, persons with disabilities know very little or nothing of the City's emergency plans. They do not know, for instance, how they will be notified, how and if they will be evacuated, which shelters are accessible, how and if they will be transported and what assistance, if any, they will receive.

90. In assessing the efficacy of its emergency plans, a city must test its plans with regards to persons with disabilities.

91. The City of New York has held no drills or exercises to test the efficacy of its plans for persons with disabilities. Indeed New York City has turned away persons with disabilities from participating in emergency drills which are open to the general public.

92. In identifying needs and resources in advance of an emergency, a city must plan for the needs of, and provide the resources specifically for, persons with disabilities. This

requirement includes, for instance, planning for replacement life-sustaining mediations, consumable medical supplies, and durable medical equipment for persons with disabilities and determining the number of accessible seats available on evacuation buses.

93. New York City has made no such plans to assess the emergency needs of persons with disabilities let alone made plans to ensure that these needs will be met.

94. In notifying and communicating with persons with disabilities prior to and during an emergency, a city must ensure that communications are accessible.  This requires, among other accommodations, having plans that provide for captioning or American Sign Language interpreters for persons who are deaf or hard of hearing and that avoid bullhorn type announcements to inform persons of imminent emergencies.  This further requires ensuring that websites with emergency information are accessible to screen readers used by persons with no or low vision.

95. New York City has no adequate or effective plans for ensuring accessible notification and communication prior to and during emergencies.

96. When sheltering in place is required, persons with disabilities may need assistance. For example, persons with disabilities may need help in daily life activities (e.g., eating, dressing) which normally would be provided by an aide or caretaker.  Persons with disabilities may also be dependent on electricity for respirators, wheelchairs or other assistive technologies which, during power-outages, means persons with disabilities may require immediate assistance. A city must develop specific policies as to how it will address these and other scenarios when persons with disabilities are forced to remain in their homes or apartments during emergencies.

97. New York City has failed to develop such policies.  New York City does not, for instance, offer in-home assistance or sheltering options for persons with disabilities whose survival depends on electrically powered equipment when electrical power is disrupted for extended periods of time.

98. When a city provides shelter and mass care to persons forced to evacuate their homes, a city must have plans to ensure that the shelters are free of architectural barriers to persons with

disabilities. For example, there must be useable ramps instead of stairs, paths of travel throughout the shelter which are wide enough for wheelchairs and bathrooms which are useable by persons with mobility disabilities. A city must conduct surveys of its shelters so it knows which of its shelters are architecturally accessible to persons with disabilities.

99. There must also be programmatic access, ensuring that the mass care offered is equally available to persons with disabilities. For instance, there must be plans to ensure cots usable by men and women with disabilities (allowing persons using wheelchairs to safely transfer to the cot), refrigeration for medications that must be refrigerated (e.g., insulin) and back-up medications, consumable medical supplies and durable medical equipment for persons with disabilities who need these items.

100. The City of New York has not adequately surveyed its shelters to ensure that they will be architecturally barrier free during emergencies and fails to identify which of its shelters, if any, are accessible during emergencies. Nor has New York City taken responsibility for ensuring that its shelters are equipped with accessible cots, accessible bathrooms, life-sustaining medications and replacement medical equipment. As a result, shelters have not been and continue not to be accessible to persons with disabilities.

101. If evacuation and transportation from affected areas is necessary, a city must make plans for assisting those who cannot evacuate on their own. For example, persons in wheelchairs or scooters may not be able to leave their building without electricity to operate the elevators. If the physical environment has changed (e.g., rubble, barricades), persons with vision disabilities may have greater difficulty navigating out of the affected areas. A city must also make plans to provide a sufficient amount of transportation that is accessible.

102. New York City has made no such plans to ensure that persons with disabilities will have assistance evacuating or that accessible transportation from affected areas will be provided.

103.    A city must also make plans to ensure that any temporary housing provided to those who cannot return to their homes following an emergency is architecturally accessible to persons with disabilities.

104.    New York City has made no such plans that specify how it will ensure that temporary housing is accessible to persons with disabilities.

105.    In providing assistance in recovery and remediation efforts after an emergency or disaster, a city must plan for the specific needs of persons with disabilities who may require, for instance, transportation back to their homes from shelters and assistance to restore accessible features (e.g., removing rubble, repairing ramps).

106.    The City of New York has made no plans as to how it will specifically assist persons with disabilities during the recovery and remediation phase following an emergency.

107.    Because Defendants have failed to provide for the unique needs of persons with disabilities in its emergency preparedness program, Mayor Bloomberg and New York City are denying persons with disabilities meaningful access to New York City's emergency preparedness program and are discriminating against men, women, and children with disabilities.

## CLASS ACTION ALLEGATIONS

108.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs bring this action for injunctive and declaratory relief on their own behalf, on behalf of their members, and on behalf of all persons similarly situated. The class that the named Plaintiffs seek to represent consists of all persons with disabilities in New York City who have been and are being denied the benefits and advantages of New York City's emergency preparedness program.

109.    The persons in the class are so numerous that joinder of all members of the class is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.

110.    Data from the United States Census American Community Survey conducted in 2008 indicate that almost 900,000 non-institutionalized New York City residents have a

disability. Such data further show that more than 180,000 non-institutionalized New York City residents have a hearing disability, more than 210,000 non-institutionalized New York City residents have a vision disability and over 535,000 non-institutionalized New York City residents have a mobility disability.

111.    There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented, in that named Plaintiffs, members of organizational Plaintiffs and individuals in the class have been and continue to be denied their civil rights of access to, and use and enjoyment of, the City of New York's emergency preparedness program due to Defendants' discriminatory implementation of this program, resulting not only a denial of meaningful access to that program for persons with disabilities but also an extreme and unacceptable risk of death or serious injury to such persons.

112.    Common questions of law and fact predominate, including questions raised by Plaintiffs' allegations that Defendants have failed to address the unique needs of persons with disabilities in their emergency planning and that, as a result, key components of Defendants' emergency preparedness program exclude and discriminate against persons with disabilities.

113.    The claims of the named Plaintiffs, and their members, are typical and are not in conflict with the interests of the class as a whole. Defendants' omissions and violation of the law as alleged herein has caused named Plaintiffs, Plaintiffs' members and class members to be deprived of the opportunity to effectively utilize Defendants' emergency preparedness program. Therefore, all class members will suffer the same or similar injuries for the purposes of the injunctive and declaratory relief sought. Plaintiffs' claims are thereby representative of and co-extensive with the claims of the class.

114.    The named Plaintiffs are adequate class representatives because they and their members are directly affected by Defendants' discriminatory implementation of their emergency preparedness program. The interests of the named Plaintiffs are not antagonistic to, or in conflict with, the interests of the class as a whole.

115.    The attorneys representing the class are experienced both in disability law and in class action institutional litigation.  Counsel representing the plaintiff class is qualified to fully prosecute this litigation and possesses adequate resources to see this matter through to resolution. Plaintiffs will fairly and adequately represent and protect the interests of the class.

116.    Defendants have acted and/or failed to act on grounds generally applicable to the class as a whole, thereby making appropriate final declaratory and injunctive relief with respect to the class as a whole.

## FIRST CAUSE OF ACTION
## FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT,
## 42 U.S.C. § 12131, ET SEQ.

117.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

118.    Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in or denying the benefits of a program of the public entity to a person with a disability or otherwise discriminating against a person on the basis of disability.  Title II provides, in pertinent part, that

> No qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the
> benefits of the services, programs, or activities of a public entity,
> or be subjected to discrimination by any such entity.

119.    The term "disability" includes physical and mental impairments that substantially limit one or more major life activities. 42 U.S.C. § 12102(2).  A "qualified individual with a disability" means an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C § 12131(2).

120.    The named Plaintiffs, members of organizational Plaintiffs, and the class are persons with disabilities within the meaning of the statute in that they have impairments which

substantially limit one or more major life activities (e.g., walking, hearing, seeing). They are also qualified in that they are located in New York City and thus, are eligible for the benefits of the City's emergency preparedness program. Thus, named Plaintiffs, members of organizational Plaintiffs, and the class are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12102, 42 U.S.C. § 12131, and 28 C.F.R. § 35.104.

121.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1). Defendant New York City is a public entity within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104. Mayor Bloomberg is being sued in his official capacity as the chief executive of New York City.

122.    By failing to plan to meet the unique needs of persons with disabilities during an emergency, Defendants have excluded them from participation in, denied them the benefits of, and discriminated against them in an emergency preparedness program offered by a public entity, in violation of 42 U.S.C.§ 12132.

123.    Congress directed the Department of Justice ("DOJ") to promulgate regulations implementing Title II's prohibition against discrimination. 42 U.S.C. § 12134. Pursuant to this mandate, the DOJ has issued regulations defining the forms of discrimination prohibited by Title II of the ADA. 28 C.F.R. § 35.101 *et. seq.*

124.    Pursuant to 28 C.F.R. § 35.130(b)(1)(i), (ii) and (vii), a public entity, in providing any aid, benefit, or service, may not directly or through contractual, licensing, or other arrangements, on the basis of disability (1) deny qualified individuals with disabilities the opportunity to participate in or benefit from the aid, benefit, or service; (2) afford qualified individuals with disabilities an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others or (3) otherwise limit qualified individuals with disabilities in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

125.    Defendants provide an aid, benefit, or service in the form of an emergency preparedness program. However, they do so in an unequal manner which denies or limits the

25

ability of disabled men, women, and children to enjoy the benefits as others can. For instance, because New York City's emergency plans do not ensure shelters are architecturally accessible, persons using wheelchairs may be turned away and because New York City's plans do not ensure accessible communication, persons with vision disabilities may be limited in how they are notified about imminent emergencies.

126.    Pursuant to 28 C.F.R. § 35.130(b)(3)(i), a public entity may not, directly or through contractual or other arrangements, utilize methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.

127.    Defendants may not avoid their responsibility to address the unique needs of persons with disabilities during emergencies by delegating responsibility to other agencies or organizations such as the American Red Cross. That is, even if the American Red Cross is charged with managing shelters, it is New York City's ultimate responsibility to ensure, for instance, that refrigeration, life-sustaining medications, durable medical equipment, and service animal facilities are provided at its shelters.

128.    Pursuant to 28 C.F.R. § 35.130(b)(4), a public entity may not, in determining the site or location of a facility, make selections that have the effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise subjecting them to discrimination.

129.    Defendants claim to know which shelters are accessible to persons with disabilities. However, there is no evidence that New York City hired any trained professionals to ensure that shelters are indeed architecturally and programmatically accessible. Indeed during the most recent emergency, Hurricane Irene, New York City opened several shelters that were not architecturally accessible to persons using wheelchairs.

130.    Pursuant to 28 C.F.R. § 35.130(b)(7), a public entity shall make reasonable modifications in policies, practices or procedures when modifications are necessary to avoid discrimination on the basis of disability.

131.    Defendants have utterly failed to provide reasonable modifications. For example, Defendants have not modified their policy of sheltering in place for three days in order to assist

persons with disabilities who may not, because of their disability, be able to remain in their homes for three days without any assistance.

132.    As a proximate result of Defendants' violations of Title II of the ADA, Plaintiffs have been injured as set forth herein.

133.    Defendants' conduct constitutes an ongoing and continuous violation of the ADA and unless restrained from doing so, Defendants will continue to violate said law. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law. Plaintiffs will suffer irreparable harm in that they will continue to be discriminated against and denied access to New York City's emergency preparedness program. Consequently, Plaintiffs are entitled to injunctive relief pursuant to section 308 of the ADA (42 U.S.C. § 12188), as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**SECOND CAUSE OF ACTION**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973**
**(29 U.S.C. § 794, ET SEQ.)**

134.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

135.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and its implementing regulations, prohibit discrimination against persons with disabilities by recipients of federal funding. Section 504 of the Rehabilitation Act provides, in pertinent part, that

> no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

136.    An "individual with a disability" is defined under the statute, in pertinent part, as "an individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102). "Otherwise qualified" means a person who "meets the essential eligibility

requirements for participation in, or receipt of benefits from, that program or activity." 28 C.F.R. § 39.103.

137.    The named Plaintiffs, members of organizational Plaintiffs, and the class are individuals with disabilities within the meaning of the statute as they have impairments which limit one or more major life activities (e.g., walking, hearing, seeing). Such individuals are otherwise qualified as they are located in New York City and thus, eligible for the benefits for the City's emergency preparedness program. Hence, named Plaintiffs, members of organizational Plaintiffs, and the class are otherwise qualified individuals with disabilities within the meaning of 29 U.S.C. § 705(20)(B) and the implementing regulations.

138.    The City of New York and the Office of the Mayor receive federal financial assistance to provide New York City's emergency preparedness program.

139.    By failing to plan to meet the unique needs of persons with disabilities during an emergency, Defendants have excluded them from participation in, denied them the benefits of, and discriminated against them in an emergency preparedness program that receives federal financial assistance, solely by reason of their disabilities, in violation of 29 U.S.C. § 794 and its implementing regulations.

140.    As a proximate result of Defendants' violations of Section 504 of the Rehabilitation Act, Plaintiffs have been injured as set forth herein.

141.    Defendants' conduct constitutes an ongoing and continuous violation of Section 504 of the Rehabilitation Act and unless restrained from doing so, Defendants will continue to violate said law. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law. Plaintiffs will suffer irreparable harm in that they will continue to be discriminated against and denied access to New York City's emergency preparedness program. Consequently, Plaintiffs are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## THIRD CAUSE OF ACTION

## VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
## (N.Y.C. ADMIN. CODE § 8-101 ET. SEQ.)

142.     Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

143.     The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a), provides that "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . ."

144.     The term "person" includes governmental bodies or agencies. N.Y.C. Admin. Code § 8-102(1). New York City is a governmental body or agency and thus is a person within the meaning of N.Y.C. Admin. Code § 8-102(1). Mayor Bloomberg is being sued in his official capacity as the chief executive of a governmental body or agency.

145.     The term "place or provider of public accommodation" includes "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available." N.Y.C. Admin Code § 8-102(9). The City's emergency preparedness program constitutes a public accommodation as it is a service, accommodation, advantage, or privilege offered to the general public and thus falls within the meaning of N.Y.C. Admin Code § 8-102(9).

146.     Defendants, as persons under the statute, act as the "managers" of the City's emergency preparedness program, a public accommodation. In so doing, the City of New York and Mayor Bloomberg directly and indirectly deny to persons with disabilities the accommodations, advantages, facilities or privileges of the emergency preparedness program for the reasons set forth herein.

147.    The NYCHRL additionally requires that any person prohibited from discriminating under Section 8-107 on the basis of disability "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15).  The term "covered entity" is defined as a person required to comply with any provision of Section 8-107 which includes Defendants under N.Y.C. Admin. Code § 8-102(1).

148.    The City of New York and Mayor Bloomberg in his official capacity qualify as covered entities and must make the reasonable accommodations necessary to allow persons with disabilities the opportunity to enjoy the right of benefiting from the City's emergency preparedness program pursuant to N.Y.C. Admin. Code § 8-107(15).  Defendants have made inadequate or no reasonable accommodations to allow persons with disabilities the opportunity to enjoy the right of benefiting from the City's emergency preparedness program.

149.    As a proximate result of Defendants' violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

150.    Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL and unless restrained from doing so, Defendants will continue to violate said law. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.  Plaintiffs will suffer irreparable harm in that they will continue to be discriminated against and denied the accommodations, advantages, facilities or privileges of the City's emergency preparedness program as well as reasonable accommodations which would provide the opportunity to benefit from the City's emergency preparedness program. Consequently, Plaintiffs are entitled to injunctive relief and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION
## DECLARATORY RELIEF

151.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the
Complaint.

152.    Plaintiffs contend that Defendants have failed and are failing to comply with
applicable laws prohibiting discrimination against persons with disabilities in violation of Title II
of the ADA, 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794,
*et seq.*, and the NYCHRL, N.Y.C. Admin. Code §8-101 *et. seq.*

153.    Defendants disagree with Plaintiffs' contention.

154.    A judicial declaration is necessary and appropriate at this time in order that each
of the parties may know their respective rights and duties and act accordingly.

WHEREFORE, Plaintiff prays for relief as set forth below.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows, including but not limited to:

155.    A declaration that Defendants' failure to adequately plan to meet the emergency
preparedness needs of persons with disabilities violates the Americans with Disabilities Act,
Section 504 of the Rehabilitation Act and the NYCHRL.

156.    An order and judgment enjoining Defendants from violating the Americans with
Disabilities Act, Section 504 of the Rehabilitation Act, and the NYCHRL, and requiring
Defendants to develop and implement a emergency preparedness program that addresses the
unique needs of people with disabilities during emergencies.

157.    Plaintiffs' reasonable attorneys' fees and costs.

158.    Such other and further relief as the Court deems just and proper.

Dated: New York, NY                By:
June 29, 2012                              Attorneys for Plaintiffs

                                   DISABILITY RIGHTS ADVOCATES
                                   JULIA PINOVER (JMP333)
                                   Disability Rights Advocates
                                   1560 Broadway, 10th Floor