UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------  x
BROOKLYN CENTER FOR : Case No. Case No. 11-cv-6690 (JMF)
INDEPENDENCE OF THE DISABLED, a
nonprofit organization, CENTER FOR :
INDEPENDENCE OF THE DISABLED,
NEW YORK, a nonprofit organization, : **DECLARATION OF**
TANIA MORALES, and GREGORY BELL, : **DR. PETER BLANCK, Ph.D, J.D.,**
**IN SUPPORT OF PLAINTIFFS'**
Plaintiffs, : **MOTION FOR CLASS**
**CERTIFICATION**
:
-against-
:

:
MICHAEL R. BLOOMBERG, in his official
capacity as Mayor of the City of New York, :
and the CITY OF NEW YORK
:
Defendants. :
-----------------------------------------------------------  x

I Peter Blanck, Ph.D, J.D., hereby, declare that:

1. I am an expert witness retained by Plaintiffs in this matter. The facts stated below are based on my personal knowledge, and if called as a witness I would testify competently to them.

**Background and Qualifications in Emergency Planning for People with Disabilities**

2. I hold the rank of University Professor at Syracuse University, which is the highest facu1ty rank granted at the University. I am the Chairman of the Burton Blatt Institute ("BBI") at Syracuse University, which seeks to advance the civic, economic, and social participation of persons with disabilities. I am Chairman of the Global Universal Design Commission ("GUDC"), a nonprofit corporation, which is creating consensual standards that private and public buildings, programs, services, and technology may be accessible to and useable by persons with disabilities. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

3. I received a Juris Doctorate from Stanford University, where I was President of the Stanford Law Review, and a Ph.D. in Psychology from Harvard University. I have published articles and books on the Americans with Disabilities Act (ADA) and disability laws and policies. I have received grants from federal agencies such as the U.S. Departments of Education, Labor, and Veterans Affairs, the National Council on Disability, and from foundations such as the Annenberg Foundation, addressing barriers to society facing children and adults with disabilities. I studied disability law and policy, and barriers and discrimination facing persons with disabilities in society and from organizational attitudes, practices, and po1icies.

4. I have testified before Congress, the Equal Employment Opportunity Commission (EEOC), and federal and state administrative bodies on disability matters. I have been a Senior Fellow of the Annenberg Washington Program and a member of the President's Committee on Employment of Persons with Disabilities. I have served as court-appointed officer for the U.S. District Court, District of Wyoming, in the oversight of services for children and adults with disabilities, such as in health and safety, living conditions, education, and transportation. I have been qualified as an expert witness in federal district court in Rivas-Parker v. Attractions Hawaii, Case No. 10-

00164 KSC (Dist. Ct. Dist. HI 2012), on organizational attitudes, policies and procedures in equal access for a blind individual to participate in commercial recreational services.

5. My research articles and books are published in peer-reviewed journals, law reviews and other scholarly venues. I have lectured in the U.S. and internationally at universities, federal and state governmental agencies, and foreign political and administrative bodies, on the physical, social and economic participation in society of persons with disabilities. My treatise and casebooks on the ADA, disability policy, law and research are used in classes at numerous law schools and, among other topics, discuss disaster preparedness, mitigation, and response for persons with disabilities. My research examines the damaging effects of discrimination facing persons across the spectrum of disability. I study organizational policies, procedures and best practices that lessen the negative effects of such discrimination.

6. In addition to my research, writings and experiences in the disability field in general, I have been involved in research and applied projects on emergency planning, preparedness, and response for people with disabilities, in particular.

7. In the area of disaster preparedness, response, and mitigation, in 1995, in one early post-ADA study, as a senior fellow of the Annenberg Foundation Washington Program, I authored "Disaster Mitigation for Persons with Disabilities: Fostering a New Dialogue." This Report was supported by the Annenberg Program in collaboration with The President's Committee on Employment of People with Disabilities, of which I was a member at the time.

8. The Annenberg Report contributed to national and international discussion on how disasters change the lives of Americans with disabilities and others around the world, and has been cited in reports by the U.S. federal agencies such as the Departments of Homeland Security, and Health and Human Services, and by the National Council on Disability. The Report discussed how advance preparation and planning, with collaboration of the disability community, are crucial to mitigating the impact of disasters on people with disabilities. It found that with adequate planning and preparation, many of the harmful effects of disasters may be avoidable and mitigated in the short- and longer terms.

9. In 2005, I was involved in examination of the emergency response to Hurricane Katrina and its impact on people with disabilities. At the time, the Employment and Training Administration (ETA) within the U.S. Department of Labor (DOL) provided assistance to states affected by the hurricane through several programs, including one that deployed a team of Disability Program Navigators (DPNs or "Navigators") to the region. Navigators were deployed from thirteen states, including California, Colorado, Florida, Illinois, Iowa, Maryland, New Mexico, New York, Oklahoma, Oregon, South Carolina, Vermont, and Wisconsin.

10. Navigators served individuals with disabilities through the benefits, employment, and training communities. The Disability Program Navigator Hurricane Initiative (DPN-HI) deployed volunteer teams of DPNs to Mississippi and Louisiana from across the U.S. during September and November, 2005.

11. The Burton Blatt Institute (BBI) and the prior institute I directed, the Law, Health Policy and Disability Center, partnered with ETA in areas to: (1) evaluate the effectiveness of DPNs in assisting people with disabilities in the region; (2) chronicle the experiences of people with disabilities on the Gulf Coast after Hurricane Katrina; (3) determine the extent to which federal, state, and local emergency preparedness policies and procedures adequately served the needs of people with disabilities; and (4) examine the DPN-HI program and lessons that may be applied to future disasters and in development of emergency preparedness policies related to people with disabilities.

12. In 2007, BBI was retained by the Israeli government, Ministry of Social Welfare, to help evaluate and implement the country's emergency preparedness and response capabilities for persons with disabilities. We reviewed reports that documented findings and recommendations for improved policy and practices to support persons with disabilities in times of crisis and emergency in the U.S., the state of Israel, and worldwide.

13. I am principal investigator of the Southeast ADA Center, which provides technical assistance, training, and materials about the ADA, with a focus on serving an eight-state

geographic region (Mississippi, Alabama, Georgia, Florida, North Carolina, South Carolina, Kentucky, and Tennessee). As part of this project funded by the U.S. Department of Education, the ADA center provides emergency preparedness and disability resources for the region.

14. My colleague and I have been retained by the City of Sioux Falls, South Dakota, to review the City's ADA and Section 504 "Transition Report." This project includes review of City services, programs, and activities as relevant to persons with disabilities, including the nature of emergency planning, preparedness and response. Our activities involve review and analysis of City services such as public transportation, and the accessibility of City buildings and website activities to people with disabilities. It includes review of government and nongovernmental organizations, and their activities, as affecting persons with disabilities, and their families and support services. The review uses multiple methods for data collection, such as archival document analysis, interviews with stakeholders, observations of relevant facilities and activities, and town hall meetings with government leadership and staff, local citizens, and leaders from the disability community.

**People with Disabilities in the City of New York**

15. As part of my research, writings and experiences in the disability field, I examine and study U.S. Census and other national data sources regarding the population of people with disabilities. There are well-recognized data sets that assess the population of people with disabilities living in New York City. For example, the 2011 publication by the Center for Independence of the Disabled New York (CIDY) *Disability Matters* references the 2008 American Community Survey (ACS) from the U.S. Census bureau, which is a recognized data set to determine the population of people with disabilities. A true and correct cop of this publication is attached hereto as Exhibit B. This publication finds that there are almost nine hundred thousand (889,219, 11 percent of the population) people living with disabilities in the New York City (see page 7). The data used in this publication were prepared by researchers at

5

the Hunter College Rehabilitation and Training Center on Disability Statistics and Demographics (StatsRRTC) in 2011, which also has been a partner of BBI on disability research activities.

16. Additionally, many people with disabilities, travel to New York City on a daily basis for education, work, and health services, and for social events and other activities.

**Needs of People with Disabilities in Emergency Planning**

17. My research, writings and experiences, and that of others, in the field of emergency planning and response for people with disabilities finds that there are well-recognized and common elements that emergency preparedness, mitigation, and response plans contain for those efforts and plans to be accessible to people with disabilities. Research shows that when the needs and experiences of people with disabilities are not systematically assessed prior to a crisis or disaster, these needs may go unmet through the first response and longer-term relief processes, which may have life and death consequences.

18. In my research, I identify principles that apply to emergency preparedness, planning, and response for people with disabilities. One principle in support of the validity of the emergency response process, and to ensure its accessibility, is to include people with disabilities, their family members and supporting organizations in a systematic manner in emergency planning activities. Well-recognized principles derived from the review and analysis of post-crisis information and emergency plans at local and national levels include the meaningful involvement of people with disabilities and the disability community in plan development and review of communications, transportation, shelter, health care, and other areas.

19. Other basic principles include that *a priori* roles and responsibilities be determined among public authorities and agencies, demarcating lines of authority for decision making, response, and follow-up activities. These roles and responsibilities are to be identified and coordinated among public agencies, disability stakeholders, and nongovernmental organizations to address the needs and capabilities of the disability population.

20. Recognized principles also include that emergency plans address the importance of physical and technological accessibility, and the possibility for reasonable accommodations in notices and communications, evacuation and transportation services, shelters, personal assistance, and health care needs, among other areas.

21. In addition, research suggests that emergency response plans that meaningfully address accessibility issues consider the situations of people with disabilities who may need assistance in evacuation from their homes, whether from standalone residences or in high rise structures. Also, emergency response plans need to consider the nature of and demand for accessible forms of transportation to reach shelters and to evacuate the area in the event of a mass evacuation. Municipalities further need to ensure that staff have appropriate training and expertise to assist individuals with disabilities in evacuating their homes and other locations where they may be located during an emergency. To appropriately maximize the use of available transportation resources that are accessible to people with disabilities, the planning process needs to identify, assess, and prepare for use in disasters public and private local transportation systems, and human service vehicles that have accessible features.

22. Another principle of emergency preparedness and planning for people with disabilities is the need to ensure that designated sites, used as shelters in the event of emergencies and disasters, are accessible to people with disabilities. This principle requires systematic and regular assessment and maintenance of the physical and programmatic accessibility of shelters as needed during emergencies. Accessibility includes ensuring that appropriate supplies and equipment for accommodating the needs of people with disabilities in general population shelters are available and may be deployed reasonably to shelters when emergencies occur. Advance planning and ongoing assessment are needed to ensure that shelters may appropriately accommodate the needs of people with disabilities. This includes the need to ensure that shelters, when opened, contain life-sustaining equipment and other means that people with disabilities need, which may include accessible cots, bathing and toileting facilities, emergency medications, and durable medical equipment such as wheelchairs,

walkers, and crutches.

23. Other principles in the emergency planning process include that municipalities need to ensure that programs and services enable people with disabilities to return to their homes and routines in the aftermath of an emergency and during the recovery phase of emergency management, and that system-wide efforts are accessible to and inclusive of people with disabilities. In circumstances where a municipality provides temporary or permanent housing for people whose homes have been damaged or destroyed from a disaster, such options need to include accessible housing for people with disabilities. This may also include that governments address the needs of people with disabilities in debris removal to support the return to independent living by persons with disabilities.

24. Municipalities also need ensure that their emergency communication services are accessible to and usable by people with varying disabilities. Mobile and handheld communications technology and devices are integral to disaster relief and mitigation; for instance, as reflected in the 2010 Communications and Video Accessibility Act, "CVAA". People with hearing impairments may require closed captioning for communication and mobile devices, as well as interpreters, and signaling devices. Materials must be capable of text to speech conversion on mobile and communications devices, and provided in other accessible formats such as Braille, for people with visual impairments and those who are blind. People with cognitive impairments, such as those with developmental disabilities, Autism, Alzheimer's disease, and brain injury, require easy to use and comprehensible materials and communications technologies that enable their effective use, and to help these individuals adapt to new surroundings and minimize confusion and life-threatening factors.

25. Although not exhaustive, the above principles derive from well-recognized research, policy, and best practice experiences. They illustrate elements necessary to ensure that emergency planning addresses the needs of people with disabilities and provides effective programs and services in disaster planning, mitigation, and response.

**Illustrative Issues of Relevance to New York City**

26. In addition to the my research, writings, and experiences, I have reviewed numerous documents and depositions in this matter as provided to me by plaintiffs' counsel. I understand that my review is to be ongoing, and I anticipate continuing to evaluate other relevant materials as this matter continues. This may require me to supplement by views. Following, however, are some preliminary issues that I have identified in regard to the City of New York's emergency planning for people with disabilities.

27. *New York City demographics and scope*: Research in the area of emergency planning shows that governments need to be responsive to the circumstances and demographics of the particular region and local areas. By its scope and diversity, New York City presents unique challenges for emergency planners that have relevance to people with disabilities. These challenges exist across different types of emergencies and, without proper planning, are made more difficult by emergencies when there is no advance warning.

28. *High Rise Structures*: New York City is populated with multi-story and high rise structures. These buildings pose challenges for large-scale evacuation of people with disabilities who are not able to self-evacuate using stairways and who are not easily evacuated with assistance. Effective and adequate evacuation planning from high rise structures is important to the needs of people with mobility impairments in the event of large scale or localized evacuations. Based on my review to date, I have been presented with no information regarding a systemic plan for high rise evacuations for the City of New York as applied to people with disabilities. The deposition testimony by the representative witness for the Fire Department of New York City stated that he was not aware of such a plan. *See* Villani Deposition at 54:12-20, Exh. O to Parks Decl. While the City does have what is referred to as the "Homebound Evacuation Plan," as part of its response to Coastal Storms, that plan appears to be used only in circumstances where there is advance warning, and has other limitations. *See* Villani Depo. at 14:20-15:20; and 63:7-64:18, Exh. O to Parks Decl. (no requirement for homebound assistance in Area Evacuation Plan); Villani Depo. at 19:14-20:14, Exh. O to Parks Decl.

9

(may only be evacuated to a shelter, not to other locations).

29. As a general proposition, people with disabilities appear to be instructed by New York City of what not to do in situations requiring evacuation. *See, e.g.,* "Ready New York for Seniors and People with Disabilities," at CNY 000040 (e.g., "Do NOT use an elevator during a fire or other emergency unless directed to do so by emergency personnel."), Exh. Q to Parks Decl.

30. The absence of a systematic plan for the evacuation from high rises makes it difficult for New York City to effectively evacuate people with disabilities from such structures. This is particularly the case during a large scale evacuation and emergencies with no advance warning. The development of such plans to facilitate effective high rise evacuation may include information and requirements for using evacuation chairs and other accepted means. This planning would aid in evacuation in a timely fashion that is not necessarily dependent on assistance of fire fighters and police. Some people with disabilities who escaped during 9/11 were those who chose not to wait to be rescued, but who evacuated using evacuation chairs. *See, e.g.,* "Unsafe Refuge: Why did so many wheelchair users die Sept. 11?," *New Mobility Magazine*, December 2001; and "A Day to Remember," *New Mobility Magazine*, November 2001 (attached hereto as Exhibits C and D, respectively).

31. *Public Transportation*: In evacuations, New York City appears to rely heavily on the use of its public transit systems. *See, e.g.,* Coastal Storm Evacuation Plan at CNY000130-CNY000138, Parks Decl. Exh. M ("During an evacuation, the City will work with transportation providers to maximize and optimize the use of trains, subways, and buses. Evacuees will use public transportation to travel to Evacuation Centers, friends, family, or hotels/motels within and outside the City, and to engage in storm-preparedness activities."); Belisle Depo. at 178:12-179:13, Exh. S Parks Decl. (City relies mostly on public transportation, with some self-identification to 311 for individual help); and Area Evacuation Plan at CNY007598, Exh. N to Parks Decl. ("Mass transit will be used to the greatest extent possible"); CNY007601 ("Public transportation, including the subways, commuter railroads, and city private and commuter buses, is the most effective means of transport for large numbers of evacuees."). Although this

approach may be appropriate for the general population, I did not find in the materials I reviewed that the City's plans reference assistance provided to persons with disabilities in the context of such an evacuation (e.g., as referenced, the Homebound Evacuation Plan does not appear to address this issue).

32. For effective use in disasters, public transportation systems must be planned and implemented to be accessible within reason to persons with a range of disabilities. Based on my review, there appear to be gaps in the accessibility of the public transportation system in New York City as documented in the City's emergency plans. *See, e.g.,* Area Evacuation Plan, at CNY007650-51 (identifying "Intermodal Hubs" for Manhattan, which are hubs for subway, rail, ferries and/or buses, and suggesting gaps in accessibility). Further, the documents I reviewed suggest that that more than 98% of Taxis and 80% of subway stations are inaccessible to people with disabilities. *See, e.g., Noel v. New York City Taxi and Limousine Com'n*, 687 F.3d 63, 66 (2d Cir. 2012) (finding that 98.2% of medallion taxis in New York City are inaccessible to persons in wheelchairs); www.MTA.info "Facts and Figures," Exh. P to Parks Decl. (stating that there are 468 subway stations in New York); and www.MTA.info "Accessibility," List of Accessible Subway Stations, Exh. P to Parks Decl. (showing 77 accessible stations).

33. As part of my review, I have examined declarations by individuals who describe the accessibility challenges of New York City's public transportation system on an average day. *See, e.g.,* Declarations of Curry, Raymond, Prentiss, Halbert and Morales. In the documents I have reviewed, however, I have not found systematic planning by the City to address this issue in an emergency, such as in a large scale evacuation. I did not find that the City's evacuation planning adequately addresses this issue and how it may relate to other aspects of the planning process. The absence of systematic planning in this area may place people with disabilities in an untenable life-threatening situation, as compared to those without disabilities.

34. *Shelters*: I understand that New York City uses infrastructure such as public schools for emergency shelters. For their effective use in disasters, the emergency planning process needs

to identify and implement shelters that are physically and programmatically accessible to people with a range of disabilities. My review suggests that in the Coastal Storm Sheltering Plan that New York City designates general and "special medical needs" shelters. *See* Coastal Storm Sheltering Plan, at CNY000360, Exh. J to Parks Decl. In my review, I did not find a systematic and coordinated emergency plan as to the strategic use of special needs and general shelters. There appears to be eight (8) special needs shelters in New York City. *See* Coastal Storm Sheltering Plan, at CNY000360. Given the City's demographics cited earlier in this declaration, it was not clear to me in the documents that I reviewed the ways in which the City will meet the needs of its population of people with disabilities in these eight special needs shelters. Also, in the documents reviewed, I did not find systematic plans for addressing the needs of people with disabilities in the City's general shelters, given that the City stockpiles disability supplies, such as special needs cots, at the special needs shelters. *See* Deposition of Maniotis at 95:3-96:14 and 98:7-99:20, Exh. R to Parks Decl.

35. As a general matter, the City's emergency informational materials appear to inform people with disabilities to bring their own supplies to emergency shelters. *See* "Ready New York for Seniors and People with Disabilities" at CNY000041 ("Shelters DO NOT have special equipment (e.g., oxygen, mobility aids, batteries). Be prepared to bring your own."); Maniotis Depo. at 99:16-20, Exh. R to Parks Decl. (City's policy is that people bring their own medications with them at Coastal Storm general shelters). However, in my review, I did not find emergency contingency planning for the possibility that many people with disabilities may not be able to bring such supplies to shelters. This may be due to a number of reasons, such as the nature of their disabilities and that these individuals may not be at home at the time a disaster strikes. *See, e.g.,* Declarations of Raymond, Bell and Prentiss.

36. *72 Hours in Place*: New York City's emergency plans adopt an assumption that individuals must be prepared to survive after an emergency in place for up to three days. *See* "Ready New York," at CNY000033, Exh. Q to Parks Decl. ("Every New Yorker should plan to be self-sufficient for several days."); and Belisle Depo. at 203:7-21, Exh. S to Parks Decl. In my

review, I did not find provisional planning to provide assistance and services to people with disabilities who may not be able to survive for three days on their own. I found no planning and coordinated provisions, for instance, as to the nature and possible numbers of people with disabilities who may need life-saving assistance sooner than the three day period. *See, e.g.,* Declaration of Raymond.

37. *Participation by the Disability Community*: Based on my review of the documents and declarations presented to me, I find limited information that the disability community has been meaningfully and effectively engaged by New York City in the emergency planning process. *See* Declarations of Dooha, Wasserman, and Peters. This apparent lack of engagement, combined with the other structural and programmatic issues identified above, appear to result in an emergency planning process that places individuals with disabilities at the mercy of ad hoc decisions made at the time of a disaster. Even with the best of intentions by responders—police, fire personnel, volunteers, and others—the lack of effective emergency planning for people with disabilities may lead to life and death consequences, on the basis of a person's disability.

I declare under penalty of perjury under the laws of the State of New York that the foregoing is true and correct.  Executed this 31st day of August 2012 in Syracuse, New York.

_____

Peter Blanck, Ph.D, J.D.