**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

BROOKLYN CENTER FOR
INDEPENDENCE OF THE DISABLED, a
nonprofit organization, CENTER FOR
INDEPENDENCE OF THE DISABLED,
NEW YORK, a nonprofit organization,
GREGORY BELL, an individual, and
TANIA MORALES, an individual,

                           **Plaintiffs,**

                           **-against-**

MICHAEL R. BLOOMBERG, in his official
capacity as Mayor of the City of New York,
and the CITY OF NEW YORK,

                           **Defendants.**

-------------------------------------------------------- x

: Case No. 11-cv-6690 (JFM)

:

:

**MEMORANDUM OF POINTS**
**AND AUTHORITIES IN**
**SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS**
**CERTIFICATION**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................. 1

II. STATEMENT OF FACTS ................................................................... 2

    A.  The City Has Developed Centralized Plans for Meeting the Needs of People in the City of New York During a Major Emergency or Disaster. ........................... 2

    B.  The Proposed Class Is Comprised of Nearly Nine Hundred Thousand People with Disabilities in the City of New York. ................................................... 3

    C.  People with Disabilities Are Not Being Served by The City's Current Emergency Planning, Despite the Clear Needs of this Population…………………………..4

        1.  The City's Plans Have Significant Omissions Regarding the Specific Needs of People with Disabilities in Evacuation ........................................ 5

        2.  The City Has Major Gaps in Evacuation of People with Disabilities from High Rises ........................................................................... 6

        3.  Significant Elements of the Emergency Shelter System Are Inaccessible to People with Disabilities ............................................................ 7

        4.  The City Does Not Adequately Address the Needs of People with Disabilities in the Anticipated Period of No Assistance After Disasters .... 9

    D.  The Class Is Suffering Direct and Ongoing Harm as a Result of These Failures... 9

III. Legal Argument .................................................................................. 10

    A.  The Proposed Class is Designed Purely For Injunctive Relief In This Case Challenging Defendants' Failure to Plan for People with Disabilities. ............... 10

    B.  The Class Meets the Requirements of Rule 23. ................................................. 11

    C.  The Class Meets All the Requirements of Rule 23(a). ....................................... 13

        1.  The Class Is So Numerous that Joinder Is Impracticable. ...................... 13

        2.  There Are Numerous Questions of Law and Fact Common to the Class. 14

        3.  The Named Plaintiffs' Claims Are Typical of the Class. ........................ 18

        4.  Plaintiffs Will Fairly and Adequately Protect the Interests of the Class. . 20

    D.  The Class Is Ascertainable ................................................................ 21

    E.  The Conditions of Rule 23(b)(2) are Met. .......................................... 22

IV. Conclusion ......................................................................................... 24

TABLE OF AUTHORITIES

Page(s)

Cases

*In Re Amaranth Natural Gas Commodities Litigation*
269 F.R.D. 366 (S.D.N.Y.2010) ............................................................22

*Amchem Prods., Inc. v. Windsor*
521 U.S. 591 (1997)...............................................................12, 23

*Armstrong v. Davis*
275 F.3d 849 (9th Cir. 2001) ...........................................................15

*Arnold v. United Theatre Circuit, Inc.*
158 F.R.D. 439 (N.D. Cal. 1994)...................................................15, 23

*Baby Neal for and by Kanter v. Casey*
43 F.3d 48 (3rd Cir. 1994) ...........................................................15, 19

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*
222 F.3d 52 (2d Cir.2000) .............................................................20

*Baur v. Veneman*
352 F.3d 625 (2d Cir. 2003)..........................................................19

*CALIF v. City of Los Angeles*
Case No. CV 09-0287 CBM (RZx), Order .............................................2, 4, 11, 21

*Californians for Disability Rights, Inc. v. California Dep't of Transp.*
249 F.R.D. 334 (N.D. Cal. 2008) .....................................................13

*Casale v. Kelly*
257 F.R.D. 396, 406 (SDNY 2009) ...................................................22

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*
504 F.3d 229 (2d Cir.2007)...........................................................13

*Comer v. Cisneros*
37 F.3d. 775 (2d Cir. 1994)...........................................................23

*Dimarzo v. Cahill*
575 F.2d 15 (1st Cir. 1978)...........................................................20

*Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*
2012 U.S. App. LEXIS 6984 (2d Cir. Apr. 6 2012) ...................................19

*Disability Rights Council of Greater Washington v. WMATA*
239 F.R.D. 9 (D.D.C. 2007)..........................................................15

*In re Drexel Burnham Lambert Group, Inc.*
  960 F.2d 1138 (2d Cir. 1993)................................................................18, 20

*Dupler v. Costco Wholesale Corp.*
  249 F.R.D. 29 (E.D.N.Y.2008) .........................................................14

*Fogarazzo v. Lehman Bros.*
  263 F.R.D. 90 (S.D.N.Y. 2009) .........................................................14

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*
  574 F.3d 29 (2d Cir.2009)...................................................................12

*In Re Fosamax Products Liability Litigation*
  248 F.R.D. 389 (SDNY 2008) ...........................................................22

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*
  204 F.3d 149 (4th Cir. 2000) .............................................................20

*Gen'l Telephone. Company of the Southwest v. Falcon*
  457 U.S. 147 (1982).............................................................................18

*Gortat v. Capala bros., inc.*
  2010 WL 1423018 (E.D.N.Y. APR. 9, 2010).....................................22

*Hargrave v. Vermont*
  340 F.3d 27 (2d Cir. 2003)..................................................................19

*Harris v. Bd. of Supervisors, Los Angeles County*
  366 F.3d 754 (9th Cir. 2004) .............................................................19

*Hirschfeld v. Stone*
  193 F.R.D. 175 (S.D.N.Y.2000) ........................................................20

*Holmes v. Continental Can Co.*
  706 F.2d 1144 (11th Cir. 1983) .........................................................23

*In re Initial Pub. Offerings Secs. Litig.*
  471 F.3d 24 (2d Cir.2006)...................................................................12

*Kincaid v. City of Fresno*
  244 F.R.D. 597 (E.D. Cal. 2007) ......................................................18

*Loper v. New York City Police Dep't*
  135 F.R.D. 81 (S.D.N.Y.1991) ..........................................................22

*Lovely H. v. Eggleston*
  235 F.R.D. 248 (S.D.N.Y.2006) ..................................................17, 18

*Marisol A. v. Giuliani*
  126 F.3d 372 (2d Cir.1997).................................................................14

*Marisol A. v. Giuliani*
  929 F.Supp. 662 (S.D.N.Y.1996), aff'd, 126 F.3d 372 (2d Cir.1997) .....................................22

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*
  643 F.Supp.2d 446 (S.D.N.Y. 2009)........................................................................20

*In re NASDAQ Market–Makers Antitrust Litig.*
  169 F.R.D. 493 (S.D.N.Y.1996) ...............................................................................13

*Nnebe v. Daus*
  644 F.3d 147 (2d Cir. 2011)........................................................................................19

*Noel v. New York City Taxi and Limosine Com'n*
  687 F.3d 63 (2d Cir. 2012)..........................................................................................6

*In re NYSE Specialists Sec. Litig.*
  260 F.R.D. 55 (S.D.N.Y.2009) ...........................................................................13, 20

*Pottinger v. Miami*
  720 F. Supp. 955 (S.D. Fla. 1989) ............................................................................18

*Ragin v. Harry Macklowe Real Estate Co.*
  6 F.3d 898 (2d Cir.1993)............................................................................................19

*Raymond v. Rowland*
  220 F.R.D. 173 (D.Conn. 2004)...........................................................................15, 17

*Robidoux v. Celani*
  987 F.2d 931 (2d Cir. 1993)..................................................................................14, 18

*Robinson v. Metro–N. Commuter R.R. Co.*
  267 F.3d 147 (2d Cir.2001).........................................................................................18

*Rodde v. Bonta*
  357 F.3d 988 (9th Cir. 2004) .....................................................................................17

*Rosario v. Livaditis*
  963 F.2d 1013 (7th Cir. 1992) ...................................................................................17

*In re Sadia, S.A. Sec. Litig.*
  269 F.R.D. 298 (S.D.N.Y.2010) ........................................................................12, 13, 22

*In re Salomon Analyst Metromedia Litig.*
  544 F.3d 474 (2d Cir.2008)........................................................................................12

*Stinson v. City of New York*
  --- F.R.D. ----, 2012 WL 1450553 (S.D.N.Y. 2012)...........................................12, 22

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*
  546 F.3d 196 (2d Cir.2008)........................................................................................12

*Trief v. Dun & Bradstreet Corp.*
   144 F.R.D. 193 (S.D.N.Y.1992) ...........................................................................14

*Walters v. Reno*
   145 F.3d (9th Cir. 1998) ...................................................................................23

*Wal–Mart Stores, Inc. v. Dukes*
   —— U.S. ——, 131 S.Ct. 2541 (2011)...........................................................12, 14

<u>Statutes</u>

28 C.F.R. § 35.130(d) ..................................................................................................7

29 U.S.C. § 794 et seq...................................................................................2, 16, 11

42 U.S.C. § 12131, et seq.............................................................................2, 7, 16, 10

Fed. R. Civ. P. 23 .........................................................................................2, 11, 21

Fed. R. Civ. P. 23(a) ............................................................................. 11, 12, 20, 21

Fed. R. Civ. P. 23(a)(1)..............................................................................................13

Fed. R. Civ. P. 23(a)(2)..............................................................................................14

Fed. R. Civ. P. 23(a)(3)..............................................................................................18

Fed. R. Civ. P. 23(a)(4)..............................................................................................20

Fed. R. Civ. P. 23(b) ..................................................................................................12

Fed. R. Civ. P. 23(b)(2)...............................................................................1, 11, 12, 22, 23

N.Y.C. Admin. Code § 8-101 .....................................................................................11

<u>Other Authorities</u>

1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*
   § 3:3 (4th ed. 2006)…...……………………………………...…………………13

3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*
   § 7:24, 78………...………………………………………………..………………20

1966 Rules Advisory Committee Notes
   39 F.R.D. 69, 102 (1966)…………………………………………….…………23

4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*
   § 4.11 (3rd ed., 1992)………...………..…………………………….…………23

Wright, Miller & Kane, *Federal Practice & Procedure* Civil 2d
   § 1775, p. 470 (1986)……………………………………………….…………23

Advisory Committee Notes to Rule 23(b)(2)………………………………………....23

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case addresses the systemic failure of the City of New York (the "City") to address the special needs of hundreds of thousands of vulnerable men, women and children with disabilities in its emergency preparedness plans. This systemic problem is precisely the sort of discrimination that Rule 23(b)(2) class actions were designed to address.

Indeed, this case presents a prototypical class action alleging civil rights violations affecting a large group of people. Nearly nine hundred thousand people with disabilities are estimated to live in the City of New York, with many thousands more working in or traveling to the City on a daily basis. This group of people is subject to a common and centralized system of emergency planning that currently fails to meet their needs – defiencies that have life and death consequences.

The City has left major gaps in most basic elements of emergency planning. These include a failure to plan effectively for the needs of people with disabilities in (a) evacuations generally, (b) high rise evacuations, and (c) the emergency shelter system – along with a myriad of other problems in the areas of post-disaster recovery and remediation. These terrible oversights create common barriers to meeting the needs of people with disabilities when an emergency happens.

The harm that arises from this lack of planning is neither speculative nor remote.  The present lack of critical centralized emergency preparedness plans for people with disabilities puts this group at a much higher risk than the general population. It also causes immediate fear and apprehension amongst people with disabilities who have a right to be included meaningfully in emergency preparedness plans that have been created by the City. As aptly summarized by class member Jean Ryan: "I am afraid of dying in an emergency because of an inability to get help I might need." Ryan Decl. ¶4. Ms. Ryan's remarks indicate the very real fear and risk that members of the class live under daily because of the City's failure to adequately plan for them.

1

As a challenge to the City's centralized plans, this case presents many common questions of both law and fact, and presents the fundamental legal question of whether Defendants' failures violate the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act of 1973. Certification as a class action is the most efficient way to address these systemic issues, and to avoid multiple lawsuits that would raise similar questions and involve similar facts and legal claims.

The proposed class meets all of the requirements of Rule 23, and is the most efficient and manageable method for addressing the deficiencies in the City's emergencing planning. Indeed, a very similar matter proceeded against the City of Los Angeles, resulting in class wide-relief from the Court. *See CALIF v. City of Los Angeles*, Case No. CV 09-0287 CBM (RZx), Order Granting Class Certification, and Order re Summary Judgment, Declaration of Shawna L. Parks ("Parks Decl."), Exhs. B and C. Similarly here, the failures of the City of New York in its emergency planning should be addressed on a class wide basis.

Accordingly, the Court should certify the proposed class under Federal Rule of Civil Procedure 23.

## II.     STATEMENT OF FACTS

### A.     The City Has Developed Centralized Plans for Meeting the Needs of People in the City of New York During a Major Emergency or Disaster.

The City of New York is uniquely vulnerable to many types of disasters. These include biological hazards, power disruptions, flash floods, coastal storms and terrorist attacks of various kinds, among others.  The City has responded to this risk of emergencies by developing multiple centralized written plans to respond to the needs of New York residents during such crises.  New York City's Office of Emergency Management (often referred to as OEM) "plans and prepares for emergencies, educates the public about preparedness, coordinates emergency response and recovery, and collects and disseminates emergency information."  *See* OEM website, Exh. G to Parks Decl. OEM's charge is to plan for emergencies in New York City, and coordinate response

and recovery. *See* McKinney Depo. at 30:17-22, Exh. U to Parks Decl.  As part of this charge, OEM has, over the years, developed a series of written city-wide plans to address specific disasters that could affect the City, such as the the City's Winter Weather Plan, as well as general plans that are not disaster specific, such as the City's "Area Evacuation Plan."  *See* List of OEM plans, CNY007881-7883, Exh. H to Parks Decl. Between January 2010 and December 2011, OEM's Citywide Interagency Coordinators responded to almost 1,200 emergencies while Watch Command monitored more than 4,000 incidents in the five boroughs. *See* OEM 2011 Report at "Operations: OEM Responses 2010-2011," Exh. I to Parks Decl.

The City has not constructed separate emergency preparedness plans for each resident depending on that person's needs, nor have Plaintiffs asked for such individualized planning in their request for relief.  Rather, Plaintiffs challenge the City's existing planning efforts as inadequately providing, or failing to provide entirely, for the City's population of people with disabilities.  Plaintiffs' demand for relief is aimed at modifying the City's existing plans.  Indeed, Plaintiffs seek injunctive relief that would incorporate the emergency preparedness needs of the proposed class of people with disabilities into Defendants' existing emergency management structure.

**B.**     **The Proposed Class Is Comprised of Nearly Nine Hundred Thousand People with Disabilities in the City of New York.**

There are nearly nine hundred thousand people with disabilities in the City of New York. *See* Declaration of Peter Blanck ("Blanck Decl.") Decl. ¶15, and *Disability Matters*, at p. 7, Exh. B to Blanck Decl. (stating that per census data there are 889,219 people with disabilities in the City of New York).  The City's own statistics show more than 540,000 people with mobility and sensory disabilities.  *See* Coastal Storm Sheltering Plan Social Vulnerability Statistics, CNY000361-362, Exh. J to Parks Decl.   Moreover, many people with disabilities travel to New York on a daily basis, including for work, school, medical appointments, social events, and a variety of other occasions. *See* Blanck Decl. ¶16.

**C.**    **People with Disabilities Are Not Being Served by the City's Current**
**Emergency Planning, Despite the Clear Needs of this Population.**

While the particular needs and situations of the hundreds of thousands of individuals with disabilities in the event of an emergency will no doubt vary, as do the emergency needs of people without disabilities, the declaration of Peter Blanck, who has extensive experience in the field of emergency planning for people with disabilities, sets out a number of elements that comprehensive emergency plans *must* contain in order for those plans, as a general matter, to be accessible to people with disabilities. Blanck Decl. at ¶¶17-25.  For example, emergency responders must be prepared to provide evacuation assistance to persons with disabilities, means of transportation that can accommodate evacuees with disabilities, shelter facilities that are physically accessible, and sufficient medications, medical equipment, electricity, and other emergency supplies for people required to stay in shelters. Blanck Decl. at ¶¶20-25.  These common emergency planning principles for people with disabilities are reinforced by federal guidance on this issue. *See, e.g.,* U.S. Department of Justice, ADA Best Practices Tool Kit for State and Local Governments *Chapter 7 Addendum 2:The ADA and Emergency Shelters: Access for All in Emergencies and Disasters* ("Chapter 7 Toolkit"), Exh. K to Parks Decl.; Federal Emergency Management Agency, Guidance on Planning for Integration of Functional Needs Support Services in General Population Shelters, Exh. L to Parks Decl.; *see also CALIF v. City of Los Angeles,* Order re Partial Summary Judgment at 3:8-4:6, Exh. C to Parks Decl. (identifying elements of emergency planning).

As demonstated below, even though these are essential elements of emergency planning for people with disabilities, they are not meaningfully incorporated into the City's emergency plans.

1.    **The City's Plans Have Significant Omissions Regarding the Specific Needs of People with Disabilities in Evacuation.**

For example, the City's plans have significant deficiencies in the context of evacuation. In particular, the City intends to rely heavily on public transportation in the event of evacuation. *See, e.g.,* Coastal Storm Evacuation Plan at CNY000130-CNY000138, Parks Decl. Exh. M ("During an evacuation, the City will work with transportation providers to maximize and optimize the use of trains, subways, and buses. Evacuees will use public transportation to travel to Evacuation Centers, friends, family, or hotels/motels within and outside the City, and to engage in storm-preparedness activities."); Belisle Depo. at 178:12-179:13, Exh. S to Parks Decl. (City relies mostly on public transportation, with some self-identification to 311 for individual help); and Area Evacuation Plan[1] at CNY007598, Exh. N to Parks Decl. ("Mass transit will be used to the greatest extent possible"); CNY007601 ("Public transportation, including the subways, commuter railroads, and city private and commuter buses, is the most effective means of transport for large numbers of evacuees."). However, there is not clear planning regarding persons with disabilities who are unable to access that transportation.[2]

Rather, the the City in its planning explicitly concedes that many of the facilities that will be relied on for evacuations are not accessible to people with mobility impairments. *See, e.g.,* Area Evacuation Plan at CNY007650-51 (identifying "Intermodal Hubs" for Manhattan, which are hubs for subway, rail, ferries and/or buses, and showing many that are not accessible to

---

[1] The City appears to be undertaking a revision of the Area Evacuation Plan, but no new version or draft version of this plan has been produced in this case.

[2] While the City does have what is referred to as the "Homebound Evacuation Plan," as part of its response to Coastal Storms, that plan is only operative when the City has significant advance warning of an emergency. *See* Villani Depo. at 14:20-15:20; and 63:7-64:18, Exh. O to Parks Decl. (no requirement for homebound assistance in Area Evacuation Plan), Exh. N to Parks Decl. Moreover, the Homebound Evacuation Plan has a number of serious flaws, including, but not limited to, that it will only take people to shelters, even when other residents have options to go elsewhere. *See* Villani Depo. at 19:14-20:14, Exh. O to Parks Decl. In Hurricane Irene, only 200 people were evacuated via this method although there was a mandatory evacuation call for 370,000 residents overall. *See* OEM 2011 report at "Hurricane Irene: Evacuation" and "Healthcare and Homebound Evacuation," Exh. I to Parks Decl.

people with disabilities). In fact, on an average day, public transportation in New York is exceptionally difficult to navigate for persons with disabilities. *See* Declarations of class members Curry, Raymond, Prentiss, Halbert and Morales (explaining difficulty of locating and using accessible public transportation in New York). Indeed, there is clear documentation that more than 98% of Taxis and 80% of subway stations are inaccessible to people with disabilities. *See, e.g., Noel v. New York City Taxi and Limosine Com'n*, 687 F.3d 63, 66 (2d Cir. 2012) (finding that 98.2% of medallion taxis in New York City are inaccessible to persons in wheelchairs); www.MTA.info "Facts and Figures," Exh. P to Parks Decl. (stating that there are 468 subway stations in New York); and www.MTA.info "Accessibility," List of Accessible Subway Stations, Exh. P to Parks Decl. (showing 77 accessible stations). In light of the public transportation challenges already in place for people with disabilities, the population density in the City, and the reliance on mass transit for evacuation purposes, the failure to plan for people with disabilities in the context heavy reliance on public transportation in evacuation makes this population particularly vulnerable. *See* Blanck Decl. at ¶¶31-32.

        **2.**     **The City Has Major Gaps in Evacuation of People with Disabilities from High Rises.**

The City has no plan for the evacuation from high rise buildings for people with disabilities. *See* Villani Deposition at 54:12-20, Exh. O to Parks Decl. This is despite the fact that New York, which has the largest number and highest percentage of high rise buildings in America, is a city of multi-story buildings, that are heavily reliant on the use of elevators. Indeed, the only apparent information regarding this issue provided to people with disabilities in the event of an emergency is: "Do NOT use an elevator during a fire or other emergency unless directed to do so by emergency personnel." *See* "Ready New York for Seniors and People with Disabilities" at CNY 000040, Exh. Q to Parks Decl. However, no information is provided as to what someone who uses a wheelchair or scooter or walker, or who has a heart condition is supposed to do instead of using the elevator in a multi-story building. This presents a life or

death issue. Absent a plan for evacuation from high rises, it will be difficult for the City to be able to help people with disabilities out of buildings, especially in the event of a large scale evacuation. *See* Blanck Decl. at ¶¶30; *cf.* "Unsafe Refuge: Why did so many wheelchair users die Sept. 11?" *New Mobility Magazine*, December 2001, Exh. C to Blanck Decl.; and "A Day to Remember," *New Mobility Magazine*, November 2001, Exh. D to Blanck Decl.

### 3.    Significant Elements of the Emergency Shelter System Are Inaccessible to People with Disabilities.

The City has also failed to ensure that its shelter system is accessible to people with disabilities. For example, in the Coastal Storm setting, the City has differentiated between what it refers to as general shelters and "special medical needs shelters."[3] *See* Coastal Storm Sheltering Plan, at CNY000360, Exh. J to Parks Decl.  Despite the fact that there are only eight special medical needs shelters in the City, and that not all people with disabilities are anticipated to go to special medical needs shelters, the City has only stockpiled disability related supplies for use at special needs shelters. *See* Deposition of Maniotis at 95:3-96:14 and 98:7-99:20, Exh. R to Parks Decl.; and Coastal Storm Sheltering Plan, at CNY000360, Exh. J to Parks Decl. In other words, critical disability related supplies, such as accessible cots and medication kits, are not stockpiled for use at general shelters, even though the City fully anticipates that people with disabilities will be sent to those shelters.  In fact, the City specifically tells people with disabilities *not* to expect to be provided with such items at shelters and to bring their own, even though such an expectation in an emergency is unrealistic. *See* "Ready New York for Seniors and People with Disabilities" at CNY000041 ("Shelters DO NOT have special equipment (e.g., oxygen, mobility

---

[3] The concept of differentiating between special needs and general shelters for people with disabilities who do not require hospitalization or nursing home care is disfavored, as it leads to problems with service delivery and maintenance of family unification, and generally violates the mandate to provide integrated services as set forth in the Americans with Disabilities Act. *See* Chapter 7 Toolkit at Section C ("To comply with the ADA's integration requirement, emergency managers and shelter operators need to plan to house people with a variety of disabilities in mainstream mass care shelters, including those with disability related needs for some medical care, medication, equipment, and supportive services."), Exh. K to Parks Decl.; and 28 C.F.R. §35.130(d) ("A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.").

aids, batteries). Be prepared to bring your own."); Maniotis Depo. at 99:16-20, Exh. R to Parks Decl. (City's policy is that people bring their own medications with them at Coastal Storm general shelters); and Blanck Decl. ¶35.

In addition, many of the coastal storm shelters are physically inaccessible to people with disabilities.  However, the City does not know which shelters are accessible and does not make that information available to the public.  *See* Maniotis Depo. at 88:6-12 (not all shelters accessible, but cannot state percentage that are accessible), Exh. R to Parks Decl. Although the City supposedly surveyed these shelters, emergency officials from OEM – including OEM's Special Needs Outreach Coordinator – cannot describe what the surveys mean, or the implications of the scores.  *See* Deposition of Aaron Belisle, OEM "Special Needs Outreach Coordinator," Exh. S to Parks Decl. at 79:8-22 (stating that he cannot speak to the accuracy of the information in the coastal storm shelter surveys); and 195:5-199:9 (that accessibility scores in surveys do not show, for example, whether the bathroom at the shelter is accessible); Wasserman Decl. at ¶10 (OEM Special Needs Coordinator told him during Hurricane Irene that he did not know which shelters were accessible).

As a result, many of the shelters that the City claimed were accessible during Hurricane Irene, are not, in fact, accessible.  Moreover, many shelters crafted ad hoc attempts at accessibility that would actually be dangerous to people with disabilities.  *See* Dooha Decl. at ¶28, and Exh. A (photos of dangerous ramp at entrance to Newcomer School); and City Survey of Newcomer High School, Exh. T to Parks Decl. (survey indicating shelter has alternative accessible entrance). Moreover, other shelters, such as "refuges of last resort," have not been surveyed, and accessibility for people with disabilities is not even a criteria for their use. *See* Belisle Depo. at 202:11-203:6, Exh. S to Parks Decl.; and McKinney Depo. at 127:11-16, Exh. U to Parks Decl.

**4.      The City Does Not Adequately Address the Needs of People with Disabilities in the Anticipated Period of No Assistance After Disasters.**

Finally, the City has developed its plans on the assumption that New Yorkers will need to survive for three days without assistance after a major emergency. *See* "Ready New York," at CNY000033, Exh. Q to Parks Decl. ("Every New Yorker should plan to be self-sufficient for several days."); and Belisle Depo. at 203:7-21, Exh. S to Parks Decl. (City's working assumption is that it would be three days before people could realistically expect assistance). This assumption is life threatening for many people with disabilities. Many people with disabilities, even those prepared for an emergency, may need assistance sooner than the three day period. *See, e.g.,* Declaration of Raymond; and Blanck Decl. ¶36. However, the City's plans fail to effectively articulate the City's response to this need.

While not exhaustive, the above demonstrate the types of systemic failures in the City's emergency plans.

**D.      The Class Is Suffering Direct and Ongoing Harm as a Result of These Failures.**

The named plaintiffs, as well as members of the proposed class, have suffered and continue to suffer direct harm because of Defendants' failure to include the needs of people with disabilities in their emergency planning. For example, Plaintiff CIDNY has expended resources to advocate for its constituents who are not served by existing City emergency plans, and the organization must also provide direct assistance to those constituents when disaster strikes and Defendants fail to assist them. Dooha Decl. ¶25-31.

Class members have stated that they have needs for physical access, accommodations and services in the case of an emergency, including such things as accessible shelters, assistance in evacuating, accessible transportation, and access to medication and electricity in the event of removal from their homes, none of which is accounted for in the City's plans. *See, e.g.,* Declarations of Morales, Prentiss, Halbert, Raymond, Ryan, Curry, Buckner, Ellenhorn. These

class members have stated that they do not know how they would receive these critical items, services, or accomodations, and are worried about the ability of the City to serve their needs in case of a major emergency. *See, e.g.*, Declarations of Bell, Morales, Conner, Prentiss, Ryan, Raymond. This creates a current risk for class members in that disaster can strike at any time. These needs and the lack of preparedness for them creates a real risk on a daily basis for each of these individuals. Class members underscore their fear and apprehension regarding the increased risk they face on a daily basis.  As Plaintiff Tania Morales explains, "I am extremely worried about what I would happen to me if a strong hurricane, fire, terrorist attack, or power outage, struck New York City. I am extremely worried that my needs as a person with a disability would not be met. Morales Decl. at ¶12. Similarly, Class member Raymond shares:

> Under normal circumstances, I have constructed my existence to meet my personal needs, every single day. In the event of an emergency, all of that would be turned upside down, and I do not have any idea what to do or where to go to continue getting the accommodations and services that I need because of my disability. When I think about these things, they concern me enough to keep me up at night.

Raymond Decl. at ¶17; *see also* Buckner Decl. at ¶15 ("I am also really concerned about being sure that I have the assistance of someone by my side to help me navigate dangerous and chaotic situations that emergencies cause, regardless of the type of emergency. I am not sure where I would get this assistance, and that really scares me.").  Such statements underscore how present this issue is on a daily basis for class members in this case.

## III.    LEGAL ARGUMENT

### A.    The Proposed Class is Designed Purely For Injunctive Relief In This Case Challenging Defendants' Failure to Plan for People with Disabilities.

Plaintiffs seek an order and judgment enjoining Defendants from violating the Americans

with Disabilities Act, Section 504 of the Rehabilitation Act, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101, and requiring Defendants to develop and implement an emergency preparedness plan that addresses the emergency needs of people with disabilities. As such, Plaintiffs move to certify a class under Fed. R. Civ. P. 23(a) and 23(b)(2) consisting of: All persons with disabilities in the City of New York who have been and are being denied the benefits and advantages of New York City's emergency preparedness program because of Mayor Bloomberg and New York City's continuing failure to address the unique need of this population in the City's emergency planning and preparations.  Plaintiffs seek only injunctive and declaratory relief on behalf of the class. There is no claim for damages.

In light of the nature of the claims in this matter, the proposed class meets all of the requirements of Rule 23, and is the most efficient and manageable method for addressing the deficiencies in the City's emergencing planning. Indeed, the matter against the City of Los Angeles addressing its emergencing planning resulted in class wide-relief from the Court. *See CALIF v. City of Los Angeles*, Case No. CV 09-0287 CBM (RZx), Order re Summary Judgment, and Order Granting Class Certification, Parks Decl., Exh. C. Similarly here, the failures of the City of New York in its emergency planning may be addressed on a class wide basis.

### B.    The Class Meets the Requirements of Rule 23.

Plaintiffs seek class certification to ensure that the requested relief extends to the group of people who are affected by the City's current lack of emergency preparedness planning for people with disabilities. In order to be certified as a class, plaintiffs must show that they meet the requirements of Rule 23(a) as well as one of the prongs of Rule 23(b).  Fed. R. Civ. P. 23.

Under Rule 23(a), class certification is proper if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a). In the Second Circuit, courts have also found an implied

requirement of ascertainability to the express requirements set forth in Rule 23(a). *See In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 305 (S.D.N.Y.2010) (citing *In re IPO*, 471 F.3d at 30).

In addition to meeting the requirements of Rule 23(a), the class must also be certifiable under one of three sub-provisions of Rule 23(b). Fed. R. Civ. P. 23(b); *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 614 (1997). Here, Plaintiffs seek certification under Rule 23(b)(2), pursuant to which class certification is proper if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

Class certification is appropriate where the proposed class meets, by a preponderance of the evidence following a court's "rigorous analysis," the requirements of Rule 23(a) and the proposed class constitutes one of the types of classes enumerated in Rule 23(b). *See Wal–Mart Stores, Inc. v. Dukes*, ––– U.S. ––––, 131 S.Ct. 2541, 2551–52 (2011); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Bombardier*, 546 F.3d at 202); *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 (2d Cir. 2008); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 29 (2d Cir. 2006); *Stinson v. City of New York*, --- F.R.D. ----, 2012 WL 1450553 at *6 (S.D.N.Y. 2012). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S.Ct. at 2551. However, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re IPO*, 471 F.3d at 41; *see also Stinson* at *6.

As set forth below, Plaintiffs satisfy all requirements of Rule 23(a) and the requirements of Rule 23(b)(2). As a result, this action should be certified as a class action.

C.    **The Class Meets All the Requirements of Rule 23(a).**

1.    **The Class Is So Numerous that Joinder Is Impracticable.**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 69–70 (S.D.N.Y.2009). "The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 504 F.3d 229, 244–45 (2d Cir. 2007); *see also In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 508 (S.D.N.Y. 1996). Classes with more than 40 members generally satisfy the numerosity requirement. *NYSE Specialists*, 260 F.R.D. at 70 (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995)); *see also In re Sadia*, 269 F.R.D. at 304 ("Sufficient numerosity can be presumed at a level of forty members or more.")); and 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §3:3 (4th ed. 2006) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.").

Here, Defendants' own published data as well as census data, general knowledge and common sense indicate that the size of the proposed class satisfies the numerosity requirement. Data shows there are nearly 900,000 people with disabilities living in the City of New York. *See* Blanck Decl. ¶15. Organizational Plaintiff CIDNY alone serves 14,000 consumers with disabilities in New York. Dooha Decl. ¶7. Courts often appropriately consider statistical and census data in determining whether the numerosity requirement has been met.  *See, e.g., Californians for Disability Rights, Inc. v. California Dep't of Transp.*, 249 F.R.D. 334, 347 (N.D. Cal. 2008) (certifying a class of individuals with mobility and vision disabilities challenging access barriers along pedestrian rights of way maintained by state department of transportation).

In determining "impracticability," the Second Circuit has looked to factors such as judicial economy and type of relief, where prospective injunctive relief involving future class

members favors class certification.  *See, e.g., Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). As the Second Circuit explained in *Robidoux:*

> Relevant considerations include judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members... Many of these additional factors are present in this case.

These considerations certainly apply in the instant matter. The proposed class accordingly meets the numerosity requirement of Rule 23(a)(1).

### 2.    There Are Numerous Questions of Law and Fact Common to the Class.

Rule 23(a)(2) requires that there exist "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality requirement is met if plaintiffs' grievances share a common question of law or fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir.1987)). "What matters ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S.Ct. at 2551 (citation omitted).  However, "[c]ommonality does not mandate that all class members make identical claims and arguments, only that common issues of fact or law affect all class members." *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y.1992) (citing *Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150, 153–54 (2d Cir.1983)). "A court may find a common issue of law even though there exists some factual variation among class members' specific grievances." *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 37 (E.D.N.Y. 2008) (citation omitted); *see also Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) ("Commonality does not mandate that all class members make identical claims and

arguments. When common questions do predominate, differences among the questions raised by individual members will not defeat commonality.") (internal citations omitted).

Moreover, actions for injunctive relief are generally considered to present common questions. *See Baby Neal for and by Kanter v. Casey,* 43 F.3d 48, 57 (3rd Cir. 1994) ("[B]ecause they do not also involve an individualized inquiry for the determination of damage awards, injunctive actions by their very nature often present common questions satisfying Rule 23(a)(2).") (*quoting* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1763, at 247 (2d ed. 1986)); *see also Armstrong v. Davis,* 275 F.3d 849, 868 (9th Cir. 2001) ("commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."); *Disability Rights Council of Greater Washington v. WMATA*, 239 F.R.D. 9, 26 (D.D.C. 2007) (citing 7AA Charles A. Wright *et al.*, Federal Practice and Procedure § 1762, at 176 (3d ed. 2005 & Supp. 2010) (Class actions that seek class-wide injunctive or declaratory relief "by their very nature present common questions of law and fact."); *Arnold v. United Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994) (commonality requirement is "met by the alleged existence of common discriminatory practices").

Here, this action is a quintessential civil rights class action for injunctive relief, in that it revolves around the City's illegal system-wide policies and practices, and system-wide failures to take necessary action, which affect all class members similarly.  This is an action based solely on Defendants' actions, not Plaintiffs' individual circumstances. Plaintiffs' claims all stem from a common set of facts.  As explained in *Raymond v. Rowland,* a case challenging the failure to provide accommodations by the state Department of Social Services, "[t]he Court finds that the question of reasonable accommodations is common to the class as defined here since Plaintiffs are challenging acts and omissions of DSS that are not specific to any particular Plaintiff." *Raymond v. Rowland*, 220 F.R.D. 173, 180 (D.Conn. 2004) (citing *Henrietta D. v. Giuliani*, 1996 WL 633382, *14 (E.D.N.Y. Oct. 25, 1996) ("While the details of each individual plaintiff's

alleged injury may vary, the predominant issues of fact and law include plaintiffs' disability, defendants' alleged reduction of [services] and the alleged resulting denial of meaningful and timely access to public assistance offered by New York City. Plaintiffs therefore satisfy Rule 23(a)(2)'s commonality requirement.")).

Similarly here, the determination of the City's liability will turn on whether the City's systemic inactions and actions, including inadequate policies, are sufficient to satisfy their obligations under applicable law.  That inquiry will involve numerous questions of both law and fact that are common to the class, and thus better answered in a single class action, rather than in a multitude of individual suits addressing the very same questions.

The commonality of the legal issues raised is readily apparent from Plaintiffs' Complaint, which outlines a number of causes of action based on the City's alleged violations of various state and federal anti-discrimination provisions.  Plaintiffs contend that Defendants have violated these non-discrimination laws by failing to make adequate provisions in their emergency planning for individuals with disabilities.  The class members, because they are qualified individuals with disabilities, have been harmed by these planning failures. Consequently, these same questions exist for the prospective class as a whole, including the common questions of whether Defendants are violating Title II of the ADA, 42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq., by failing to make their programs, services and activities accessible to and useable by persons with disabilities, and otherwise discriminating against persons with disabilities, as set forth above.

Further common questions include whether the City's emergency plans exclude people with disabilities, discriminate against people with disabilities, and/or deny people with disabilities the benefits of those plans, including whether these plans account for the needs of people with disabilities with respect to communication, evacuation, transportation, and shelters.

Moreover, the records, expert testimony and other evidence documenting the state of Defendants' existing emergency plans are the same across the class as a whole.  In short, the

facts that will establish whether the City is liable to the class as a whole are the same facts that would be raised in individual class member suits.

That the class in this case includes people with various disabilities, or that there may be some issues which affect one subgroup more than the other, does not defeat commonality. *Cf Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992) ("The fact that there is some factual variation among the class grievances will not defeat a class action … a common nucleus of operative fact is usually enough to satisfy the commonality requirement.").  The Court in the Central District of California, in addressing this same issue in Los Angeles, articulated the standards for emergency planning and conducted the legal analsysis on a class-wide basis. *See CALIF* Class Certification Order*, Case No. CV 09-0287 CBM (RZx), Exh. B to Parks Decl. That matter was ultimately resolved on a class wide basis.  *See CALIF* Summary Judgment Order, Exh. C to Parks Decl.

Many other courts have certified cross-disability classes in similarly appropriate circumstances. S*ee, e.g., Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004) (certifying class consisting of: "All present and future recipients of the Medicaid program: (a) who reside in the County of Los Angeles; (b) who have or will have disabilities; and (c) who, because of their disabilities[,] need or will need inpatient and/or outpatient rehabilitative and other medical services that are currently provided at [the hospital]"); *Lovely H. v. Eggleston*, 235 F.R.D. 248, 254 (S.D.N.Y. 2006) (certifying class of "[r]ecipients of public assistance, Food Stamps and/or Medicaid in New York City who have a physical, mental or medical impairment within the meaning of the New York State Human Rights Law. . . and who have received or will receive a notice from HRA involuntarily transferring their case to one of three 'hub centers' in Manhattan, the Bronx or Brooklyn."); *Raymond v. Rowland*, 220 F.R.D. 173 (D.Conn. 2004) (certifying class of "all disabled individuals who are or will be eligible for subsistence benefits through AABD, TFA, SAGA, Food Stamps, or Medicaid programs, who require reasonable accommodation to obtain and maintain essential services and benefits from Defendant DSS, and

whose meaningful access to such subsistence benefits has been or is being denied or effectively limited by DSS."); *cf. Pottinger v. Miami*, 720 F. Supp. 955, 958 (S.D. Fla. 1989) (certifying a class consisting of all those who are "involuntarily homeless" within a geographic area, stating the "status of the plaintiffs as homeless is a fact common to the class"); *Kincaid v. City of Fresno*, 244 F.R.D. 597, 601 (E.D. Cal. 2007) (certifying class of "All persons in the City of Fresno who were or are homeless, without residence, after October 17, 2003, and whose personal belongings have been unlawfully taken and destroyed a sweep, raid, or clean up by any of the Defendants").

### 3.    The Named Plaintiffs' Claims Are Typical of the Class.

Under Rule 23(a)(3), class certification is proper when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 1138, 291 (2d Cir. 1993). When the same unlawful conduct is directed at or affects both the named plaintiffs and the prospective class, typicality is usually met. *See Robidoux*, 987 F.2d at 936–37; *see also Robinson v. Metro–N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir.2001) (the typicality requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.")..

A finding of commonality frequently supports a finding of typicality. *See Gen'l Telephone. Company of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982) (noting how the commonality and typicality requirements "merge"). Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Lovely H.*, 235 F.R.D. at 256. Moreover,when discrimination is alleged, it is sufficient that the named plaintiffs have suffered the same type and manner of injury from the same allegedly discriminatory practice as the other

members of the class. *See, e.g., Baby Neal v. Casey*, 43 F.3d 48, 58 (3rd Cir. 1994) ("cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims").

In this case, the named Plaintiffs have alleged that they suffered and will suffer the same type of harm as members of the class, caused by the same system-wide failures of the City's lack of emergency preparedness planning for people with disabilities, and the named Plaintiffs' claims and class claims are based on the same legal theories. Like the members of the class, the named Plaintiffs allege that they have been directly harmed by the City's failure to include people with disabilities in their emergency planning. This harm takes the form of fear and anxiety, as well as elevated risk of suffering death or injury when the next emergency strikes New York.

Case law is clear that Plaintiffs have standing to bring these claims and do not have to wait for serious bodily harm or death to have standing. The kind of risk that the Plaintiffs and the class have here is sufficient to confer standing in this matter.[4] *See, e.g., Hargrave v. Vermont*, 340 F.3d 27, 34 (2d Cir. 2003) (threat posed by the state law's establishment of means to override durable powers of attorney for health care to allow involuntary medication would be enforced against persons diagnosed with mental illness was sufficient injury-in-fact to support standing); *Baur v. Veneman*, 352 F.3d 625, 632-37 (2d Cir. 2003) (holding that in the context of food and drug safety suits, enhanced risk qualifies as sufficient injury to confer standing); *Harris*

---

[4] Moreover, the two organizational Plaintiffs here have the requisite standing to proceed in this action. *See* Dooha Decl. at ¶¶5-31 and Peters Decl. at ¶¶7-31. The organizational Plaintiffs clearly meet the test outlined in the recent *Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc.*, 2012 U.S. App. LEXIS 6984 (2d Cir. Apr. 6 2012)("DAI"), as well as other applicable laws. Second, the organizational plaintiffs have direct standing. Such direct standing is a result of their work and resources expended on emergency preparatory issues, including counseling individuals with disabilities on where to seek assistance during emergencies, how to handle emergencies, and in attempting to serve people during emergencies. *See* Dooha Decl. at ¶5-31 and Peters Decl. at ¶¶24-31; and *Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) (only a "perceptible impairment" of an organization's activities is necessary for there to be an "injury in fact."); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir.1993).

*v. Bd. of Supervisors, Los Angeles County*, 366 F.3d 754, 761-62 (9th Cir. 2004) (holding that threatened harm to patients' health as a result of planned cutbacks in hospital and medical services was sufficient to establish injury in fact); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 150-51 (4th Cir. 2000) (en banc) (property owner had standing to sue when his lake was in the path of the defendant's toxic chemical discharge, and had reasonable fear that the water in which he swam and fished would become contaminated); *Dimarzo v. Cahill*, 575 F.2d 15, 18 (1st Cir. 1978) (noting in the context of a challenge to hazardous fire conditions "One need not wait for the conflagration before concluding that a real and present threat exists."); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 643 F.Supp.2d 446, 458 n. 77 (S.D.N.Y. 2009) (current threat of harm sufficient for standing).

The named Plaintiffs' individual claims and the class claims in this case are brought under the same laws and share the very same legal theories, and the relief that Plaintiffs seek – declaratory relief and injunctive relief requiring the City to address the various system-wide failures – is class-wide.

### 4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The adequacy of representation inquiry under Rule 23(a) considers "whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir.2000); *see also NYSE Specialists*, 260 F.R.D. at 73.  Adequate representation is usually presumed in the absence of contrary evidence.  *See* 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §7:24, 78.  In order to defeat class certification, there must be "a showing of a genuine conflict" between the proposed class representative's interests and those of the other members of the class, *In re Drexel*, 960 F.2d at 291, and "only a conflict that goes to the very subject matter of the

litigation will defeat a party's claim of representative status." *Hirschfeld v. Stone*, 193 F.R.D. 175, 183 (S.D.N.Y. 2000).

As set forth in declarations submitted herewith, the individual class representatives are deeply committed to improving access for persons with disabilities and are ready, willing and able to act as effective advocates for the class in this case. *See* Declarations of Dooha, Peters, Bell and Morales. Similarly, organizational Plaintiffs CIDNY and BCID have worked hard for many years to improve access for persons with disabilities, and are fully prepared to vigorously represent both its clients and the class in this case. *See* Declarations of Dooha and Peters. Moreover, there is no conflict between the interests of the class representatives and those of the other members of the class.

Plaintiffs have likewise chosen accomplished counsel who are recognized experts in class action litigation and the protection of the rights of persons with disabilities. Plaintiffs' counsel here is highly qualified and experienced, and their resources are more than adequate to represent the class completely. *See* Declarations of Parks and Daniel Brown. Disability Rights Advocates has been counsel in numerous class action lawsuits involving persons with disabilities, has obtained verdicts and settlements that have benefited large groups of persons with disabilities, and has extensive experience representing individuals with disabilities in class action and systemic reform litigation. DRA's attorneys are the experts in the nation litigating the question of emergency preparedness for people with disabilities, and successfully handled the only case in the nation that has been litigated to date on this matter, *CALIF v. City of Los Angeles.* Parks Decl. at ¶8. Sheppard Mullin is a well respected major law firm, with significant commitments to public interest cases of this nature. Thus, both the named Plaintiffs and their attorneys are well-qualified to litigate their claims against the City.

### D.    The Class Is Ascertainable.

Although not expressly stated in Rule 23, courts in the Second Circuit have found an implied requirement of ascertainability to the express requirements set forth in Rule 23(a). *See*

*Stinson* at *12-13; *In Re Sadia*, 269 F.R.D. at 305 (citing *In Re Ipo*, 471 F.3d at 30). As noted above, "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria." *In Re Fosamax Products Liability Litigation*, 248 F.R.D. 389, 395 (S.D.N.Y. 2008) (quoting *In Re Mtbe*, 209 F.R.D. at 337). Put another way, the ascertainability requirement means that "the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Casale v. Kelly*, 257 F.R.D. 396, 406 (SDNY 2009); *see also In Re Amaranth Natural Gas Commodities Litigation*, 269 F.R.D. 366, 376–77 (S.D.N.Y.2010) ("[t]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."). The standard for ascertainability "is not demanding." *Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *2, (E.D.N.Y. Apr. 9, 2010). "It is designed only to prevent the certification of a class whose membership is truly indeterminable." *Id.*  Here, members of the proposed class, while numerous, are certainly ascertainable.  The contours of the class are defined by the City's plans themselves, which cover all people in the City of New York. In light of the allegations in this case, all people with disabilities in the City of New York are subject to the plans failings in the disability context.

    **E.**    **The Conditions of Rule 23(b)(2) are Met.**

Plaintiffs seek to certify the class under Federal Rule of Civil Procedure 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). To certify a class seeking prospective declaratory or injunctive relief, Plaintiffs must show that Defendants "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). "Rule 23(b)(2) is designed to assist and is most commonly relied upon by litigants seeking institutional reform in the form of injunctive relief." *Marisol A. v. Giuliani*, 929

F.Supp. 662, 692 (S.D.N.Y. 1996), aff'd, 126 F.3d 372 (2d Cir. 1997). Class certification under Rule 23(b)(2) is particularly appropriate in civil rights litigation. *See Loper v. New York City Police Dep't*, 135 F.R.D. 81, 83 (S.D.N.Y.1991) ("Without class certification, their case—as its requested relief with respect to all similarly situated persons—could fail on technicality. Indeed, it is in part for concerns such as these that civil rights actions are paradigmatic 23(b)(2) class suits.").

The claims raised by Plaintiffs in this action are precisely the sorts of claims that Rule 23(b)(2) was intended to facilitate. "Rule 23(b)(2) class actions were designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons." 1966 Rules Advisory Committee Notes, 39 F.R.D. 69, 102 (1966); *see* 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* §4.11 (3rd ed., 1992); Wright, Miller & Kane, *Federal Practice & Procedure* Civil 2d, § 1775, p. 470 (1986).

Indeed, suits brought to vindicate these types of rights are exactly the types of suits for which Rule 23(b)(2) was designed. *See Comer v. Cisneros*, 37 F.3d. 775, 796 (2d Cir. 1994) (race discrimination case); *Arnold*, 158 F.R.D. at 452 (disability discrimination case). "[D]iscrimination cases for injunctions against state or local officials are the 'paradigm' of [Rule 23(b)(2)] cases." *Comer*, 37 F.3d. at 796; *see also Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997); *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983) ("Subsection (b)(2) was 'intended primarily to facilitate civil rights class actions, where the class representatives sought broad injunctive relief against discriminatory practices.'") (citation omitted); *Walters v. Reno*, 145 F.3d, 1032, 1047 (9th Cir. 1998); Advisory Committee Notes to Rule 23(b)(2).

Here, Plaintiffs' claims in this case are brought on behalf of a large class, and stem from deficiencies with the City's policies and practices that apply to the entire class. Finally,

Plaintiffs in this case only seek class-wide injunctive and declaratory relief to address such deficiencies, and do not seek any damages.  Certification under Rule 23(b)(2) is thus proper.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the class set forth in the Notice of Motion, appoint Plaintiffs as the class representatives, and appoint Disability Rights Advocates and Sheppard Mullin Richter & Hampton LLP as class counsel.

Dated: New York, NY          By: _____/s/_____
                                       Shawna L. Parks
August 31, 2012                        Attorneys for Plaintiffs

                             DISABILITY RIGHTS ADVOCATES
                             JULIA PINOVER (JMP333)
                             Disability Rights Advocates
                             40 Worth Street, 10th Floor
                             New York, NY 10013
                             Telephone:    (212) 644-8644
                             Facsimile:    (212) 644-8636
                             Email:        general@dralegal.org

                             SID WOLINSKY (CA Bar No. 33716)*
                             SHAWNA L. PARKS (CA Bar No. 208301)*
                             REBECCA S. WILLIFORD (CA Bar No. 269977)*
                             Disability Rights Advocates
                             2001 Center Street, Fourth Floor
                             Berkeley, CA  94704
                             Telephone:    (510) 665-8644
                             Facsimile:    (510) 665-8511
                             TTY:          (510) 665-8716
                             Email:        general@dralegal.org

                             *Admitted *pro hac vice*

                             SHEPPARD MULLIN RICHTER & HAMPTON LLP
                             Daniel L. Brown
                             Paul Garrity
                             30 Rockefeller Plaza
                             New York, NY  10112
                             Telephone: 212-653-8700
                             Facsimile: 212-653-8701

                             Attorneys for Plaintiffs