UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, a nonprofit organization, CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK, a nonprofit organization, GREGORY BELL, an individual, and TANIA MORALES, an individual, <br><br>                Plaintiffs, <br><br> -against- <br><br> MICHAEL R. BLOOMBERG, in his official capacity as Mayor of the City of New York, and the CITY OF NEW YORK, <br><br>                Defendants. | No. 11-cv-6690 (JMF) |

## PLAINTIFFS' MEMORANDUM OF FACT AND LAW

SHEPPARD MULLIN RICHTER &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY  10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701
Paul Garrity
Daniel L. Brown
Valentina Shenderovich

DISABILITY RIGHTS ADVOCATES
40 Worth Street, Tenth Floor
New York, NY 10113
Tel:  (212) 644-8644
Fax:  (212) 644-8636
TTY:  (877) 603-4579
Shawna L. Parks
Sid Wolinsky
Julia M. Pinover
Rebecca S. Williford

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I. Introduction ........................................................................................................ 1

II. The City Has An Affirmative Duty Under Applicable Law To Address The
    Needs Of People With Disabilities In Disaster Planning To Ensure That
    People With Disabilities Have Meaningful Access To The Benefit Of The
    City's Plans And Programs. ....................................................................................3

III. Major Deficiencies In The City's Disaster Plans Jeopardize The Health,
    Safety And Lives Of Disabled People In Emergencies. ......................................6

    A.    With The Exception Of The Very Limited Homebound Evacuation
        Operation, The City Has No Plan To Assist Large Numbers Of
        People With Disabilities To Escape From The Thousands Of
        Multi-Story Buildings In New York. ...................................................... 7

    B.    The City Has Failed To Address The Evacuation And
        Transportation Needs Of People With Disabilities.................................. 9

    C.    The City Has Failed To Provide A Sheltering System That Is
        Accessible To People With Disabilities, Or That Provides Needed
        Supplies And Services. ......................................................................... 10

        1.    The City Has Failed To Provide An Accessible Emergency
            Sheltering System. .................................................................. 11

        2.    The City Does Not Plan For Essential Disability Supplies
            At Shelters............................................................................... 12

    D.    The City's Power Outage Plans Neglect Vulnerable People With
        Disabilities. ......................................................................................... 13

    E.    The City Does Not Address The Unique Needs Of People With
        Disabilities For The Time In A Disaster During Which People Are
        On Their Own To Survive Without Assistance From The City; The
        Fallacy Of "Sheltering In Place".......................................................... 15

        1.    The City Fails To Account For The Reality That Many
            People With Disabilities Face When They Are Forced To
            Try To Survive On Their Own.................................................. 15

        2.    The City's Plans Ignored The Unique Needs Of Thousands
            Of New York City Housing Authority Tenants With
            Disabilities Who Were Trapped In Their Apartments With
            No Power, Water, Or Heat During And After Sandy. ............... 15

i

F.      The City's Communication Systems Are Under-Resourced, Have
        Not Been Assessed For Capacity, And Fail To Communicate
        Essential Information To People With Disabilities. .............................................. 16

        1.      The City's Disaster Notification Does Not Give People
                With Disabilities The Necessary Information And Actually
                Deters Them From Seeking Assistance. ................................................... 16

        2.      The City's Misplaced Reliance On Services, Including 311
                And 911, Without Adequate Resources Or Guidance,
                Further Jeopardizes The Life, Health, And Safety Of
                People With Disabilities Who Need Assistance. ...................................... 17

        3.      The City Fails To Ensure That Communication Is Provided
                In Accessible Formats. ............................................................................. 19

        G.      The City's Recovery Plans Fail To Provide For People With
                Disabilities. ......................................................................................... 19

IV. The City's Plans For People With Disabilities Are Characterized By Failures
    To Plan In Advance, To Coordinate The Work Of Multiple Agencies, And To
    Designate Clear Decisionmakers On Disability Issues .................................................. 20

        A.      The City Fails To Effectively Pre-Plan, And Instead Engages In
                Hasty And Improvised Action After The Disaster Strikes. ................................. 20

        B.      The City's Emergency Planning For People With Disabilities
                Lacks Effective Coordination Among The Multiple Agencies And
                Bureaucracies Involved. ............................................................................. 21

        C.      The City Has No Central Person Or Persons Assigned
                Responsibility For Planning For Or Responding To The Unique
                Needs Of People With Disabilities In Disasters. ................................................... 21

V. The City's After-The-Fact Rationalizations Are No Excuses For Having Failed
   To Properly Plan In Advance. .................................................................................. 23

VI. Remedy ............................................................................................................. 24

VII. Conclusion ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Choate*,
    469 U.S. 287 (1985).................................................................................. 4

*Barden v. Sacramento*,
    292 F.3d 1073 (9th Cir. 2002) .................................................................. 4

*CALIF v. City of Los Angeles*,
    Case No. CV 09-0287 CBM (RZx), 2011 WL 4595993 ........................... 6

*Civic Ass'n of the Deaf of New York City, Inc. v. City of New York*,
    No. 95 Civ. 8591, 2011 WL 5995182 (S.D.N.Y. Nov. 29, 2011) ............. 4

*Henrietta D. v. Bloomberg*,
    331 F.3d 261 (2d Cir. 2003) .............................................................. 3, 4, 5

*Innovative Health Systems, Inc. v. City of White Plains*,
    117 F.3d 37 (2d Cir. 1997) superceded on other grounds *Zervos v. Verizon
    N.Y., Inc.,* 252 F.3d 163, 171 n. 7 (2d Cir.2001) .................................... 4

*Johnson v. Saline*,
    151 F.3d 564 (6th Cir. 1998) .................................................................... 4

*McGary v. City of Portland*,
    386 F.3d 1259 (9th Cir. 2004) .................................................................. 5

*National Market Share, Inc. v. Sterling Nat. Bank*,
    392 F.3d 520 (2d Cir. 2004) ..................................................................... 4

*Olmstead v. Zimring*,
    527 U.S. 581 (1999).................................................................................. 5

**Statutes**

29 U.S.C. § 794(a) .......................................................................................... 3

29 U.S.C. § 794, *et seq.*................................................................................... 3

42 U.S.C. § 12131, *et seq.*............................................................................... 3

42 U.S.C. § 12132........................................................................................ 3, 4

**Regulations**

28 C.F.R. § 25.130(b)(1)(i).............................................................................. 6

28 C.F.R. § 25.130(b)(1)(ii) ........................................................................................... 6

28 C.F.R. § 35.150 ......................................................................................................... 6

28 C.F.R. § 35.151 ......................................................................................................... 6

28 C.F.R. § 35.160(a)(1) ................................................................................................ 6

28 C.F.R. § 35.130(b)(1)(iii) .......................................................................................... 6

28 C.F.R. Part 35 ........................................................................................................... 6

28 C.F.R. pt. 35, app A at 456 ....................................................................................... 4

**Other Authorities**

N.Y.C. Admin. Code §8-101 *et seq.* ............................................................................. 3

N.Y.C. Admin. Code§ 8-107(4)(a) ................................................................................ 3

I.    **Introduction**

This case addresses the failure of the City of New York ("City") to account for the unique needs of the City's nearly nine hundred thousand women, men and children with disabilities in its disaster preparedness plans. The City's plans have major deficiencies, each of which put the lives and health of these New Yorkers at immense risk. The gaps in the basic elements of disaster planning include the City's failure to plan effectively for people with disabilities in areas such as: (1) high-rise evacuation, (2) area/mass evacuation and transportation, (3) emergency shelters, (4) power outages, (5) the time after a disaster during which people are expected to survive on their own, (6) communication and notification, and (7) the recovery phase after a disaster. Among many other deficiencies, the City:

- Relies on largely inaccessible public transportation for major evacuations, without effective, alternative provisions for what people with disabilities are supposed to do when those modes of transportation are inaccessible or unavailable to them;

- Relies on a shelter system that is not accessible to people with disabilities. Among other things, the City does not know which of its shelters are physically accessible, fails to stockpile critical disability related supplies at general shelters (including such basic things as generators), and affirmatively tells people with disabilities in its messaging that their needs will not be met at shelters;

- Does not have plans for identifying and serving large numbers of people with disabilities trapped in their homes for extended periods of time due to power outages, and also has no specific plan for assisting the many people with disabilities who live and work in high rise buildings;

- Instructs people with disabilities to call an overwhelmed 311 system for assistance rather

-1-

than providing any clear information on how the City, or 311 will address disability related issues in major emergencies;

- Does not identify persons in the City with clear decisionmaking authority to ensure that the City's emergency plans adequately serve persons with disabilities.

Emergency planning requires each of the critical components of the plans to function together. Just as one or two defective links will break a chain, planning that neglects even some of the emergency needs of people with disabilities puts them in harms' way. The City, unfortunately, has neglected multiple components of disaster planning for this population.

Plaintiffs' case is about the City's defective planning; it is not just about Hurricane Sandy.  However, Sandy vividly demonstrated the many gaps in the City's plans for people with disabilities, as an untold number of men and women with disabilities suffered greatly and needlessly. People became prisoners in their own dark and unheated apartments, making it painfully clear that the City has no plan for how it will either (a) locate, (b) evacuate or (c) serve a wide variety of people with disabilities who are trapped in high-rise buildings when power goes out. The City abandoned public housing, with its high concentration of people with disabilities in high rise towers. Public transit was suspended within eight hours after the evacuation order, whereas paratransit stopped outbound trips less than one hour after the evacuation order.  People with disabilities, who the City instructed to call 311 and 911 for assistance, called for help and either could not get through or received no useful information. The City (and 311 operators) did not even know which emergency shelters were accessible to people with disabilities, and affirmatively told people with disabilities their needs would not be met at those shelters. The City did not begin a serious search for people trapped in their high rise apartments without heat, water, light, working toilets, or critical disability related supplies for ten

days. The City's plans contain no provisions for such searches – rather they were improvised, belatedly, in light of the massive unmet need in the City.

These consequences were foreseeable results of the major deficiencies in the City's planning – defects the City has been warned about for years. Moreover, what people with disabilities experienced during Sandy will be just the tip of the iceberg should a larger disaster occur, particularly one that is spontaneous and catastrophic in nature. The evidence will show that the City has failed – well before Sandy and continuing to this day – in its affirmative duty to provide meaningful access to its disaster preparedness plans for people with disabilities.

**II.** **The City Has An Affirmative Duty Under Applicable Law To Address The Needs Of People With Disabilities In Disaster Planning To Ensure That People With Disabilities Have Meaningful Access To The Benefit Of The City's Plans And Programs.**

Plaintiffs bring this action for declaratory and injunctive relief pursuant to Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq.,* Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.,* and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-101 *et seq.* Plaintiffs have a right under these statutes to meaningful access to government programs, activities, and services, and to receive the benefits afforded by public entities. *See* 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity"); 29 U.S.C. § 794(a); N.Y.C. Admin. Code§ 8-107(4)(a); *Henrietta D. v. Bloomberg,* 331 F.3d 261, 273 (2d Cir. 2003)

Plaintiffs state a claim under the ADA and Section 504 if they show: (1) they are "qualified individuals" with a disability; (2) that Defendants are subject to these laws; and (3) that plaintiffs were excluded from participation in or denied the benefits of the services,

programs, or activities of the public entity, or were subjected to discrimination by the entity. *See* 42 U.S.C. §12132; and *Henrietta D.*, 331 F.3d at 272.[1] There is no dispute as to the first and second prongs in this matter. Thus, the trial in this matter addresses the third prong.[2]

Regarding the third prong, a public entity discriminates on the basis of disability if it fails to provide *meaningful access* to its services, programs, or activities for persons with disabilities. *Henrietta D.*, 331 F.3d at 272. Under key precedent, public entities have a duty to ensure that individuals with disabilities are provided with "meaningful access to the benefit that the [entity] offers" and to this end "reasonable accommodations in the [entity's] program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see also Civic Ass'n of the Deaf of New York City, Inc. v. City of New York,* No. 95 Civ. 8591, 2011 WL 5995182, at *9 (S.D.N.Y. Nov. 29, 2011).

Here, the City is offering a governmental program – its emergency preparedness and planning program – which provides benefits, such as shelter and evacuation, to the general public to mitigate the effects of a disaster. The City has failed to properly address the needs of men, women and children with disabilities in myriad areas of these plans, including high-rise evacuation, evacuation and transportation, shelters, power outages, and others. These major planning gaps deny Plaintiffs the benefits of the City's emergency planning program. The lack of

---

[1] The standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). While in certain areas, such as housing and education, there may be differences between the two statutes, none of those differences are relevant to the instant action. The ADA applies to everything a public entity does. *See, e.g., Innovative Health,* 117 F.3d, at 45 n. 8 citing 28 C.F.R. pt. 35, app A at 456 (1996); *see also Johnson v. Saline,* 151 F.3d 564, 569 (6th Cir. 1998); *Barden v. Sacramento*, 292 F.3d 1073 (9th Cir. 2002). Thus, the City's emergency planning and preparedness are covered activities.

[2] Notably, Defendants have not pled the available affirmative defenses in this matter of undue burden or fundamental alteration, and thus have waived those defenses. *See* Def's Answer to Amended Complaint, Filed 7/16/12 (Dckt. No. 33); and *National Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 526 (2d Cir. 2004).

critical centralized emergency plans for people with disabilities places them at risk for damage to their health, catastrophic injury or death. Persons with disabilities cannot derive the same benefits as others from the program in its current form because of their unique needs and the City's failure to address those needs.

Importantly, Plaintiffs need not identify a "comparison class" of "similarly situated individuals given preferential treatment" to bring a case under this theory. *Henrietta D.* at 273; *see also McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004) (*citing Olmstead v. Zimring*, 527 U.S. 581, 598 (1999)). Moreover, Plaintiffs need not show that the City provides certain accommodations to the general public. *See Henrietta D.* at 283.

Rather, Plaintiffs need only demonstrate that the City failed to take the affirmative steps needed to ensure meaningful access to its emergency planning and preparedness program for people with disabilities. For example, Aaron Belisle, the "special needs" coordinator for the City's Office of Emergency Management ("OEM"), will testify that disaster plans are based on an assumption of an initial 72-hour period during which residents will not receive any government help and must fend for themselves.[3] If the Court were to conclude that the City does not provide for other residents when they are on their own in the period after a disaster strikes, the City would still have an obligation, under these statutes, to provide assistance to persons with disabilities. Without taking affirmative actions, such identifying and serving people with disabilities in need of assistance, New Yorkers with disabilities cannot derive meaningful access to the benefit – namely a chance at survival – during this "on your own" period.

The U.S. Department of Justice ("DOJ") regulations implementing the ADA further

---

[3] Notably, after Hurricane Sandy this period was much longer for many people in the City. *See infra* Section III.E.

illustrate the types of discrimination prohibited in this matter. *See generally* 28 C.F.R. Part 35. The DOJ regulations broadly prohibit public entities from discriminating in *any* activity in which they engage. Thus, a public entity may not "directly or through contractual, licensing or other arrangements, on the basis of disability…[d]eny a qualified individual with a disability the opportunity to participate in or benefit from" the public entities program. 28 C.F.R. § 25.130(b)(1)(i). Likewise, a public entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 25.130(b)(1)(ii). Lastly, a public entity must take steps to provide qualified individuals with disabilities with "an equal opportunity to obtain the same results, [or] gain the same benefit . . . As that provided to others." 28 C.F.R. § 35.130(b)(1)(iii); *see also* 28 C.F.R. §§ 35.150, 151 (must ensure that physical barriers do not deny people with disabilities access to the program; and § 35.160(a)(1) (must ensure effective communication with people with disabilities). Under the plain meaning of these regulations public entities have an affirmative duty to ensure that individuals are not discriminated against due to any actions, whether direct, indirect, or via contract, taken by that public entity.

In a similar class action, the City of Los Angeles was found liable under these same statutes and regulations, due to deficiencies in its emergency planning for people with disabilities, resulting in the issuance of class wide-relief. *See CALIF v. City of Los Angeles*, Case No. CV 09-0287 CBM (RZx), 2011 WL 4595993, Order, Exh. 121. Here, the City of New York has failed in its emergency planning and likewise is in violation of these anti-discrimination laws, by failing to provide the benefit of its emergency planning to people with disabilities.

### III.   Major Deficiencies In The City's Disaster Plans Jeopardize The Health, Safety And Lives Of Disabled People In Emergencies.

The denial of the benefits at issue stems from numerous failures to address the specific

and well documented needs of people with disabilities in the City's emergency plans.

**A.**     **With The Exception Of The Very Limited Homebound Evacuation Operation, The City Has No Plan To Assist Large Numbers Of People With Disabilities To Escape From The Thousands Of Multi-Story Buildings In New York.**

New York, which has the largest number and highest percentage of high rise buildings in America, is a city of multi-story buildings that are heavily reliant on the use of elevators. Nevertheless, the City has admitted that it has no plan for the evacuation from high rise buildings for people with disabilities.[4] *See* Villani Deposition at 55:19-23 (NYFD FRCP 30(b)(6) designee not aware of plan that addresses high rise evacuations for people with disabilities in the City).

The City does not have written evacuation protocols, requirements for evacuation devices, or coordinated efforts to identify and help people with disabilities stranded in high-rise buildings during a disaster. As Mr. Belisle will testify, the City does not require evacuation devices in high-rises, despite the fact that evacuation chairs saved lives during 9/11.[5] *See* Blanck Decl. ¶¶63-69; Lessons Learned from the World Trade Center Disaster – Emergency Preparedness for People with Disabilities in New York, Sept. 9, 2004 at P000110, Exh. 140; Wasserman Decl. ¶¶2, 15-22; McKinney Depo. Vol. I at 87:15-24. The City has also failed to

---

[4] The City's "Homebound Evacuation Operation" is extremely limited. *See* CNY000139-146, Exh. 6. It is only used in emergencies for which there is advance notice. *See* Villani Depo. at 14:20-15:20; 63:7-64:18 (Plan anticipates advance notice, and no requirement for homebound assistance in Area Evacuation Plan). It also relies on 311 for individual requests for assistance, and is not reactivated after the triggering emergency event, such as a coastal storm, even if there is a need to help people evacuate who are stranded in the aftermath. *See* Manahan Depo. at 101:12-25. Moreover, this operation will only take people to shelters, even when nondisabled residents have options to go elsewhere. *See* Villani Depo. at 19:14-20:14. Finally, the City does not actually tell people about this plan. The program thus has had very limited impact historically. In Hurricane Irene, the City only evacuated 200 people via this method although the mandatory evacuation called for 370,000 residents to evacuate. *See* Office of Emergency Management 2011 report at "Hurricane Irene: Evacuation" and "Healthcare and Homebound Evacuation," P001946, Exh. 155.  In Hurricane Sandy, this program evacuated fewer than 100 people. *See* McKinney Depo. Vol. III at 18:12-16; Situation Report 10/29/12 0800 hrs, at CNY0022651, Exh. 79.

[5] Evacuation devices include a variety of life-saving chairs and other devices that are placed in or near stairwells and can help people who cannot walk down stairs to escape in an emergency.

establish a system so that someone in desperate need has a way to signal that they need help.

Importantly, the City has been warned about this issue of high rise evacuation for years, including explicit warnings from people like Marvin Wasserman, former Executive Director of BCID, who for many years tried to focus the City's attention on this issue. *See* Wasserman Decl. ¶¶2, 15-22. This concern was also highlighted at a City sponsored forum on emergency preparedness. *See* Emergency Preparedness Strategies for People with Special Needs: A Symposium - Lessons Learned, at CNY0001014, Exh. 49.

Unfortunately, these warnings went unheeded. The deficiencies in the City's planning were dramatically demonstrated during Sandy, many people with disabilities could not get evacuation assistance to get out of multi-story buildings. *See* Delarosa Decl. ¶¶64-70; Torres Decl. ¶¶61-66. In areas throughout Queens, Brooklyn, and Lower Manhattan, people were stranded, in some cases for over a week. *See* New York Times, "Housing Agency's Flaws Revealed By Storm," Dec. 9, 2012, Exh. 226; Miller Depo. at 35:4-5, 13-14, 16-24; 38:4-18; 54:10-24; 58:18-24; 134:9-21 (detailing experiences assisting stranded people with disabilities at multi-story building at 711 Seagirt in Queens).

Moreover, the City waited ten days after Sandy hit to conduct systemic door-to-door efforts with the National Guard to reach residents in high-rise buildings in Far Rockaway and Coney Island. *See* City Press Release, Nov. 9, 2012, Exh. 74; NYT: Housing Agency's Flaws, at P003515, Exh. 226 ("It was not until November 9…that Mr. Bloomberg announced a much more robust effort to reach out to tenants of buildings still without power and heat."); Situation Report 11/9/12 1530 hrs, at CNY22037, Exh. 95; Situation Report 11/6/12 1400 hrs, at CNY22960, Exh. 105. These door-to-door searches were *not* part of the City's planning pre-Sandy, but instead developed after the fact. *See* McKinney Depo. Vol. III at 22:4-17.

**B.      The City Has Failed To Address The Evacuation And Transportation Needs Of People With Disabilities.**

The City's own planning documents demonstrate that the City's plans for evacuation rely very heavily on public transportation in emergency evacuations. *See, e.g.,* Coastal Storm Evacuation Plan at CNY000111, Exh. 6 ("During an evacuation, the City will work with transportation providers to maximize and optimize the use of trains, subways, and buses. Evacuees will use public transportation to travel to Evacuation Centers, friends, family, or hotels/motels within and outside the City, and to engage in storm-preparedness activities."); Area Evacuation Plan[6] at CNY019244, Exh. 5 ("Mass transit will be used to the greatest extent possible"). This plan may work for residents without disabilities, but it is an invitation to catastrophe for persons with mobility, cognitive, or sensory disabilities.

The City concedes that many of its transportation assets are not accessible to people with mobility impairments. *See, e.g.,* Area Evacuation Plan at CNY019250-19251, Exh. 5 (identifying "Intermodal Hubs" for Manhattan, which are hubs for subway, rail, ferries and/or buses, and showing many that are not accessible to people with disabilities). In fact, public transportation in New York is exceptionally difficult to navigate for persons with disabilities. *See* Declarations of Morales at ¶¶2, 28-30, Buckner at ¶¶16-24, Conner at ¶¶ 15-17, Curry at ¶¶27-31, Ryan at ¶¶ 18-25, and Halbert at ¶¶ 14-19 (detailing difficulties on a daily basis of attempting to use public transit in New York with a disability). More than 98% of taxis and 80% of subway stations are inaccessible. *See, e.g., Noel v. New York City Taxi and Limousine Com'n*, 687 F.3d 63, 66 (2d Cir. 2012) (98.2% of taxis are inaccessible); *and compare* www.MTA.info "Facts and Figures"

_____

[6] While the City produced an updated draft of an Area Evacuation Plan, it is not in effect. *See* McKinney Vol. II Depo. at 64:10-65:6 (stating that the 2005 Area Evacuation Plan is currently in effect for the City). Even if it were to become effective, it is still vague and it does not adequately address the needs of people with disabilities. *See* Kailes Decl. fn. 1.

at P002126-2129, Exh. 157 *with* www.MTA.info "Accessibility," List of Accessible Subway

Stations at P002130-2137, Exh. 157 (showing only 77 of 468 subway stations are accessible).

There is no paratransit plan or detailed emergency transportation plan for the disability

community, with dangerous repercussions. *See* Kailes Decl. ¶44.  Mr. Belisle will testify that he

is not aware of any agreement with the paratransit provider regarding emergency response.

Hurricane Sandy underscored the failures of the City's evacuation plans when paratransit,

essential for people with disabilities, shut down almost simultaneously with the order for Zone A

to evacuate. This gave people who rely on this service limited chance to get out when ordered.[7]

*See, e.g.,* MTA Website, Oct. 28, 2012 at P003382, Exh. 160; "Disabled Riders Say Acces-A-

Ride Shutdown Stranded Them Before Sandy," NY1.com, Exh. 224.

The experiences of class members in this matter also demonstrate how the City's failure

to plan for accessible transportation played out in real-life as they were not able to get accessible

transportation to evacuate. *See* Martinez Decl. ¶¶33-35 (evacuation buses were too full for him to

get on); Torres Decl. ¶66 (could not find accessible transportation during Sandy).

**C.**     **The City Has Failed To Provide A Sheltering System That Is Accessible To People With Disabilities, Or That Provides Needed Supplies And Services.**

Providing shelters in a disaster is the core of any emergency program, as Mr. Belisle will

testify. Shelters are of even greater importance to people with disabilities, because many cannot

just depend on friends, family and neighbors, who may not have accessible homes or otherwise

may not be able to accommodate their needs. *See, e.g.,* Torres Decl. ¶¶24-26; Delarosa Decl.

---

[7] Instead, the City could have made arrangements with paratransit to continue operations during the evacuation period. If that were not possible, the City should have provided for alternate modes of transportation to provide equivalent resources to what paratransit provided. This could have included pre-planning and agreements with private vendors. *See* Kailes Decl. at ¶43. However, the City cannot both rely on paratransit for evacuation and  not have taken the steps it needs to in order to ensure paratransit will be able to provide those services.

¶¶27-28, Dooha Decl. ¶38. New York City has more than 1,000 potential shelter sites, primarily located in public schools, which unfortunately, are generally not physically accessible to people with disabilities. Incredibly, despite prior representations that shelters are accessible, the City does not even know which of its shelters have accessible features such as restrooms and entrances, and provides limited, inaccurate and confusing information to the public about shelter accessibility. Further, although the City has eight shelters that it refers to as "Special Medical Needs Shelters" for people with acute medical needs, the City assumes that most people with disabilities will be housed in general shelters; however, it does not plan to meet the needs of people with disabilities in those general shelters.

    1.    <u>The City Has Failed To Provide An Accessible Emergency Sheltering System.</u>

The inability of people with disabilities to know whether they can get into a particular shelter or whether they can use the toilet there makes it impossible for them to make an informed decision about whether to evacuate their apartments. *See generally* Decls. of Delarosa, Torres, Ryan, Halbert.

Prior to Hurricane Sandy, the City had claimed that all evacuation centers are accessible to people with disabilities. *See* Email from Belisle, Aug. 25, 2012, Exh. 151. However, during Sandy, the City represented that evacuation centers and shelters had only an accessible or "usable" entrance (i.e, not the restrooms or internal facility, or the shelters themselves). *See* City Press Statement, Oct. 28, 2012 at CNY00023748, Exh. 69 (stating each shelter had "at least one entrance usable by wheelchairs"); Advance Warning System Email, Oct. 28, 2013, Exh. 61 ("All shelters have at least one wheelchair accessible entrance.").[8] The reality is that the City does not

---

[8] The Mayor and Mayor's Office for People with Disabilities have added to the confusion about inaccessible shelters. As Victor Calise will testify, they describe shelter entrances as "usable," a meaningless and lower standard than "accessible." *See* City Press Release, at CNY00023744, Exh. 68.

actually know which shelters are accessible.[9] *See* Maniotis Depo. at 88:6-19.

However, just having an accessible entrance is a woefully deficient and entirely unacceptable option for people with mobility impairments. *See* Kailes Decl. ¶77. Moreover, the shelters actually contain myriad accessibility barriers, including at entrances. Notes and photographs from shelter visits during Hurricanes Irene and Sandy depict access barriers such as worn-down plywood, ramps; accessible signage at inaccessible entrances; and ramps too steep for wheelchairs. *See* Trapani Decl. at ¶¶39, 41, 43, 53, 58, 61; and CIDNY Irene Photos, Exh. 123; CIDNY Sandy Photos, Exh. 127. These barriers render these facilities not just inaccessible, but actually dangerous. *See* Trapani Decl. ¶41. Some of the barriers present during Sandy were also present during Irene, even the City was told about these barriers. *See* Trapani Decl. ¶44.

The City's most recent efforts to survey shelters will not help. The shelter survey instruments distributed by the City late in 2012 do not ask the right questions and are being completed by untrained school employees. This inadequate and makeshift approach to determining accessibility does not follow any standard procedure, and, *inter alia,* will lead the City to misclassify bathrooms as accessible, when in fact they may not be.[10] *See* Kailes Decl. ¶ 80.  Mr. Belisle will also testify that the City has no current plan for what it will do with the information it gathers from these surveys. Moreover, OEM does not have a budget to fix any access barriers. *See* McKinney Depo. Vol. 1 at 111:9-11.

### 2.    The City Does Not Plan For Essential Disability Supplies At Shelters.

The City has also failed to provide an emergency sheltering system which meets the

---

[9] The City has no accessibility criteria whatsoever for "refuges of last resort," which are supposed to shield people from a coastal storm if they are on the street and unable to make it to a shelter before the storm hits. *See* McKinney Depo. Vol. I at 127:14-16.

[10] For example, the survey simply asks whether the bathroom is marked with a wheelchair symbol, rather than asking for any measurements. *See* Kailes Decl. ¶ 80.

needs of residents with disabilities because it does not stockpile essential supplies. The City clearly lays out that many critical disability supplies, including crutches, walkers, oxygen, accessible cots and diabetic testing kits, are only stockpiled for "Special Medical Needs" shelters. *See* Shelter Stockpile Strategy: Response to FEMA at CNY00023926, Exh. 43; *see also* Maniotis Depo. at 95:3-96:14 and 98:7-99:20. However, these are also needed at general shelters. Many items, such as meals to accommodate limited diets (e.g., diabetic), are not stockpiled at all.[11] Perhaps most surprisingly, the City also does not require that shelters have backup generators, or otherwise stockpile generators for shelter use. *See, e.g.,* Maniotis Depo. at 99:10-15; and Transcript of Testimony before City Council on 1/16/13, p. 169-171, Exh. 116.

This is contrary to federal guidance on the issue.  For example, FEMA's "Consumable Medical Supplies Sample List" for *general* shelters includes such things as: nutrition drinks for diabetics, colostomy supplies, hearing aid batteries, wheelchair battery chargers.[12] *See* Appendix 4, FEMA FNSS Guidance at P002077-2082, Exh. 153. Similarly, FEMA's "Durable Medical Equipment Sample Supply List" calls for inclusion of accessible cots, wheelchairs, crutches and canes. [13] *See* Appendix 3, FNSS Guidance at P002076, Exh. 153; Kailes Decl. ¶74.

**D.**     **The City's Power Outage Plans Neglect Vulnerable People With Disabilities.**

New York City is extremely vulnerable to power losses, and extended power outages

---

[11] Further, to the extent the City maintains any stockpile, it does so only for ten to fifteen percent of the number of people it says it can shelter. *See* Shelter Stockpile Strategy at CNY00023926, Exh. 43 (indicating the City is only stockpiling for 70,000 people); and Coastal Storm Sheltering Plan (stating the shelter system can accommodate up to 600,000 people) at CNY000363, Exh. 7.

[12] FEMA guidance also states that for general shelters "Plans should include strategies to provide power for services that require a back-up power system in an emergency or disaster. It is important to determine if a facility has a source of emergency power generation." FNSS Guidance, P001978, Exh. 153.

[13] The City claims it can get some items upon request during a disaster, but this is not an effective way to meet the needs of people with disabilities. For instance, just to get a diabetic meal at an emergency shelter might require going through at least three levels of bureaucracy, with no guarantee of whether the meal will get there in time.  *See* Maniotis Depo at 72:17-74:12.

were a major problem after Sandy. As of October 30, 2012, more than 700,000 people were without power in the City. *See* Situation Report at CNY00022469, Exh. 81. Power remained out in much of Lower Manhattan for nearly a week after Sandy hit, and in many areas of hard hit New York, for many days and weeks after that.

The City has a Power Disruption Plan that, with one limited exception, contains <u>no</u> information about either what people with disabilities should do in disasters, or what the City will do to help them. *See* Power Disruption Plan at CNY001693-1694, Exh. 19. The exception is Con Edison's notification plan for a very small subset of disabled people who rely on certain "life sustaining equipment." This does not include the wide range of people who are frail, elderly, use wheelchairs, or would otherwise be stranded. *See* Con Ed. Life Sustaining Devices, Exh. 112. Other than the very small number of people Con Edison has on a list, the City does not have a plan to warn people about or assist them during power outages.

The City's failure to notify people with disabilities that the power would go out had dire consequences. For example, class member Joyce Delarosa, who uses a power wheelchair and lives in Zone B, called Con Edison to tell them she uses life sustaining medical equipment. She heard on the media that the utility company was planning on turning off the power, but received no official notice from Con Edison or the City. *See* Delarosa Decl. ¶40. She spent three days unable to use her oxygen concentrator. The lack of oxygen caused her to deteriorate, and by the third day she needed to evacuate to a hospital.  *See* Delarosa Decl. ¶63.

In the absence of advance plans, the City also failed to designate charging stations for disabled people who had power needs in Sandy. *See* Kailes Decl. ¶¶65, 66. In addition, the City lacked any plan with a priority system for people who needed electricity at shelters, or even guarantee the shelters had electricity. *See* Kailes Decl. ¶68.

**E.**      **The City Does Not Address The Unique Needs Of People With Disabilities For The Time In A Disaster During Which People Are On Their Own To Survive Without Assistance From The City; The Fallacy Of "Sheltering In Place".**

   **1.**      The City Fails To Account For The Reality That Many People With Disabilities Face When They Are Forced To Try To Survive On Their Own.

Mr. Belisle will testify that the City's plans assume that men and women can and will provide for themselves, without help, for three days. This is contained also in the City's materials themselves. *See* "Ready New York," at CNY000033, Exh. 1 ("Every New Yorker should plan to be self-sufficient for several days."). Defendants somewhat euphemistically label this "sheltering in place." *See, e.g.,* Ready New York – Preparing for Emergencies in New York City at CNY000008, Exh. 2. What Sandy and other emergencies have demonstrated is that this period of being left on your own after an emergency is in fact likely to be much longer. *See* Blanck Decl. ¶86, Kailes Decl. ¶89; Peters Decl. ¶¶60, 66 (BCID's advocacy on behalf of stranded people).

However, many people with disabilities cannot survive on their own in a disaster situation for this period of time; they depend on electricity, medications, infusion therapies, or support from caregivers. With the best of personal preparedness, personal plans can be wholly insufficient. The longer some people have to go without power, the more danger they face because of hypothermia, exhausted batteries, and depleted medications. *See* Kailes Decl. at ¶87. The City again relied on hasty, improvised, and after-the-fact efforts instead of advance planning.  It waited until November 9 – ten days after Sandy struck – to go door-to-door to find people who were trapped with no power, overflowing toilets, and no heat. *See* City Press Release at CNY00023870-23871, Exh.74.

   **2.**      The City's Plans Ignored The Unique Needs Of Thousands Of New York City Housing Authority Tenants With Disabilities Who Were Trapped In Their Apartments With No Power, Water, Or Heat During And After Sandy.

Among those not served by the City's plans during this period after Sandy were some of

15

the City's most vulnerable residents - New York City Housing Authority tenants with disabilities. *See, e.g.,* Torres Decl. The City admits that New York City Housing Authority tenants with disabilities have to be covered by the City's emergency plans, yet failed to address their needs in the context of Sandy. This is despite the fact that well before Sandy, the Hurricane Irene After-Action Report had highlighted that the City's Coastal Storm Plan failed to include evacuation plans for New York City Housing Authority buildings.  The report recommended that "NYCHA, in coordination with OEM and NYPD, should develop evacuation policy and plans for all at-risk facilities." *See* Irene After-Action Report, June 25, 2012 at CNY007487, Exh. 45.

These bureaucracies failed to do so, with dire consequences. The Fire Department Incident Management Team was not asked to provide evacuation assistance to New York City Housing Authority residents trapped in their homes. *See* Manahan Depo. at 110:16-19. Furthermore, the City had no MOU or other agreements with the Housing Authority before Sandy. *See* McKinney Depo. Vol. III at 58:9-12. Even when Sandy did wreak havoc on NYCHA buildings – buildings with a high number of people with disabilities – OEM's special needs coordinator will testify that he was not involved in the City's response to NYCHA after Sandy.[14]

**F.**     **The City's Communication Systems Are Under-Resourced, Have Not Been Assessed For Capacity, And Fail To Communicate Essential Information To People With Disabilities.**

     **1.**     <u>The City's Disaster Notification Does Not Give People With Disabilities The Necessary Information And Actually Deters Them From Seeking Assistance.</u>

The City deters people with disabilities from going to shelters by telling them *not* to expect to be provided with items they need for survival. *See* "Ready New York for Seniors and

---

[14] The fact that NYCHA also has obligations with respect to emergency planning does not absolve the City. Rather, the City should develop an agreement with NYCHA that identifies what emergency actions need to be taken (e.g. door-to-door notification, evacuation transportation) and which entity (the City or NYCHA) will cover that function. *See* Kailes Decl.¶98.

People with Disabilities" at CNY000041, Exh. 1 ("Shelters DO NOT have special equipment (e.g., oxygen, mobility aids, batteries)"); Hurricane Irene 311 Script at CNY0019658 ("Centers are not equipped to provide food for special diets. If you have special dietary needs, bring the food you need with you to the center"); Hurricane Sandy 311 Script at CNY00025366 ("Refrigeration for medication will NOT be provided at evacuation centers.")

To the extent it is not telling people with disabilities what they will *not* receive, the City otherwise leaves people with disabilities in the dark about what will happen to them. Based on this information, many residents with disabilities will rationally choose to take their chances at home. *See* Kailes Decl. ¶70; Conner Decl. ¶12; Ryan Decl. ¶15. When people with disabilities do not know what the plans are and whether the emergency evacuation and sheltering systems will give them what they need, they are deterred from even trying to use these systems. *See* Kailes Decl. ¶70; Ryan Decl. ¶¶14-15; Halbert Decl. ¶¶9-10.

The City also admits that its emergency plans are not public, and that it does not share its written plans with the disability community – not even with the City's Special Needs Advisory Group. *See* McKinney Vol. II Depo. 68:8-16. As Mr. Belisle will testify, the City also has never held any public hearings on its emergency plans to get input. *See also* McKinney Depo. Vol. II at 112:4-13. Further, the City's Advance Warning System ("AWS"), the centerpiece of the City's efforts to communicate with people with disabilities, omits the most critical information that residents need in order to make life and death decisions as to whether to evacuate, and if so, how.[15] *See* Tranpani Decl. ¶76.

**2.**     The City's Misplaced Reliance On Services, Including 311 And 911, Without

---

[15] The AWS is laid out in the City's Special Needs Advance Warning System Plan (Exh. 18) and relies on third party entities, such as nonprofits, to disseminate emergency information to people with disabilities, and other "special needs" residents.

Adequate Resources Or Guidance, Further Jeopardizes The Life, Health, And Safety Of People With Disabilities Who Need Assistance.

The City directs people with disabilities to call 311 or 911 if they need help in an emergency, despite the fact that 311 and 911 systems, which serve all 8 million New Yorkers, are frequently overwhelmed in major emergencies. *See* Mayor's Office for People with Disabilities (hereafter sometimes "MOPD") website, Nov. 1, 2012 at P003436, Exh. 167. When Sandy arrived on October 29, 911 received 20,000 calls *per hour*, and the 1,400 City 911 dispatchers were overwhelmed. The 911 system typically handles 30,000 calls a *day*. *See* New York Post, Exh. 173; City Council Report at P003664-3665, Exh. 115 (discussing delays, busy signals and recorded messages at 911).

On October 31, 311 received 244,290 calls and as of 11:20 p.m. people were waiting 26 minutes for an operator. *See* Situation Report 11/1/12, 800 hrs at CNY22409, Exh. 84. The City Council Sandy Report stated that "the 3-1-1 system experienced a very high volume of calls before, during and after the hurricane that resulted in call takers being overwhelmed and unable to respond to the calls . . . One news report stated that around 1 p.m. on Sunday, October 28, a day before the storm hit, calls to 3-1-1 went unanswered or rang busy." *See* City Council Report at P003666, Exh. 115.

This kind of bureaucratic chaos resulted in some people with disabilities, such as class member Kenneth Martinez, being referred back and forth between 911 and 311, without a response from either. *See* Martinez Decl. ¶37-41.  Class member Melba Torres and her attendant called 311 to ask about evacuation and shelter assistance, but 311 never answered. She also called the Mayor's Office for People with Disabilities on Friday, October 26 to ask how she should evacuate and where she could find accessible shelter, but no one took her call. *See* Torres Decl. ¶¶52, 58, 60, 74. Many people also could not afford to waste precious cell phone batteries

18

waiting on hold for 311, particularly when they were unsure of what assistance they might get. *See* Delarosa Decl. ¶48.

Lastly, the City's AWS system has never been evaluated for the effectiveness of its ability to reach people with disabilities, and it is clear that it can only be effective in a limited way. AWS partners, many of which are nonprofits, are not provided any resources or training by the City. *See* Peters Decl. ¶¶43-44; Trapani Decl. ¶¶74-75.  Mr. Belisle will testify that there has been no effort to evaluate whether these agencies can actually reach their clients.

    **3.**    <u>The City Fails To Ensure That Communication Is Provided In Accessible Formats.</u>

While the City has taken some steps regarding communication with people with disabilities, it still has major gaps in its planning in this regard. For example, the City relied heavily during both Irene and Sandy on paper flyers describing evacuation. *See* Torres Decl.¶46; Conner Decl. ¶14. The FDNY does not have policies regarding "on the ground" communication, such as the use of audio or visual cues to assist those with sensory disabilities. *See* Villani Depo. at 72:5-12. Further, even though during Sandy the Mayor had a sign language interpreter, there was no such interpreter during press conferences regarding Irene, and the City's plans do not require interpreters at press conferences. *See* McKinney Depo. Vol. III at 64:2-5.

**G.**    **<u>The City's Recovery Plans Fail To Provide For People With Disabilities.</u>**

In a number of areas related to recovery, the City has failed to address the needs of people with disabilities. For example, the City's plans for accessible housing in the recovery phase after an emergency are virtually nonexistent. The City has only "specifications" for temporary housing units. *See* CNY006994-7010, Exh. 37. No housing units have yet been built pursuant to these specifications, there is a dearth of accessible housing in New York City that could be used for relocation, and the City has no plans for an inventory of what housing does

exist. *See* McKinney Vol. I Depo. 122:23-123:18; Dooha Decl. ¶44.

The City's plans for removing debris and distributing essential supplies after an emergency do not account for the needs of people with disabilities. *See, e.g.,* Ryan Decl. ¶32, Halbert Decl. ¶21 (stating their need for assistance clearing debris after an emergency). Instead of having a system for prioritizing removal of debris to ensure that disabled  people can move around after a disaster, the City only has a cursory mention of people with disabilities in the Debris Management Plan, stating that coordinating the needs of people with disabilities is one task that "the Human Services Emergency Support Function Coordinator will consider." *See* Debris Management Plan at CNY000745, Exh. 17. Similarly, the City also does not require commodity distribution points that provide food, water, and other essentials to be accessible, but rather just assumes they will be. *See* McKinney Vol. I Depo. 124:19-125:10 (does not know whether accessibility is a criteria for commodity distribution points but assumes they would be accessible); and *generally* Commodities Distribution Point Plan, Exh. 24.

**IV.    The City's Plans For People With Disabilities Are Characterized By Failures To Plan In Advance, To Coordinate The Work Of Multiple Agencies, And To Designate Clear Decisionmakers On Disability Issues.**

**A.    The City Fails To Effectively Pre-Plan, And Instead Engages In Hasty And Improvised Action After The Disaster Strikes.**

The City has failed to plan in advance for people with disabilities in a number of ways. Planning ahead is the essence of disaster preparation. Instead of pre-planning, the City routinely engages in hasty and ad hoc decision-making, such as the City's decision to wait ten days after Sandy to begin searching for trapped people and the shutdown of paratransit almost immediately after the City gave evacuation orders. The FDNY and NYPD do not use evacuation plans, but make many of these determinations at the time and onsite. *See, e.g.,* Wahlig Depo. at 34:22-35:14 (NYPD aware of no specific plan for evacuating people in wheelchairs during a

catastrophic emergency, but "we will make sure that they get the appropriate assistance needed at that point in time…."); *id.* at 55:13-18 (policy with respect to evacuating persons with disabilities in the event of a catastrophic emergency is to do whatever the NYPD could do); *id.* at 59:9-16 (in blackout, no specific policy, but take it on a "case by case" basis); Villani Depo. at 69:17-70:10 (no particular procedure for FDNY for evacuation in a black out); Blanck Decl. ¶61.

**B.     The City's Emergency Planning For People With Disabilities Lacks Effective Coordination Among The Multiple Agencies And Bureaucracies Involved.**

OEM – despite being the coordinating body for large scale emergency response for the City – has no authority to make sure that the various roles and responsibilities assigned to City agencies by emergency plans are in fact followed through on. *See* McKinney Depo. Vol. I at 34:18-21. Moreover, it lacks agreements with key players in emergency management.

The key players OEM needs to coordinate with include the Mayor's Office for People with Disabilities, the Metropolitan Transit Authority, Fire Department, Police Department, and those entities whose work inherently impacts emergency responses such as utility companies, nursing homes, and the New York City Housing Authority. However, there are no agreements between the City and NYCHA, the power companies, or MTA regarding emergency planning. *See, e.g.,* McKinney Depo. Vol. III 58:9-12 (no agreement with NYCHA re emergency plans).

Mr. Belisle will testify that these entities do not coordinate with each other about the specific needs of disabled people and that he was in touch with neither the Fire nor Police Departments during Sandy. Remarkably, neither the New York Fire or New York Police Departments have ADA coordinators. *See* Villani Depo. at 12:17-21; Wahlig Depo. at 51:15-52:16; Maniotis Depo. at 35:6-9, 12-22 (OEM has not assessed police and fire capabilities).

**C.     The City Has No Central Person Or Persons Assigned Responsibility For Planning For Or Responding To The Unique Needs Of People With Disabilities In Disasters.**

Neither the Mayor's Office for People with Disabilities nor the special needs coordinator

at OEM have any decision-making authority regarding the City's plans. OEM's "special needs" coordinator is on the lowest rung of the OEM's organizational chart. *See* OEM Organizational Chart, Exh. 44. Moreover, as Mr. Belisle will testify, this position has no staff, and it is not even currently filled with a full-time employee. Mr. Belisle, who formerly filled this role, will also testify that he moved to a different position at OEM in August of 2012, and OEM has not hired a replacement. He was the "acting" special needs coordinator during Sandy, but he worked only on shelters – not disability issues – during Sandy, as part of his new position.

As Plaintiffs' expert Kailes testifies, Mr. Belisle, as special needs coordinator, demonstrates an "alarming lack of depth of involvement, understanding and situational awareness of issues regarding people with access and functional needs in emergency planning, response and recovery," revealing that the "position of Special Needs Coordinator is tokenistic and serves more for appearances than a true City commitment to and involvement with these critical and diverse functional needs issues." *See* Kailes Decl. ¶121.

Similarly, Commissioner Victor Calise of the Mayor's Office for People with Disabilities will testify that he is not involved in the City's disaster plans, his office was actually closed during the weekend when Sandy approached, and he was not in charge of Sandy response.[16]

Moreover, the Mayor's Office for People with Disabilities and the special needs coordinator do not work together in any organized fashion, compounding the bureaucratic confusion that characterizes the City's planning for its disabled men, women, and children. For instance, Mr. Belisle will testify that Commissioner Calise led a "functional needs committee

---

[16] Although Mr. Calise will testify that they purportedly forwarded calls to his cell, class members have testified that they were unable to reach MOPD during the days before, and after, the storm. *See* Delarosa Decl. ¶¶3, 47; and Torres Decl. ¶¶47, 60, 75.

during Sandy." Yet, Mr. Calise, the key person in the Mayor's Office for People with

Disabilities, will testify that he knows nothing about such a committee.

**V.**     **The City's After-The-Fact Rationalizations Are No Excuses For Having Failed To Properly Plan In Advance.**

The City has asserted no legally cognizable affirmative defenses in this matter. Instead, it

has advanced several excuses for its failure to properly pre-plan.

First, the City attempts to blame-the-victim by arguing that people with disabilities are

responsible for their own  safety. However, personal preparedness is no substitute for the City's

duty to plan for people with disabilities. *See CALIF v. City of Los Angeles, et al.* Order at

P000535, Exh. 121 ("Although it is certainly important for all of the City's residents to prepare

for an emergency, it is the City's emergency preparedness program that is at issue in this action. .

. . It is irrelevant for purposes of this action whether individuals should also personally plan and

prepare for emergencies and/or disasters.").

Second, the City argues that it can wait until a disaster strikes to strategize about

response. At this point, however, it is often too late and unnecessarily puts the life and health of

disabled people at risk. As the court in *CALIF* stated "[t]he purpose of the City's emergency

preparedness program is to anticipate the needs of its residents in the event of an emergency and

to minimize the very type of last-minute, individualized request for assistance. . . particularly

when the City's infrastructure may be substantially compromised or strained by an imminent or

ongoing emergency or disaster." See Exh. 121 at p.26. Similarly, the U.S. DOJ in *CALIF* stated:

> [G]eneral assurances to individuals with disabilities of an ad hoc response during
>
> the exigencies of an emergency are not equal to the access being afforded to
>
> individuals without disabilities, for whom planning and preparations have already
>
> occurred . . . It is simply unrealistic to assume that physically accessible shelters,

> wheelchair accessible transportation, and the ready availability of disability-related
>
> medications, medical supplies, equipment, and disability-related support services
>
> can be provided in an ad hoc manner when requested, without advance planning
>
> and preparations.

*See* Statement of Interest of the United States at p. 23, Exh. 122.

Finally, the City tries to rely on volunteer organizations to fill gaps that arise in its disaster response. However, they are by no means sufficient to fill gaps in the City's plans. The City cannot rely on the efforts of volunteers to fulfill the basic duties of emergency response, particularly when the City has not entered into any prior agreement with them. *See, e.g.,* Miller Depo. at 166; "Occupy Sandy: A Movement Moves to Relief," *New York Times*, Exh. 219.

## VI.   **Remedy**

The remedy in this case is not overly difficult or expensive. Upon a determination of liability, the Court may then choose from a wide range of procedural devices and remedies to bring the case to a conclusion. *Milliken v. Bradley*, 433 U.S. 267, 281 (1977) (finding the scope of a district court's equitable powers is broad).

There are myriad steps the City can take to improve its planning for people with disabilities. For example, the City can develop a high-rise evacuation protocol for people with disabilities.  This could include, for example designating a team of evacuation specialists and protocol to get disabled people out of high-rises and methods and/or devices for people to signal that they are trapped and need help. This can be as simple as a loud whistle or a flashing light.

Similarly, the City can establish a mechanism by which people with disabilities can call for help in an emergency, since 311 and 911 are not sufficient. For instance, a designated hotline for people with disabilities to call for assistance with evacuation, shelter, and essential medication could help protect the lives, health, and safety of many New Yorkers. Alternately, the

City could improve the resources and capacity of its 311 system and provide dedicated disability counselors during emergencies. Further, the City could develop agreements with organizations to assist with door-to-door life and safety checks, evacuation, shelter, and transportation in emergencies.

These are but a few of the examples of the types of things the City could do to improve its planning. However, the precise mix of changes and improvement that is necessary for New York should be carefully developed using an expert or experts in the field and community input.

Thus, Plaintiffs propose that upon a finding of liability that the Court order a third party expert to engage in a comprehensive review and revision of the City's planning and preparedness, with the goal being to develop mechanisms, policies and plans to meet the emergency needs of people with disabilities in the City of New York. The expert(s) should have an extensive background in emergency planning for people with disabilities, and should work with Plaintiffs, the City and disability community representatives to conduct these revisions.[17]

## VII.   Conclusion

For the foregoing reasons, Plaintiffs request that this Court find Defendants to be in violation of Title II of the Americans with Disabilities Act and its implementing regulations, as well as Section 504 of the Rehabilitation Act, and New York City Human Rights Law.

Dated:  February 26, 2013              Respectfully submitted,
        Berkeley, CA                  DISABILITY RIGHTS ADVOCATES

_____
Shawna L. Parks

---

[17] The precise framework for the expert's work, as well as a mechanism for the Court to select a third party expert can be briefed by the parties and determined by the Court after a finding of liability.

JULIA PINOVER (JMP333)
DISABILITY RIGHTS
ADVOCATES
40 Worth Street, 10th Floor
New York, NY 10036
Telephone: (212) 644-8644
Facsimile: (212) 644-8636
Email: general@dralegal.org

SHAWNA L. PARKS
(CA Bar No. 208301)*
SID WOLINSKY
(CA Bar No. 33716)*
REBECCA S. WILLIFORD
(CA Bar No. 269977)*
DISABILITY RIGHTS
ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
Email: general@dralegal.org

*Admitted pro hac vice*

*Attorneys for Plaintiffs*

PAUL GARRITY
DANIEL L. BROWN
VALENTINA
SHENDEROVICH
SHEPPARD MULLIN
RICHTER & HAMPTON
LLP
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701