UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, a nonprofit organization, CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK, a nonprofit organization, GREGORY BELL, an individual, and TANIA MORALES, an individual, | No. 11-cv-6690 (JMF) (FM) |

                                       Plaintiffs,

      -against-

MICHAEL R. BLOOMBERG, in his official
capacity as Mayor of the City of New York, and
the CITY OF NEW YORK,

                                       Defendants.

---

## DEFENDANTS' PRE-TRIAL MEMORANDUM OF LAW

---

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, N.Y. 10007
Tel: 212-788-1281
Fax: 212-788-8877

Of Counsel:   Martha A. Calhoun
                 Mark G. Toews
                 Carolyn E. Kruk

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT

    NEW YORK CITY PROVIDES MEANINGFUL ACCESS
    TO ITS EMERGENCY MANAGEMENT PROGRAM FOR
    ALL NEW YORKERS ........................................................................................ 4

    A.    The Requirements of the ADA, the Rehabilitation Act,
         and NYCHRL. ........................................................................................ 4

    B.    The Law Requires Meaningful Programmatic Access,
         Not Provision of a Particular Service or any Pre-
         Defined Level of Care. ........................................................................ 6

    C.    Meaningful Programmatic Access does not Guarantee
         Equality of Results ................................................................................ 7

    D.    Meaningful Programmatic Access does not Require
         that Every Facet of the Government Program be
         Accessible to Everyone ........................................................................ 7

    E.    Meaningful Access Must be Evaluated within the
         Specific Context of the Particular Government
         Program and the Services it Provides. ................................................ 10

    F.    The Services Provided by New York City's
         Emergency Management Program are Wholly
         Consistent with the Requirements of the Statutes,
         Implementing Regulations, and the Interpretive
         Caselaw .................................................................................................. 13

         i.    Communication: Outreach and Pre-Event
             Notification ............................................................................ 13

         ii.    Evacuation and Transportation .......................................... 15

         iii.    Sheltering ................................................................................ 17

         iv.    Recovery: Search and Rescue, Door to Door
             Canvassing, and Temporary Housing. .............................. 21

CONCLUSION .................................................................................................................. 23

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                          <u>Pages</u>

<u>Borkowski v. Valley Cent. Sch. Dist.</u>,
    63 F.3d 131 (2d Cir. 1995) ......................................................................5, 10

<u>Cole v. Goord</u>,
    2009 U.S. Dist. LEXIS 75580 (S.D.N.Y. August 25, 2009) ......................................9

<u>Foley v. City of Lafayette</u>,
    359 F.3d 925 (7th Cir. 2004) ...............................................................11, 12

<u>Fulton v. Goord</u>,
    591 F.3d 37 (2d Cir. 2009) ........................................................................10

<u>Greer v. Richardson Indep. Sch. Dist.</u>,
    472 Fed. Appx. 287 (5th Cir. 2012) ...............................................................8

<u>Henrietta D. v. Bloomberg</u>,
    331 F.3d 261 (2d Cir. 2003) .............................................................5, 15, 22

<u>Karvelas v. Milwaukee County</u>,
    2012 U.S. Dist. LEXIS 126539 (E.D. Wis. Sept. 5, 2012).......................................12

<u>Liberty Res., Inc. v. Phila. Hous. Auth.</u>,
    528 F. Supp. 2d 553 (E.D. Pa. 2007)..............................................................22

<u>Lincoln CERCPAC v. Health and Hosps. Corp.</u>,
    147 F.3d 165 (2d Cir. 1998) ......................................................................6, 11

<u>Loye v. County of Dakota, Plaintiffs</u>,
    625 F.3d 494 (8th Cir. 2010)
    cert. denied, 131 S. Ct. 2111 (2011) ...........................................................9, 15

<u>Midgett v. Tri-County Metro. Transp. Dist.</u>,
    254 F.3d 846 (9th Cir. 2001) ................................................................8, 12, 17

<u>Olmstead v. L.C.</u>,
    527 U.S. 581 (1999) .................................................................................4

<u>Pierce v. County of Orange</u>,
    526 F.3d 1190 (9th Cir. 2008) .....................................................................9

<u>Rodriguez v. City of NY</u>,
    197 F. 3d 611 (2d Cir. 1999) ................................................................6, 15, 20

| Cases | Pages |
|-------|-------|

Stauber v. N.Y. City Transit Auth.,
10 A.D.3d 280 (1st Dep't 2004) ...................................................................8, 17

Stephens v. Shuttle Assocs., L.L.C.,
547 F. Supp. 2d 269 (S.D.N.Y. 2008) ........................................................8, 17

Tennessee v. Lane,
541 U.S. 509 (2004) .....................................................................................8, 11

United Spinal Ass'n v. Bd. of Elections,
2012 U.S. Dist. LEXIS 112474 (S.D.N.Y. August 8, 2012) ...........................7

Wernick v. FRB,
91 F.3d 379 (2d Cir. 1996) ..............................................................................10

Wright v. Giuliani,
230 F.3d 543 (2d Cir. 2000) .........................................................................6, 11

**Statutes**

28 C.F.R. § 35.130(d) ............................................................................................4

28 C.F.R. § 35.150 ...........................................................................7, 9, 17, 19

28 C.F.R. § 35.150(b)(1) .......................................................................................8

28 C.F.R. § 35.160(b)(1) .....................................................................................15

28 C.F.R. § 41.51(d) ..............................................................................................4

28 C.F.R. § 35.135 ...............................................................................................21

29 U.S.C. § 794(a) ..................................................................................................4

42 U.S.C. § 12101, *et seq.* ..................................................................................4

42 U.S.C. § 12132, *et seq.* ..................................................................................4

44 C.F.R. § 16.150 ...........................................................................................9, 19

49 C.F.R. § 37.161(c) ..........................................................................................12

**<u>Other Authorities</u>**                                                                                    **<u>Pages</u>**

DOJ Technical Assistance Manual ...........................................................................7, 19

National Council on Disability, Effective Emerg. Mgmt. (2009) ....................................................2

## PRELIMINARY STATEMENT

Plaintiffs bring this class action lawsuit alleging that Defendants fail to adequately account for the needs of individuals with disabilities in their emergency management program. As the voluminous record in this case amply demonstrates, those allegations lack foundation. They are seemingly based upon a superficial understanding of the City's plans and supporting programs, and they reflect of a narrow and unsophisticated understanding of how effective emergency programs operate.

Plaintiffs are apparently content to build a case upon claims of isolated instances of inaccessibility to the City's emergency management program. In support of those claims they identify class members who profess ignorance about the City's widespread community outreach and messaging efforts, who were apparently unaware of the approach of Superstorm Sandy or the Mayor's mandatory evacuation order (despite a veritable blitz of media coverage), who heard second-hand accounts from others that the City's shelter volunteers were insufficiently attuned to their needs, or who simply claimed that they have no plan in place, should an emergency occur. From this record, Plaintiffs now ask the Court to conclude that systemic, widespread violations of federal and state law exist hidden beneath the surface, and to order a judicially monitored overhaul of the City's plans. Not only is that remedy completely unwarranted in light of the record developed here, it also reflects a fundamental misunderstanding of what the law requires, which is providing individuals with disabilities the opportunity to meaningfully access government programs and services.

The voluminous evidentiary record demonstrates that New York City's emergency management program is accessible to all. Defendants have developed over the course of many years a program that is sufficiently robust to provide services to an enormously diverse

population of millions of people, and sufficiently flexible to allow informed decision-making in response to fluid circumstances. The City's planning efforts recognize that effective planning cannot be accomplished by pre-identifying a laundry-list of "if this, then that" scenarios within the overarching planning documents. Instead, planning documents must create structure that enables those individuals actually implementing the plan to capably respond during an emergency. Supporting programs and materials, like playbooks, field guides, and trainings, help to educate and enable decision-makers. This structure was developed in recognition of the fact that emergency events are inherently unpredictable. It is also consistent with guidance from the National Council on Disability, which stresses that "due, in part, to the unpredictable nature of disasters …. The generic, one-size-fits-all approach to disaster planning does not work." NCD, Effective          Emerg.          Mgmt.          (2009)          at http://www.ncd.gov/newsroom/publications/2009/NCD_EmergencyManagement_HTML/Effecti veEmergencyManagement.html.

It follows from this widely accepted premise that any reasonable evaluation of the effectiveness of the City's planning is not reducible to the presence or absence of a single resource or feature of the program. When the program is more appropriately evaluated as a whole and in depth, one sees a concerted commitment to accounting for the needs of people with disabilities through an integrated and inclusive approach. That approach is guided in many cases—but by no means all—by OEM's Special Needs Coordinator. Fundamentally, the approach means providing for the vast array of special needs of New York City's diverse population in each of the program's central components. Broadly understood, the City's program includes: (1) targeted outreach to the public and a system of notification prior to an impending, anticipated event; (2) assistance with evacuation; (3) sheltering; and (4) recovery and temporary

housing. A review of the record with respect to each of these components of the City's program clearly reveals that people with disabilities are being provided with the opportunity to meaningfully access those services.

Recent emergency events have provided concrete evidence of the efficacy of the City's planning efforts at work. Hurricane Irene, which made landfall in New York City in late August 2011, gave rise to the first-ever activation of the City's Coastal Storm Plan and the first ever activation of the City's sheltering system. The results were largely successful. As one example, the City evacuated over 200 people who requested assistance through its Homebound Evacuation Operation. See Manahan Declaration ¶ 13. Hurricane Irene also revealed opportunities for improvement. As a part of the City's after-after action review process, the City developed recommendations for revisions and set in motion a process to implement those recommendations. See, e.g., Maniotis Declaration ¶ 36; McKinney Declaration ¶ 28, et seq.

That process was only partially complete when New York City again braced itself for a large-scale coastal storm, Superstorm Sandy, which would become one of the costliest natural disasters in U.S. history. Approximately 375,000 people were ordered to evacuate from New York City alone; regionally, more than 8 million people lost power. The record reflects that the City's emergency response was likewise unprecedented. The sheltering system, for example, provided refuge to approximately 6,700 people. After the storm, a door to door canvassing effort reached approximately 116,500 households and completed 90,000 wellness surveys. The City's response to these two recent natural disasters, as illustrated in Defendants' declarations and exhibits, provides compelling evidence of effective emergency planning in action—planning that includes and integrates the diverse array of functional needs of all New Yorkers during a disaster, particularly for the most vulnerable populations.

ARGUMENT

## NEW YORK CITY PROVIDES MEANINGFUL ACCESS TO ITS EMERGENCY MANAGEMENT PROGRAM FOR ALL NEW YORKERS.

### A. The Requirements of the ADA, the Rehabilitation Act, and NYCHRL.

Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).[1]

The ADA also requires public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d); see also 28 C.F.R. § 41.51(d) (same under Section 504). The Supreme Court has explained the integration mandate of the ADA and Section 504: "Unjustified isolation, we hold, is properly regarded as discrimination on the basis of disability." Olmstead v. L.C., 527 U.S. 581, 597, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999).

For plaintiffs to prevail on an ADA claim they must establish that: (1) they are qualified individuals with disabilities, and (2) they were denied the opportunity to participate in or benefit

---

[1] Standards under and requirements imposed by the Rehabilitation Act and the ADA are effectively the same, and claims under the two statutes are generally treated identically and in tandem. See, e.g., Henrietta D., 331 F.3d at 272.

from the defendant's services, programs or activities, or were otherwise discriminated against by defendant, by reason of their disabilities. Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003). In addition, where, as here, a plaintiff makes a claim that they were denied access to a benefit because of defendant's failure to provide a reasonable accommodation, the plaintiff bears the burden of production by offering a proposed accommodation that is not unreasonable on its face. Henrietta D., 331 F.3d at 280 (citing Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995)). The defendant then has the opportunity to show that the proposed accommodation would impose an undue hardship on the operation of the program or fundamentally alter the nature of the program. Id. at 281.

New York City Human Rights Law ("NYCHRL") prohibits "unlawful discriminatory practice" because of an actual or perceived . . . disability. N.Y.C. Admin. Code, § 8-107(4)(a). While the precise contours of NYCHRL's requirements concerning provision of government services are still loosely defined, since the passage of New York City Local Law No. 85 of 2005, courts now hold that claims under the City statute require independent analysis (St. Jean v. UPS, 2013 U.S. App. LEXIS 2456 (2d Cir. 2013)) and that the statute confers "somewhat broader rights." Krist v. Kolombos Rest., Inc., 688 F.3d 89, 97 (2d Cir. 2012). Federal courts generally defer to state courts on state law disability claims. Brief v. Albert Einstein College of Med., 423 Fed. Appx. 88, 93 (2d Cir. 2011) (dismissing state law claims and finding that because New York law is still developing concerning the overlap of federal and state disability law, plaintiff should pursue NYCHRL claims in state court); Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001) ("[I]n the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims ... as defined by New York state and municipal law is a question best left to the courts of the State of New York."); see also Kreisler

v. Second Ave. Diner Corp., 2012 U.S. Dist. LEXIS 129298, *40 (S.D.N.Y. Sept. 10, 2012)
(recognizing that many questions remain as to how the NYCHRL should be construed but
declining to apply a different standard under the NYCHRL versus ADA.)

### B. The Law Requires Meaningful Programmatic Access, Not Provision of a Particular Service or any Pre-Defined Level of Care.

Federal and state law prohibits discrimination against people with disabilities in the
provision of public services, but the statutes neither guarantee "any particular level of [services]
for disabled persons, nor assure maintenance of service previously provided." Lincoln
CERCPAC v. Health and Hosps. Corp., 147 F.3d 165, 168 (2d Cir. 1998); see also Rodriguez v.
City of NY, 197 F. 3d 611, 618 (2d Cir. 1999) (ADA requires only that a service that is being
provided to some not be denied to disabled people.) The "relevant inquiry" instead focuses on
meaningful access, asking "not whether the benefits available to persons with disabilities and to
others are actually equal, but whether those with disabilities are as a practical matter able to
access benefits to which they are legally entitled." Henrietta D., 331 F.3d at 273. "Meaningful
access" is not measured or defined in relation to the access that persons without disabilities have
to a particular service, nor does it relate to the adequacy of services provided. See id. at 275
(noting that the relevant measure is "whether the plaintiffs with disabilities could achieve
meaningful access, and not whether the access the plaintiffs had (absent a remedy) was *less*
meaningful than what was enjoyed by others"); Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir.
2000) (explaining that the disabilities statutes require that government entities enable
"'meaningful access' to such services as may be provided, whether such services are adequate or
not"). Rather, persons with disabilities must be able to "benefit meaningfully" from the specific
service or benefit that a government entity provides. See Alexander, 469 U.S. at 302.

C.  **Meaningful Programmatic Access does not Guarantee Equality of Results**

While government entities must ensure that persons with disabilities have "meaningful access" to a government benefit or service, the Supreme Court explicitly rejected the notion that all conduct resulting in a disparate impact on disabled persons violated the Rehabilitation Act. In doing so it identified "two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." Alexander, 469 U.S. at 299.  The "meaningful access" standard thus strikes a balance between these two legitimate goals.  See id. at 299-301; see also Henrietta D. 331 F.3d at 274 (stating that Second Circuit cases applying the Rehabilitation Act "speak simply in terms of helping individuals with disabilities access public benefits to which both they and those without disabilities are legally entitled. . . ; the cases do not invite comparisons to the results obtained by individuals without disabilities"); United Spinal Ass'n v. Bd. of Elections, 2012 U.S. Dist. LEXIS 112474 (S.D.N.Y. 2012) ("It is well-established in this Circuit that … the ADA and its implementing regulations do not require "equal access" or "equal results" for individuals with disabilities."); DOJ's TAM II-3.3000 ("The ADA provides for equality of opportunity, but does not guarantee equality of results.").

D.  **Meaningful Programmatic Access does not Require that Every Facet of the Government Program be Accessible to Everyone.**

A corollary to the above well-settled principles is that any evaluation of whether access to a government program is meaningful requires an analysis of the accessibility of the program as a whole, rather than narrow focus on isolated or temporary instances of inaccessibility based on unexpected events or human error. See 28 C.F.R. § 35.150 (requiring accessibility of the program "when viewed in its entirety"); DOJ Technical Assistance Manual, II § 5.1000 (explaining that meaningful access should be evaluated in the context of services, programs, or

activities, when viewed in their entirety). Any contrary interpretation would render governmental compliance essentially impossible.

Courts have consistently held that narrow focus on individual barriers to access without regard for the program as a whole reflects a misunderstanding of the statute. The principle has been applied by the courts in various contexts relevant to the case at bar, including, for example, accessible transportation. See Midgett v. Tri-County Metro. Transp. Dist., 254 F.3d 846, 849 (9th Cir. 2001) (holding that regulations implementing the ADA do not contemplate perfect service for wheelchair-using bus commuters and that isolated or temporary problems are not violations of the ADA); Stephens v. Shuttle Assocs., L.L.C., 547 F. Supp. 2d 269, 278 (S.D.N.Y. 2008) (acknowledging that the ADA cannot regulate individuals' conduct in every situation and dismissing ADA claim based on an isolated incident); Stauber v. N.Y. City Transit Auth., 10 A.D.3d 280, 282 (1st Dep't 2004) (ADA and its implementing regulations "do not contemplate perfect service for wheelchair-using bus commuters.").

Courts have held the same principle equally applicable in the context of physical accessibility of existing facilities. See Tennessee v. Lane, 541 U.S. 509 (2004) (citing 28 C.F.R. § 35.150(b)(1) and holding that in the case of older facilities … a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services); Greer v. Richardson Indep. Sch. Dist., 472 Fed. Appx. 287, 291-292 (5th Cir. Tex. 2012) (holding that "meaningful access" does not require a public entity to make all of its existing facilities accessible to disabled individuals and acknowledging that although "regulations may be informative, program accessibility is ultimately a subjective determination by viewing the program or activity at issue in its entirety and not solely by evaluating individual elements of the

facility where the program is held."); <u>Pierce v. County of Orange</u>, 526 F.3d 1190, 1221 (9th Cir. 2008) (holding that "the ADA does not require perfect parity among programs offered by various facilities that are operated by the same umbrella institution" and that ADA regulations contemplate reassignment of services to accessible buildings, as a permissible means of accommodation."); <u>Cole v. Goord</u>, 2009 U.S. Dist. LEXIS 75580 (S.D.N.Y. 2009) (same).

The relevant regulatory framework likewise contains explicit guidance with regard to physical accessibility of facilities. 28 C.F.R. § 35.150 is clear that there is no requirement that a public entity make each of its existing facilities accessible to and usable by individuals with disabilities. 44 C.F.R. § 16.150 contains an identical exemption.

While less commonly litigated, the same principle is also applicable in the area of accessible communication. For example, in <u>Loye v. County of Dakota</u>, Plaintiffs, who are deaf, alleged a violation of the ADA based upon the County's failure to provide an ASL interpreter during the course of an emergency response to a mercury contamination and during some of the subsequent informational meetings. 625 F.3d 494 (8th Cir. 2010), cert. denied, 131 S. Ct. 2111 (2011). In rejecting Plaintiffs' claims that "an interpreter is required for everything," the court held that "[p]roviding timely information about the risks of mercury and the decontamination process was an important aspect of effective emergency response services. But there is a difference between providing information -- a service -- and the series of meetings at which information is provided. Plaintiffs confuse the two when they argue that Title II required that an ASL interpreter must be present at every meeting." Thus, the Court recognized in the context of accessible communication, as it has in other areas, that access to the service or program as a whole is the touchstone for compliance, not access to every piece of communication the government conveys.

E. **Meaningful Access Must be Evaluated within the Specific Context of the Particular Government Program and the Services it Provides.**

It is well established in this circuit that the concept of what constitutes a "reasonable accommodation" to allow for "meaningful access" is a fact-specific inquiry. See Fulton v. Goord, 591 F.3d 37, 44 (2d Cir. 2009) (determining what is a reasonable accommodation requires a context-sensitive inquiry); Wernick v. FRB, 91 F.3d 379, 385 (2d Cir. N.Y. 1996) ("Whether or not something constitutes a reasonable accommodation is necessarily fact-specific."); Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. N.Y. 1995) (holding that within the meaning of the Rehabilitation Act "'[r]easonable'" is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce.")

There is a paucity of guidance concerning the requirements of the ADA within the factual context of emergency preparedness programs. The sole case that discusses the mandates of the ADA vis a vis emergency planning, CALI v. City of Los Angeles, litigated by co-counsel for Plaintiffs in the action before this Court, is not binding and, in any case, provides minimal guidance. As a general matter, the Court determined that emergency management programs provide services and benefits to the public within the meaning of the ADA, and that municipalities must account for the needs of individuals with disabilities in their planning and to ensure meaningful access to their services in order to comply with the law. That proposition, apparently a disputed issue in CALI, is uncontroverted here. The Court apparently had no opportunity to opine on what kinds of accommodations are, in fact, required by the law, in light of the fact that the Defendants in CALI apparently conceded that their emergency program did not include any accounting whatsoever for the needs of people with disabilities in the areas of

notification, evacuation, sheltering, or recovery. Those facts clearly bear no resemblance to the record developed here.

Although factually distinct, those cases which emphasize the fact-specific nature of the inquiry, both within and outside of this circuit, do provide some helpful guiding principles. First, courts have consistently recognized that what constitutes a reasonable accommodation may vary across qualified individuals and across government facilities and services. See Fulton, 591 F.3d at 44; Foley v. City of Lafayette, 359 F.3d 925, 929 (7th Cir. Ind. 2004) (recognizing that the only way to apply 49 C.F.R. § 37.161 is to consider the unique circumstances inherent in any particular transportation service site.) This follows from the truism that individual circumstances vary almost infinitely; so too the array of appropriate and lawful responses that government may implement in order to make its program available to a diverse community. The ADA should not require a cookie cutter approach to emergency planning, nor proscribe specific governmental responses to individual needs. See e.g., Lane, 541 U.S. at 532 (recognizing implementing regulations allow flexibility in making reasonable accommodation); Lincoln, 147 F.3d at 168; Wright, 230 F.3d at 548; NCD, Effective Emerg. Mgmt. (2009) at http://www.ncd.gov/newsroom/publications/2009/NCD_EmergencyManagement_HTML/Effecti veEmergencyManagement.html

The above principle is especially salient in the case before this Court. New York City is the largest city in the United States, with a population of approximately 8.2 million people, characterized by enormous diversity, and consequently, a diversity of individual special needs. During an emergency, government officials are faced with a complex multiplicity of situations requiring accommodation of all kinds. Moreover, in an emergency event, many of those situations are inherently unpredictable. Disasters evolve—decision-makers must evolve with

them. Thus, effective emergency management *must* put in place a structure that allows for discretion and flexibility, instead of rote adherence to pre-determined plans.

In addition to flexibility, courts have recognized the importance of accounting for timing and duration as factors in the analysis. Where non-compliance with the overarching policy goals of the statute—access for everyone—is temporary, courts have declined to find a violation. Foley 359 F.3d at 925, 930 (finding temporary inaccessibility due to inclement weather of elevator and ramp, which was covered with snow, did not constitute an ADA violation); Midgett, 254 F.3d at 850 (citing to § 37.161(c) and holding that in the context of accessible transportation for people with disabilities, temporary problems are not violations of the ADA); Karvelas v. Milwaukee County, 2012 U.S. Dist. LEXIS 126539 (E.D. Wis. Sept. 5, 2012) (temporary placement of an individual with a disability in a less-than ideal facility does not violate the ADA's most integrated setting mandate).

This principle is also particularly relevant to the facts before this Court. Emergency management programs can account for situations that can be predicted with some degree of certainty, but emergencies by their nature present decision-makers with unpredictable conditions and circumstances. Temporary ramps may become rain-soaked because of unexpected deluges; a tree may fall across the path of an accessible entrance; flooding may incapacitate the telecommunications network of a large section of the City; weather patterns in other regions may affect fuel supplies. Emergency managers cannot prevent unpredictable events from happening; instead, effective emergency management creates structures and processes to ensure that temporary inaccessibility in a particular aspect of the program is just that--temporary. In recognition of these unpredictable challenges faced during an emergency, the pertinent caselaw strongly suggests that the ADA is not violated by temporary inaccessibility of a specific aspect

- 12 -

of the program—whether a rain-soaked and slippery ramp, an unexpected blackout in a high-rise building, or temporarily locating an individual with a disability in an evacuation center that is not accessible in every respect before transfer to a more appropriate setting—so long as the municipality has the necessary structure in place to ensure that the program as a whole remains accessible. See id.

**F.   The Services Provided by New York City's Emergency Management Program are Wholly Consistent with the Statutes, Implementing Regulations, and the Interpretive Caselaw.**

When viewed in the above context, the record contained in Defendants' declarations and exhibits amply demonstrates that New York City's emergency management program is fully compliant with the relevant statutes, regulations, and judicial precedent. As noted above, the City's emergency management program consists of four central components: (1) communication to the public through community outreach and pre-event notification; (2) evacuation and transportation services; (3) sheltering; and (4) recovery.  Defendants have taken concrete steps in each of these areas to ensure that the emergency program is accessible to people with disabilities. In cases where Defendants have identified inaccessible aspects of the program, Defendants have developed accommodations to ensure that people with disabilities can meaningfully receive the same services in some other fashion.

**i.   Communication: Outreach and Pre-Event Notification**

The record reflects that Defendants have taken numerous meaningful steps to ensure that people with disabilities are aware of the services provided through the City's emergency management program—both as a part of the City's general outreach efforts and during the period prior to a known emergency event. Those efforts fall into several categories.

First, Defendants engage in widespread community outreach, focused on a broad spectrum of vulnerable populations, including people with disabilities. See generally, Schaffer Declaration; Belisle Declaration.

Second, Defendants have developed a series of disaster preparedness guides, some of which are tailored specifically to the elderly and people with disabilities. See Schaffer Declaration ¶ 26, et seq.; Belisle Declaration ¶ 38.

Third, Defendants have taken steps to ensure that emergency preparedness materials are provided in a variety of alternative formats. For example, the emergency preparedness guides referenced above are provided in Braille, audio, and video. See Schaffer Declaration ¶ 26.

Fourth, Defendants have taken extensive steps to ensure that information intended to notify people of a known emergency event is provided through multiple distribution channels, including radio, television, internet, social media, and text. See Expert Report of Elizabeth Davis ¶ 118, et seq. The City's 311 information system is also accessible through TTY and text. See Morrisroe Decl. ¶ 12, et seq. In addition, an ASL interpreter was present at Mayor Bloomberg's press conferences when he delivered critical information about Hurricane Sandy. See Supplemental Expert Report of Elizabeth Davis ¶ 45.

Fifth, Defendants have developed a system of communicating with people with special needs and providing emergency notification called the Advance Warning System, a website-based messaging system for special needs service providers to provide emergency and preparedness messages to the vulnerable populations they serve. AWS consists of approximately 1,700 special needs providers and community groups; it allows OEM to disseminate targeted information to individuals with disabilities, persons with chronic health conditions, and those with other special needs during hazardous weather, utility or transportation disruptions, public

health emergencies, and incidents requiring evacuation. The AWS also includes conference calls, which facilitate communication between OEM and umbrella AWS agencies about emergency information, plan activations, agency outreach efforts, and resource needs. See Belisle Declration ¶ 40, *et seq.*

While the above examples do not represent the entire universe of Defendants' efforts to effectively communication with people with disabilities, even when evaluated on their own, they undoubtedly far exceed the minimum requirements of the law. Indeed, there is scant indication in the record of any inadequacy in the City's communication strategy. By contrast, the record is filled with examples of the City's successful attempts to notify people about the approaching storm. Tellingly, the record clearly reflects class members' knowledge about and use of the various forms of communication through which the City disseminates information. Thus, testimony by class members that they were nonetheless lacking information is not indicative of any deficiency in the City's communication strategies. In short, when these efforts are viewed through the prism of "meaningful access," it is clear that Defendants are complying with the law. See 28 C.F.R. § 35.160(b)(1); Henrietta D., 331 F.3d at 274; See Rodriguez,197 F. 3d 611 (2d Cir. 1999); Loye 625 F.3d 494.

### ii. **Evacuation and Transportation**

Defendants have likewise amply demonstrated that their evacuation program far exceeds the minimum requirements of the law. The City's program of providing additional assistance to individuals who are unable to evacuate through their own power takes several forms. First, the City has developed a Homebound Evacuation Operation ("HEO"), an all-hazards evacuation plan that coordinates the "last resort" evacuation of homebound individuals. The HEO enables homebound individuals who have been unable to evacuate by other means to request evacuation

assistance by calling 311. A 311 call operator uses a short questionnaire to determine the individual's Transportation Assistance Level ("TAL") in order to triage the situation and match the individual's need to a specific type of evacuation resource. That individual is then evacuated by an EMT and/or paramedic via ambulance, a Firefighter Transport Team, or MTA Paratransit, depending on their level of need. See Villani Declaration ¶ 8, *et seq.*

In addition, Defendants have also developed a Health Care Facility Evacuation Operation, which is the City's procedure for assisting health care facilities, including nursing homes, to evacuate special needs residents. The New York City Fire Department ("FDNY") assists the facilities in several ways: first, fire companies are dispatched to individual facilities prior to a storm to confirm with the facility administrator that they are aware of an impending storm and of the possible need to evacuate, and to ensure that they have an emergency plan in place; second, during an evacuation FDNY identifies beds for transfer and manages transportation assets. See Villani Declaration ¶ 8, *et seq.*

The City's emergency management program also accounts for accessible transportation between sheltering facilities and for transportation to temporary housing following a stay at a shelter. See e.g., Villari Declaration ¶ 22; Maniotis Declaration ¶¶ 21, 24. Van Pelt Declaration ¶ 14.

It is telling that Plaintiffs have not presented any credible evidence concerning any evacuation prior to Hurricane Irene and have identified only two individuals who requested assistance evacuating prior to Hurricane Sandy. One of those class members, Mr. Martinez, testified that he first called 911 when the water was already near his waist, but hung up before speaking with anyone, and dialed 311 instead. See Martinez Tr. 89, 90. The other class member,

Ms Delarosa, was evacuated by FDNY EMS once she communicated to EMS that her situation was an emergency. See Delarosa Tr. 113-115.

Neither of the above examples reflects deficiencies within either the Homebound Evacuation Operation or the 911 system. Instead, there is ample indication in the record that the above plans are sound. Indeed, one of Plaintiffs' experts in this case conceded that her only criticism of the HEO was that it could be more widely publicized so that more people could utilize its services. See Kailes dep at p. 83:17-23. In any case, isolated examples of dissatisfaction with Defendants' evacuation plan are not sufficient on their own, to give rise to liability under the disability statutes. See Midgett, 254 F.3d at 849; Stephens, 547 F. Supp. 2d at 278; Stauber, 10 A.D.3d at 282.

### iii. Sheltering

Defendants have developed and implemented a sheltering operation that, "when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." See 28 C.F.R. § 35.150. The system is the largest local emergency sheltering program in the nation, capable of providing shelter to more than 600,000 people. It includes 65 evacuation centers, 500 shelters, and 8 special medical needs shelters. OEM uses a scalable "solar system model" for sheltering. Under this approach, evacuees are first directed to one of 65 local evacuation centers. The evacuation center is the initial point of entry to the shelter system. The evacuation centers have a wheelchair usable entrance. After arrival and triage, individuals are transported to a facility that can most appropriately address their needs during the storm, either a hurricane shelter or a special medical needs shelter ("SMNS"), depending on their needs. If a resident requires acute medical care they will be transferred to a hospital. See Val Pelt Declaration ¶ 12, et seq.

Hurricane shelters can support the needs of the majority of the people with disabilities who Defendants anticipate will seek public shelter. OEM's operating protocols and programmatic elements at its shelters reflect that basic premise. SMNS are designed to reduce the number of people requiring hospitalization (which will likely be high during a hurricane) thereby lessening the burden on health care facilities during an emergency. They provide care to residents whose medical needs exceed the capabilities of a hurricane shelter, but do not require hospitalization.

There are currently eight SMNS, with at least one in every borough. Each facility is supported with special medical cots; medical supplies, and has full back-up generator capacity. The SMNS are all wheelchair accessible. The Health and Hospitals Corporation ("HHC") is responsible for the medical operations within the SMNS. SMNS are staffed by Medical staff; DOHMH Medical Reserve Corps, with non-medical operations managed by the general population sheltering staff. See Maniotis Declaration ¶ 20, et seq.

Department of Education ("DOE") schools make up the majority of the sheltering locations. DOE schools were selected as sites because they are familiar facilities located in every community in every borough; they are City owned and therefore can be turned on quickly; they are pre-supplied with materials and school food.; they are staffed with public safety officers; the buildings have kitchens and cooks to prepare hot, healthy meals for shelterees, and DOE buildings have the existing infrastructure to maintain operations for the duration of the sheltering operation including but not limited to sanitation, maintenance, and cooking. See Van Pelt Declaration ¶ 16.

The sheltering operation is intended to provide a temporary place of refuge during an emergency—it is not intended as short or medium-term housing, nor is the system designed to

provide individuals with all of the supplies to which they would otherwise have access. During an emergency, individuals may be required to temporarily forego a shower or a cot, temporarily. See Belisle Declaration ¶ 62. In short, the system's primary objective is not comfort, but rather to serve as a short-term place of shelter to save lives during an emergency.

Here, once again, aside from Plaintiff Tania Morales, who alleges that she encountered a fence blocking access to the accessible entrance at an evacuation center prior to Hurricane Irene, Plaintiffs have not produced any meaningful discovery concerning any individual with a disability who sought refuge at a New York City evacuation center, general population shelter, or SMNS during Hurricane Sandy. By contrast, though not required to do so in order to prevail on this issue, Defendants *have* provided numerous examples of individuals with disabilities who were appropriately accommodated at the City's sheltering system. See Villari Declaration; Belisle Declaration.

Plaintiffs are apparently claiming that the system as a whole is not accessible to people with disabilities because of allegations of individual instances of temporary ramps or bathrooms that do not conform to code; however, as discussed above, both the implementing regulations and interpretive caselaw clearly support Defendants' position that its sheltering operation complies with the law. Both 28 C.F.R. § 35.150 and 44 C.F.R. § 16.150 make clear that there is no requirement that a public entity make each of its existing facilities accessible to individuals with disabilities. see also DOJ TAM II-5.1000 ("Public entities, however, are not necessarily required to make each of their existing facilities accessible."). As is demonstrated in the record, while no such legal requirement exists, Defendants have taken concrete steps to ensure that all of its existing evacuation center facilities *are* able to be used by individuals with disabilities.

In this context, it should also be noted that while not required by law to do so, the record also amply demonstrates that New York City's emergency management program does account for the provision of the personal services and devices that may be needed during an emergency at both its general population and special medical needs shelters.[2] While the City's public messaging system strongly encourages individuals to bring with them any personal devices they require, if an individual is unable to bring those items with them, it will be provided. See e.g., Van Pelt Declaration ¶ 40, 41.

To the extent that Plaintiffs intend to argue in this context that the contents of the City's stockpile is somehow deficient because it does not contain each and every one of Plaintiffs' laundry list of supposedly mandatory items, that approach is flawed for a variety of reasons. First, the record clearly reflects that Defendants took great care in developing an appropriate inventory of items to be stockpiled in its warehouse. See Jenkins Declaration ¶ 24, et seq. Second, the record reflects that Defendants' planning contemplates obtaining items that are not maintained in the City's stockpile through alternate sources, including the Citywide Asset and Logistics Management System and procurement contracts with pre-identified vendors. See id. ¶ 11, et seq. Third, as is clear from the relevant caselaw, the ADA does not require any particular services be provided; instead, meaningful access to the program is the key. Rodriguez, 197 F. 3d 618; Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998). In short, there is no authority for the proposition that the ADA should serve as a vehicle for micromanagement of the operational details of a government program, particularly where the record reflects measured decision-making by policymakers with subject matter expertise.

---

[2] It should be further noted that Plaintiffs have not identified any class members who claim to have been denied any such personal device during Hurricane Irene or Hurricane Sandy.

While the City does provide individuals with personal assistive items in its sheltering system, 28 C.F.R. 35.135 specifically exempt the City from any such legal obligation. It provides, in pertinent part, that:

> This part does not require a public entity to provide to individuals with disabilities personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including assistance in eating, toileting, or dressing. 28 CFR 35.135

While Appendix A to Part 35 of the regulation makes the above exemption inapplicable where there exist "special circumstances, such as where the individual is an inmate of a custodial or correctional institution," no such "special circumstances" exist here. Indeed, there is no apt analogy between a prison and an emergency shelter. As explained above, the sheltering system offers a temporary place of refuge, where no other alternatives exist--not involuntary confinement for an extended period. As just one illustration of this distinction, whereas a prison administrator's refusal to provide a personal assisted device results in a *de facto* denial of that privilege (in light of the fact that prisoners are necessarily deprived of their personal effects upon entry into the facility), the sheltering operation, by contrast, encourages (and publicizes the need for) people to bring their personal effects with them. In short, although Defendants' planning does contemplate providing personal devices to individuals with disabilities, the law does not require it during an emergency.

### iv. Recovery: Search and Rescue, Door to Door Canvassing, and Temporary Housing.

The City's recovery efforts, illustrated vividly following Hurricane Sandy, are specifically geared towards reaching the most vulnerable populations. Firefighters and urban search and rescue teams, in coordination with the FDNY Special Operations Command, and

- 21 -

NYPD, searched approximately 30,000 buildings and rescued approximately 6,000 people. See Manahan Declaration ¶ 23. As the Storm subsided, City human service agencies prioritized and reached out to their most vulnerable clients. As one example, staff from the New York City Department for the Aging ("DFTA") sent staff on door-to-door wellness checks. DFTA staff also worked closely with its contracted case management agencies who reached nearly 15,000 individuals in the days immediately after the storm. See Whitaker Declaration ¶ 26, *et seq*. In addition, an enormous volunteer effort was coordinated by Deputy Mayor Gibbs' office. See Murray Declaration. Both were pieces of a larger operation coordinated at Floyd Bennett Field by New York City's Incident Management Team. See Manahan Declaration ¶ 24, *et seq*. Defendants also successfully provided temporary accessible housing to people with disabilities. See Weissman Declaration ¶ 12, et seq.

Instead of acknowledging the obvious efforts undertaken to ensure that individuals with disabilities could participate in the recovery services being offered, Plaintiffs apparently will argue that the recovery efforts were too slow. However, even if the Court accepts as true the allegation that the City's door to door canvassing efforts were slow to materialize (which Defendants dispute, particularly in light of the severity of the storm and the extent of the necessary search and rescue efforts which took precedence), that fact is not probative on the issue of the accessibility of the City's door to door canvassing and, more generally, the City's recovery response efforts.

The appropriate analysis on the issue of liability should *not* focus on whether people with disabilities are disproportionately affected during the recover period—many assuredly were—but instead on whether the City's recovery efforts, once underway, were meaningfully available to people with disabilities. See Henrietta D. 331 F.3d at 274; Liberty Res., Inc. v. Phila. Hous.

Auth., 528 F. Supp. 2d 553 (E.D. Pa. 2007) (ADA and Rehabilitation Act claims dismissed where the crux of the claim rested on the fact that mobility disabled people were unable to locate and obtain accessible housing units because there were so few available on the market.). Here, there is *nothing* in the record concerning the City's response reflecting ignorance or indifference to the needs of people with disabilities. Instead, a review of the record detailing the City's recovery efforts reveals concrete steps to prioritize the needs of people with disabilities in order to ensure that individuals with disabilities and others with special needs had access to the programs offered.

## CONCLUSION

For the reasons set forth above and based upon the evidentiary record before the Court, Defendants request that this Court find Defendants in full compliance with the Americans with Disabilities Act, its implementing regulations, Section 504 of the Rehabilitation Act, the New York City Human Rights Law, and all other applicable statutes and regulations.

Dated:     New York, New York
           February 26, 2013

                          MICHAEL A. CARDOZO
                          Corporation Counsel of the
                           City of New York
                          Attorney for Defendants
                          100 Church St., Rm. 2-106
                          New York, NY 10007

           By:

                          Mark G. Toews
                          Senior Counsel