UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

BROOKLYN CENTER FOR
INDEPENDENCE OF THE DISABLED, a
nonprofit organization, CENTER FOR
INDEPENDENCE OF THE DISABLED, NEW       No. 11-cv-6690 (JMF) (FM)
YORK, a nonprofit organization, GREGORY
BELL, an individual, and TANIA MORALES,
an individual,

                              Plaintiffs,

            -against-

MICHAEL R. BLOOMBERG, in his official
capacity as Mayor of the City of New York, and
the CITY OF NEW YORK,

                              Defendants.

---

## DEFENDANTS' RESPONSE TO PLAINTIFFS' PRE-TRIAL
## MEMORANDUM OF LAW

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, N.Y. 10007
Tel: 212-788-1281
Fax: 212-788-8877

Of Counsel:    Martha A. Calhoun
               Mark G. Toews
               Carolyn E. Kruk

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT

> PLAINTIFFS' MEMO MISCONSTRUES THE REQUIRED SERVICES UNDER THE RELEVANT STATUTES AND CONTROLLING CASELAW.............................................................................. 2

> PLAINTIFF'S MEMO IS FILLED WITH INACCURACIES AND BLATANT MISCHARACTERIZATIONS CONCERNING THE NATURE OF DEFENDANTS' PROGRAM............................................................................................. 5

> PLAINTIFFS' PROPOSED REMEDY IS COMPLETELY UNWARRANTED...................................................................................... 10

CONCLUSION ................................................................................................................. 11

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

Alexander v. Choate
   469 U.S. 287 (U.S. 1985)................................................................................4

B.N. v. Murphy
   2011 U.S. Dist. LEXIS 132482 (N.D. Ind. Nov. 16, 2011).....................5

Clark v. Woods
   2001 NDLR (LRP) LEXIS 90 (NDLR (LRP) 2001)................................3

Doe v. Pfrommer
   148 F.3d 73, 83 (2d Cir. 1998) ..............................................................2

Jaramillo v. Prof'l Examination Serv.
   544 F. Supp. 2d 126, 131 (D. Conn. 2008) .......................................2, 3

Lewis v. Casey
   518 U.S. 343 (U.S. 1996)......................................................................11

Loye v. County of Dakota, Plaintiffs,
   625 F.3d 494 (8th Cir. 2010)
   cert. denied, 131 S. Ct. 2111 (2011) ...................................................10

Milliken v. Bradley
   433 U.S. 267 (U.S. 1977).....................................................................11

National Market Share, Inc. v. Sterling Nat. Bank
   392 F.3d 520 (2d Cir. 2004)...................................................................5

Olmstead v. L.C.,
   527 U.S. 581 (1999).............................................................................2, 3

Powell v. Coughlin
   953 F.2d 744  (2d Cir.1991) ...................................................................3

Rodriguez v. City of NY,
   197 F. 3d 611 (2d Cir. 1999) .................................................................2

Schwartz v. Dolan
   86 F.3d 315 (2d Cir. 1996).....................................................................11

United Spinal Ass'n v. Bd. of Elections,
   2012 U.S. Dist. LEXIS 112474 (S.D.N.Y. August 8, 2012)...................4

| **Cases** | **Pages** |
|---|---|

Zahran v. N.Y. Dep't of Educ.
306 F. Supp. 2d 204, 213 (N.D.N.Y 2004)……………………………………………………3

**Statutes**

28 C.F.R. §35.150 ..........................................................................................................2

## PRELIMNARY STATEMENT

Plaintiffs' pre-trial memorandum of law does not contain any compelling legal arguments to support the allegations in the Amended Complaint. Aside from generalities concerning the basic requirement of Title II, there is a conspicuous absence of analysis concerning the ways in which Defendants' emergency management program is legally deficient. Those arguments that are contained in the memo merely reference the general provisions of the ADA's implementing regulations and ignore the specific provisions that provide nuance and meaning to the statute's requirements. That, coupled with the focus on selective aspects of the program that Plaintiffs argue require modification—adding items to the inventory of the City's stockpile or increasing the number of back-up generators at shelters—reveals a serious misunderstanding of the legal requirements of the statute in context.

Moreover, Plaintiffs' memo of law essentially re-formulates the same broad claims in the Amended Complaint, often in disregard of clear countervailing evidence of Defendants' efforts and accomplishments, and frequently supported by reference to inadmissible hearsay. Where Plaintiffs do identify and acknowledge elements of Defendants' program, they are often mischaracterized or unfairly de-legitimized. In short, for the reasons set forth below, Plaintiffs' analysis of the law and their characterization of Defendants' emergency management program are both seriously misguided.

**ARGUMENT**

**POINT I**

**PLAINTIFFS' MEMO MISCONSTRUES THE REQUIRED SERVICES UNDER THE RELEVANT STATUTES AND CONTROLLING CASELAW.**

Plaintiffs' pre-trial memorandum of law reflects a fundamental misunderstanding about the nature of government services and programs under the relevant statutes and controlling caselaw. First, Plaintiffs are apparently proceeding on a theory that every aspect of a government's program must be accessible to everyone. As set forth in Defendants' Pre-Trial Memorandum of Law, that is plainly not the law. See e.g., 28 C.F.R. § 35.150 (requiring accessibility of the program "when viewed in its entirety"); DOJ Technical Assistance Manual, II § 5.1000 (explaining that meaningful access should be evaluated in the context of services, programs, or activities, when viewed in their entirety).

In addition, by focusing on individual items that they feel should have been included in Defendants' emergency management program, they also apparently contend that the ADA requires specific services and benefits in order to be accessible to people with disabilities, which is also flatly incorrect. Olmstead v. L. C. by Zimring, 527 U.S. 581, 603 (U.S. 1999) FN 14 ("We do not in this opinion hold that … the ADA requires States to provide a certain level of benefits to individuals with disabilities.") Rodriguez v. City of New York, 197 F.3d 611, 619 (2d Cir. 1999) ("Under the ADA, it is not our role to determine what Medicaid benefits New York must provide."); Doe v. Pfrommer, 148 F.3d 73, 83 (2d Cir. 1998) (rejecting Rehabilitation Act claim …because "what [plaintiff] seeks to challenge is not illegal discrimination against the disabled, but the substance of the services provided to him"); Jaramillo v. Prof'l Examination Serv., 544 F. Supp. 2d 126, 131 (D. Conn. 2008) (As for accommodations, the ADA requires only "reasonable

accommodations," not necessarily the particular accommodations an individual would prefer.); Zahran v. N.Y. Dep't of Educ., 306 F. Supp. 2d 204, 213 (N.D.N.Y 2004) ([U]nder the disability discrimination statutes, a plaintiff may challenge access to, but not the content of, the programs at issue.).

Federal courts have repeatedly recognized that judicial micromanaging of a municipality's decision-making in administering its programs is not proper. See Olmstead, 527 U.S. at 612 (Kennedy, J., concurring in judgment) ("No State has unlimited resources, and each must make hard decisions on how much to allocate to treatment of diseases and disabilities. . . . The judgment [regarding resource allocation], however, is a political one and not within the reach of the statute."); Clark v. Woods, 2001 NDLR (LRP) LEXIS 90 (NDLR (LRP) 2001) (finding it inappropriate to involve the Court in the micromanagement of the common daily incidents of prison life.); Powell v. Coughlin, 953 F.2d 744, 755 (2d Cir.1991) ("there is a line between enforcement of constitutional requirements and excessive involvement of the judiciary in the details of state administrative matters").

Plaintiffs apparently do not share the Supreme Court's concern about judicial micromanagement of local program administration. Indeed, they suggest by implication that the Court direct Defendants to include a provision in its Power Disruption Plan that instructs emergency services personnel from New York City's Fire and Police Departments on the appropriate method of transporting an individual in a wheelchair out of a building in the dark. See Mem. pp. 20-21. However, that suggestion essentially ignores well-settled precedent—what matters is that the service is provided, not the particular method in which it is done. See, e.g., Jaramillo, 544 F. Supp. 2d at 131. With respect to the service at issue here—evacuation—there is no doubt from the record that FDNY and NYPD provide those services to everyone, disabled or

not.

Additionally, and significantly, Plaintiffs are apparently operating under a fundamentally flawed understanding of the nature of government benefits at issue in this case. In so doing, they conflate two critical concepts in the "meaningful access" analysis: access to a benefit is not tantamount to achieving a particular outcome. This confusion is on display in Plaintiffs' Memo when they assert that "New Yorkers with disabilities cannot derive meaningful access to the benefit—namely a chance at survival…" (Pls' Mem. p. 5).

That description of a government benefit is plainly incorrect. Nothing in the language of the statute or the regulations makes a municipality the guarantor of individual's well-being. Indeed, courts analyzing the ADA's requirement consistently acknowledge that government services are not tantamount to circumstantial outcomes, and that equality of results is not guaranteed under the law. See Alexander v. Choate, 469 U.S. 287, 303-304 (U.S. 1985) (Rehabilitation Act does not require the State to alter this definition of the benefit being offered simply to meet the reality that the handicapped have greater medical needs.); United Spinal Ass'n v. Bd. of Elections, 10 Civ. 5653 (DAB), 2012 U.S. Dist. LEXIS 112474 (S.D.N.Y. Aug. 8, 2012) ("It is well-established in this Circuit that … the ADA and its implementing regulations do not require "equal access" or "equal results" for individuals with disabilities."); DOJ's TAM II-3.3000 ("The ADA provides for equality of opportunity, but does not guarantee equality of results.").

That principle is particularly apt here, where the variety of outcomes after a disaster is essentially impossible to predict with any certainty in light of the inherent uncertainty associated with emergency events. Additionally, it is particularly applicable in the emergency context because, unlike other government benefits, the services Defendants have made available here,

- 4 -

such as sheltering and evacuation assistance, are not always sought or desired by the recipients. That was particularly evident during Sandy as only a small fraction of the individuals who resided in a mandatory evacuation zone elected to do so.

In short, the government service at issue here is not, as Plaintiffs assert, the amorphous concept of "survival"; rather, the services consist of outreach and notification, evacuation assistance, sheltering, and recovery assistance. When each of these areas is evaluated based upon the evidence in the record, it is clear that Defendants' have made the program accessible to people with disabilities.

## POINT II

### PLAINTIFF'S MEMO IS FILLED WITH INACCURACIES AND BLATANT MISCHARACTERIZATIONS CONCERNING THE NATURE OF DEFENDANTS' PROGRAM.

Plaintiffs fundamentally mischaracterize Defendants' affirmative case as "after-the-fact rationalizations and excuses." Perplexingly, they claim that Defendants have no legally cognizable defenses. (Pl. Mem. at 23). To be clear: Defendants will demonstrate through the well-developed documentary and testimonial record that the City has taken concrete and effective steps to ensure that the City's emergency management program is available to all, and that Defendants are, accordingly, in full compliance with all applicable laws and regulations.[1]

---

[1] It should also be noted in this context that Defendants have not, as Plaintiffs assert, waived any arguments that a particular modification would present an "undue hardship" or a "fundamental alteration." The case Plaintiffs cite in support of that proposition, National Market Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 526 (2d Cir. 2004) plainly does not, nor do the few cases that have actually considered the question. See B.N. v. Murphy, 2011 U.S. Dist. LEXIS 132482, 27-28 (N.D. Ind. Nov. 16, 2011) (While not reaching the issue, noting that Plaintiffs have not pointed to a case where a fundamental alteration defense was considered to be waived for failure to affirmatively plead it.). Additionally, both the fundamental alteration and undue burden analyses are explicitly provided for by regulation. See 28 C.F.R. § 35.150(a)(3) ("§ 35.150(a)

It is not immediately clear from what portion of the record Plaintiffs drew the conclusion that Defendants' are engaging in any "blame the victim" rationalizations. (Id.) Conspicuously absent from the testimony of any of Defendants' witnesses is any attempt to absolve the City of the responsibility of planning for people with disabilities. To the contrary, one of OEM's primary responsibilities is to assist all New Yorkers to better prepare themselves for emergencies. <u>See</u> Belisle Decl. ¶ 13.

Where Plaintiffs do provide specific examples of alleged shortcomings, they are apparently based on error or willful refusal to acknowledge the existence of the City's accomplishments in a particular area. They are also frequently based on speculation or inadmissible hearsay.

As the first in a non-exhaustive list of examples, Plaintiffs argue that there is no coordination among the principal agencies and people involved with emergency management. (Pl. Mem. at 21). Plaintiffs apparently base this statement on the absence of any formal Memorandum of Understanding ("MOU") between City agencies requiring certain actions during an emergency event. First, it is an absurdity on its face to presume that an MOU is the only method of effective coordination and communication across agencies. Moreover, one of OEM's core functions is to identify the core competencies of the various City agencies and coordinate the roles and responsibilities of those agencies. See <u>Maniotis Tr.</u> 26:10-14 ("OEM by city charter is a coordinative agency that will coordinate agencies to produce plans where there is

---

does not: require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."). Finally, the precise accommodation that Plaintiffs request is not yet clear—they seek an order from the Court requiring the City to engage an expert in a comprehensive review of the City's planning and preparedness, and to propose modifications. In the event any such proposals are made, they may very well entail an undue burden or a fundamental alteration.

an interagency interaction."); <u>McKinney Tr. (I)</u> pp. 45-46 (describing collaborative relationship in planning with FDNY). In addition, during an emergency activation, representatives from all of the key City agencies are present in the Unified Operations Resource Center and the Emergency Operations Center to facilitate a coordinated response. <u>See</u> McKinney Decl. ¶ 46, *et seq.*, ¶ 55, *et seq.*, Exhibit 39.

Perplexingly, Plaintiffs also take issue with Defendants' guidance for individuals to prepare sufficient supplies to survive for three days on your own after an emergency. That guidance is widely accepted (by FEMA and others) as sound advice—for everyone. <u>See</u> http://www.ready.gov/shelter (advising that "there may be situations, depending on your circumstances and the nature of the disaster, when it's simply best to stay where you are and avoid any uncertainty outside by 'sheltering in place'" and recommending storing three days worth of supplies.) Providing this guidance is not tantamount to any uncritical assumption that everyone can survive on their own after a disaster. Instead, it recognizes that disaster conditions may be sufficiently extreme that it may take several days for assistance to arrive. Plaintiffs are apparently advancing the argument here, as elsewhere, that individuals with disabilities are not capable of participating in any disaster preparedness efforts whatsoever.

Plaintiffs also groundlessly assert that the City's 311 and 911 systems "are frequently overwhelmed in major emergencies." It is not immediately apparent what support Plaintiffs seek from the MOPD website (P003436). That website informs people that they should call 311 if they need assistance and provides a direct contact for people with disabilities who require home food delivery, but it lends no credence to the assertion that 311 was "overwhelmed." Indeed, neither does the City Council Report, which states only that during Sandy the system was again "put to the test" and that there have been "allegations that the call center was understaffed."

Moreover, the Council apparently was made aware of those "allegations" via a newspaper article in the New York Post. See P003665, FN 230, 231 (City Council briefing paper referencing two articles appearing in the New York Post). The fact that Plaintiffs must rely on inadmissible triple hearsay at this late stage in the litigation is reflective of the paucity of evidence in the record to support many of Plaintiffs claims. Furthermore, as the briefing paper notes, the City disputes that allegation. In short, a 26 minute wait during the peak call volume period is hardly tantamount to "bureaucratic chaos." As Mr. Morrisroe, the Director of 311 explains in his declaration, notwithstanding the unprecedented surge in 311 calls during Sandy and the fact that Verizon telecommunications service was not operational, the 311 phone, online, texting and TTY services remained operational at all times. That was due, in part, to the after-action recommendations that were implemented after Hurricane Irene. See Morrisroe Decl. ¶ 50, *et seq.*

Plaintiffs also fault the City for incorporating New York City's extensive system of public transportation into its evacuation plan. However, in light of the fact that huge numbers of New Yorkers rely daily and exclusively on pubic transportation, it would be extraordinarily foolish to counsel otherwise. Moreover, although Plaintiffs cite figures about the accessibility of the City subway system and taxis, they fail to mention that the MTA's buses *are* accessible. See http://mta.info/accessibility/transit.htm.

Plaintiffs also take issue with the City's recovery efforts in the area of interim housing and state in their memo that the City's plans for providing accessible interim housing are "virtually nonexistent." Support for that falsehood come exclusively, not surprisingly, from Plaintiff Dooha, who claims she is unaware of any efforts by the City to provide accessible interim housing to people with disabilities. See Dooha Decl. ¶ 44. Ms. Dooha's understanding is apparently not based upon a carful review of the record in this case. For example, Brad Gair,

Director of the City's Housing Recovery Operation, explained at his deposition (and now in his declaration) the processes by which the City has provided individuals and families temporary housing and that addressing the needs of people with disabilities is a core principle of the Housing Recovery Operation. Mr. Gair stated in his declaration that his office works closely with MOPD to assess and meet the need of individuals with disabilities. He has specifically negotiated with FEMA to include repair of pre-existing accessible features such as ramps as covered items in the Rapid Repair program. See Gair Decl.

Further, Joanna Weissman has described the City's hotel operation, which is one aspect of the housing recovery operation. She explains the process by which Defendants provided temporary interim housing at accessible interim placement facilities (after the shelters were deactivated and schools re-opened), and later at accessible hotel rooms. See Weissman Decl. It should be noted in this regard that Ms. Dooha's concerns about the potential difficulties that might be encountered by CIDNY consumers in obtaining hotel accommodation because of their "serious financial restrictions" is unwarranted in this case—the accommodations are provided at no cost. See Dooha Decl. ¶ 44; Weissman Tr. 96: 8-13.

Plaintiffs also apparently seek to discredit the fact that the City is developing accessible, multi-story, interim housing units that are suited to an urban environment like New York City. That initiative is hardly deserving of trivialization--it is apparently the first fully accessible interim housing initiative in the country. The initiative began in 2007; the prototype is expected to be completed in fall 2013. See Maniotis Decl. ¶ 32, et seq.

Plaintiffs next assert that the City fails to utilize accessible forms of communication. That also flatly ignores the evidentiary record. Examples abound and include the fact that the City distributes emergence preparedness information in a variety of formats, including Braille and

audio. See Schaffer Decl ¶ 26. The City's 311 system is accessible to individuals by phone, text, and TTY and is online. See Morrisroe Decl. ¶¶ 12, 16. The MOPD website is accessible to individuals who are blind or have low vision by using software such as JAWS, System Access and Voiceover. See Exhibits 351-388. OEM has developed message boards for use by individuals who have difficulty communicating at evacuation centers. See Belisle Decl. ¶ 47. Defendants also employed an ASL interpreter at Mayoral press conferences during Sandy and distributed a media alert to broadcast media requesting that they use open captioning for Sandy press conferences. However, that accommodation was apparently unsatisfactory to Plaintiffs, who now argue that the City's *written plans* must include a provision that directs the Mayor's office to utilize an interpreter at every event. Clearly, the ADA includes no such mandate. See e.g., Loye v. County of Dakota, 625 F.3d 494 (8th Cir. 2010), cert. denied, 131 S. Ct. 2111 (2011) (rejecting the contention that an ASL interpreter was required to be present at every meeting). In short, while the above examples are by no means exhaustive, they illustrate an unfortunate but unavoidable irony: Plaintiffs now find themselves in the position of attempting to discredit obviously meaningful steps by Defendants' to ensure programmatic access, which is what they supposedly hope to achieve through this lawsuit.

## POINT III

## PLAINTIFFS' PROPOSED REMEDY IS COMPLETELY UNWARRANTED.

Plaintiffs state in their memo that their proposed remedy is "not overly difficult or expansive." (Pltf's Memo p. 24). They then request that the Court order a third-party expert to engage in a comprehensive review and revision of the City's emergency planning and preparedness efforts. First, for the reasons set forth above and in Defendants' Pre-Trial Memorandum of Law, that remedy is completely unwarranted in light of the obvious efforts and

accomplishments that are documented in the record. Second, as is clear from the record, such an undertaking would be *incredibly* expansive. It would involve myriad City agencies and include a review of thousands of pages of planning documents and interviews of scores of policy-makers. That would translate into an enormously time-consuming and burdensome process for everyone involved. It would also represent an enormous waste of time and resources, in light of the fact that the record clearly demonstrates that the City already has an effective after-action review process in place. That process was followed during Irene and is currently underway with respect to lessons learned from Hurricane Sandy.

Moreover, the Supreme Court has made clear that injunctive relief must account for the interest that localities have in managing their affairs. See Milliken v. Bradley, 433 U.S. 267, 280-281 (U.S. 1977) ("courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs"); Lewis v. Casey, 518 U.S. 343, 363 (U.S. 1996) (federal courts must give the States the first opportunity to correct the errors made in the internal administration of their prisons); Schwartz v. Dolan, 86 F.3d 315, 319 (2d Cir. 1996) (District Court exceeded its authority by fashioning a remedy before providing Defendants with an opportunity to present its own proposal for the modification of the existing scheme, because there were different possible ways to remedy the violation.). Accordingly, in the unlikely event that this Court finds that a certain element of Defendants' program fails to comply with the law, the Court should allow Defendants to propose a remedy in the first instance, since there would almost assuredly exist many ways to correct any deficiency.

## CONCLUSION

For the reasons set forth above and based upon the evidentiary record before the Court, Defendants request that this Court find Defendants in full compliance with the Americans with

Disabilities Act, its implementing regulations, Section 504 of the Rehabilitation Act, the New York City Human Rights Law, and all other applicable statutes and regulations.

Dated:        New York, New York
              March 1, 2013

                              MICHAEL A. CARDOZO
                              Corporation Counsel of the
                               City of New York
                              Attorney for Defendants
                              100 Church St., Rm. 2-106
                              New York, NY 10007

              By:             _____
                              Mark G. Toews
                              Senior Counsel