# EXHIBIT C

# Chapter 7 Addendum 2:
# The ADA and Emergency Shelters:
# Access for All in Emergencies and Disasters

One of government's primary responsibilities is to protect residents and visitors. Providing emergency shelter during disasters and emergencies is a basic way of carrying out this duty.  Shelters are sometimes operated by government entities themselves.  More commonly, though, shelters are operated for the state or local government by a third party – often the American Red Cross.  Regardless of who operates a shelter, the Americans with Disabilities Act (ADA) generally requires shelters to provide equal access to the many benefits that shelters provide, including safety, food, services, comfort, information, a place to sleep until it is safe to return home, and the support and assistance of family, friends, and neighbors.[1]  In general, the ADA does not require any action that would result in a fundamental alteration in the nature of a service, program, or activity or that would impose undue financial and administrative burdens.[2]  This Addendum discusses some of the key issues that emergency managers and shelter operators need to address in order to comply with the ADA when they plan for and provide shelter during emergencies and disasters.  Although this Addendum focuses primarily on issues affecting shelter residents with disabilities, these issues are also generally applicable to volunteers and employees with disabilities.

## A.   Advance Planning

- **Equal access requires advance planning.**  During emergencies and disasters, people with disabilities sometimes have different, disability-related needs than other individuals.  Many of these needs cannot be met during emergencies and disasters without advance planning.  For example, if a person's health will be jeopardized without access to life-sustaining medication that must be refrigerated, an emergency shelter will be of little use to him unless he has access to the required medication and a way to keep it sufficiently cold.  Resources of this kind will likely be unavailable unless emergency managers and shelter operators arrange to have them available well before an emergency or disaster occurs.

---

[1] 28 C.F.R. §§ 35.130, 35.149.

[2] 28 C.F.R. §§ 35.130(b)(7), 35.150(a)(3), 35.164.

Chapter 7 Addendum 2: The ADA and Emergency Shelters:
Access for All in Emergencies and Disasters
(July 26, 2007)                                                              Page 1 of  13

To provide equal access to people with disabilities, effective advance planning requires at least two steps: (1) identify the disability-related needs of the residents and visitors likely to be housed in a shelter, and (2) make the advance arrangements necessary to meet those needs in the event an emergency or disaster strikes.  The most effective way for emergency managers and shelter operators to ensure that advance planning addresses the needs of people with disabilities in their community is to involve community members with a wide variety of disabilities in the advance planning process. These individuals will be able to identify the types of disability-related needs that community residents and visitors are likely to have during emergencies as well as some of the community resources that may be available to help meet those needs.

To help in the advance planning process, the following sections of this Addendum identify some of the more common disability-related needs that shelter residents are likely to have.  However, since people with different disabilities will typically have different needs, the issues addressed in this document are not exhaustive.  Each community will have disability-related issues specific to its own residents and visitors that need to be identified and addressed.  These issues are also likely to change over time as residents move into and out of communities and as changes occur in the types of equipment, medication, and technology that people with disability use.

## B.  Accessibility

- **Ensure that the sheltering program is accessible to people with disabilities.**  Disasters and emergencies are unpredictable.  Even the best emergency managers cannot say with certainty when an emergency will strike, how extensive the damage will be, and which shelters will remain available to house people who must evacuate their homes.  For most people, any building designated as a shelter will meet their basic emergency needs so long as it provides a safe place to eat, sleep, and take care of personal hygiene needs.  But an emergency shelter is of little use to a person using a wheelchair if it has steps at the entrance or toilet rooms she cannot use.

   Under the ADA, emergency sheltering programs must not exclude or deny benefits to people with disabilities.[3]  Emergency managers and shelter

---

[3] 28 C.F.R. §§ 35.130, 35.149.

operators should therefore seek to ensure that shelters are physically accessible to people with disabilities, including people who use wheelchairs.  Before designating a facility as an emergency shelter, emergency managers and shelter operators need to determine if it is accessible.  Elements such as a shelter's parking, walkway to the entrance, entrance, toilets, bathing facilities, drinking fountains, sleeping area, food distribution and dining quarters, first aid/medical unit, emergency notification system, and other activity and recreation areas need to be examined for barriers.  Government facilities built since 1992 and private business facilities built since 1993 are often the best candidates for emergency shelters because they were subject to ADA requirements for physical accessibility when they were built.[4]  Some older facilities have been altered to provide physical accessibility[5] or can be made physically accessible by using temporary measures stored on site and readily available for use in the event an emergency occurs.  Other older facilities are poor candidates for emergency shelters because they have barriers that are too expensive or infeasible to remove.  For guidance on emergency shelter accessibility, please see the Department of Justice's "ADA Checklist for Emergency Shelters" at www.ada.gov/pcatoolkit/chap7sheltercheck.htm.  The checklist includes two assessment tools to ensure that emergency shelters provide access to all: (1) a preliminary checklist that will help emergency managers and shelter operators decide if a facility has the characteristics that make it a good candidate for a potential emergency shelter, and (2) a more detailed checklist that will help identify and remove the most common barriers to physical accessibility.

> ***Emergency managers and shelter operators need to ensure that sheltering programs are accessible to people with disabilities, including individuals who use wheelchairs.***

---

[4] 28 C.F.R. § 35.151(a) (for public facilities); 28 C.F.R § 36.406 (for private facilities that are subject to the requirements of Title III of the ADA because they are public accommodations or commercial facilities).

[5] 28 C.F.R. § 35.151(b) (for public facilities); 28 C.F.R. §§ 36.402 - 36.405 (for private facilities that are subject to the requirements of Title III of the ADA because they are public accommodations or commercial facilities).

## C. Eligibility Criteria

Shelters are usually divided into two categories: (1) "mass care" shelters, which serve the general population, and (2) "special needs" or "medical" shelters, which provide a heightened level of medical care for people who are medically fragile. Special needs and medical shelters are intended to house people who require the type and level of medical care that would ordinarily be provided by trained medical personnel in a nursing home or hospital.

■ **House people with disabilities in mass care shelters.** Emergency managers and shelter operators sometimes wrongly assume that people need to be housed in special needs or medical shelters simply because they have a disability. But most people with disabilities are not medically fragile and do not require the type or level of medical care that special care and medical shelters are intended to provide. The ADA requires people with disabilities to be accommodated in the most integrated setting appropriate to their needs,[6] and the disability-related needs of people who are not medically fragile can typically be met in a mass care shelter. For this reason, people with disabilities should generally be housed with their families, friends, and neighbors in mass care shelters and **not** be diverted to special needs or medical shelters.

To comply with the ADA's integration requirement, emergency managers and shelter operators need to plan to house people with a variety of disabilities in mainstream mass care shelters, including those with disability-related needs for some medical care, medication, equipment, and supportive services. Emergency managers and shelter operators must also ensure that eligibility criteria for mass care shelters do not unnecessarily screen out people with disabilities who are not medically fragile based on erroneous assumptions about the care and accommodations they require.

■ **Respect the right of people with disabilities to make choices about where to shelter.** In some communities, emergency managers have designated shelters specifically for individuals with disabilities or individuals with a specific type of disability. For example, a community with a school for students who are deaf may designate that facility as an emergency shelter for people who are deaf. While the ADA does not prohibit offering these types of emergency shelters,[7] it generally does prohibit emergency managers and shelter operators from requiring people with disabilities or

---

[6] 28 C.F.R. § 35.130(d).

[7] 28 C.F.R. § 35.130(b)(2) - (c).

people with a specific type of disability to stay in such shelters.[8]  The ADA requires emergency managers and shelter operators to accommodate people with disabilities in the most integrated setting appropriate to their needs, which is typically a mass care shelter.

- **House people with disabilities in mass care shelters even if they are not accompanied by their personal care aides.**  Some people with disabilities use personal care assistance for activities of daily living, such as eating, dressing, routine health care, and personal hygiene needs.  One question that frequently arises is whether people with disabilities who use attendant care can be appropriately housed in mass care shelters.  In most instances, they can.  Most people with disabilities who use attendant care are not medically fragile and do not require the heightened level of medical care provided in a special needs or medical shelter.

  In the past, some shelter operators maintained policies that prevented people with disabilities who regularly use attendant care from entering mass care shelters unless they were accompanied by their own personal care attendants.  These policies denied access to many people with disabilities.

  During emergencies, many personal care attendants – like other people – evacuate or shelter with their own families instead of staying with their clients.  Shelter operators should provide support services in mass care shelters to accommodate people with disabilities who are not medically fragile but need some assistance with daily living activities unless doing so would impose an undue financial and administrative burden.  Such assistance can be provided by medical personnel or trained volunteers.

> *Local governments and shelter operators may not make eligibility for mass care shelters dependent on a person's ability to bring his or her own personal care attendant.*

- **Make arrangements in advance to ensure that special needs and medical shelters have sufficient numbers of adequately trained medical staff and volunteers.**  Special needs and medical shelters house people with disabilities who require the heightened medical care that is ordinarily provided in nursing homes and hospitals.  However, in the past, these shelters have often had too few qualified staff – or relied too heavily

---

[8] 28 C.F.R. § 35.130(b)(2), (e)(1).

on volunteers with minimal training – to provide adequate care to the medically fragile people they house.

Advance planning is the only way emergency managers and shelter operators can secure enough trained medical personnel and adequately trained volunteers to ensure the safety and comfort of residents of special needs and medical shelters.

- **Keep families together whenever possible, even in special needs and medical shelters.**  Family members provide each other the support and assistance necessary to cope with emergencies and disasters.  During these difficult times, separation from family members increases loneliness, worry, and additional stress.  But while most families have been able to stay together during emergencies, individuals with disabilities have often been unnecessarily separated from their families because many special needs and medical shelters do not allow them to be accompanied by more than one person.

In disasters and emergencies, people are ordinarily allowed to shelter with their families.  This benefit needs to be available to persons with disabilities as it is for everyone else.  Of course, some people in special needs and medical shelters may need to be housed in medical wards apart from their families because of critical medical needs, but their families should still be housed nearby.

## D.   Reasonable Modifications

The ADA generally requires emergency managers and shelter operators to make reasonable modifications to policies, practices, and procedures when necessary to avoid discrimination.[9]  A reasonable modification must be made unless it would impose an undue financial and administrative burden.[10]  The following are examples of reasonable modifications that emergency managers and shelter operators will generally need to make:

- **Modify "no pets" policies to welcome people who use service animals.**  Many emergency shelters do not allow residents or volunteers to bring their pets inside.  But shelters must generally modify "no pets" policies to allow people with disabilities to be accompanied by their service animals.

---

[9] 28 C.F.R. § 35.130(b)(7).
[10] 28 C.F.R. § 35.130(b)(7).

A service animal is <u>not</u> a pet.  Under the ADA, a service animal is any animal that is individually trained to provide assistance to a person with a disability.  Most people are familiar with dogs that guide people who are blind or have low vision.  But there are many other functions that service animals perform for people with a variety of disabilities.  Examples include alerting people who are deaf or hard of hearing to sounds; pulling wheelchairs; carrying or retrieving items for people with mobility disabilities or limited use of arms or hands; assisting people with disabilities to maintain their balance; and alerting people to, and protecting them during, medical events such as seizures.

How can a service animal be identified?  Service animals come in all breeds and sizes.  Many are easily identified because they wear special harnesses, capes, vests, scarves, or patches.  Others can be identified by the functions they perform for people whose disabilities can be readily observed.  When none of these identifiers are present, shelter staff may ask only two questions to determine if an animal is a service animal: (1) "Do you need this animal because of a disability?" and (2) "What tasks or work has the animal been trained to perform?"  If the answers to these questions reveal that the animal has been trained to work or perform tasks for a person with a disability, it qualifies as a service animal and must generally be allowed to accompany its owner anywhere other members of the public are allowed to go, including areas where food is served and most areas where medical care is provided.  Questions about the nature or severity of a person's disability or ability to function may not be asked.  It is also inappropriate to question a person's need for a service animal or to exclude a service animal on the grounds that shelter staff or volunteers can provide the assistance normally provided by the service animal.

- ■ **Modify kitchen access policies for people with medical conditions that may require access to food.**  Most shelter operators restrict residents' and volunteers' access to the kitchen to preserve food and beverage supplies and maintain efficient kitchen operations.  But people with medical conditions such as diabetes may need immediate access to food to avoid serious health consequences.  Shelter operators need to make reasonable modifications to kitchen policies so that residents and volunteers with disability-related needs can have access to food and beverages when needed.

- ■ **Modify sleeping arrangements to meet disability-related needs.**  To maximize efficiency, shelter operators typically provide one standard type of cot or mat for use by shelter residents.  However, some people have disability-related needs for cots to be modified or may need to sleep on cots or beds instead of on mats placed on the floor.  For example, a person with

muscular dystrophy may require a cot with a very firm mattress to provide the physical support needed to facilitate breathing. Similarly, many people with mobility disabilities will be unable to use a sleeping mat placed on the floor. For example, many people using wheelchairs or scooters will be unable to safely transfer on and off a cot or bed unless it is firmly anchored so it does not move and has a firm sleeping surface that is 17 - 19 inches above the floor. Shelter operators need to establish procedures that people with disabilities can use to request reasonable modifications to sleeping arrangements.

## E.   Effective Communication

From the moment people begin to arrive at a shelter, good communication between staff, volunteers, and residents is essential. Many shelter residents and volunteers might have communication-related disabilities, including those who are deaf or hard of hearing and those who are blind or who have low vision. People with mental retardation or psychiatric disabilities might also have communication difficulties in certain circumstances, such as registering, filling out applications for benefits, or trying to understand what benefits and services are available.

Under the ADA, shelter operators must provide "effective communication" to people with disabilities unless doing so would result in a fundamental alteration or would impose undue financial and administrative burdens.[11] Shelters that are part of a state or local government sheltering program must give "primary consideration" to the type of auxiliary aid or service preferred by the person with a disability;[12] they must defer to that choice unless another equally effective method of communication is available or the preferred method would impose an undue financial and administrative burden or fundamental alteration.[13] This requirement applies even if a third party operates the shelter under an arrangement with the state or local government.

Advance planning is critical to ensuring effective communication during an emergency. Without such planning, it may be difficult or impossible to locate auxiliary aids and services and have them ready for use at the shelter. Advance planning will also alleviate the expense and burdens associated with providing auxiliary aids.

---

[11] 28 C.F.R. § 35.160.

[12] 28 C.F.R. § 35.160(b)(2).

[13] 28 C.F.R. § 35.164.

- **Provide alternate format materials for people who are blind or who have low vision.** People who are blind or have low vision may request documents and brochures in alternate formats (Braille, large print, or audio recording). Generally, shelter supplies should include alternate format versions of documents that are routinely made available to shelter residents. Having alternate formats available for distribution during an emergency requires advance planning.

  When documents are prepared on the spot and alternate formats cannot be prepared in advance or produced as needed, shelter operators are still required to provide effective communication through alternate means.[14] Often, the most effective solution in an emergency is to provide a person to read printed documents and, where applicable, someone to help fill out forms. People who serve as readers or provide assistance filling out forms must be "qualified" – in the context of an emergency shelter, this means being capable of and willing to read materials and complete forms as instructed by the person with a disability.

- **Ensure that audible information is made accessible to people who are deaf or hard of hearing.** In emergency shelters, most information is conveyed through oral announcements. Shelter operators must ensure that people who are deaf or hard of hearing have access to this information in a timely and accurate manner. In some circumstances, qualified sign language or oral interpreters may be required by the ADA. In others, posting messages and announcements in written format on a centrally located bulletin board, or writing notes back and forth with residents who are deaf or hard of hearing, may suffice.

  The type of auxiliary aid or service required in a specific situation depends on several factors, including the length, complexity, and importance of the communication and the person's language skills and history. For example, handwritten notes will not communicate information effectively to a person who cannot read. Similarly, providing a sign language interpreter will not be effective for a person who is hard of hearing and does not understand sign language.

  If it becomes an undue financial and administrative burden to obtain qualified sign language or oral interpreters at a shelter, then the ADA does not require them. However, advance planning can significantly reduce the costs and administrative burdens of making interpreters available.

---

[14] 28 C.F.R. § 35.164.

■   **Provide a TTY for the use of people who are deaf or hard of hearing.**
Many people in shelters use telephones to apply for disaster relief benefits,
arrange for transitional housing, and speak to family and friends.  People
who can use standard voice telephones typically make use of shelter
telephones or cellular phones for this purpose.  But without access to a
teletypewriter (TTY), people who are deaf or hard of hearing and those who
have speech disabilities are unable to communicate with others over the
telephone.

## F.   Shelter Environment

■   **Offer orientation and wayfinding assistance to people who are blind or
have low vision.**  Until they become familiar with the shelter layout, blind
people and those with low vision may have difficulty locating different areas
of the shelter.  Even after they are oriented to the shelter environment,
changes in furniture layout or the addition or removal of cots may be
disorienting to people who rely on these landmarks to find their way around.
When they arrive at a shelter, people who are blind and those with low
vision might need assistance orienting themselves to the shelter layout and
locating pathways to sleeping areas, toilet rooms, and other areas of the
shelter they may wish to use.  Offer, but do not insist, on providing
orientation and wayfinding assistance.  Some people who are blind or have
low vision need such assistance.  Others can, and prefer to, find their own
way.

■   **Maintain accessible routes.**  Cots and other furniture need to be placed to
ensure that accessible routes – routes that people who use wheelchairs,
crutches, or walkers can navigate – connect all features of the shelter.  For
instance, accessible routes need to connect the sleeping quarters to the
food distribution and dining quarters, to the toilet rooms and bathing
facilities, activity areas, etc.  Generally, an accessible route is 36 inches
wide, except at doors and for short distances, when it can be narrower, and
where it turns, when it must be wider.  More guidance on accessible routes
is provided in the "ADA Checklist for Emergency Shelters" at
www.ada.gov/pcatoolkit/chap7sheltercheck.htm.

■   **Eliminate protruding objects in areas where people can walk.**
Furniture and other items should be positioned to direct pedestrians who
are blind or have low vision safely away from overhead or protruding
objects.  This requirement extends beyond the "accessible route" and
applies throughout the shelter environment to any place where a person
can walk.  Hazards posed by protruding and overhead objects can

typically be eliminated by placing a cane-detectable barrier on the floor beneath or next to them.  But care should be taken so cane-detectable barriers do not block accessible routes or the clear floor space that people using mobility devices need to access common protruding objects such as drinking fountains.  For more guidance on protruding objects, please see please see the "ADA Checklist for Emergency Shelters" at www.ada.gov/pcatoolkit/chap7sheltercheck.htm.

- ■ **Consider low-stimulation "stress-relief zones."**  The stress from the noise and crowded conditions of a shelter – combined with the stress of the underlying emergency – may aggravate some disability-related conditions, such as autism, anxiety disorders, or migraine headaches.  Without periodic access to a "quiet room" or quiet space within a larger room, some people with disabilities will be unable to function in a shelter environment.  In locations where a school gym serves as the emergency shelter, a nearby classroom can provide the necessary relief from noise and interaction that some shelter residents and volunteers with disabilities will need.  Other shelter residents and volunteers may want a break from the noise and crowds.  But quiet spaces are limited, they should be made available on a priority basis to people whose disabilities are aggravated by stress or noise.

- ■ **Consult residents with disabilities regarding placement of their cots.**  Some individuals will have disability-related needs that require accommodation when assigning the location of their cot.  For instance, a person who uses a wheelchair, crutches, or a walker may need a cot located close to an accessible toilet room.  Since an assigned cot may not be identifiable by touch, a blind person may need a cot placed in a location that she can easily find.  A person with low vision may need his bed located close to light so he can see or away from bright light that aggravates his eyes.  Likewise, someone who is deaf or hard of hearing may need a cot placed away from visual distractions that would prevent him from sleeping.

## G.  Supplies

- ■ **Provide an effective way for people to request and receive durable medical equipment and medication.**  Despite advance planning, some people with disabilities will find themselves in shelters without a supply of the medications or medical equipment they need.  For example, some medical insurance plans prohibit people from purchasing medication until their existing supply is almost gone.  Other people may be required to evacuate without medication or medical equipment or be inadvertently separated from medication or medical equipment during evacuation.

Emergency managers and shelter operators need to plan and make arrangements in advance so persons with disabilities can obtain emergency supplies of medications and equipment.

- **Whenever possible, provide refrigeration for certain types of medication.** Many people with disabilities need medication that must be refrigerated. Shelters need to have a safe and secure refrigerated location where medications can be stored and accessed when needed.

- **If electricity is available, give priority to people with disabilities who use ventilators, suctioning devices, and other life-sustaining equipment.** Some people with disabilities require ventilators, suctioning devices, or other life-sustaining equipment powered by electricity. Without electrical power, many of these individuals cannot survive. When electrical power is available, access should be given to people who depend on electrically powered equipment to survive.

   Many people with disabilities depend on battery-powered wheelchairs and scooters for mobility. The batteries in these mobility aids must frequently be recharged, or they will stop functioning. Without these mobility aids, many people with disabilities will lose their ability to move about, they may be unable to participate in some services offered by the shelter, and they may need to depend more heavily on assistance from others. When possible, provide these individuals the opportunity to charge the batteries that power the equipment they use for mobility and independence.

- **Provide food options that allow people with dietary restrictions to eat.** Because of disabilities, some people are unable to eat certain types of food. For example, people with diabetes must restrict their intake of carbohydrates. Other people have severe allergies to common food ingredients, such as peanut oil and byproducts. In planning food supplies for shelters, emergency managers and shelter operators need to consider foods and beverages for people with common dietary restrictions.

- **Provide emergency supplies that enable people with disabilities to care for their service animals.** Many people with disabilities rely on service animals to do things they cannot do themselves. But when evacuating during an emergency, some individuals will be unable to transport enough food and water for their service animals. Shelter operators need to make food and water available so individuals can feed and care for their service animals. Shelter operators should also make reasonable modifications to security screening procedures so that people with disabilities are not repeatedly subjected to long waits at security

checkpoints simply because they have taken their security animals outside for relief.

## H.   Transitions Back to the Community

■  **Provide people with disabilities a reasonable amount of time and assistance to locate appropriate housing.**  Shelters provide temporary refuge during and after an emergency until people can return home or arrange an alternative place to live.  In some instances, shelter operators have required individuals with disabilities to move to hospitals, nursing homes, or other institutions when these individuals could not locate accessible housing or the supportive services they needed to live in their own home as quickly as other individuals.  As a result, some people with disabilities who once lived independently  in their own homes found themselves institutionalized soon after a disaster occurred.

The ADA generally requires people with disabilities to receive services in the most integrated setting appropriate to their needs unless doing so would result in a fundamental alteration in the nature of services or impose undue financial and administrative burdens.[15]  To comply with this requirement and assist people with disabilities in avoiding unnecessary institutionalization, emergency managers and shelter operators may need to modify policies to give some people with disabilities the time and assistance they need to locate new homes.

## I.   Other Resources

As discussed above, the ADA requires that people with disabilities have equal access to shelters and the benefits they provide.  Providing equal access to people with different disabilities can involve very different issues.  This document discusses a few of the most common issues and how they can be addressed. Other issues are addressed in Chapter 7 of the "ADA Best Practices Tool Kit for State and Local Governments," "The ADA Guide for State and Local Governments: Making Emergency Preparedness and Response Programs Accessible to People with Disabilities, " the "ADA Checklist for Emergency Shelters," and other technical assistance materials that are available on the Department of Justice's ADA Home Page at www.ada.gov.

---

[15] 28 C.F.R. § 35.130(d).