UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

BROOKLYN CENTER FOR
INDEPENDENCE OF THE DISABLED, a
nonprofit organization, CENTER FOR
INDEPENDENCE OF THE DISABLED, NEW      No. 11-cv-6690 (JMF) (FM)
YORK, a nonprofit organization, GREGORY
BELL, an individual, and TANIA MORALES,
an individual,

                               Plaintiffs,

              -against-

MICHAEL R. BLOOMBERG, in his official
capacity as Mayor of the City of New York, and
the CITY OF NEW YORK,

                               Defendants.

---

**DEFENDANTS' POST TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS
OF LAW REGARDING PLAINTIFFS' CLAIMS**

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, N.Y. 10007
Tel: 212-788-0923
Fax: 212-788-8877

Of Counsel:    Martha A. Calhoun
               Mark G. Toews
               Carolyn E. Kruk

### PROPOSED FINDINGS OF FACT

A. <u>NEW YORK CITY'S OFFICE OF EMERGENCY MANAGEMENT EFFECTIVELY PLANS AND PREPARES FOR EMERGENCIES.</u>

      1.    The New York City Office of Emergency Management ("OEM") is the agency responsible for coordinating the City's emergency planning and response to emergency conditions and potential incidents. Among other things, OEM develops a broad range of emergency plans and supporting documents, conduct training and exercises and, oversees an extensive education and outreach program. Ex. 554 (McKinney). ¶9; City Charter, Chap. 19-A, §§ 496, 497.

      2.    OEM's emergency response and recovery activities include: (1) constant incident monitoring through its Watch Command; (2) activating the Emergency Operations Center ("EOC") during large incidents as a command center for information coordination, resource requests and decision making; (3) field response to large incidents to ensure interagency communication, resource requests and to ensure agencies are following the Citywide Incident Management System ("CIMS"); (4) logistics planning and response to ensure that the right resources are acquired and delivered to the right place at the right time; (5) working with governmental and non-profit organizations to provide assistance and disaster relief following an emergency. Ex. 554 (McKinney). ¶11.

      3.    All emergency planning flows from the City-wide Incident Management System ("CIMS") which defines the roles and responsibilities for City, State and other government entities and non-profit and private sector organizations that perform and support emergency response. <u>Id</u>. ¶15. CIMS represents the City's implementation of the National Incident Management System ("NIMS"). Ex. 554 (McKinney) ¶16; Ex. 38 at CNY16820.

4.     The planning and preparedness division at OEM plans for all types of hazards and emergency situations that New York City may face--both natural and man-made. Planning documents are not limited to documents titled "plan", but also include playbooks, field guides, quick reference sheets/checklists, data dashboards, manuals, protocols and technical memoranda. Ex. 554 (McKinney) ¶14. OEM has prepared a variety of foundational plans, such as CIMS, the Emergency Operations Center "EOC" Guide (Ex. 39), and the Natural Hazard Mitigation Plan (Ex. 33), that guide the agency in the execution of its key responsibilities. Beyond the foundational plans, OEM's planning documents are "all-hazard", hazard–specific, or a hybrid of the two. Ex 554 ¶18.

5.     Every emergency presents unique circumstances, requiring unique actions in response. OEM's baseline plans are starting points – "in addition to the actions described in the plans, they serve to get the right agency partners and other stakeholders mobilized to identify and mitigate any impact that the hazard may bring. This activity of mobilizing to identify and mitigate impacts is also known as "consequence management." Id. ¶20.

6.     In addition to these baseline plans, agencies develop tactical emergency plans that describe how they implement their role in the baseline plan. For example, the New York City Police Department ("NYPD") has tactical plans for implementing the Area Evacuation Plan and the Metropolitan Transportation Authority ("MTA") has plans for modifying service to implement evacuation operations as described in the Coastal Storm Plan. Id. ¶22.

7.     Special needs are addressed in the City's plans in a number of ways. Certain plans explicitly address the needs of people with disabilities: the Homebound Evacuation Operation ("HEO") (Ex. 6 at CNY139-146), the Special Needs Advance Warning System (Ex. 18), the special medical needs sheltering plans (*e.g.*, Ex. 7 and 14), and Heat Emergency Plan,

which developed specifically for the elderly and people most vulnerable to the impacts of heat (Ex. 22). Ex 554 ¶34.

8.    Other plans have special needs considerations imbedded in them. The Power Disruption Plan (Ex. 19) provides for various types of outreach to vulnerable populations in the event of a power disruption. The Commodities Distribution Point Plan (Ex. 24) specifies that individuals the Emergency Operations Center must take a number of steps to specifically reach out to vulnerable populations, ensuring that providers contact at-risk populations, such as seniors and people with disabilities (id. at CNY18553). The Area Evacuation Plan contains operational strategy that account for populations with special needs in the areas of evacuation and transportation (Ex. 245-A). Ex 554 ¶36.

9.    Planning documents are the result of a complex and collaborative process. The initial planning design memos generally include "a summary of the hazard, the operations contemplated and the technical approach to each, the demographics of the population affected by the hazard, the components and documents that comprise the plan, potential issues and key challenges that must be overcome by those operations and in the planning process and the agencies and stakeholders that should be involved in development of the plan" See Ex. 554 (McKinney ). ¶¶37-39.

10.    The selection of interagency planning team partners is based on their capabilities and expertise (CIMS calls these "Core Competencies"), their legal responsibilities and authorities with respect to the issues contemplated. Every effort is made to include stakeholders and those with relevant expertise in special needs issues by engaging planning partners with experience serving people with special needs such as MOPD, DFTA, HRA, ACS, ARC. Id ¶41. Despite this robust program of advance planning, the written planning documents

3

can only encompass a portion of the actions the City would be required to execute during an emergency event. Id. ¶42.

11.    A series of discussions between the planning partners results in an Agency Review Draft plan that undergoes a rigorous review process by the executives of agencies and stakeholder organizations. Key provisions of the draft are reviewed with important external stakeholders, including members of the Special Needs Advisory Group. Id. ¶43.

**Decision-Making in the Emergency Operations Center ("EOC")**

12.    The EOC functions as the command center for large-scale emergencies where senior officials from the City, State and federal agencies and other entities coordinate decision making and response efforts, gather and disseminate information, and allocate and deploy resources. See Ex. 39. Representatives are organized into the following emergency support functions ("ESF"): Human Services, Health and Medical, Public Safety, Utilities, Transpiration, Infrastructure, Logistics, Emergency Management/Regional Coordination, Private Sector Coordination, External Affairs and Administration/Finance. Id. ¶ 48. The EOC also contains an Operations Section, a Response Support Branch, and a Planning Section. Ex. 554 (McKinney ). ¶50; Ex. 39.

13.    The Planning Section prepares key planning documents such as the EOC Action Plan and Situation Reports ("Sit Reps"), which contain information about the situation on the ground and assist in centralizing information and guiding decision-making. Other tools utilized in the EOC are the checklists and agency responsibility tables in the plans that define the roles and responsibilities of agency task forces. Id ¶52-53

14.    During the response to Hurricane Sandy, over 100 agencies and organizations were represented in the EOC between October 25 and December 3, 2012,

including City agencies, non-profit and volunteer organizations, and representatives from utilities, transportation agencies and branches of the military. Id. ¶54.

15.     During Hurricane Sandy a number of the City's plans were either formally activated or in play. These included:

| Plan | Exhibit | Bates |
|---|---|---|
| Coastal Storm: Activation Playbook (1) | 8 | CNY18268-18386 |
| Coastal Storm: Evacuation Plan (3) and Annexes (3a) | 6 | CNY103-209 |
| Coastal Storm: Healthcare Facility Evacuation Plan (4) | 9 | CNY210-351 |
| Coastal Storm: Sheltering Plan (5) | 7 | CNY352-503 |
| Coastal Storm: Post-Storm Commodities Logistics (6a) | 11 | CNY521-613 |
| Coastal Storm: Public Information Plan (7) | 12 | CNY614-665 |
| Coastal Storm: Recovery and Restoration Plan (8) | 13 | CNY666-687 |
| Coastal Storm: Debris Management Plan (8a) | 17 | CNY2096-2260 |
| Commodity Distribution Point Command Center Manual | 273 | CNY18387-18516 |
| Commodity Distribution Point Site Manual | 25 | CNY18582-18704 |
| Shelter Stockpile Strategy: Response to FEMA | 43 | CNY23924-23951 |
| Commodity Distribution Point Plan | 24 | CNY18517-18581 |
| Debris Management Plan | 17 | CNY2096-2260 |
| Disaster Animal Response Plan | 26 | CNY2261-2393 |
| Disaster Assistance Service Center Plan | 30 | CNY15191-15349 |
| Donations and Volunteer Management Plan | 32 | CNY17347-17647 |
| Downed Trees Emergency Protocol | 40 | CNY18778-18788 |
| Flash Flood Plan | 28 | CNY7732-7801 |
| Logistics Center Manual | 269 | CNY1937-2058 |
| Draft Logistics Shelter Plan | 249 | CNY25549-25716 |
| Logistics Staging Area Manual (currently in draft and awaiting final oversight review) | 250 | CNY24527-24611 |
| Logistics Center Forms and Toolkit | 268 | CNY1937-2057 |
| Mission Request Protocol | 274 (Table of Contents) | CNY24211-24520 |
| Power Disruption Plan | 19 | CNY1658-1789 |
| Damage Assessment and Power Restoration Protocol | 266 | CNY18705-18777 |
| Special Needs Advance Warning System Plan | 18 | CNY854-1007 |
| Winter Weather Emergency Plan | 20 | CNY1511-1657 |

Id. ¶56.

16.     Emergency plans both define roles and responsibilities to various agencies (based on their particular core competencies) and describe courses of action. During an

emergency, courses of action must frequently be adjusted, but roles and responsibilities remain fixed. The lead agency become experts at modifying the planned course of action to accommodate exigent circumstances to maintain mission focus on the affected individuals and families. Id. ¶57.

17.    Emergency response strategies were continually adjusted during the Sandy response to respond to the needs of the specific situation. Some of these adjustments are specifically contemplated in plans; others were developed through considered decision making at the time. Many of these decisions were relatively uncomplicated—such as providing NYPD with 30 MTA buses to evacuate residents after public transportation had shut down and well past zero hour. Others required mobilizing and coordinating enormous resources, such as procuring and deploying approximately 230 generators for buildings without power, placing first priority to deploy them to hospitals, then critical care and NYCHA facilities. Id. ¶60.

**Self-Improvement Through the After-Action Review Process**

18.    Because of the inherently unpredictable nature of disasters, effective emergency planning must contain an institutionalized and rigorous after action process. For example, after Hurricane Irene, the City and OEM engaged in a thorough after-action analysis to determine what went well and where improvements must be made. As a result of the post-Irene after-action review, a number of areas were identified for improvement, including sheltering, communications and logistics. The implementation of these recommendations resulted in improved decision making and response during Hurricane Sandy. See Ex. 45; Ex 554 ¶¶23-28-32.

19.    The Sandy after-action process affords another opportunity for the City to analyze its planning and response. For example, plans will likely be revised to include some

version of the door-to-door canvassing effort that was mounted when the power disruption persisted. Ex. 554 (McKinney) ¶72. OEM will also look closely at revising sheltering plans to include longer term contingencies and to expand disaster housing recovery plans to incorporate the strategies being developed by the Housing Recovery Operation for both interim and permanent housing for those displaced by Sandy. Id. ¶¶71-72.

**Systemic Integration of Special Needs Related Issues**

20.     OEM's Special Needs Coordinator ("SNC"), ensures that the needs of people with disabilities are fully integrated into OEM's emergency preparedness planning. Ex. 537 (Belisle) ¶2. Aaron Belisle is the current SNC. Id. at ¶1. Before becoming SNC in 2008, Mr. Belisle was employed at Plaintiff CIDNY as the coordinator for the Protection and Advocacy for Voter Access Program. Id. ¶¶8-9.

21.     The SNC has input into all facets of the agency's activities. Id. (Belisle Decl.) ¶13. The SNC has provided input into the following plans: Special Needs Advance Warning System Plan (Ex. 18), Vacate Protocol (Ex. 255), Cooling Center Protocol (Ex. 23), Family Assistance Service Center Plan (Ex. 31), Food Access Plan (Ex. 252), Area Evacuation Plan (Ex. 245 and 245A), the Regional Disaster Housing Recovery Plan (Ex. 248), and the Regional Sheltering Plan. See Ex. 537 (Belisle Decl.) ¶33. Mr. Belisle also assisted in drafting the operational documents that support plans, such as the Coastal Storm Plan Field Guides (Ex. 14-16). See Id. "All of these materials contain components geared towards ensuring that the services connected with each of the above emergency responses are able to be accessed *by all*." See id.

22.     The SNC has also worked to ensure that all training modules include scenarios involving people with disabilities. See Ex. 538 (Belisle Decl.) ¶45. For example,

OEM's Coastal Storm Plan Operator training includes numerous problem solving situations that help educate shelter staff on disability related issues, including the accessibility of shelter facilities and potential functional needs services. See Ex. 538 (Belisle Decl.) ¶45; Ex. 501 at CNY14087-88. Following Hurricane Irene, the SNC also developed a training module that provides additional instruction on interacting with people with disabilities titled "Working with People (individuals or populations) with Access and Functional Needs." See Ex. 538 (Belisle Decl.) ¶45. The SNC also serves as a Special Needs consultant to the regional catastrophic planners at the Regional Integration Center. See Ex. 538 (Belisle Decl.) ¶35.

## B. **DEFENDANTS OVERSEE A BROAD AND EFFECTIVE OUTREACH AND EDUCATION EFFORT.**

**Special Needs Advisory Group**

23.     The SNC chairs OEM's Special Needs Advisory Group ("SNAG"), a quarterly planning meeting that brings together more than 50 government agencies, non-profit service providers and advocacy groups that represent and work with people with special needs. See Ex. 538 (Belisle ) ¶34; Tr. 130: 9-16 (Trapani). The meetings provide a forum to discuss concerns and issues around emergency planning and recovery, as they relate to people with disabilities and older adults and for OEM to gain valuable insight and feedback from these groups, which informs plans and protocols. See Ex. 538 (Belisle) ¶¶3, 34; Ex. 508 at CNY19126, 28, 30-33, 35, 38-40.

24.     SNAG participants have been consulted on special needs issues in various plans, including the Heat Emergency Plan (Ex. 22) and Cooling Center Protocol (Ex. 23). See Ex. 538 (Belisle) ¶37. SNAG recently assisted in the development of the "Ready New York: My Emergency Plan" preparedness guide, which is targeted to people with disabilities and seniors. See Ex. 538 (Belisle Decl.) ¶38; Ex. 3.

**OEM's Division of Community Outreach**

25.     OEM offers a multifaceted, nationally recognized, education and outreach program that includes disability and special needs stakeholders and provides the necessary tools to empower New Yorkers – particularly those with disabilities – to put personal emergency plans in place. See Exhibit 564 (Davis) ¶¶34, 38; Ex. 550 (Schaffer) ¶11.

26.     OEM's Director of Community Outreach, Herman Schaffer, who was recognized as a 2012 White House Champion of Change for his work on Emergency Preparedness Education, is responsible for developing and implementing OEM's strategic outreach priorities and activities around disaster preparedness education and volunteerism, including:

- Community Emergency Response Team ("CERT"), a volunteer program that recruits, trains, manages and deploys 53 teams of approximately 1,200 volunteers to local emergencies;

- Ready New York, the City's emergency preparedness education program that conducts over 400 events per year and includes 11 guides, which are available in audio tape and Braille;

- Citizen Corps Council ("CCC"), a collaborative partnership between non-profit, faith and community-based organizations, and other government agencies to address emergency preparedness through regular communication, special events, and conferences.

Ex. 550 (Schaffer) ¶¶1, 2.

CERT

27.     The CERT program recruits, trains, and engages volunteers to assist with the City's emergency response and to educate their community on emergency preparedness. See Ex. 550 (Schaffer.) ¶14. Some CERT volunteers have disabilities. See Ex. 550 (Schaffer Decl.) ¶15. CERT volunteers are encouraged to build a Community Disaster Network of contacts within their community that would assist them in responding to an emergency. See Ex. 550 (Schaffer)

¶14. In a disaster, CERT volunteers warn people within their community, work in shelters or at reception centers, and disseminate information post-disaster. See Ex. 550 (Schaffer.) ¶21.

28.     CERT volunteers complete a 10-week training program focusing on, among other things, how to identify and engage community members with special vulnerabilities. See Ex. 550 (Schaffer) ¶¶14, 18; Ex. 495 (CERT training module). Volunteers learn to communicate and work with people with special needs; to conduct outreach to them prior to a disaster; and to build a community disaster network that focuses on vulnerabilities and special needs. See Ex. 550 (Schaffer) ¶18-20. At the conclusion of the training, an emergency drill is conducted which includes individuals with disabilities to role-play victims during an emergency. See Ex. 550 (Schaffer.) ¶¶ 24, 25. CERT volunteers also complete post-training courses to maintain their certification with the group, including a class developed by CIDNY. See Ex. 550 (Schaffer Decl.) at ¶22-23. In 2012, OEM and CERT participated in over 730 presentations and fairs. See Ex. 550 (Schaffer) ¶28.

Ready New York

29.     Ready New York is OEM's outreach program targeted at individuals and families. Ex. 550 (Schaffer) ¶26. The program has developed and produced 11 informational guides to help individuals prepare for emergencies. Ex. 550 (Schaffer) ¶26; Ex. 1-4A. The "My Emergency Plan" guide, which was created with significant input from OEM's Special Needs Coordinator and from SNAG, takes individuals with special needs through the steps necessary to develop an individualized emergency plan. Ex. 550 (Schaffer.) ¶27; Ex. 3; Ex. 537 (Belisle Decl.) ¶38.

30.     OEM employs a staff member within the division of Education and outreach who focuses outreach to the disabled population and seniors and who gives

presentations to groups who serve those populations, including: Visions, YAI, League for the Hard of Hearing, City Meals on Wheels, Helen Keller Services for the Blind, Visiting Nurse Service, Lighthouse International, senior centers, and case management organization Ex. 550 (Schaffer) ¶29.

### Citizens Corps Council

31.     Mr. Schaffer is also the co-chair of the Citizens Corps Council. Ex. 550 (Schaffer) together local leaders from community organizations, not-for-profits, and faith based, government, private, and volunteer programs, in order to promote grassroots emergency preparedness and volunteerism, thereby helping New Yorkers to prepare for, respond to, and recover from disasters. Ex. 550 (Schaffer) ¶30; Tr. 127:18-3 (Trapani).

32.     Several hundred organizations are invited to attend meetings and collaborate on various special events and other initiatives. See Ex. 550 (Schaffer Decl.) ¶31. These organizations include a large number of groups that serve people with disabilities including: Visions, Harlem Independent Living Center, CIDNY, BCID, The Guild for Exceptional Children, Visiting Nurse Service of New York, Catholic Charities of Brooklyn and Queens, FEGS, and CAMBA. Id. ¶31.

33.     The Council has a Special Needs subcommittee. Id. ¶32. In the past three years the Council has sponsored two symposia on planning and supporting people with disabilities during an emergency Id. ¶33. A number of advocates and representatives from the disability community participated, including CIDNY. Id. After each symposium a report was disseminated through the Citizens Corps network and posted on OEM's website. See Exhibit 550 (Schaffer) at ¶34; Ex. 49.

**MOPD Outreach**

34.     Staff at the Mayor's Office for People with Disabilities ("MOPD") communicate directly with City residents and members of the disability community concerning issues related to people with disabilities and special needs. See Ex. 539 (Calise) at ¶¶25-26, 29; Ex. 405 (Sit Rep Oct. 28, 2012 20:00hrs) at p. 7; Ex. 77 (Sit Rep 10/28 2000hrs) at CNY22682. During Sandy, MOPD staff helped to resolve issues such as arranging for meal delivery through Meals on Wheels and New York Cares and arranging for members of FDNY to visit residences of individuals who called MOPD with requests for assistance evacuating. Ex. 539 (Calise) at ¶¶26, 27.

**NYPD Outreach**

35.     NYPD's conducts community outreach through its Community Affairs Division. See Ex. 558 (Wahlig Decl.) at ¶24. Outreach occurs daily and preemptively where there is advance notice of an event. See Ex. 558 (Wahlig Decl.) at ¶24. Officers visit large residential buildings, NYCHA complexes, and nursing homes to identify individuals with special needs and ensure they receive the services they need. See Ex. 558 (Wahlig Decl.) at ¶24. The NYPD also distributes information on the impending event; in advance of Hurricane Sandy, officers visited NYCHA facilities to inform residents of the Mayor's mandatory evacuation order. See Ex. 558 (Wahlig Decl.) at ¶24.

C.     **DEFENDANTS' PROGRAM OF COMMUNICATION WITH THE PUBLIC IS ACCESSIBLE TO ALL.**

36.     The City's Emergency Public Information Plan and Coastal Storm Public Information Plan outline the City's strategies to address public information needs and establish a unified approach for communicating to the public before, during, and after emergencies. See Ex. 29 (Emergency Public Information Plan) at CNY11847; Ex. 12 (Coastal Storm Public

Information Plan) at CNY000618. Both plans include specific strategies to communicate with the disability and special needs community. <u>See</u> Ex. 29 (Emergency Public Information Plan) at CNY11881-11882; Ex. 12 (Coastal Storm Public Information Plan) at CNY631.

37.     The Coastal Storm Public Information Plan stresses that "[a]ccessibility of information is also critical...OEM will also work with the media and partner organizations to ensure information is disseminated to people with hearing and sight impairments, and that information is provided in an accessible format." <u>See</u> Ex. 12 (Coastal Storm Public Information Plan) at CNY619.

38.     Defendants' expert, Elizabeth Davis, opined that the planning strategies developed in the City's Emergency Public Information Plan and Coastal Storm Public Information Plan are evidence of a concerted, sustained focus by the City on including people with disabilities in its overall public information campaign. <u>See</u> Ex. 564 (Davis ) ¶58.

39.     Consistent with the guidance in these plans, the City targets its messaging to disability and special needs populations through an array of communication methods, including: traditional media (TV, print, radio), 311, electronic media (websites), NotifyNYC, social media (Twitter, Facebook), the Advance Warning Systems, communication boards, via community organizations, and door-to-door notification. Ex. 537 (Belisle Decl.) at ¶¶40, 41, 44; Ex. 554 (McKinney) at ¶63; Ex. 564 (Davis) at ¶53; <u>see also, e.g.,</u> Ex. 12, 61-64, 66-75, 275-296, 299-335, 366-350, 351- 388.

40.     OEM encourages and assists individuals in identifying outlets for obtaining emergency information in advance of an event-both high-tech (social media) and low-tech (planning with a neighbor who can share information during an emergency). <u>See</u> Ex. 1-4A (Ready New York guides); Ex. 550 (Schaffer) at ¶¶26-28. When implemented during a major

event, such as Hurricanes Irene and Sandy, these multi-faceted strategies and modalities enable the City to reach people who rely on widely disparate access points for information. See Ex. 564 (Davis) ¶53; Ex. 537 (Belisle) ¶44.

**Press Conferences and Releases**

41.     OEM, in collaboration with the Mayor's Press Office, develops press conference materials and releases for a variety of media outlets. See Ex. 66-75, 299-335. The majority of the Mayor's press conferences addressed issues and/or services relevant to people with disabilities and other special needs. See id. A few examples from mayoral press releases and briefings prior to Sandy's landfall included the following information:

- "All of the shelters [City Evacuation Shelters] have at least one entrance useable for wheelchairs." (Ex. 67, 68, 69 and 70);

- "If you can't get to a shelter by yourself, you can request transportation by calling 311." (Ex. 67; see also Ex. 68); and

- "As to the homebound who are living in these communities [Evacuation Zone A]: if you have homebound relatives or acquaintances in these low-lying areas, consider taking steps now to move them to a safer location, in your own home, or in the home of a relative or friend." (Ex. 66).

42.     Consistent with City policy, mayoral press conferences held in connection with Hurricane Sandy included the presence of an American Sign Language ("ASL") interpreter. See Ex. 298; Tr. 295: 23-296: 3; Ex. 539 (Calise) at ¶11. The City also communicated with broadcasters about the importance of making information accessible, including ensuring that the ASL interpreter always remained in the televised frame while being broadcast during the Mayor's press conferences. See Ex. 297.

**Notify NYC**

43.     Notify NYC is the City's emergency notification service. See Ex. 4 (Ready New York – Hurricanes); Ex. 18 at CNY857, CNY994 (AWS Plan); Tr. 200:1-18;

Exhibit 554 (McKinney) at ¶63. Notify NYC messages reach individuals through various sources, as selected by that individual when registering, including email; text messages; telephone; Website; Rich Site Summary ("RSS") Feed (a family of web feed formats used to publish frequently updated works - such as blog entries, news headlines, audio, and video - in a standardized format); and Twitter. See, e.g., Ex. 1 at CNY47.

   44. Defendants' expert opined that the ability to register via website or phone, coupled with the diversity of formats offered, make the program accessible to large numbers of people with disabilities. See Ex. 564 (Davis) at ¶68. Leading up to Hurricane Irene, Notify NYC received a surge of 12,000 registrants. Ex. 45 at CNY7497. As of October 28, 2012, the day prior to Hurricane Sandy's landfall, Notify NYC had a total of 100,245 subscribers (up from 98,280 the previous day) and had 47,485 followers on Twitter (as of November 29 at 05:00hrs). See Ex. 79 (Sit Rep Oct. 29, 2012 08:00 hrs) at CNY22659; Ex. 554 (McKinney) at ¶63.

**City Web sites and Social Media**

   45. The website NYC.gov also offers emergency related information for people with disabilities and special needs. Ex. 1 (Ready New York for Seniors and People with Disabilities) at CNY38 ("Remember to...access NYC.gov...for the latest emergency information."); Ex. 2 at CNY8. The OEM website (www.nyc.gov/oem) also displays updated emergency preparedness and educational materials. See, e.g., Ex. 1-4A; Ex. 68. Further, during Sandy, MOPD's website provided detailed information for individuals with disabilities who were seeking information about the storm. See Ex. 539 (Calise Decl.) at ¶24; Ex. 351-388 (MOPD web pages). For example, the site provided information on Access-a-Ride's availability, subways and buses, evacuation assistance, meal delivery, the locations of Disaster Assistance Service

Centers, Warming Centers, pharmacies that would deliver, as well as links to the latest press conferences. See Ex. 539 (Calise) at ¶24.

46.     In recognition of the critical function of the City's websites, following Hurricane Irene, the New York City Department of Information and Technology ("DoITT") worked to harden and reinforce the City's websites to reduce the likelihood of volume related outages. See Ex. 551 (Morrisroe) at ¶58, Ex. 45.

47.     OEM also utilizes Facebook, Twitter, and a CrowdMap application to share information with the public regarding both emergency preparedness in advance of an event and critical information during an emergency. See Ex. 29; Ex. 76 (Sit Rep 10/28 0800hrs) ("External affairs is updating OEM's Facebook and Twitter handles with new weather updates and related storm information.").

**The Special Needs Advance Warning System**

48.     A central component of the City's system of communicating with people with disabilities is the Special Needs Advance Warning System ("AWS"). See Ex. 18 (AWS Plan), 61-64 (AWS Notices and attachments), 275-296 (same). AWS is a website-based messaging system that reaches governmental and non-governmental agencies and organizations that serve people with disabilities and other special needs, through online messaging and regular conference calls. See Ex. 18 (AWS Plan) at CNY857; Ex. 537 (Belisle) at ¶40.

49.     The AWS includes three components: (1) emails sent to partners with information about a current or pending emergency; (2) the AWS website, which provides detailed emergency information and reference materials as well as management of email messages and conference calls; and (3) a conference call convened by OEM whenever there is a

citywide emergency that may impact vulnerable populations. See Ex. 18 (AWS Plan) at CNY872, 884; Ex. 537 (Belisle) ¶42; Tr. 294:11-20 (Belisle).

50.     There are approximately 900 AWS agencies that receive AWS emails and have access to information through the AWS website, including City agencies that provide services to vulnerable populations, advocacy groups like CIDNY and BCID, case management providers, like Catholic Charities, health care organizations, like dialysis centers, the Visiting Nurse Services, and others. See Ex. 18 (AWS Plan) at CNY958; Tr. 510:4-11; Tr. 294:21-295:1 (Belisle); Ex. 537 (Belisle) ¶¶42-43.

51.     Twenty-one umbrella AWS agencies also participate in calls. OEM estimates that through the 16 largest of these 21 AWS agencies, there is the potential to reach over 600,000 people with special needs, a significant proportion of New York City's most vulnerable residents. See Ex. 18 (AWS Plan) at CNY958. These agencies play a critical role in the emergency response. See, e.g., Ex. 12 (Coastal Storm Evacuation Plan) at CNY139-146.

52.     Emergency messages are conveyed to service providers who in turn transmit the information to the populations they serve. See Ex. 18 (AWS Plan) at CNY857; Tr. 510:4-11 (Plaintiff BCID received the City's AWS notices, which they posted on their web site). This method permits emergency information to be shared through pre-existing, trusted relationships, by agencies that understand their emergency needs. See Ex. 18 (AWS Plan) at CNY857.

53.     The messages encourage people with disabilities to prepare for the storm, evacuate as necessary, and ensure they have appropriate supplies if evacuating to a shelter. See Ex. 18 (AWS Plan) at CNY857; Ex. 537 (Belisle) ¶40; Ex. 61-64, 277-290; Tr. 511:5-9 (Peters). Through AWS, OEM is able to disseminate targeted information to individuals with disabilities,

persons with chronic health conditions, and those with other special needs during hazardous weather, utility or transportation disruptions, public health emergencies, and incidents requiring evacuation. <u>See</u> Ex. 18 (AWS Plan) at CNY857, CNY974.

54.     AWS is a two-way communication system. <u>See</u> Ex. 18 (AWS Plan) at CNY868, CNY974. AWS partners can and do provide real-time reports to OEM about how the event is impacting their clients and information about resources that are needed to support their response. <u>See</u> Ex. 18 (AWS Plan) at CNY857; Ex. 537 (Belisle Decl.) at ¶¶ 40, 41. Conference calls facilitate communication between OEM and umbrella AWS agencies about emergency information, plan activations, agency outreach efforts, and resource needs. <u>See</u> Ex. 537 (Belisle Decl.) at ¶42.

55.     The first Special Needs Advance Warning System ("AWS") message related to Hurricane Sandy was distributed Wednesday night (October 24), and the initial AWS conference call was held on Thursday (October 25). <u>See</u> Ex. 554 (McKinney Decl.) at ¶59; Ex. 395 (Sit Rep, Oct. 25, 20:00 hours) at p. 1. There were daily AWS conference calls in connection with Sandy, which continued for several weeks. <u>See, e.g.</u> Ex. 401 (Sit Rep 10/28 0800hrs) at p. 6; Exhibit 77 (10/28 2000hrs) at CNY22682 ("NYC VOAD Conference held jointly with AWS; over 19 NGOs coordinating services").

56.     Ms. Davis opined that the AWS is an innovative example of OEM's efforts to improve the City's overall ability to deliver emergency information and notifications to people with disabilities and other special needs. <u>See</u> Ex. 564 (Davis Decl.) at ¶73. Ms. Davis also opined that one benefit of the City's collaboration with community and non-profit service networks is the collective ability of these groups to reach out to some of the most hard to reach

populations in the City and that NYC is one of the most successful jurisdictions in the nation at leveraging these networks. See Ex. 564 (Davis) ¶72.

**The 311 System**

57.    New York City's 311 system is a free, "one-stop" City resource, available 24 hours a day, seven days a week, that provides access to answers to frequently asked questions and information on City services, policies, procedures and programs. See Ex551 (Morrisroe) ¶11; Tr. 598:13-15. The information available via the various 311 channels is provided by government agencies and updated on a regular basis. See Ex. 551 (Morrisroe Decl.) ¶17.

58.    Customers can access 311 information, services and assistance by dialing 311, visiting 311 Online at www.nyc.gov/311, texting 311-692, or hearing impaired customers, by using the NY State Relay system. Id. ¶12.

59.    Most inquiries are resolved through the Integrated Voice Response ("IVR") system, which consists of recorded messages, announcements, and instructions the customer hears when they first reach 311. Id. ¶19. Callers with questions or needs that are not resolved through the IVR system are connected with a 311 call representative. Id. ¶27. The 311 representative finds the right service for the caller's needs based on responses to questions that the 311 representative is trained to ask the caller. See Ex 551 (Morrisroe) ¶27; Ex. 484. 311 representatives have access to over 3,600 discrete pieces of information (i.e., 311 content or services) from over 300 City, State, and Federal agencies. See Ex. 551 (Morrisroe) ¶24.

60.    OEM works with 311 to maintain consistent messaging and accurate information. See Ex. 551 (Morrisroe) ¶34. For example, the same information that OEM or the Mayor's Office provides publicly during an emergency is also available via 311 channels. See Ex. 551 (Morrisroe.) ¶35. Moreover, when OEM activates its EOC during an emergency, 311

maintains a full-time representative at the EOC responsible for relaying questions to OEM and answers back to 311's Executive Director, who directs 311's response during emergencies. See Ex. 551 (Morrisroe) ¶36.

61.   During the course of a 311 call with a customer, a 311 representative may identify a need to refer the call to 911. Id. ¶32. 311 call takers are trained to listen for 911 calls and know the protocol for transferring calls to 911. Id. When a transfer to 911 is required, 311 representatives initiate a conference call with 911. Id. ¶¶32, 33. The 311 representative stays on the line with both the caller and the 911 operator until a determination is made by the 911 operator as to whether 311 should handle the call or 911 should take over. See Ex. 551 (Morrisroe Decl.) at ¶33; Tr. 615:14-616:4. Class member, Joyce Delarosa, testified that 311 representatives connected her calls with 911 on multiple occasions, and that a conference call between the three parties was held. See Tr. 79:3-10.

62.   During Hurricane Sandy, 311 provided specific instructions, criteria, guidelines and information on emergency preparedness and response, evacuation, shelters, and sheltering in place. Ex. 551 (Morrisroe) ¶38; see also Ex. 50-58, 484 (samples of 311 call "scripts" that 311 representatives would relay to callers).

63.   City press releases encouraged people to call 311 or visit nyc.gov to:

- learn whether they lived in an evacuation zone. See, e.g. Ex. 69 (Press Release Oct. 28, 2012) ("If you're not sure if you live in Zone A, find out by calling 311 or going to nyc.gov, where you can find a map of the zones or type your address into the zone finder …);

- inquire about evacuation assistance. See, e.g., Ex. 67 (Press Release Oct. 27, 2012) ("If you can't get to a shelter by yourself, you can request transportation by calling 311.");

- learn the location of their nearest shelter. See, e.g., Ex. 67 (Press Release Oct. 27, 2012) ("…to locate one of those shelters, all you have to do is go to nyc.gov or call 311);

- report downed trees. See, e.g., Ex. 72 (Press Release Oct. 30, 2012) ("Let me just urge everybody: 311 for downed trees, please. Or text 311 to report damaged trees.").

64.     There was an unprecedented surge in 311 call traffic during Hurricane Sandy, which caused longer than average wait times. Ex. 551 (Morrisroe) ¶50. Online visits during Hurricane Sandy also surged, totaling seven times the daily average of the year prior. Id. ¶52.

65.     Before, during and after Hurricane Sandy, between October 25 and November 16, 2012, the 311 system received 4,074,525 contacts, including:

- 2,498,015 calls that were IVR Resolved;

- 621,212 calls with 311 representatives;

- 831,797 Online visits; and

- 123,501 text sessions.

Id. ¶¶47-48.

66.     During the period of October 25 to November 10, 2012, the overall average wait time to speak with a 311 representative was 5.3 minutes (318 seconds). See Ex. 551 (Morrisroe Decl.) ¶50; Tr. 600:22-601:1. The day with the longest average wait time during this period was Sunday, November 4, 2012, when callers waited an average of 11.2 minutes. The longest time that any customer waited to speak with a 311 representative on that day was just over 20 minutes (1,207 seconds). See Ex. 551 (Morrisroe) ¶50; Tr. 599:20-600: 4, 601: 2-24.

67.     Although both Verizon locations that feed phone lines to 311 failed due to flooding during the storm, 311 had established a contingency plan to allow 311 to remain operational under such circumstances. Ex. 551 (Morrisroe) ¶55. As a result, while 311

experienced significantly higher than overage activity volume in connection with Hurricane

Sandy, 311 phone, Online, texting and TTY services remained operational at all times. Id. ¶54.

68.     During and following Hurricane Sandy, Plaintiff witness Ms. Delarosa,

testified that she called 311 and spoke with 311 representatives on multiple occasions -- at least

10 times. Tr. 78:25-79:2; 79:6-10; 80:16-23; 86:15-20. The longest period of time that she was

on hold was 15 or 20 minutes. Tr. 86:25-87:5. Although Ms. Delarosa testified that her calls with

311 were sometimes disconnected causing her to need to call 311 back, there is no evidence in

the record that this was due to any deficiency in Defendants' planning or any systemic failure by

311—Ms. Delarosa testified that her calls with friends were also disconnected. Tr. 86:11-24;

89:21-90:3.

## D.  **NEW YORK CITY'S PROGRAM FOR ASSISTING INDIVIDUALS WITH EVACUATION IS FULLY ACCESSIBLE.**

**Building Evacuation Procedures, Resources, and Training**

69.     FDNY is the lead agency charged with response to building evacuations in

New York City. See Ex. 559 (Villani) ¶34. As the largest municipal fire department in the nation,

FDNY has a wealth of experience in safely evacuating individuals from buildings--every day,

FDNY responds to several thousand medical calls and other emergencies. Id. ¶34.

70.     FDNY has 197 engine companies who are trained as certified first

responders and 43 ladder companies. See Tr. 957:19-958:10. FDNY also has five (5) rescue

companies consisting of highly trained individuals specializing in high-impact rescues, such as a

scaffolding collapse or an underground rescue operation. See Tr. 957:19-958:10. All firefighters

receive an 18-week academy training that includes training on conducting evacuations. See Tr.

959:17-960:1.

71.     Because New York City contains a high concentration of high-rise buildings, FDNY has particular expertise in conducting high-rise evacuations. Ex. 559 (Villani) ¶34; Tr. 958:19-959:3. Like other evacuations, high-rise evacuations are situation-specific. See Tr. 955:4-19. It is common for building occupants to include person who are aged, infirm, or with disabilities. Ex. 559 (Villani) ¶35.

72.     During an evacuation Firefighters and EMT's use their training and experience to quickly assess the needs of the individual and transport them out of harm's way—whether to a hospital or other safe place—depending on the needs of the individual and the dictates of the particular emergency situation. Ex. 559 (Villani) ¶36.

73.     FDNY has a tiered response structure—the type of response is dictated by the type and level of resources required for a particular evacuation. See Tr. 945:10-13; 955: 20-24. While individuals with disabilities are not treated *categorically* different than able bodied individuals in the context of an emergency evacuation (see Ex. 559 (Villani) ¶36; Tr. 944:15-945:6) the type of response is dictated by the individual characteristics of the person. See Tr. 956:18-957:5. Firefighters, EMS technicians, and paramedics have broad discretion to use their training and experience to determine the most effective way to transport an individual out of a building. Ex. 559 (Villani) ¶37. FDNY EMS operating procedures dictate that individuals being transported to a hospital via ambulance are to be encouraged to bring service animals, wheelchairs, or other equipment with them in the ambulance. Tr. 797:2-15.

74.     They also have various tools at their disposal to assist them. Ex. 559 (Villani) ¶37. One such resource is FDNY's Critical Information Dispatch System ("CIDS"). CIDS alerts FDNY personnel while en route to an emergency of special circumstances—such as

use and occupancy of a building as a nursing home or hospital that may present additional hazards or challenges. Id. ¶38.

75.     Firefighters are equipped with various physical resources in order to conduct evacuations, including Stokes baskets, backboards, and skids, which can be all be used to evacuate an individual, depending on the dictates of the situation. See Tr. 958:2-15. Another such resource is known as a stair chair, which is a device that can be used to assist in evacuating non-ambulatory patients down stairs and into a transport vehicle. See Ex. 559 (Villani Decl.) ¶39. Every ambulance in New York City is equipped with a stair chair. Stair chairs are also issued to New York City firefighters who are engaged in the HEO operations. See Ex. 559 (Villani) ¶40.

76.     FDNY Chief Frederick V Villani testified that based upon his 32 years of experience as an EMS provider, he is not aware of a single instance of a firefighter, paramedic, or EMT who was unable to safely evacuate an individual due to an individual's disability. Id. ¶44.

77.     Plaintiffs' expert June Kailes advocates placing a stair chair on every floor of every building in New York City that is 75 feet or taller. Tr. 201: 25-203: 17. Ms Kailes conceded that chairs used by non-professionals can cost over $1,000. Tr. 257:20-258:9. She also conceded that such as system would require a training program to instruct private individuals how to use the chairs. Tr. 202:17-203:13. According to Defendants' expert, Ms. Davis, there are no accepted standards or guidelines concerning use of evacuation chairs. Tr. 910:2-7. Moreover they require maintenance. Ms. Kailes proposal is would be enormously costly, complicated and problematic to implement. See Tr. 920: 15-922: 14 (Davis). No other jurisdiction in the country has implemented such a system. See Tr. 909:7-910:7 (Davis).

**Homebound Evacuation**

78.     The Homebound Evacuation Operation ("HEO") plan is an all-hazards evacuation plan specifically designed to evacuate individuals who require assistance leaving their homes. Ex. 559 (Villani) ¶9; Ex. 6 (HEO) at CNY139-146. The plan coordinates actions and allocates resources from multiple City and State agencies. Tr. 335:7- 336:15; Ex. 6 (HEO) at CNY139-146.

79.     The City's 311 system is the primary point of intake for individuals who request evacuation assistance. Ex. 551 (Morrisroe.) ¶41; Ex. 559 (Villani) ¶10; Ex. 6 at CNY140; (City Press Releases); Ex. 355-357 (MOPD web pages). This message is publicized through Mayoral press conferences and releases (Ex. 67-70), NYC.gov, 311's online website and texting services, MOPD's website (Ex. 355-357), Citizen Corps Council emails, Home Based Care Alliance emails, among others channels. See Ex. 551 (Morrisroe) ¶41.

80.     Plaintiff's expert states in her declaration that the public is not provided with any information about how to obtain evacuation assistance. Ex. 536 (Kailes) ¶49. However, Ms Kailes conceded at trial that she is aware that 311 is the entryway to homebound evacuation, and that 311 is widely publicized. Tr. 191:3-9 (Kailes). She also conceded that she was aware that the Mayor delivered regular, televised press conferences prior to Sandy making landfall at which time he explicitly advised people how to get assistance evacuating (Tr. 195:23-196:25) and that the public also received that information through the Advance Warning System, radio, internet, text, and Notify NYC (Tr. 197:15-22).

81.     On Saturday October 27, 2012, two days before Hurricane Sandy's predicted landfall, the Mayor recommended that people living in low-lying areas concerned

about flooding or extended power loss should consider evacuating and staying with friends or family. See Ex. 67 (Press Release Oct. 27, 2012) at CNY23738-39; Ex. 551 ¶43.

82.      The following day, October 28, 2012, at 11:30 a.m., the Mayor issued a mandatory evacuation order of Zone A, which included Coney Island, Manhattan Beach, Red Hook and other areas along the East River in Brooklyn, the Rockaways, Hamilton Beach, Broad Channel in Queens, almost all the coastal areas of Staten Island, City Island, part of Throgs Neck and other patches of the South Bronx, Battery Park City and stretches of the West Side waterfront and Lower East Side and West Village in Manhattan. Ex. 68 at CNY23743; Ex. 76 (Sit Rep 10/28 1400hrs) at CNY23346. Residents in Zone A, totaling approximately 375,000 people, were ordered to evacuate by the end of the day. Ex. 76 at CNY23346.

83.      When a customer calls 311 to inquire about assistance evacuating, the 311 representative identifies the level of assistance that the requesting individual requires (a.k.a. an individual's Transportation Assistance Level ("TAL")), which matches individuals' needs to a specific type of service provided by one of three agencies. Ex. 551 (Morrisroe) ¶42; Ex. 559 (Villani) ¶10.

84.      Individuals requiring evacuation assistance through the HEO are classified into one of three different TALs:

- TAL 1 – an individual who is capable of getting to the sidewalk in front of their residence;

- TAL 2 – an individual who is not capable of getting out of their residence but can physically sit up on their own for an extended period of time; or

- TAL 3 – an individual who is not capable of sitting up and must be transported on a stretcher.

Ex. 559 (Villani) ¶11.

85.     Callers identified as TAL 1 are transferred to the operators/dispatchers at MTA Paratransit for transportation to an evacuation center. See Ex. 551 (Morrisroe) ¶42. TAL 2 callers, 311 conducts further intake by obtaining the caller's location and other relevant information, and forwards the reports to FDNY borough dispatch. Id. TAL 3 callers are transferred to FDNY-EMS. Id.

86.     MTA is a State agency and has its own operating procedures. Tr. 335:22-23; 336:22-337:4. While a separate entity, MTA Paratransit occupies a key role in the operation of the HEO with respect to TAL 1 individuals; the City works closely with MTA to procure the necessary resources to operate that component of the plan. Tr. 335:9-11, 22-23; 336: 10-15.

87.     TAL 2 individuals are provided transportation to an evacuation center with the assistance of FDNY Firefighter Transport Teams ("FFTT"). Ex. 559 (Villani Decl.) ¶12 The FFTTs are comprised of at least three FDNY firefighters on a New York City Department of Education ("DOE") contract school bus. Ex. 559 (Villani Decl.) ¶12

88.     TAL 3 evacuees are transported to hospitals outside the designated evacuation zone by EMS emergency medical technicians ("EMTs") and paramedics. See Ex. 559 (Villani) ¶12.

89.     Hurricane Irene prompted the first-ever activation of the HEO. Tr. 960: 23-24. One hundred fifty firefighters were assigned to the operation. Tr. 9610:18-961:5. Approximately 200 people were evacuated through the HEO during Irene. Ex. 565 (Manahan) ¶13. Every person who requested evacuation through the Hurricane Irene HEO activation was safely evacuated. Id. ¶13.

90.     259 people contacted 311 to inquire about evacuation assistance in connection with Hurricane Sandy. See id. Twenty-five callers were transferred to the MTA

Paratransit line, 80 were referred to the FDNY for assistance, and 34 callers were referred to EMS for transportation assistance. The other 120 callers were provided with information about homebound evacuation assistance but ultimately determined that they did not want or need evacuation assistance, thus no next step action was required. Ex. 551 ¶43; Ex. 476; Ex. 58.

91.     As of October 29 at 2:00 a.m., MTA Para-transit had transported 28 individuals. Ex. 78 at CNY22673.

92.     Consistent with the plan, FFTT handled evacuation of TAL 2 individuals during Sandy. Ex. 565 (Manahan) ¶15; Tr. 950:13-20. FDNY received addresses of individuals who requested evacuation assistance from 311 via email on a periodic basis. See Ex. 565 (Manahan) ¶18. The locations were communicated to FFTTs positioned at five staging areas in New York City; one in each borough. Ex. 565 (Manahan) ¶19; Tr. 953:7-11. There were 10 firefighters (grouped into 3 teams) assigned to each location. Tr. 953: 16-24. Each location was commanded by a lieutenant or captain, who in turn communicated with the staging area manager. Tr. 962:18-21. The location of the staging areas and the level of staffing were determined, in part, by lessons learned from Hurricane Irene. Tr. 960:23-961:5. FFTTs responded to the locations of the individuals requesting assistance and transported them to an evacuation center. Ex. 565 (Manahan) ¶19; Tr. 961:20-962: 6.

93.     During Sandy HEO evacuation operations, the FFTTs maintained continual communication with the FDNY operations center. Ex. 565 (Manahan) ¶20; Tr. 962: 22-963: 7. There were no reports of problems or disruptions involving FFTT evacuation activities, or insufficient resources or staffing to complete the operation. See Ex. 565 (Manahan) ¶21; Tr. 963:8-24; 964:13-16.

94.     OEM deactivated the HEO at 10 p.m. on October 28, 2012, the timing of which was dictated by concerns for the safety of the individuals engaged in the HEO's operation. Ex. 565 (Manahan) ¶17.

95.     The HEO is scalable, which means that its capacity to assist individuals can be increased, depending on the level of need, which is determined in coordination with OEM. Tr. 964: 2-12. FDNY has assessed the resources—both personnel and vehicles—that it can utilize during an evacuation and has allocated sufficient resources to the HEO. Ex. 559 (Villani) ¶22; Tr. 963: 17-24. The Commissioner of FDNY has pre-approved the use of 300 firefighters to operate the HEO, which is six times the number of firefighters that was required to successfully manage the HEO during Sandy. Tr. 963:17-24.

96.     In coordination with OEM, FDNY also identified available transportation assets, including ambulances activated by REMSCO through regional mutual aid agreements with commercial ambulance providers, the NYS DOH Ambulance Mobilization Plan, and FEMA's National Ambulance Contract. Ex. 559 (Villani) ¶23.

97.     There is no evidence in the record that the HEO has insufficient capacity to effectively evacuate individuals who require assistance. Plaintiff's expert, June Kailes, conceded that the Homebound Evacuation planning document does not include any limitations on its capacity. Tr. 190:3-6.

98.     Plaintiffs Kenneth Martinez testified that he sought evacuation assistance prior to the storm's landfall. See Ex. 547 (Martinez) at ¶¶33-35. 41. Mr. Martinez testified that he was unaware of the approach of Hurricane Sandy until Sunday, October 28, 2012--the day prior to the storm making landfall, despite the fact that he lives with his fiancée and two daughters, owned a radio, television, and cell phone with internet access, and had a home health

aid who visited him daily. See Ex. 547 (Martinez.) 4, ¶11, 22; Martinez marked Depo. 7: 3-5; 8: 14-15, 18-19; 32: 21-33: 9; 34: 3-7, 10-17.

99.     Although he lived on the ground floor of a house situated 1 block from Jamaica Bay and was aware of the probability of flooding, it did not occur to him to call 311 until Monday afternoon on the October 29 (after the HEO had been deactivated), 24 hours after the City issued a mandatory evacuation order for his residence and 48 hours after the Mayor advised residents in low-lying areas who have concerns about severe flooding to consider staying with friends or family. See Ex. 547 (Martinez) ¶36; Martinez Depo. 7:3-5; Ex. 67 (Press Release Oct. 27, 2012) at CNY23738-39; Ex.68 (Press Release Oct. 28, 2012) at CNY23742; Ex. 76 (Sit Rep. 10/28 1400hrs) at CNY23346.

100.    Mr. Martinez testified that to the best of his recollection, he called 911 only after the flood water was rushing into his home, on Monday night. See Ex. 547 (Martinez Decl.) ¶¶39-42; Martinez Depo. 161:12-14.

**Search and Rescue Operations**

101.    FDNY Urban Search and Rescue ("USAR") operations, which are geared towards finding and assisting people who are in critical need of assistance, continued after the deactivation of the HEO, as the storm made landfall. See Ex. 565 (Manahan) ¶15; Tr. 945: 14-946:2; 952:13-17.

102.    On October 29 and 30, 2012, firefighters and members of two USAR teams from other states, in coordination with the FDNY Special Operations Command and NYPD, searched approximately 30,000 buildings and rescued approximately 6,000 people. Ex. 565 (Manahan) ¶23; Ex. 518 (Executive Summary) at CNY22542-43.

103.    NYPD assisted FDNY with the evacuation of Zone A as the storm approached. See Ex. 558 (Wahlig) ¶17; Tr. 747: 4-23. Officers requisitioned 30 accessible MTA buses and drove through neighborhoods in the evacuation zone to give people an opportunity to evacuate after other modes of transportation were shut down. Ex. 558 (Wahlig) ¶¶18, 19; Tr. 747:4-23; 749:3-9. The buses operated along designated routes, but also took calls that came through 311, 911, and other officers on patrol. Tr. 748:1-6. During Sandy, the buses were operating up until 30 minutes prior to the second storm surge. Tr. 748:14-24.

104.    The NYPD also drove through Zone A with loud speakers announcing that a mandatory evacuation had been ordered and visited nursing homes where evacuations were ordered to ensure that people with special needs was evacuated. Tr. 752:4-16. (Wahlig)

105.    NYPD also worked with the FDNY in search and rescue efforts, rescuing approximately 500 people during the height of the storm. Ex. 558 (Wahlig Decl.) at ¶25; Tr. 752:19-753:12 (Wahlig).

**Healthcare Facility Evacuation Plan**

106.    The City's procedure for assisting health care facilities evacuate their residents is found in the Healthcare Facility Evacuation Plan, which outlines the agencies, personnel, resources, procedures, and timing required to transport patients and residents from healthcare facilities ("HCFs") in designated evacuation zones to like facilities on higher ground. Ex 9 (Coastal Storm Healthcare Facility Evacuation Plan); Ex. 559 (Villani) ¶14.

107.    The New York State Department of Health ("NYSDOH"), the entity charged with regulatory oversight of licensed medical facilities, prioritizes HCFs according to vulnerability. Ex. 559 (Villani) ¶15. When an evacuation order is issued, the HCF retains responsibility for arranging for transportation through their contracted ambulance company until

notified by the NYS Health Department through the HEC that all further transfers are to be coordinated through the HEC. Id. FDNY assists the facilities in preparing for this eventuality and will also assist in transporting patients, in some cases, when the facility requests assistance. Ex. 559 (Villani) ¶16.

108.   As a part of its planning process, FDNY, in coordination with the New York State Department of Health ("NYSDOH") and other entities, has conducted an assessment of the number of facilities and the number of individuals residing at those facilities who may require assistance with transportation to another HCF. Ex. 559 (Villani) ¶19. New York City has 24 hospitals and 63 nursing homes in evacuation zones, with a total of approximately 24,000 individuals with special needs who need assistance evacuating. Id.

109.   The plan also calls for FDNY, upon request, to dispatch fire companies to meet with HCFs that have been pre-identified by the NYSDOH prior to a storm. Ex. 559 (Villani) ¶20. The purpose of the meetings is to confirm with the HCF's administrator that they are aware of an impending storm and of the possible need to evacuate, and to ensure that they have an emergency plan in place. Id. Additionally, FDNY provides the HCF operator with a checklist that they complete and which is then routed to OEM and NYSDOH. Id. In the event that a facility operator has questions or concerns about their ability to safely evacuate their patients, that information is conveyed to OEM and the NYSDOH, who is charged with assisting them in resolving those issues. Ex. 559 (Villani) ¶21.

110.   As an additional preparatory step, OEM requested that FDNY conduct a facility survey for 46 facilities, in order to evaluate their emergency evacuation plans, consistent with the process described above. Ex. 559 (Villani ) ¶31. The surveys of the health care facilities

likely to be affected began on October 26, 2012 and were completed on or about October 28, 2012. Id. ¶32.

111.    On October 25, 2012, in coordination with OEM, FDNY requisitioned 100 ambulances for HCF evacuation operations during Hurricane Sandy. Id. ¶29. Most of the ambulances arrived on Sunday, October 28, 2012 and were in due course positioned at evacuation centers, which were being used as staging sites for the HCF evacuation operations. Id. ¶30.

112.    The City's mandatory evacuation order did not apply to healthcare facilities (hospitals, nursing homes and adult care facilities) with the exception of ventilator dependent patients. Ex. 77 (Sit Rep 11/28 2000hrs) at CNY22681. All 87 ventilator patients at the facilities in Zone A, the Rockaways, City Island, Hamilton Beach and costal areas of the Bronx were evacuated. Ex. 79 (Sit Rep 10/29 0800hrs) at CNY22651. Some facilities decided to self-evacuate, with support and monitoring from HEC. Ex. 77 (Sit Rep 11/28 2000hrs) at CNY22681.

**No-Notice Evacuation**

113.    The New York City Area Evacuation Plan (AEP) coordinates evacuations of one or more neighborhoods in response to a large-scale, no-notice incident. See Ex. 245-A at p. 6. It was developed in conjunction with the New York City Fire Department ("FDNY"), the Metropolitan Transportation Authority ("MTA"), the New York City Department of Transportation ("DOT"), and the City's Office of Emergency Management ("OEM"). Ex. 558 (Wahlig) ¶10. The New York City Police Department ("NYPD") has primary operational responsibility for the AEP. Ex. 558 (Wahlig) ¶¶9, 12; Tr. 798:18-21. The current version of the

AEP was updated most recently in February of 2013 and was approved on March 4, 2013. See Ex. 245-A; Tr. 863: 9-15.

114.    The AEP contains overarching, operational strategies for responding to the needs of people with disabilities during a no-notice emergency and requires that "every operational strategy must account for populations with special needs and mobility impairments…" See Ex. 245-A at p. 8; Tr. 733:3-6. The Plan further directs that agencies develop and deliver specialized messaging directed at individuals with special needs to facilitate evacuation. Ex. 245-A at p. 48.

115.    The plan addresses the supporting evacuation of individuals with special needs through multiple strategies:

- Facilitating the movement, management, and support of people who require assistance to evacuate or relocate, which includes people with physical or mental limitations, and those lacking resources to relocate or find services on their own. Ex. 245-A at p. 33.

- Establishment of evacuation staging areas where NYPD personnel and other first responders will determine the particular needs of individual evacuees requiring assistance and assist in managing their movement. See Ex. 245-A at p. 33-4; Tr. 739:11-23. One of the considerations for site selection is ADA accessibility. See Ex. 245-A at p. 35.

- Enhanced MTA paratransit service, as well as redirection of paratransit resources from normal operations and implementation of shuttle routes to hospitals or evacuation staging areas. Ex. 245-A at p. 27, 28, 35, 36

- Priority access for buses and paratransit on restricted transpiration routes. Id. at p. 28.

- Implementation of the HEO. Id. at 36.

116.    The HEO is only one method for evacuating homebound individuals in a no-notice emergency event. See Tr. 799: 17-24. Emergency evacuation would also be handled through 911 and through door to door canvassing. Tr. 799: 7-21.

117.    Tactical decisions relating to evacuating individuals with disabilities during a no-notice event are made on a case-by-case basis, because every emergency situation presents unique challenges tat require a unique response. Ex. 558 (Wahlig) ¶16; Tr. 731:23-732: 6; 732:17-20. NYPD will first ascertain whether an individual is present inside of a unit, and evacuate that individual using the most appropriate method, depending on the individual and on the particular situation.  Ex. 558 (Wahlig) ¶15; Tr. 753:19-754:9. This is accomplished first and foremost by communicating with the individual. Ex. 558 (Wahlig) ¶17. For example if an individual is deaf or hearing impaired, NYPD would write down instructions or find someone to assist in communicating with the individual. Id. ¶20. The Operations Division maintains a database of ASL interpreters for that purpose. See Ex. 558

118.    Depending on the situation, the door to door canvassing that NYPD conducts will either be done by patrol officers or by NYPD's Emergency Services Unit ("ESU"). Ex. 558 (Wahlig Decl.) ¶13. ESU is NYPD's special operations division. It provides specialized support, including confined space search and rescue, and advanced equipment to other NYPD units. Id. ¶14. There are approximately 500 officers in the ESU of NYPD. Tr. 751: 20-21. All members of ESU teams are trained as emergency medical technicians, and many are also paramedics. Ex. 558 (Wahlig) ¶17. ESU officers are equipped with additional equipment, such as

stair chairs, backboards, stretchers, and other devices to assist in evacuating individuals with mobility disability. Tr. 751: 4-17.

119.    NYPD protocol dictates that no one is left behind during an emergency evacuation. Ex. 558 (Wahlig) ¶17.

120.    Plaintiffs' expert testified that the Area Evacuation Plan almost completely ignores the needs of people with disabilities. ¶37. However, she conceded at trial that this opinion was based upon the outdated version of the plan. Tr. 215:3-18. She does not have the same opinion with respect to the revised AEP. Tr. 227: 24 - 228: 3. Indeed, Ms. Kailes conceded that she saw improvement in the current version of the AEP (though she failed to include that opinion in her expert report). See Tr. 229:3-9.

121.    When asked what additional provisions should be included in the AEP to address the needs of people with disabilities, the only thing Ms. Kailes could identify is the need for additional accessible vehicles. Tr. 266:14-267:22. However, there is no evidence in the record that the City has ever experienced a shortage of accessible vehicles.

**Blackouts**

122.    NYPD has a standing protocol for ensuring the safety of individuals who rely on electrically powered life-sustaining equipment, or "critical care customers," during a blackout. See Ex. 558 (Wahlig.) ¶22. NYPD coordinates with Con Edison, who maintains a list of those individuals. Id. During a large-scale power outage, Con Edison reaches out to those individuals by telephone to make sure that they are safe, that they have another individual caring for them, that their electrical backup battery power is sufficient, and to ascertain whether they have any additional special needs. Id.

123.    If Con Edison is unable to contact them, they send the individual's contact information to the NYPD Operations Unit. Id.   The Operations Unit then forwards it to the relevant borough command, then to the precinct. At the precinct level, an officer is dispatched to make sure that individual is safe. Id. Once at the unit, if no one responds to our inquiry at the floor, we get the building superintendant. Id. ¶23. If officers are unable to reach the superintendant, the NYPD will try to identify family members. Id.   If all else fails, NYPD officers contact ESU to gain entry. Id.

E.    **THE CITY'S SHELTERING PLANS MEET THE NEEDS OF PEOPLE WITH DISABILITIES.**

124.    The basic plan for providing shelter to individuals during a disaster in New York City is contained within the Coastal Storm Plan. See Ex. 7 (Coastal Storm Sheltering Plan). The Sheltering Plan is an "all-hazards" plan, meaning that it could be activated during any large-scale emergency. Ex. 554 (McKinney) ¶¶17, 23.

125.    The City's Sheltering Plan uses a scalable "solar system model" for sheltering. Ex. at CNY00357; Ex. 561 (Van Pelt) ¶12; Ex. 15 at CNY1109. The City has designated 65 evacuation centers located across the five boroughs to serve as the hubs of a solar system. Ex. 7 at CNY357; 363. All but three of these evacuation centers have co-located hurricane shelters. Ex. 7 at CNY360; Tr.326:6-8 (Belisle). Each evacuation center also has five to 10 hurricane shelters affiliated with it which can be opened if necessary. Ex. 7 at CNY357. The City also has eight special medical needs shelters ("SMNS"), with at least one located in every borough. Id.

126.    The vast majority of evacuation centers and hurricane shelters are located within New York City Department of Education ("DOE") schools. Tr.'840:17-841:4 (Van Pelt). DOE schools were selected as sites because they are welcoming, familiar facilities located in

every neighborhood in every borough; they are City owned and can be turned on quickly; they are pre-supplied with materials and school food; they are staffed with public safety officers. Id. The buildings have kitchens and cooks to prepare hot, healthy meals for shelterees, and DOE buildings have the existing infrastructure to maintain operations for the duration of the sheltering operation including but not limited to sanitation, maintenance, and cooking. Id.

127. The first tier facilities of the system – including the evacuation centers, their co-located hurricane shelters, and the eight special medical needs shelter -- have a capacity to shelter approximately 71,000 individuals. Ex 7 at CNY395; see also Ex. 45 at CNY7483. The first facilities to open when the shelter system is activated are the evacuation centers and shelters co-located with the evacuation centers. Id. at CNY395-96. Subsequently, if necessary, shelters within walking distance of the evacuation center will be opened. Id. at CNY396; Tr. 323:14-15 (Belisle). If fully activated, the entire system has the potential to shelter over 600,000 individuals in more than 500 shelters. Ex. 7 at CNY359. During Hurricane Irene, the City provided shelter to a peak census of 9,446 individuals. Ex. 45 at CNY7483. During Hurricane Sandy, the peak number of evacuees in the shelter system was somewhat over 6,000. Ex. 81 at CNY22461.

128. The SMNS are intended to shelter individuals whose needs exceed the capability of the hurricane shelters but who do not require hospitalization. Ex. 7 at CNY389; Ex. 14 at CNY1390. There are currently 8 SMNS, all wheelchair-accessible. Ex. 561 (Van Pelt) ¶13. The Health and Hospitals Corporation ("HHC") is responsible for the medical operations within the SMNS. Id. SMNS are staffed by Medical staff; DOHMH Medical Reserve Corps, with non-medical operations managed by the general population sheltering staff. Ex. 7 at CNY389. Each facility is supported with special medical cots; medical supplies, and has back-up generator capacity. Id.; Ex. 14 at CNY1418-19

129.    Defendants' expert, Elizabeth Davis, noted that the Solar System approach has important advantages. Ex. 564 (Davis) ¶97. First, because the system is scalable, it allows emergency managers to activate facilities only when needed and efficiently allocates City staff, equipment, and other specialized resources. Exh 7 CNY000357. Id. at ¶98. Second, it allows for a consistent message to the public, because the 65 Evacuation Centers are always fixed and operational for every activation of the system. Id. Because the evacuation information and notifications are *not* dependent on the size of the storm, individuals know which Evacuation Center is closest to their home and can more easily develop an evacuation plan in advance of the event. Id..

130.    The locations of evacuation centers are publicized in advance of an emergency in a variety of ways, including through OEM's website and Ready New York outreach materials. See Exhibit 4A (Ready New York: Hurricanes and New York City). Evacuation center locations are also widely publicized through 311, social media, text (via Notify NYC), email, Mayoral Press Conferences on television and radio as well as through mainstream press reports. Ex. 68 at CNY23744; see also Ex. 69 at CNY23748; Exhibit 7 at CNY417; Tr. 836:20-21 (Van Pelt). The City does not publicize the location of every hurricane shelter in the system because individuals might then attempt to evacuate to a shelter that was not, in fact, open.

131.    Upon arriving at an evacuation center, individuals undergo an initial triage and are then placed either in the co-located hurricane shelter or transported to another hurricane shelter, a SMNS, or a hospital. Ex. 561 (Van Pelt) ¶14. Accessible transportation is provided to those who need it. Id.; Ex. 7 at CNY357.

132.   Hurricane shelters or general needs shelters can support the needs of the majority of the people with disabilities who the City anticipates will seek public shelter. OEM's operating protocols and programmatic elements at its shelters reflect that basic premise. Ex. 7 CNY366. If a general needs shelter does not provide the level accessibility a person needs, the individual would be transported to a shelter that would more appropriately do so. Tr. 328:8-9 (Belisle); Ex. 539 (Calisi) ¶116.

**Problem Solving Structure**

133.   When the sheltering system is activated, the City also activates the Unified Operations Resources Center ("UORC"). Ex. 554 (McKinney) ¶55; Ex. 561 (Van Pelt Decl.) ¶42. The UORC is the centralized command unit responsible for coordinating the City's Emergency Sheltering System. Ex. 561 at ¶42 The UORC is multi-agency operation led by the New York City Department of Homeless Services ("DHS") and staffed with up to 200 staff and liaisons from various City entities including OEM, Department of Education ("DOE"), City University of New York ("CUNY"), Department of Citywide Administrative Services ("DCAS"), Human Resources Administration ("HRA"), Department of Health and Mental Hygiene ("DOHMH"), Health and Hospitals Corporation ("HHC"), New York City Housing Authority ("NYCHA") and New York City Police Department ("NYPD") School Safety Unit. Additional support comes from NYC's Animal Planning Task Force ("APTF"), the American Red Cross (ARC) and other non-governmental organizations. Id. UORC staff monitors sheltering operations by collecting and summarizing sheltering information and reporting situational activities to the EOC. Id. at ¶43. This information is used to create the shelter dashboards that are included in the situation reports. See e.g. Ex429 at CNY0002176. The UORC provides operational support to the shelters including both routine and emergency logistical coordination.

Ex. 552 (Jenkins) at ¶8; Ex. 555 (McLachlan) ¶13; Ex. 561 (Van Pelt) ¶¶42-43; Ex. 562 (Villari) at ¶9.

134. Problems or issues that arise at an evacuation center or shelter are handled within the reporting structure, which is clearly established in the Coastal Storm Plan ("CSP"). Ex. 561 (Van Pelt) ¶46. Issues are first addressed at the facility level. Id. The facility operators, who have managerial and problem solving experience, coordinate that process. Id. If a solution cannot be implemented using the resources at the facility, the issue is raised to the UORC. Id. If the UORC cannot implement a solution, or the resources being requested are beyond the scope of the UORC to procure, the issue will be raised to the EOC and LC. Id.; Ex. 10 at CNY18243-44, 46.

135. Erin McLachlan, a planner with the Regional Catastrophic Planning Group, who was the manager of the Park Slope Armory SMNS, testified: "[w]e have established this chain of command not to be bureaucratic but to be able to address issues as they arise efficiently and effectively. All requests or issues that are not able to be resolved at the shelter level get transferred up to the UORC where they can be resolved logistically or by a higher decision-making authority." Ex. 555 (McLachlan) ¶24.

**Shelter Staffing and Training**

136. The shelters are staffed and operated by City employees. In a worst-case scenario, approximately 34,000 staff would be needed to support a full scale sheltering operation. The Coastal Storm Shelter Plan requires the recruitment of more than 60,000 City employees from eighteen City agencies. OEM exceeded its recruiting goal and recruited more than 150,000 city employees from the 18 staffing agencies to staff the sheltering system. Ex. 561 (Van Pelt) ¶¶22, 23.

137.     There are three categories of shelter staff: operators who are the managers and deputy managers of the evacuation centers and shelters, mid level staff or "specialists" and non-supervisory staff. Ex. 561 (Van Pelt) ¶¶25-31. Each category receives specific, specialized training. Id.

138.     Shelter operators participate in a mandatory, comprehensive full day of training designed specifically for their roles as managers and based on the type of facility they manage. Ex. 561 (Van Pelt) ¶26.

139.     Beginning in 2012 the mandatory training was expanded to two days and Hurricane shelter mangers and evacuation center managers were cross-trained to be able to fill either position. Ex. 561 (Van Pelt) ¶28. This training includes disability awareness information such as making accommodations in shelters. Id. This training was made available to all operators in the CSP system months before Sandy made landfall and prior to the commencement of New York's 2012 hurricane season. Id.

140.     The Hurricane Shelter Practicum for Shelter Managers is an interactive training designed in a virtual reality environment simulating a hurricane shelter. Participants are challenged to set up and operate a hurricane shelter facility. Ex. 561 (Van Pelt) ¶29. Simulation scenarios introduce different issues and problems that require the operator to accommodate a person using a wheelchair and to address dietary and medical issues. Id.

141.     Mid-level shelter managers or "specialists" take a Hurricane Sheltering Orientation, a self-paced, series of on-line training modules. Ex. 561 (Van Pelt) ¶30. This course is designed for shelter facility staff with managerial or supervisory experience. Id. In 2012, OEM created a revised classroom version of this training with the American Red Cross ("ARC"). Id. OEM Human Services and ARC provided the training to the DOHMH employees who serve as

the nurses in the Coastal Storm Shelter System. Id. It included a section on "Access and Functional Needs" with topics on equal access, physical access, effective communication, inclusion, and integrated settings. Id. It also included a section on nursing and emerging medical needs in an emergency shelter. Id.

142.    Non-supervisory staff receives "Just-in-Time" ("JIT") training, which is provided on site at the shelters and evacuation centers during the activation. Ex. 561 (Van Pelt) ¶31; see also Exhibits 502, 503 (JIT Training). The JIT is designed to educate staff on shelter structure and functions and their roles and responsibilities. Id. It includes six courses focused on evacuation center and hurricane shelter functional areas. Id.

143.    In addition, in 2012, all self-paced, on-line computer training modules described above were made available to all 150,000 staff in the system, regardless of which category the staff members works in an evacuation center or hurricane shelter. Id. ¶32

144.    OEM is developing a new video training course entitled "Working with People (individuals or populations) with Access and Functional Needs." Ex. 561 (Van Pelt) ¶33. This training is currently being tested and is expected to be completed prior to the 2013 hurricane season. Id. The course will be available to all City employees involved in the emergency sheltering system and will address the following topics: identifying access and functional needs and understanding their effects; recognizing the broad spectrum of access and functional needs; accommodating differing access and functional needs; and establishing clear and open communication. Id. ; Ex. 537 (Belisle) ¶5.

145.    Erin McLachlan testified that:

> [T]he training developed by New York City emphasizes role play to develop the skills to confront numerous problems. The focus is on building decision-making skills with an understanding of shelter operations and [UORC] operations so that staff can address any

43

issue whether or not that specific issue was trained on. The City's plans call for using people with management experience in key positions in the command structure so that they can exercise judgment and make decisions. If they are unable to resolve an issue, they take it up the chain of command. Ex. 555 (McLachlan) ¶24.

146.    Erin Vilari, who served as shelter manager for two different general needs

facilities in Queens during Hurricane Sandy, testified that:

> The training outlines essential roles, identifies job activities and uses scenario-based problem solving challenges to teach sheltering objectives. The focus is on the command structure and how you can access the necessary resources up the chain of command. The training is geared toward giving shelter operators and UORC the ability to keep the decision-making as close to the issue as possible, and if that person cannot reasonably resolve it moving the issue up the chain effectively to achieve the best outcome. Ex. 562 (Villari) ¶27.

147.    In addition to training on the Coastal Storm Shelter Plan, New York City

also conducts exercises with respect to various parts of the shelter system that involves playing

out various scenarios and providing valuable lessons to help the City strengthen its plans. Ex.

561 (Van Pelt Decl.) ¶¶34, 37. People with disabilities have participated in these exercises. Ex.

561 (Van Pelt ) ¶34.

**Additional Supporting Materials for Sheltering Operations**

148.    Supporting materials, including but not limited to, the coastal storm

activation playbook and field guides specifically for evacuation centers, hurricane shelters, and

special medical needs shelters, were developed to supplement the basic sheltering plans. See Ex.

561 (Van Pelt) ¶38; Ex. 8, 14-16.

149.    Shelter training materials and field guides provide staff with guidance to

accommodate the needs of people with disabilities, including guidance on facility set-up, such as

arranging dormitory areas to ensure sufficient space between cots, accommodating wheelchairs,

walkers or other mobility devises, and noting accessible and non-accessible areas for people with disabilities. Ex. 561 (Van Pelt) ¶39. Additionally, both the shelter training materials and the field guides explain that service animals are permitted in the dormitory areas of shelters and stress the importance of not separating people from their services animals. Id. ¶40; Ex. 14-16.

150.    Shelter operators are provided with facility ccessibility checklist developed by OEM's Special Needs Coordinator. Ex. 537 (Belisle) ¶48; Ex. 472. The checklist, which is discussed in training, instructs the operator to confirm the accessibility of their location and to maintain its accessibility throughout the operation by identifying the location of the accessible entrance, accessible bathrooms and paths of travel to service areas, and ensuring the accessible entrance is unlocked or staffed and clearly marked. Id.

151.    Robert VanPelt testified that the checklist and training has been revised to direct shelter operators to make the accessible entrance the main entrance of the shelter for all evacuees. Tr. 834:15-23 (Van Pelt). This will eliminate any confusion over the location of the accessible entrance. The information provided to the public will be revised to indicate the address of the accessible entrance as the evacuation center address. Tr. 835:1-8.

152.    The Special Needs Coordinator has developed a guide for shelter staff, "Working with People with Special Needs," which contains guidance on how to respectfully and effectively communicate with and and address the needs of people with disabilities, special needs or functional needs. See Ex. 537 (Belisle) ¶46; Ex. 48.

153.    OEM has also developed an emergency communications board that is distributed to all the facilities in the shelter system in the operator packages. Ex. 537 (Belisle) ¶47. The boards contain pictures and symbols related to emergency situations and basic needs which are used to help individuals who have difficulty communicating, either because of a

disability or language barriers, share their needs with shelter staff. Id. Victor Calise, the MOPD Commissioner, testified that the boards or "cue cards" were at the registrations tables of the shelters he visited. Ex. 539 ¶¶13-15.

**Sheltering During Hurricane Sandy**

154.    Prior to Hurricane Sandy's arrival, the Special Functional Needs Interagency Task Force was activated; OEM began to deploy the emergency stockpile to the shelters on October 26, 2012. Ex. 395 at CNY22790; Ex. 552. Delivery of the stockpile was completed on October 27. Ex. 76 at CNY23346. Staff was directed to report to shelter assignments by 8 a.m. on October 27, at which time UORC was activated. Id. On Saturday October 27, 2013, in a press conference, the Mayor advised individuals in low lying areas who were concerned about flooding or sustained power outage to evacuate even though there was no evacuation order at that time. Ex. 67 at CNY23738-39.

155.    Prior to any evacuation order being issued, jump teams from OEM visited the evacuation centers and confirmed that each evacuation center had an entrance that was usable by people using a wheelchair. Ex. 401. After consultation with MOPD on appropriate messaging, this information was communicated to the public through the Mayor's press conferences and the OEM and MOPD websites. Ex. 539 (Calisi) ¶17; Ex. 67 at CNY23739 ("All of these shelters, incidentally, do have at least one entrance usable for wheelchairs."); see also, e.g., Ex. 69 at CNY23748; Ex. 70 at CNY23754. The term "usable" was chosen because, while OEM jump teams had verified that most evacuation centers had ground level entrances or accessible ramps, others had temporary ramps that may not have been consistent with ADAG standards, but would, nonetheless, enable an individual using a wheelchair to enter the shelter, sometimes with assistance. Ex. 539 (Calisi) ¶18.

156.    At trial, Victor Calise, the Commissioner of MOPD, who himself uses a wheelchair, testified that individuals with disabilities can and do use facilities that do not meet every component of the ADAG standards. Tr. 439:16-440:4. For example, some people who use wheelchairs may be able to enter a particular restaurant in order to eat, but the bathroom may not be accessible because it is in the basement and there is no elevator. Ex. 539 (Calisi.) ¶20. He noted that the courthouse was not accessible in that the door was not accessible and he could not access the witness stand, but testified that the courthouse was nonetheless still usable such that he could testify. Tr. 439:16-440:4.

157.    Commissioner Calise made unannounced visits to six shelter facilities and found that five of them had fully accessible entrances. Ex. 539 (Calise) ¶¶12-16; Tr. 448:24-449:4. He visited Hunter College and the Park Slope Armory, both SMNS shelters and found that both had accessible entrances and bathrooms. Exh 539 ¶13. He found that John Jay College and Brooklyn Technical High School, facilities with co-located evacuation centers, SMNS and general needs shelters, also had fully accessible entrances and bathrooms. Id. ¶14. The one facility, Seward High School, that had a temporary and rather steep ramp, also had a police officer posted at the entrance to assist individuals to enter the facility. Id. ¶15. At Seward Commissioner Calise found that the door to the women's bathroom on the ground floor was too narrow for a wheelchair user but that there was a bathroom on the upper floor that had door of sufficient width and an ambulatory accessible bathroom. Id. He also observed an evacuee at Seward who used a wheelchair. Id. He visited an additional facility with an accessible entrance but no accessible bathrooms but testified that if anyone came into this facility or any other needing an accessible restroom they would be transported via accessible transportation to a different facility. Id ¶16.

47

158.     Erin Vilari, an Assistant Commissioner at DHS, served as a shelter operator at P.S. 217 and Hillcrest High School in Queens. Ex. 562 (Vilari) ¶¶13, 17-18. She testified that both these facilities had accessible entrances and rest rooms. Id. ¶¶16, 18. Both facilities had refrigerators for medication in the nurse's office. Id. at ¶26.  Both had electricity, as well as electrical outlets that could be used by evacuees to charge electronic equipment. Id. ¶25. These general needs facilities accommodated people with a variety of disabilities. Id. ¶¶ 15, 18, 19, 23, 24.

159.     At P.S. 217, there was a gentleman who used a wheelchair and residents of a group home for the developmentally disabled and their aides. Id. ¶¶16, 24. Both the wheelchair user and the group home residents moved to Hillcrest when the shelter operation at P.S. 217 closed. Id. 19. At Hillcrest there was a second family, a mother and her adult daughter, who both used wheelchairs.  Id. The daughter was developmentally disabled and her aide was with her at the shelter. Id.  The wheelchair users had special medical needs cots. Id.

160.     At Hillcrest, there was a woman who was deaf or hearing-impaired who was able to read lips and could speak clearly enough to be understood. Id. ¶23.. Id. There was a man who used an oxygen tank and a second group of residents from a group home for the developmentally disabled and their aides. Id.¶24.

161.     As of October 28 at 8 p.m., 1,452 staff and 1,332 residents were present at the evacuation and shelter facilities. Ex. 77 (Sit Rep 10/28 2000hrs) at CNY22676. By 8 a.m. on October 29, 2012, the day of the storm's landfall, the facilities had 2,753 residents. Ex. 79 (Sit Rep 10/29 0800hrs) at CNY226851. That evening over 2,300 staff and 3,600 shelter residents (as well as 116 pets) were present at the facilities. Ex. 80 (Sit Rep 10/29 2000hrs) at CNY22589.

One day later, on October 30, this number grew to over 2,500 staff and over 6,000 residents. Ex. 81 (Sit Rep 10/28 2000hrs) at CNY22461.

162.    None of the ten class member witnesses who testified at trial used city shelters during Hurricane Sandy.  Only one, Melba Torres, used the shelter at Hunter College during Hurricane Irene; she testified that she needed assistance from her aids to use the restroom. See Ex.553 ¶39.  However, MOPD Commissioner Victor Calise, a wheelchair user, testified at trial that he visited the SMNS at Hunter College and it had an accessible rest room. Ex 539 ¶13.

163.    Plaintiffs' witnesses, Susan Dooha and Margi Trapani, testified that they made visits to selected shelters and found problems.  At Seward high School Ms. Trapani noted the temporary ramp as posing a problem for people with disabilities; however Victor Calise testified that there was a police officer posted there to assist people. Compare Ex 534 (Trapani) ¶41 and Ex 539 ¶15. Similarly, she testified that the entrance to the ground floor restroom was too narrow for a wheelchair user but Victor Calise testified that there was another restroom on an upper floor wih a door that was wide enough. Compare Ex 534 ¶43 (Trapani) and Ex 539 ¶15. Ms. Trapani also testified that Newcomers High School did not have an accessible entrance but Aaron Belisle testified that jump teams from OEM responded to a complaint by locating the accessible entrance at Newcomers.  Compare Ex 534 ¶52 and Ex 537 ¶65. Plaintiffs submitted a series of unlabeled photographs that Ms. Dooha could not identify at trial. See Tr 500:15-504:10; Ex. 27-34. The balance of the testimony regarding accessibility was from conversations with unidentified shelter workers and was excluded by the Court.

164.    Ms. Vilari testified to the diverse skills and dedication of the staff to meet the needs of its diverse population: In her experience working in the UORC and general needs

shelters during Hurricane Sandy, the hurricane shelters served a vulnerable population from diverse backgrounds, presenting with a wide variety of needs.

> The volunteer staff in these shelters, mostly comprised of city workers, were equally as diverse in the talents and skills they brought to this sustained emergency situation.  The challenges varied from shelter to shelter. But in my experience, resources, including human capital, were distributed where they were needed. The advance training and the command structure of the emergency sheltering plan was effective in creating a large scale response to an emergency situation.  In my experience, the evacuees and volunteers worked together to create a high functioning community under very stressful personal circumstances. Issues were addressed by the volunteer staff on the smallest scale possible with great attention to detail – one family or one evacuee at a time. I observed teachers creating recreation programs for children in these shelters including a Halloween party and costume parade at P.S. 217, utilizing donations from their own home or community resources. I observed staff with specialties in elder care assisting evacuees in accessing necessary services. I personally worked to get a family transportation to Albany, so that they could use their FEMA voucher for a hotel room and start a new job on the following Monday. Lastly, I observed restaurants, churches and businesses in the surrounding community make available to the evacuees packaged food, clothing, toys, make-up and other essential items, that they could take away to help rebuild their lives.

Ex. 562 (Villari) ¶29.

**Shelter Consolidation**

165.    The City's emergency shelters, located in public schools and CUNY facilities, are designed to be short duration operations. Ex. 554 (McKinney) ¶61; Ex. 7 (Coastal Storm Sheltering Plan) at CNY385. Roughly a week after the storm hit, the public schools were scheduled to reopen and many of them also needed to serve as polling places for the general election on November 6, 2012; alternative hurricane shelter space had to be found for those evacuees who still needed a place to stay. Ex. 563 (Weisman) ¶¶8-9.

166.    The City's plans did not specifically anticipate this problem but the plans do assign the lead in sheltering to DHS. Ex. 554 (McKinney) ¶61.; Ex. 7 at CNY365, 370. Because DHS has experience seeking additional shelter space when the homeless population increases, it was able to utilize this experience to identify and bring on line alternative shelter space initially called annexes. Ex. 554 at ¶61. At its peak, there were 10 annex locations. Ex. 563 (Weissman) ¶9. As evacuees found other housing options, the number of annexes was reduced to 4 and renamed interim placement facilities. Id. As of February 26, 2013, there were two interim placement facilities and they both have accessible rooms. Id.

167.    The consolidation focused on general needs shelters. Id. at ¶10. If there was a person with a disability in a general needs shelter that continued to need further sheltering from the City, they were matched with an appropriate shelter that met their needs for accessibility and level of service. Ex. 562 ¶21 (Villari). Transportation to the annexes or interim placements, including accessible transportation for those that needed it, was provided. Id. ¶22. DHS also procured case management services for evacuees thorough local community based vendors with whom it has existing relationships. Ex. 563 (Weissman) ¶10. Providers assess immediate needs, provide medical referrals, assistance with prescription medications and connect evacuees to any city, or federal benefits. Id.

168.    Individuals in SMNS were not moved during this consolidation to minimize the number of moves for these residents. Id. at ¶11. The vast majority of the individuals who sheltered at the SMNS shelters came from nursing home or adult care facilities. Id. Officials from the City and State Departments of Health worked to find equivalent placements for those SMNS evacuees who could not return to their sending facility. Id.

**Surveying**

169.    In 2006, evacuation and shelter sites were surveyed to ascertain, among other things, their relative levels of accessibility and the information was entered into the Citywide Assert Logistics Management System ("CALMS"). Ex. 7 at CNY387 and CNY462; Ex. 483 at CNY20084.

170.    The shelter system was activated for the first time in August 2011 during Hurricane Irene after which OEM determined that it needed updated information about the facilities it uses as shelters, including information about accessibility. Ex 554 (McKinney) ¶67; Ex. 537 (Belisle.) ¶49. In 2012, OEM coordinated with DOE to create and conduct a new survey of its 1,100 facilities. See Ex. 46, 47; 537 (Belisle ) ¶¶50-51.

171.    The survey process is designed in three phases. Ex. 561 (Van Pelt) at ¶21. First, the survey tool was distributed through Survey Monkey to 1,100 DOE schools in the City. Id. Expanding the survey beyond the schools designated in the CSP gives OEM the opportunity to expand the pool of available facilities for a number of emergency purposes and capture information about schools constructed since 2006. Ex. 561 (Van Pelt) at ¶19. The survey is designed to gather a broad range of information, but information about accessibility is central. Ex. 561 (VanPelt Decl.) ¶¶19-21. The survey tool was developed with reference to guidance from the United States Department of Justice. Ex. 537 (Belisle) at ¶50. The custodial engineers at each facility completed the surveys. Ex. 561 (Van Pelt) at ¶21. Custodial engineers supervise the operations of the physical plant and have specialized knowledge of their building. Ex. 537 (Belisle) ¶50. The questions are objective and do not require disability expertise to answer.  For example the survey asks whether an entrance has a universal access sign but it also required the surveyor to record measurements.  A computer program will analyze the data to determine the

52

level of accessibility.  OEM is exploring enhancements to the CALMS system to permit the data to be accessed more easily and more accurately. Ex. 483 at CNY20084.

172.    The survey tool was distributed the week of October 22, 2012 but the arrival of Hurricane Sandy delayed completions. Ex. 561 (Van Pelt) at ¶19. As of the date of the trial approximately 1,080 out of 1,100 schools had completed the survey. Ex. 561 (Van Pelt) ¶19.

173.    The second phase of the survey involves making site visits or spot checks to verify the accuracy of the survey data. Ex. 561 (Van Pelt) at ¶21. During these visits, teams from OEM visit facilities to measure entrances and restrooms and assess for unobstructed paths of travel from entrances to service/program areas. Ex. 561 (Van Pelt) at ¶21; Tr. 835:16-21 (Van Pelt). Teams making the spot checks were given training designed by the special needs coordinator, who had done accessibility surveys in his prior position with CIDNY. Ex. 561 (Van Pelt) at ¶21; Ex. 537 (Belisle Decl.) ¶¶8-10.

174.    In addition the teams are photographing accessible entrances with a geo coded blackberry so that the accessible entrance can be mapped and clear information about the location of the accessible entrance provided to the public. Tr. 835:1-5 (Van Pelt). As of the date of the trial, teams from OEM has visited the 65 facilities used as evacuation centers. Id. This is consistent with the timetable established pre-Sandy. Ex. 483 at CNY20084. Finally, OEM is working with representative of MOPD to recruit volunteers with mobility disabilities to participate in additional spot checks of facilities. Ex. 561 (Van Pelt) at ¶21, Tr. 836:10-13 (Van Pelt).

175.    The third phase of the process is the creation of analysis and policy teams to analyze the survey results and determine appropriate priorities and corrective actions as necessary to improve accessibility of facilities either through replacement of facilities, capital

improvements or temporary fixes. Ex. 483 at CNY20085.  The City has already requested post

Sandy mitigation funds for this purpose. Ex. 554 (McKinney ) ¶69.

**Logistics**

176.   The objective of every plan and the mission of the EOC during

emergencies is to leverage all of the resources within the City as well as in surrounding counties

and states to mitigate the impacts of disaster. Ex. 554 (McKinney) ¶26. OEM's Logistics Unit

plays a key role in leveraging resources. The City's logistics plans were developed as part of the

Coastal Storm Plan but are all-hazard plans. Id. ¶23; Tr. 634:10-15 (Jenkins).

177.   During a large-scale emergency, OEM activates the Logistics Center

("LC") to coordinate logistical support to the emergency response operation. Ex. 552 (Jenkins

Decl.) ¶8; see also Ex. 268, 269, 270 The City has a process in place to essentially fill any

request. Tr. 633:13-15 (Jenkins). There are a number of ways the LC can fill a request. See Ex.

552 (Jenkins) ¶¶11-16. First, the LC looks to City resources. Id. ¶11. The Citywide Asset and

Logistics Management System ("CALMS") is a web-based tool hat stores information about city

assets that can be used to aid in emergency response and recovery efforts. Id. It also stores some

information from regional partners such as prime power assessments and limited equipment and

fleet data for regional partners. Id.

178.   If items are not captured in CALMS, or unavailable, the LC will look to

the Department of Citywide Administrative Services ("DCAS") contracts and Central Storehouse

Catalog which are available via links in CALMS for review and ordering, respectively. Id. at

¶12. The LC also works with approximately 20 City agencies, to find these items. Id. If

necessary, the City can also set up emergency procurements consistent with the  Procurement

Policy Board ("PPB") Rules, which establish an expedited method to procure goods, services, or

construction that cannot be met through the City's normal procurement methods during an emergency. Id. at ¶14; Tr. 632:9-16 (Jenkins).

179.    In addition, the Logistics Center can make a request to the New York State Office of Emergency Management ("NYSOEM").See Ex. 552 (Jenkins Decl.) ¶16. Requests can be made from a State agency through the Intrastate Mutual Aid Program ("IMAP") (for county to county or city-to-county requests), or through the Emergency Management Assistance Compact ("EMAC") for state-to-state requests. Id. NYSOEM can go also directly to FEMA for specialized federal assets, which also occurred during Hurricane Irene and Hurricane Sandy. Id. at ¶16.

180.    During Hurricane Sandy the LC used all of the above methods to obtain needed an unprecedented number supplies, equipment and services. Id. at ¶¶15, 17, 18. Some examples include: oxygen tanks, buses, ambulances, ambulettes, portasans, hand-washing stations, electric blankets, regulated medical waste pick up, refrigerators and additional durable medical goods for shelters, cell phones, translation services, heated tents for field response, generators, personal care kits, heaters, water, and meals ready-to-eat. Id.

**The Shelter Stockpile Supports the Needs of People with Disabilities**

181.    OEM and its partner agencies also maintain the Logistics Shelter Support Plan ("LSSP"). Id. at ¶21. The LSSP has six major components and corresponding operational strategies: the emergency supply stockpile ("ESS"), SMNS Support Components, Department of Education ("DOE") Emergency Meal Service, CSP Administrative Kits, Operator Package Delivery, and Vendor-Managed Inventory ("VMI") of Meals Ready to Eat ("MREs"). Id. at ¶26.

182.    The details of the shelter stockpile strategy are set forth in the Emergency Supply Stockpile ("ESS") at Exhibit 43. The ESS is designed to support 70,000 people for 7

days. Id. at CNY23926. It consists of approximately 5,500 pallets of emergency supplies and hundreds of line items, including packaged water, MREs (for non-DOE facilities); cots (4,000 special medical needs cots as well as approximately 32,000 standard cots); blankets; companion animal items; wheelchairs and other special medical needs items; and a number of specialized pre-configured kits, containing personal hygiene products, over-the-counter ("OTC") medications and nursing kits, baby formula, infant and adult diapers, feminine hygiene products, and other pet supplies. Id.; Ex. 552 (Jenkins Decl.) ¶¶27-28.

183.   The ESS includes specially kitted SMNS items purchased through HHC. These are not prescription items, but products and durable medical goods needed for persons with special medical needs. Ex. 43 at CNY23938; Ex. 552 at ¶29; Tr. 629:7-9 (Jenkins).  OEM does not stockpile items that require prescriptions, refrigeration, or extended mechanical maintenance but can and does readily obtain these items via resource request and procurement processes with HHC or through existing HHC-specific or citywide vendors/contracts. Ex. 552 at ¶30; Ex. 43; Tr. 632:9-16 (Jenkins). HHC also delivers oxygen tanks to the SMNS facilities, and provides red-bagged (regulated medical) waste container delivery and pick-up. Ex. 552 at ¶35.

184.   The LSSP includes the DOE Emergency Meal Service, used for feeding individuals in an emergency at DOE facilities used as evacuation centers and shelters. Id. at ¶31. DOE increased the shelf-stable stockpile of food in over 500 of its schools for use in sheltering events. Id. Food can be transported between schools, if needed, and the food stocks are rotated through normal school feeding cycles. Id. The DOE Emergency Meal Service is comprised of school-lunch type food and not MREs. Id.; Ex. 43 at CNY23945-46. For non-DOE facilities that use MREs, OEM worked with the Department of Health and Mental Hygiene ("DOHMH") to develop lower-sodium nutritional requirements for MREs. Ex. 552 at ¶34.

185.    OEM regularly adjusts the shelter stockpile strategy through subject matter expert working groups and the Irene and Sandy after action processes. Id. at ¶25. OEM is currently doubling the size of the SMNS shelter stockpile (which includes wheelchairs, crutches, airway kits, bandage compress kits, diabetic testing kits, electrolytes kits, spill kits, first aid kits, sphygmometer kits, etc.) to make these items available for general needs shelters as needed. Tr. 839:15-19 (Van Pelt); Ex. 552 (Jenkins) ¶29. OEM is also purchasing additional items to accommodate people with disabilities at general needs shelters including durable medical equipment such as wheel chairs, and raised toilet seats with grab bars. Tr. 839:20-23 (Van Pelt).

186.    Certain specific items are pre-deployed to evacuation centers, shelters and SMNS. However OEM has extra supplies and the flexibility to move items around as needed. Tr. 638:1-12; 21-24; Ex. 43 at CNY23934-39. For example, special medical needs cots are pre-deployed to SMNS, but, if needed they are also provided to general needs shelters. Ex. 562 (Villari Decl.) ¶19. Items are also simultaneously pre-positioned or "staged" at central locations for quick deployments as needed. Tr. 639:1-7 (Jenkins). As a result of the Irene After Action, OEM made adjustments to its deployment strategy. Ex. 45 (Irene After Action Report); Ex. 554 (McKinney) ¶28; Ex 45.

**Generators**

187.    Beginning in 2006-7, OEM partnered with the US Army Corps of Engineers ("USACE") and the 249th Prime Power Unit to conduct prime power assessment on critical infrastructure sites. See Ex. 552 (Jenkins) at ¶40. These prime power assessments survey facilities for the type of generator, cable length, and installation concerns they will need. Conducting site surveys in advance instead of during the emergency speeds response time. Id. Of the facilities to-date, all 618 individual facility records from NYC and the NYC UAWG are

included in CALMS for quick reference. Id. The City has requested significant mitigation funds to continue this program. Tr. 626:23-626:1 (Jenkins).

188.    OEM also has an existing MOU with DOE, originating in 2009, to install generator quick connects a selection of DOE sheltering facilities. See Ex. 552 (Jenkins Decl.) at ¶40. Quick connects are like wall plug in-ins or switches that permit an easy connection to a back up generator. Tr. 623:1-16 (Jenkins). During Sandy, OEM provided generators to two of these facilities using the quick connect generator hookup. See Ex. 552 (Jenkins Decl.) at ¶40.

During and after Hurricane Sandy, OEM deployed an unprecedented 232 generators within the City, all coordinated by the EOC and the Logistics Center. Id. Generators were sourced from City, state, and federal agencies, as well as private vendors. Id. The first priority was to place generators in hospitals and critical care facilities followed closely by NYCHA facilities. Id.; Ex. 554 (McKinney) ¶60; Ex 116 56:17-57:10 (Holloway)

## F.   **THE CITY'S RECOVERY EFFORTS ACCOMMODATED THE NEEDS OF PEOPLE WITH DISABILITIES.**

189.    Prior to Hurricane Sandy, the City had been involved in developing a post disaster housing plan through the Regional Catastrophic Panning Group. ("RCPG"). The basic principles of this plan are inclusive and consider the needs of all members of the community, including people with disabilities. See Ex. 248 at CNY7109. As part of this planning process the City was involved in the development of plans for fully accessible interim housing units appropriate to the urban environment. Ex. 554 (McKinney) ¶70; Ex. 37. OEM, in partnership with the USACE and DDC plans to install prototypes near its headquarters in Brooklyn in the fall 2013. Ex. at ¶70.

190.    To address the immediate need for post disaster housing created by Hurricane Sandy, on November 5, 2012, Mayor Bloomberg appointed Brad Gair to head a newly

created Housing Recovery Office ("HRO"). Ex. 560 (Gair) ¶1. Mr. Gair has extensive experience with the federal government in developing recovery housing from the Gulf States to Iraq. Id. at ¶¶2-3.

191.    The purpose of HRO is to plan, coordinate and implement a comprehensive housing recovery strategy for Hurricane Sandy survivors who need assistance to reach their permanent housing recovery solution. Id. at ¶6. Core principles under which HRO is operating are set out in HRO's draft Concept of Operations ("CONOPS"). Id. at ¶¶7-8; Ex. 258.

192.    HRO recognizes that the needs of the disabled must be accommodated as housing strategies are developed. Indeed, one of the assumptions in developing the CONOPS is the that special attention and enhanced casework will be required for those City residents whose homes were entirely or substantially destroyed, for displaced tenants, and for households with special housing need, including disabled, elderly or low-income families and individuals. Ex. 560 (Gair) ¶9. In order to ensure that the needs of people with disabilities are addressed in its planning, HRO is working closely with MOPD. Id. at ¶12.

193.    One immediate step HRO took for people with disabilities was to convince FEMA to include pre-existing accessibility components such as ramps in its Rapid Repair program so they could be restored at no cost to the individual. Rapid Repair is funded by FEMA and is designed to provide funds to restore electricity, heat, hot water, and to seal any holes in the structure so the home is livable. Id. at ¶13.

194.    HRO's initial planning efforts have focused on quantifying and articulating the need for housing related funding because post disaster funding is highly competitive. Mr. Gair testified at trial that New York City had received 20 million dollars for recovery housing under the HUD's Community Development Block Grant ("CDBG") and that

the City expected to release its mandatory action plan for pubic comment later that week. Tr. 770:5-18.

195.   HRO is developing a robust public outreach process to gather input on this action plan. To develop outreach strategies for disability issues, HRO consulted with MOPD as well as other agencies such as Department for the Aging ("DFTA"). Ex. 560 (Gair Decl.) ¶¶ 14-15.

196.   Mr. Gair testified that he believed any success that HRO has in meeting the needs of this disaster could serve as the basis of future plans for New York or other communities. Tr. 764:24-765:3.  He also cautioned that the specifics of each disaster are very different and there is always a significant "starting from scratch." Tr. 765:4-11.

**The Interim Housing- Hotel Program**

197.   The City's transition plan for interim housing for those displaced by Hurricane Sandy has been to place individuals who continue to need shelter in hotels. Ex. 560 (Gair) ¶16.

198.   Both FEMA and the City run hotel programs. Id. at ¶17. The FEMA program requires that individuals go to participating hotels and attempt to secure a room. However the hotel does not have to rent the room to them. Id.

199.   Because the City was concerned that hotels would not want to rent to Sandy evacuees as the holidays approached, the City started its own program and actually leased a large block of hotel rooms so that it would always have rooms available day or night. Id. at ¶18.

200.   The City maintained sufficient excess inventory of hotel rooms so that it could always meet demand. Id. at ¶22; Ex. 563 (Weissman) ¶21, Ex 560 (Gair ¶¶18, 22.

201.    Individuals could enter the hotel program by going to a restoration center, by calling 3-1-1 or through referrals from the National Guard door to door canvassing operations, elected officials and various community organizations. Id. at ¶¶15, 22.

202.    The Restoration Centers were set up as one-stop shops where people could obtain information and apply for various types of assistance. Staff from a number of agencies including but not limited to the Federal Emergency Management Agency ("FEMA"), the New York City Human Resources Administration, and DHS, were there to help. Id. at ¶15.Restoration centers had accessible entrances and provided sign language interpretation. See Ex 539 ¶32; See also Ex 116 72:1-16. (Holloway).As of January 16, 2013, more than 30,000 individuals had visited Restoration Centers. Id at 75:3-4. (Holloway)

203.    Representatives from Homebase, a group of community organizations engaged by DHS to offer homelessness prevention services to households in the community, were present in the Restoration Centers. Id. at ¶16. They offered services like benefit advocacy, connecting people to legal services, exploring other housing options so that individuals can remain housed in the community. Id.; Ex. 251.

204.    Both the instructions provided on the hotel referral process in the Homebase Field Guide (Ex. 251 at p. 5) and the Restoration Center Emergency Hotel Referral (Ex. 532) ask that special needs be identified. Based on the referral information, individuals and families are matched to appropriate rooms. Joanna Weisman, the DHS liaison to the Hotel program, testified that she personally recalled that the hotel program found accessible rooms for people using wheelchairs found a room where a woman could stay with her personal attendant, and found a room where an individual could stay with a service animal. Ex. 563 (Weissman) ¶20.

205.    Demographic and other information on families in hotels is kept in the HRO database and a daily report is generated representing certain aggregate data indicators. See Ex. 478. As of January 17,  2013, the City had a total inventory of 1,145 hotel rooms in 51 hotels. Id. 1696 individuals representing 707 households were occupying 833 rooms. Id. The City had 312 unoccupied rooms in its inventory. Ex. 560 (Gair) ¶¶19-20. Mr. Gair testified that as of February 26, 2012, the 54 individuals in the HRO database were identified as having a mobility issue, although some of these individuals may no longer have been in the hotel program. Id. at ¶20.

206.    Individuals in hotels were provided with case management services. Initially these serves were procured by DHS through local community based providers. Ex. 563 (Weissman) ¶23. Case mangers addressed immediate needs, including but not limited to: medical, assistance with prescription medication, helping evacuees to connect to any city or federal benefits for which they may be eligible and ensuring that evacuees have registered for any Federal Emergency Management Agency ("FEMA"). Id.

207.    Disaster case management services are now being offered through a grant from FEMA. Ex 560 (Gair) ¶25. Under this grant, caseworkers will work for 22 months to assist people in their recovery needs including housing recovery. Id.

**Post Storm Canvassing and Outreach to Vulnerable Populations**

208.    Following Hurricane Sandy the City conducted coordinated escalating outreach to vulnerable populations to identify and address needs. See generally, Ex. 556, 557; Ex 81 (Situation report 10/30/12) at CNY22466; Ex 116 at 73:8-75:3.

209.   Immediately following the storm, FDNY and NYPD conducted an urban search and rescue operation specifically designed to get people out of immediate harm's way, or to discover people who were harmed or deceased Exh 557 ¶9 (Kass).

210.   Consistent with the protocols in the Power Disruption plan, utility companies were contacting individuals who were registered with them as users of Life Sustaining Equipment. Exh 557  ¶9 (Kass), Exh Ex 19 Power Disruption Plan at CNY1693; Ex 554 ¶¶3 6, 62 (McKinney).   Where the utility cannot reach registered customers, under the plan those names are it forward to the NYPD who follow up at the precinct level. Exh 558 ¶¶22-23 (Wahlig).

211.   NYCHA maintains a list of people with critical needs and was making home visits to those people. Ex. 557 ¶9 (Kass).   The plan calls for NYPD to assist in these welfare checks. Ex 19 at CNY1750, Exh 554 p¶36 (McKinney); Ex 558 ¶26 (Wahlig).

212.   Class member, Melba Torres, the only class member who identified herself as a resident of public housing, testified that she received visits from numerous individuals after Hurricane Sandy, including a police officer, but she did not request evacuation assistance from any of these individuals. Tr. 652:14-18; 653:20-21.

213.   In addition the Commodities Distribution Plan specifies that the Human Services Emergency Support function in the EOC must take steps, including sending messaging through the AWS system, to raise awareness of Distribution points and providers of services must contact at-risk populations, coordinate efforts to address the feeding needs of seniors and people with disabilities. Ex 554 ¶36 (McKinney); Ex 24 at CNY 18553.

214.   Consistent with the city's plans, State and City agencies were directed to reach out to their case load of disabled or chronically people who receive services such as meal

delivery, home visits or home care to identify needs. Ex 557 ¶.9 (Kass). During Hurricane Sandy some of the confirmed contacts include: HRA reached all but 2 of its adult protective services, HIV/AIDS services and home care services (3,652), DFTA reached 5,015 of its case management clients. See Ex. 116: 74:21-75:3 (Holloway).

215.     The City opened distribution centers around October 29, 2012 to store and distribute supplies such as food, water and blankets to residents affected by Hurricane Sandy. The center was also a staging area for City and non-profit volunteers to meet, be briefed, and begin their canvassing efforts. designed to identify and respond to the needs of those impacted by Hurricane Sandy. Volunteer coordination was led by the NYC Service, the unit in the Mayor's Office responsible for civic engagement. Volunteers supported supply distribution immediately following the opening of distribution centers. Ex 556  ¶14 (Murray). The City also established charging centers in areas that remained without power.  Ex 554 ¶ 40

216.     Ryan Murray, from the office of the Deputy Mayor for Health and Human Services directed the city's five non-profits in door to door canvassing. to ensure that supplies were distributed to individuals who did not know about or were unable visit the distribution center because of a disability or for some other reason. Ex. 556 ¶15 (Murray).

217.     The City developed a canvassing guide and provided instructions to volunteers. Exh 556 par 23, 27-30, (Murray), Ex 477. The canvassing guide provided instructions for conducting visits, information on important resources such as Disaster Assistance Service Centers and pharmacies  and contained  a form to be filled out identifying needs for particular residents. Ex 477 at CNY0005417.  If emergency needs were identified volunteers called 911 and reported to their site leader that they had done so.  Information regarding critical needs was also reported to Mr. Murray. Ex 556 ¶ 23.  Mr. Murray testified that when he got

requests for evacuation, he referred them to the FDNY and FDNY was very responsive to the requests for assistance. Exh 554 ¶ 37.

218.    Non-urgent needs were forwarded to DFTA so that caseworkers on the ground, could follow up. New York's Visiting Nurse Service and other organizations contracted to provide follow up services assisted DFTA. DFTA and other City Agencies were already deployed to specifically reach vulnerable and special needs client lists Ex 556 ¶32.

219.    Volunteers canvassed hi and low-rise apartment buildings, public and private housing and single family homes. During November 3-5, 2012, volunteers reached an estimated 12,000 structures in four boroughs. Ex. 556 ¶¶ 22, 24. Representatives from NYPD Community Affairs Unit escorted volunteers in buildings where light had not been restored. Ex. 554 ¶43.

220.    The City took a number of steps to assist residents in obtaining prescription drugs.  These included:

- Providing information about pharmacies that were open and could expedite prescription requests, Exh 277 at CNY0002539-40; Ex 556 ¶¶44-45 (Murray)

- Assisting residents in calling pharmacies to order prescriptions; Id. ¶45

- Filing prescriptions for residents who could not do so. Eh 556 ¶17 (Kass)

- Launching a mobile pharmacy program in conjunction with the New York State Department of Health Ex 556 ¶46 (Murray)

- Implementing the federal emergency prescription assistance program See Ex. 424 (Situation Report 11/5/12) at CNY2247; Ex 438 (Situation Report 11/11/12) at CNY21930

221.    As the power outage continued the City recognized that additional efforts were needed to ensure that the needs of vulnerable populations were met. In response the City launched a massive door to door canvassing operation beginning on November 9, 2012 and ending on November 16, 2012.   This operation was directed by Daniel Kass, Deputy Commission of the New York City DOHM. See Ex. 57 ¶¶ 9-10

222.    This operation was designed to respond to a very specific need.   The lack of power was ongoing  and that situation has consequences for people residing in high-rises. Lack of elevator service might mean that some could not leave the building and those residing above the 6th floor would likely not have running water. The concern was that, despite the significant outreach efforts by agencies, service providers and volunteers, some people who were unwell or compromised would be missed. Id.

223.    Teams were organized to do door to door canvassing in buildings over 6 stories, including NYCHA buildings in Coney Island and the Rockaways.. The teams were comprised of Department of Health Sanitarians, Disaster Medical Assistance ("DMAT") teams from the Federal Emergency Management Agency (FEMA),, Federal Incident Management Teams ("IMT'), National Guard and emergency medical technical technicians. Id.¶11, Ex 516.

224.    The purpose of the operation was to assess both critical individual needs for food, water, prescription medication and whether or not an individual needed to evacuate. Department of Health Sanitarians recorded information on building level needs. Both individual and building level needs were recorded. Ex 557. ¶12; Ex. 516, 519.  Deputy Commissioner Kass testified that the procedure was for teams to ask a series of questions about needs and to observe whether the occupants were impaired any way, either medically, clinically, whether

they required food and water, or prescriptions; whether they were disabled, whether they used a wheel-chair.  They would ask whether they wanted to evacuate. Ex 557 ¶15

225.    During the operation 35 individuals were evacuated.  Ex 516. The definition of evacuation was broad  it was either deemed appropriate by the medical personnel on site or requested by the individual.  It could have been an acute medical condition or someone who needed assistance getting out of the building. Tr 722:18-22 (Kass).  Some individuals were taken to hospitals; some were treated in medical tents, and released to family members; others were evacuated to shelters or to other people they had contact with. Tr.723:

226.    Depending on the overall observation, the team might provide on site medical treatment.  They would record whether food or water was needed and they would deliver it at the time if they had supplies with them or deploy it subsequently from the lobby. At the end of each floor they would record the results. Prescriptions would be filled and returned later that day or the next morning. Exh 557 ¶16-17.

227.    The data recorded on the forms was reported back to DOHMH. Exhibit 516 is a summary of the data recorded from this operation.. It indicates that between November 9 and November 16 teams knocked on nearly 37,000 doors and found somewhat over 13,000 units occupied. Slightly fewer than 1,000 requested food and water. There were only 35 medical evacuations. Exh 516. The operation prepared for significant numbers of people requiring medical treatment and had staged DMAT teams in tents in the areas to provide treatment but there was not a great need for this service. Ex. 557 ¶19

228.    The operation ceased on November 14, 2012 because all of the targeted buildings were successfully canvassed and power was overwhelmingly restored to the high-rise buildings in the areas we were canvassing. Id. ¶20.

229.   A separate but similar canvassing program continued for low rise buildings without power in the affected areas. This effort, called Support to Residents in Their Homes (TRITH") continued until January 20, 2013.  Ex. 565 ¶¶24-32.

230.   Needs assessments were similar to the high rise operation but these teams were equipped with tablet computers so that the data could be easily uploaded and analyzed. Id.

231.   The planning and response structure established by OEM in collaboration with its planning partners enabled an extraordinary response to an unprecedented storm.

## PROPOSED CONCLUSIONS OF LAW

232.   The foregoing summary of facts clearly demonstrates that Defendants offer meaningful access to the City's emergency management program, which has been carefully developed to serve all New Yorkers. Plaintiffs have completely failed to introduce evidence into the record that the certified class of individuals has been denied the opportunity to participate in the government's program. Indeed, after more than one and one half years of litigation, during which time thirty eight depositions were taken and nearly 30,000 pages of documents disclosed, the absence of evidence in the record of the denial of any benefits from the programs and services offered is stark, particularly in light of the fact that the City's emergency management program was tested in such extreme and unprecedented fashion in recent months.

233.   Plaintiffs have failed to identify any concrete violation of the law to support the broad allegations in their complaint. Instead, they have introduced into evidence testimony from class members who profess ignorance about the City's widespread community outreach and messaging efforts, who were apparently unaware of the approach of Superstorm Sandy or the Mayor's mandatory evacuation order (despite a veritable blitz of media coverage), who heard second-hand accounts from others that the City's shelter volunteers were

insufficiently attuned to their needs, or who simply claim that they feel insufficiently prepared should an emergency occur. That record is not sufficient to establish any violation of the law.

234.    Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq*., provides in relevant part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Standards under and requirements imposed by the Rehabilitation Act and the ADA are effectively the same, and claims under the two statutes are generally treated identically and in tandem. See, e.g., Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

235.    The NYCHRL prohibits "unlawful discriminatory practice" because of the actual or perceived . . . disability. N.Y.C. Admin. Code, § 8-107(4)(a). The appropriate analytic framework to be applied to discrimination claims ... as defined by New York state and municipal law is a question best left to the courts of the State of New York. Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001).

236.    For plaintiffs to prevail on their claims they must establish that: (1) they are qualified individuals with disabilities, and (2) they were denied the opportunity to participate in or benefit from the defendant's services, programs or activities, or were otherwise discriminated against by defendant, by reason of their disabilities. Henrietta D., 331 F.3d at 272.

237.   In light of the fact that Plaintiffs are claiming that they were denied access to a benefit because of defendant's failure to provide a reasonable accommodation, Plaintiffs bear the burden of production by showing that the proposed accommodation is not unreasonable on its face. Henrietta D., 331 F.3d at 280 (citing Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995)).

238.   "[T]he disabilities statutes do not guarantee any particular level of … care for disabled persons, nor assure maintenance of service previously provided." Lincoln CERCPAC v. Health and Hosps. Corp., 147 F.3d 165, 168 (2d Cir. 1998); Rodriguez v. City of New York, 197 F. 3d 611, 618 (2d Cir. 1999). The "relevant inquiry" instead focuses on meaningful access, asking "not whether the benefits available to persons with disabilities and to others are actually equal, but whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled." Henrietta D., 331 F.3d at 273.

239.   Meaningful programmatic access likewise does not guarantee equality of results. See Alexander v. Choate, 469 U.S. 287, 299 (1985); United Spinal Ass'n v. Bd. of Elections, 2012 U.S. Dist. LEXIS 112474 (S.D.N.Y. 2012) ("It is well-established in this Circuit that although the ADA and its implementing regulations do not require "equal access" or "equal results" for individuals with disabilities."); DOJ's Technical Assistance Manual § II-3.3000 ("The ADA provides for equality of opportunity, but does not guarantee equality of results.").

240.   Plaintiffs' focus on whether Defendants are offering particular, specialized services to individuals with disabilities, such as maintaining certain items in the City's stockpile or using particular devices to evacuate people who need assistance, is misplaced and legally irrelevant, since the ADA simply requires access to government programs, not provision of a

70

particular level of service. See Lincoln., 147 F.3d 165, 168 (2d Cir. 1998); Rodriguez, 197 F. 3d

611, 618 (2d Cir. 1999)

241.    Meaningful programmatic access means accessibility of the program when

viewed in its entirety. See 28 C.F.R. § 35.150 (requiring accessibility of the program "when

viewed in its entirety"); DOJ Technical Assistance Manual, II § 5.1000 (explaining that

meaningful access should be evaluated in the context of services, programs, or activities, when

viewed in their entirety).

242.    The ADA, Rehabilitation Act, and NYCHRL do not contemplate perfectly

accessible service in every respect. See Midgett v. Tri-County Metro. Transp. Dist., 254 F.3d

846, 849   (9th Cir. Or. 2001) (holding that regulations implementing the ADA do not

contemplate perfect service for wheelchair-using bus commuters and that isolated or temporary

problems are not violations of the ADA); Stephens v. Shuttle Assocs., L.L.C., 547 F. Supp. 2d

269, 278 (S.D.N.Y. 2008) (acknowledging that the ADA cannot regulate individuals' conduct in

every situation and dismissing ADA claim based an isolated incident); Stauber v. N.Y. City

Transit Auth., 10 A.D.3d 280, 282 (1st Dep't 2004) (ADA and its implementing regulations "do

not contemplate perfect service for wheelchair-using bus commuters."). So long as the

inaccessibility is merely temporary, there is no violation of the law. See id.

243.    Every piece of communication from the government need *not* be

accessible to comply with the law. See Loye v. County of Dakota, 625 F.3d 494 (8th Cir. 2010),

cert. denied, 131 S. Ct. 2111.

244.    Not every existing facility where the government administers the program

need be accessible. See 28 C.F.R. § 35.150; Tennessee v. Lane, 541 U.S. 509 (2004) (citing 28

C.F.R. § 35.150(b)(1) and holding that in the case of older facilities … a public entity may

comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services).

245.    The record demonstrates that Defendants have developed an emergency management program that is accessible in all major respects. Defendants' program of accessible communication, through multiple modalities, allows for meaningful access to the information for people with disabilities who seek it. See ¶36, et seq., supra.

246.    The record is likewise clear that Defendants' have established a comprehensive plan to address the emergency transportation needs of people with disabilities in both advance notice and no-notice events. (See HEO Ex 6 at CNY000139-146 and AEP Ex 245-A). The general and unsupported allegations of insufficient accessible transportation for people with disabilities are not sufficient to establish a violation of the law. Much of plaintiff's evidence centers on what they characterize as an inaccessible public transportation and taxi system.  But this case is not about the accessibility of the City's public transportation system; it is about whether the transportation provisions the City makes for people with disabilities in an emergency.

247.    There is ample evidence in the record that the City's sheltering system, when viewed in its entirety, is accessible to people with disabilities, in light of the fact that (1) every evacuation center has at least one entrance useable by people with a disability; (2) Defendants assigned aides to assist persons with disabilities in accessing sheltering services where necessary; (3) the eight special medical needs shelters are fully accessible to people with all forms of disabilities; and (4) the City's plans have a triage system that evaluates the needs of shelterees upon arrival and, if necessary, relocates them via accessible transportation to another

shelter that meets their needs, either a SMNS or another general needs shelter with a higher level of accessibility; and (5) the City has a sophisticated logistics unit to provide supplies needed to accommodate people with disabilities such as medical needs cots, oxygen, durable medical equipment and medication.. <u>See</u> <u>Lane</u>, 541 U.S. 509.

248.    The evidence submitted by plaintiffs at trial, much of it disputed by defendants' witnesses such as the MOPD Commissioner Victor Calise, including unidentified photographs of individual entrances, taken at locations chosen specifically by Plaintiffs, is not credible evidence that the system is not accessible for people with disabilities. Likewise, testimony by a single individual (Ms. Morales) that she encountered a locked gate that blocked her from using a single entrance at a single facility prior to Hurricane Irene—when coupled with evidence that she did not verify whether an alternate accessible entrance existed and that she did not attempt to speak to anyone about entering the building--is plainly insufficient to establish that the City's shelter system is inaccessible to people with disabilities under the ADA. <u>See</u> <u>Lane</u>, 541 U.S. 509; Morales Depo 38: 7-11, 14-25.

249.    What constitutes a "reasonable accommodation" to allow for "meaningful access" is a fact-specific inquiry. <u>See</u> <u>Fulton v. Goord</u>, 591 F.3d 37, 44 (2d Cir. 2009) (determining what is a reasonable accommodation requires a context-sensitive inquiry); <u>Wernick v. FRB</u>, 91 F.3d 379, 385 (2d Cir. N.Y. 1996) ("Whether or not something constitutes a reasonable accommodation is necessarily fact-specific."); <u>Borkowski v. Valley Cent. Sch. Dist.</u>, 63 F.3d 131, 138 (2d Cir. N.Y. 1995) (Holding that within the meaning of the Rehabilitation Act "'[r]easonable'" is a relational term: it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce.").

250.     The adequacy of Defendants' emergency planning is appropriately evaluated within the context of emergency events and the particular challenges they pose. See id. Defendant's emergency program was developed specifically to include mechanisms for a flexible response to unforeseen events during an event, including numerous mechanisms to effectively address the needs of people with disabilities.   Equally importantly, the City has developed and institutionalized a rigorous after-action review process to evaluate responses and revise planning as necessary.

251.     The record clearly demonstrates that when viewed in context and in its entirety, Defendants' provision of emergency management services in the area of communication and notification, evacuation, sheltering, and recovery, is accessible and that persons with disabilities can (and have) benefited meaningfully from the services that Defendants provide. See Alexander, 469 U.S. at 302.

252.     The limited concrete modifications advocated by Plaintiffs, such as the proposal to purchase and supply evacuation chairs for every floor of every high rise building in New York City and to implement a training program to teach residents how to operate them, are unreasonable. See Henrietta D., 331 F.3d at 280.

253.     Even assuming such an accommodation were reasonable, the cost of that proposal would impose an undue hardship on Defendants, and is thus not required under federal law. 42 U.S.C. § 12112(b)(5)(A); Henrietta D., 331 F.3d at 280. Similarly, to require that Defendants make every one of some 500 shelters fully accessible in a system designed to shelter 600,000 people in a worst-case scenario would clearly constitute undue hardship and a fundamental alteration of Defendant's emergency management program.

## CONCLUSION

254.    The City of New York adequately accounts for the needs of people with disabilities in its emergency planning and preparedness programs and services in full compliance with all relevant laws.

Dated:        New York, New York
              May 10, 2013

                            MICHAEL A. CARDOZO
                            Corporation Counsel of the
                             City of New York
                            Attorney for Defendants
                            100 Church St., Rm. 2-106
                            New York, NY 10007

            By:    _____
                            Martha A. Calhoun
                            Mark G. Toews
                            Carolyn E. Kruk