UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, a nonprofit organization, CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK, a nonprofit organization, GREGORY BELL, an individual, and TANIA MORALES, an individual, <br><br> Plaintiffs, <br><br> -against- <br><br> MICHAEL R. BLOOMBERG, in his official capacity as Mayor of the City of New York, and the CITY OF NEW YORK, <br><br> Defendants. | No. 11-cv-6690 (JMF) |

**PLAINTIFFS' REVISED [PROPOSED] FINDINGS OF
FACT AND CONCLUSIONS OF LAW**

SHEPPARD MULLIN RICHTER &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY  10112
Telephone: (212) 653-8700
Facsimile: (212) 653-8701

Daniel L. Brown
Paul Garrity
Valentina Shenderovich

DISABILITY RIGHTS ADVOCATES
40 Worth Street, Tenth Floor
New York, NY 10113
Tel:  (212) 644-8644
Fax:  (212) 644-8636
TTY:  (877) 603-4579
Shawna L. Parks
Sid Wolinsky
Julia M. Pinover
Rebecca S. Williford

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

FINDINGS OF FACT ........................................................................................................... 1

    The City's Emergency Planning System ......................................................... 2

    Evacuation of People with Disabilities from Multi-Story Buildings ................................. 3

        *Homebound Evacuation Operation* ....................................................... 7

        *Local Ordinances* ..................................................................... 11

        *Sandy Demonstrated The Deficiencies In The City's High Rise Planning For People With Disabilities* ....................................... 12

        *Areas for Improvement for Multi-Story Evacuation* ............................ 14

    Evacuation And Transportation ....................................................................... 16

        *General Reliance on Public Transportation* ....................................... 16

        *Coastal Storms* ....................................................................... 19

        *Area Evacuation Plan* ............................................................... 21

        *Areas for Improvement for Evacuation/Transportation* ...................... 24

    The Sheltering System ................................................................................... 25

        *Sheltering is the Core of an Emergency Plan* ..................................... 25

        *There is a Wealth of Evidence that Shelters are Not Accessible* .......... 26

        *The City's Recent Attempt to Obtain Shelter Data* .............................. 32

        *Essential Disability Supplies At Shelters* ......................................... 35

        *Backup Power in Shelters* .......................................................... 38

        *Areas for Improvement in Sheltering* ............................................. 39

    The City's Power Disruption Plans Ignore The Needs of Persons with Disabilities ................................................................................... 40

        *Areas for Improvement in Power Disruption* ..................................... 44

    The City's Failure to Plan for Persons with Disabilities During Period of No Assistance ....................................................................... 44

i

*NYCHA* ........................................................................................... 47

*Areas for Improvement in the Period of No Assistance* ........................................ 48

Communication Systems ....................................................................... 49

*Failure to Provide Relevant and Helpful Information to People
with Disabilities* .................................................................. 50

*Failure to Have Reliable Communication Methods and Failure to
Assess Reliability* .................................................................. 52

*Failure To Provide Communications In Accessible Formats* ............................. 53

*Areas for Improvement* ..................................................................... 54

Recovery Plans ................................................................................. 55

*Housing* .......................................................................................... 55

*Debris Removal* ............................................................................... 57

*Access to Essential Commodities* ....................................................... 58

*Areas for Improvement in Recovery* .................................................. 59

Lack of Advance Planning .................................................................. 59

Lack of Coordination Amongst City Agencies and with Outside Agencies ................... 61

Lack of Clear Decision-maker with Authority on Disability Issues ............................. 62

CONCLUSIONS OF LAW ...................................................................... 63

The City's Justifications ..................................................................... 70

# TABLE OF AUTHORITIES

**Cases**

*Adar and Constructors v. Slater*,
  528 U.S. 216 (2000) ................................................................................................ 72

*Aherns v. Bowen*,
  852 F.2d 49 (2nd Cir. 1998) .................................................................................. 72

*Alexander v. Choate*,
  469 U.S. 287 (1985) ................................................................................................ 65

*All Ready LLC v. Nike*,
  133 S.Ct. 721 (2013) ............................................................................................... 72

*Barden v. Sacramento*,
  292 F.3d 1073 (9th Cir. 2002) ............................................................................. 65

*Civic Ass'n of the Deaf of New York City, Inc. v. City of New York*,
  No. 95 Civ. 8591, 2011 WL 5995182 (S.D.N.Y. Nov. 29, 2011) ........................... 65

*Communities Actively Living Independent and Free v. City of Los Angeles*
  *("CALIF")*,
  2011 WL 4595993 .......................................................................................... 67, 68, 71

*Dopico v. Goldschmidt*,
  687 F.2d 644 (2d Cir.1982) .................................................................................... 66

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC), Inc.*,
  528 U.S. 167 (2000) ............................................................................................ 72, 73

*Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*,
  981 F.2d 50 (2d Cir. 1992) .................................................................................... 73

*Henrietta D. v. Bloomberg*,
  331 F.3d 261 (2d Cir. 2003) ............................................................... 64, 65, 66, 69

*Innovative Health Systems, Inc. v. City of White Plains*,
  117 F.3d 37 (2d Cir. 1997) superseded on other grounds *Zervos v. Verizon N.Y.,*
  *Inc.*, 252 F.3d 163 (2d Cir.2001), citing 28 C.F.R. pt. 35, app A (1996) ................................. 64

*Johnson v. Saline*,
  151 F.3d 564 (6th Cir. 1998) ................................................................................ 64

*Lincoln CERCPAC v. Health and Hosps. Corp.*,
  147 F.3d 165 (2d Cir. 1998) .............................................................................. 66, 67

*McGary v. City of Portland,*
  386 F.3d 1259 (9th Cir. 2004) ............................................................... 69

*Meagley v. City of Little Rock,*
  09 Civ. 226 (DPM), 2010 U.S. Dist. LEXIS 84011 (E.D. Ark.) (affd, 639 F.3d
  384 (8th Cir. 2011)) .............................................................................. 73

*Milliken v. Bradley,*
  433 U.S. 267 (1977) ................................................................................ 14

*National Market Share, Inc. v. Sterling Nat. Bank,*
  392 F.3d 520 (2d Cir. 2004) ................................................................... 65

*Noel v. New York City Taxi and Limousine Com'n,*
  687 F.3d 63 (2d Cir. 2012) ..................................................................... 17

*Olmstead v. Zimring,*
  527 U.S. 581 (1999) ................................................................................ 69

*R.C. Bigelow, Inc. v. Unilever N.V.,*
  867 F.2d 102 (2d Cir.1989) ..................................................................... 72

*Seidemann v. Bowen,*
  499 F.3d 119 (2d Cir.2007) ..................................................................... 72

*United States v. Concentrated Phosphate Export Assn., Inc.,*
  393 U.S. 199 (1968) ................................................................................ 72

*United States v. W.T. Grant Co.,*
  345 U.S. 629, 73 S.Ct. 894 (1953) .................................................... 72, 73

*Wright v. Giuliani,*
  230 F.3d 543 (2d Cir. 2000) ................................................................... 67

**Statutes**

29 U.S.C. § 794(a) .................................................................................... 64

29 U.S.C. § 794, *et seq.*.......................................................................... 63

42 U.S.C. § 12131, *et seq.*...................................................................... 64

42 U.S.C. § 12132 .............................................................................. 64, 73

N.Y.C. Admin. Code §8-101 *et seq.* ..................................................... 64

N.Y.C. Admin. Code§ 8-107(4)(a) .......................................................... 64

**Regulations**

28 C.F.R. § 25.130(b)(1)(i) ........................................................................................... 70

28 C.F.R. § 25.130(b)(1)(ii) .......................................................................................... 70

28 C.F.R. §35 ................................................................................................................ 69

28 C.F.R. § 35.130(b)(1)(iii) ......................................................................................... 70

28 C.F.R. §§ 35.150 ...................................................................................................... 70

28 C.F.R. §§ 35.151 ...................................................................................................... 70

28 C.F.R. §35.130(a) ..................................................................................................... 69

28 C.F.R. § 35.160(a)(1) ............................................................................................... 70

## FINDINGS OF FACT

1.      Plaintiffs have presented substantial evidence that the City of New York's ("City") emergency plans contain numerous failures to address the specific, foreseeable, and well documented needs of people with disabilities. Plaintiffs allege, and the Court finds that Defendants are deficient in the following areas of emergency planning and preparedness for persons with disabilities: (1) evacuation of persons with disabilities from multi-story buildings, (2) evacuation and transportation, (3) the sheltering system, (4) power outages, (5) the time in which people are on their own after disasters, (6) communication systems, and (7) recovery. These deficiencies appear to stem from a number of factors, including a lack of consideration of the needs of persons with disabilities, lack of coordination among agencies responsible under the City's plans, lack of expertise within the City in emergency planning for people with disabilities, failure to identify a decision-maker with authority on these issues, and an overreliance on decision-making at the time of an event in lieu of pre-planning.

2.      In particular, Defendants' failure to understand their obligations under the Americans with Disabilities Act is apparent when one considers that the City attempted to mount a defense based on an entirely false reading of the National Council on Disability's position on planning for this population. *See* Defendants' Memorandum of Law and Fact at 2-3. Contrary to Defendants' approach to emergency planning, NCD actually argues heavily for pre-planning for the unique needs of persons with disabilities stating:

> Planning is possibly the most important, albeit the most difficult, stage in the emergency management process. . . . Although some disasters allow plenty of time to execute emergency plans, others do not. The unexpectedness that accompanies these sudden onset disasters necessitates a quick response from those in its path. . . .

> [T]he ability to take "prompt and effective action" during a disaster
> is grounded in the planning process (p. 169). This implies that a
> sense of urgency must be built in to preparedness activities. . . . ¶
> The needs of people with disabilities must be included in
> emergency plan development. The generic, one-size-fits-all
> approach to disaster planning does not work. . . . Indeed,
> addressing barriers created by the "unique needs" of people with
> disabilities, rather than focusing narrowly on the disability itself,
> can serve to better protect all people during times of disaster.

*See* NCD, Effective Emergency Management (2009), Tr. Ex. 65 at CNY020273-20275 (emphasis added); *see also id.* at CNY020277 (emergency planners must plan ahead to effectively provide services and communicate with people with disabilities before, during, and after an emergency"); CNY020280 ("Written plans identify the particulars of how emergency response activities should unfold."); and CNY020294 ("The time and resources needed to evacuate people with disabilities is often greater than what is required for individuals without disabilities . . . Thus, pre-event evacuation planning is crucial.").

3.      The Court below identifies the key failings presented at trial.[1]

**The City's Emergency Planning System**

4.      The City has a number of written plans that form its baseline for large scale emergency response in the City. These plans are developed and finalized by the City's Office of Emergency Management ("OEM") whose mission is to plan and prepare for emergencies,

---

[1] Plaintiffs presented a significant amount of evidence at trial regarding these deficiencies. The Court in these findings cites what it considers the key evidence regarding the points made.

educate the public about preparedness, coordinate emergency response and recovery, and disseminate emergency information. *See* OEM Mission Statement, Tr. Ex. 113 at P001941. OEM has more than 200 employees, and is divided into at least six levels of management. *See* OEM Organization Chart, Tr. Ex. 44 at CNY006811.

5.      The City's overarching emergency plans include joint trial exhibits 5 through 43 as well as Defendants' trial exhibits 245 and 245A. OEM's Deputy Commissioner for Planning and Preparedness Kelly McKinney testified that these are the City's "baseline" plans. *See* McKinney Depo. Vol. 2 at 7:22-8:3. However, these plans are not sufficient to meet the needs of people with disabilities. Many of the City's baseline plans, including but not limited to the Power Disruption Plan, Debris Management Plan, Winter Weather Emergency Plan, Commodities Distribution Point Plan, and Flash Flood Emergency Plan, include only a cursory mention of the needs of people with disabilities that is insufficient to address the specific needs of the population.  Others, such as the Earthquake Response Playbook and Maritime Emergency Transportation Plan, do not mention people with disabilities at all.

6.      Other plans, such as the critical Coastal Storm Plan and the Area Evacuation Plan, do contain some mention of plans for people with disabilities. However, they nevertheless have major deficiencies with regards to this population.

7.      The failings are significant in light of the fact that "are roughly 900,000 people with disabilities in New York City." Class Certification Opinion and Order, Dkt. 66 at 13 (internal citations omitted).

**Evacuation of People with Disabilities from Multi-Story Buildings**

8.      New York City has the largest number and highest percentage of high rise buildings of any city in America. *See* Kailes Decl., Tr. Ex. 536 at ¶57. Consequently, it is a city

3

where many residents and visitors rely heavily on elevators to enter, exit, and use the City's multi-story buildings.

9.     As Defendants' expert Elizabeth Davis testified, New York City is "a vertical, not a horizontal city." *See* Trial Tr. vol. 6, 917:10-13, March 19, 2013 (Davis Testimony).

10.    As Plaintiffs' expert June Kailes testified, multi-story buildings "create particularly acute needs for people with disabilities" in emergencies. *See* Kailes Decl., Tr. Ex. 536 at ¶57.

11.    Victor Calise, the Commissioner of the Mayor's Office on People with Disabilities, acknowledged that people who use wheelchairs need assistance getting out of high rise buildings during power outages when elevators are not working. *See* Trial Tr. vol. 3, 462:18-23, March 13, 2013 (Calise Testimony).

12.    For example, the Court heard unrebutted testimony from power wheelchair-user Melba Torres who lives on the eighth floor of her NYCHA apartment building in a "504 apartment" designated as accessible for people with disabilities about her evacuation needs. After the earthquake that she felt in her apartment in the summer of 2011, she asked her building management to move her to a lower floor due to her concerns about being stuck on the eighth floor during a power outage, but she has not been moved. When Hurricane Sandy hit New York City, her greatest fears were realized when she ultimately found herself trapped in her apartment for six and a half days with no electricity, running water, or heat. *See* Torres Decl, Tr. Ex. 553 at ¶¶19, 27-28, 62-64; *see also* Delarosa Decl., Tr. Ex. 533 at ¶57.

13.    However, these acute needs include not only "people who use wheelchairs or walkers" but also anyone who is unable to independently walk up or down the stairs of a multi-story building including people "with arthritis, joint pain, difficulty using stairs, respiratory and

cardiac conditions, reduced stamina, fatigue, and emotional or cognitive disabilities that affect their ability to respond (especially when under stress)." *See* Kailes Decl., Tr. Ex. 536 at ¶55.

14.     Nevertheless, the City has admitted that it has no plan for the evacuation from high rise buildings of people with disabilities. The City does not have written evacuation protocols, requirements for evacuation devices, or coordinated efforts to identify and/or assist people with disabilities stranded in high-rise buildings during a disaster.

15.     There is no plan specific to the evacuation of persons with disabilities from multi-story building in the City's emergency plans, including the Coastal Storm Plan, the Area Evacuation Plan, or the City's Power Disruption Plan. *See* Coastal Storm Evacuation Plan, Tr. Ex. 6, Area Evacuation Plan, Tr. Ex. 5; Revised Area Evacuation Plan, Tr. Ex. 245A; and Power Disruption Plan, Tr. Ex. 19.

16.     OEM's Special Needs Coordinator Aaron Belisle is not aware of any plans for the evacuation of people with disabilities from high rise buildings. *See* Trial Tr. vol. 2, 306:22-307:13, March 12, 2013 (Belisle Testimony).

17.     In fact, Mr. Belisle testified that there is nothing in any of the City's written emergency plans addressing people with disabilities who are trapped in high rises in emergencies,  *see* Trial Tr. vol. 2, 309:21-24, March 12, 2013 (Belisle Testimony), and that he is not aware of any plans that the police or fire departments have with regard to evacuating people with disabilities from high rises. *See* Trial Tr. vol. 2, 306:22-307:13, March 12, 2013 (Belisle Testimony).  He also has not talked to anyone at the fire department about the issue of evacuating people with disabilities from high rises. *See* Trial Tr. vol. 2, 307:16-19, March 12, 2013 (Belisle Testimony). He also acknowledged that OEM's Special Needs Coordinator has no

role or responsibility relating to the issues of evacuating people with disabilities from their

homes. *See* Trial Tr. vol. 2, 310:16-22, March 12, 2013 (Belisle Testimony).

18.     Even though the FDNY is ostensibly responsible for high rise evacuations, FDNY

Division Chief in the Bureau of Operations Frederick Villani, the FDNY designated liaison to

the City's Office of Emergency Management and the FDNY FRCP 30(b)(6) designee on high-

rise evacuation, is not aware of any specific plans that address evacuations of people with

disabilities from high rises in the City. *See* Trial Tr. vol. 5, 773:20-22; 774:10-11; 773:23-

774:11; 789:19-22, March 18, 2013 (Villani Testimony).

19.     FDNY Division Chief Villani was likewise unable to definitively explain any plan

for how the FDNY assists and evacuates people with disabilities in emergencies. *See* Trial Tr.

vol. 5, 789:19-22, March 18, 2013 (Villani Testimony). In fact, the FDNY routinely advises the

public to use stairways to exit buildings with no instructions for people who use wheelchairs and

cannot use stairs in an emergency evacuation. *See* Trial Tr. vol. 5, 790:2-25, March 18, 2013

(Villani Testimony). For example, FDNY Division Chief Villani testified that the City's fire

safety brochure gives these instructions. *See* Fire Safety Brochure, Tr. Ex. 506.

20.     In addition, the Fire Department identifies stair chairs as a resource for the

evacuation of people with disabilities, but stair chairs are not typically carried on fire trucks.  *See*

Trial Tr. vol. 5, 781:22-24, March 18, 2013 (Villani Testimony). There was testimony that there

are some evacuation chairs in the City that could be made available. Nonetheless, the City has no

written plan for making evacuation chairs available for people with disabilities who might be

stranded in high rise buildings. Aaron Belisle, the Office of Emergency Management's special

needs coordinator, testified that he is not aware of whether the City stockpiles evacuation chairs

or any City plans that provide for the use of evacuation chairs. *See* Trial Tr. vol. 2, 307:20-24, 308:8-9, March 12, 2013 (Belisle Testimony).

21.     Similarly, the City has no plan for someone in desperate need who is stranded in a high rise building without power to signal that they need help. While the City is aware of such signaling options, NYPD Deputy Inspector James Wahlig testified that he is not aware of any signaling devices people are told about to signal for help. *See* Trial Tr. vol. 5, 744:1-7, March 18, 2013 (Wahlig Testimony).

22.     The City has been warned about this issue of multi-story evacuation for years, including explicit warnings from people like Marvin Wasserman, former Executive Director of BCID, who for many years tried to focus the City's attention on this issue. *See* Wasserman Decl., Tr. Ex. 535 at ¶¶2, 15-22. Nonetheless, Mr. Belisle testified that even though he was aware of the disability community's concern about high-rise evacuation before he came to OEM, he had not conveyed this concern to OEM in his capacity as special needs coordinator. *See* Trial Tr. vol. 2, 305:22-306:21, March 12, 2013 (Belisle Testimony). This concern was also highlighted at a New York forum on emergency preparedness in January 2011, at which Mr. Belisle was a speaker. For example, the symposium's "Lessons Learned" document identified as a recommendation the need to answer the following question: "When there is an emergency, how would a senior citizen using a wheelchair evacuate from a high rise building?" *See* Emergency Preparedness Strategies for People with Special Needs: A Symposium - Lessons Learned, Tr. Ex. 49 at CNY0001014. Unfortunately, these warnings went unheeded.

### *Homebound Evacuation Operation*

23.     The only City emergency plan that appears to have some application to multi-story evacuation is what is referred to as the "Homebound Evacuation Operation." This plan has historically only been included in the Coastal Storm Plan. *See* Coastal Storm Evacuation Plan,

Tr. Ex. 6 at CNY000139-146. Although this plan was recently incorporated into the City's new Area Evacuation Plan on the eve of trial, there are obvious problems inherent in that approach that render it inoperable for persons with disabilities. *See infra* regarding Area Evacuation Plan discussion.

24.     As an initial matter, the Homebound Evacuation Operation makes clear that the City considers it a plan of "last resort." *See* Trial Tr. vol. 5, 776:5-10, March 18, 2013 (Villani Testimony); Trial Tr. vol. 6, 895:6-9, March 19, 2013 (Davis Testimony); Coastal Storm Evacuation Plan, Tr. Ex. 6 at CNY000107. However, the City has never identified what it considers a "first resort" multi-story evacuation plan for this population.

25.     The Homebound Evacuation Operation is an extremely limited plan. As Plaintiffs' expert June Kailes testified, the Homebound Evacuation Operation is "designed to provide individualized assistance to a small number of people." *See* Kailes Decl., Tr. Ex. 536 at ¶40.

26.     In fact, there are many critical deficiencies and limitations in the Homebound Evacuation Operation that results in its limited application and failure to constitute meaningful access to the City's emergency evacuation plans.

27.     First, the existence of the Homebound Evacuation Operation is not in any way made known to people with disabilities prior to or during an emergency. Thus, the City does not actually tell the public about the Homebound Evacuation Operation prior to or during an event. *See* Trial Tr. vol. 2, 293:13-16, March 12, 2013 (Belisle Testimony).

28.     Second, the Homebound Evacuation Operation relies on 311 for individual requests for assistance during an emergency. However, 311 is the City's nonemergency information line. *See* Trial Tr. vol. 2, 292:22-25, March 12, 2013 (Belisle Testimony); Trial Tr.

vol. 5 778:1-5, March 18, 2013 (Villani Testimony). In addition, there is substantial evidence

that the 311 system will likely be overwhelmed during a major disaster, rendering it unreliable

for this purpose. *See* Communication Systems discussion.

29.     In addition, if someone were to call 311, the first thing that they would hear is that

if it is an emergency they should hang up and call 911.  And, if a person with a disability does

not hang up upon hearing that message, the City does not tell the public what they must say to

311 to trigger the homebound evacuation operation. *See* Trial Tr. vol. 4, 614:4-13, March 14,

2013 (Morrisroe Testimony).

30.     Third, the Homebound Evacuation Operation shuts down six to eight hours prior

to the actual landfall, or arrival, of a storm, which is known as the "zero hour" in coastal storms.

*See* Trial Tr. vol. 5, 779:15-780:8, March 18, 2013 (Villani Testimony). FDNY Division Chief

Villani acknowledged that the City has no plan to address what would happen to people with

disabilities who have already called and requested to be evacuated but are still waiting to be

evacuated when the program shuts down six to eight hours before the zero hour. *See* Trial Tr.

vol. 5, 780:13-18, March 18, 2013 (Villani Testimony).

31.      The Homebound Evacuation Operation is also not reactivated after the triggering

emergency event, such as a coastal storm, even if there is a need to help people evacuate who are

stranded in the aftermath of a disaster. *See* Trial Tr. vol. 6, 952:10-12, March 19, 2013 (Manahan

Testimony).

32.     Fourth, this operation will only take people to evacuation centers or hospitals,

even when nondisabled residents have options to go elsewhere. *See* Trial Tr. vol. 2, 314:11-15,

March 12, 2013 (Belisle Testimony). Thus, if a person with a disability does not want or need to

go to a shelter or hospital, the only Fire Department plan is to get the person out of the building

and then leave them outside in front of the building. *See* Trial Tr. vol. 5, 777, 794:1-11, March 18, 2013 (Villani Testimony).

33.     Fifth, the FDNY is charged by OEM with implementing evacuations under the Homebound Evacuation Operation. Yet, the FDNY does not know its capacity to assist people with disabilities through the Homebound Evacuation Operation.  For example, it has not done any analysis to understand how many people it thinks it can evacuate in a worst-case scenario under the plan. *See* Trial Tr. vol. 5, 781:10-14, March 18, 2013 (Villani Testimony). Likewise, the FDNY does not know how many accessible vehicles are generally available for the homebound evacuation operation.  *See* Trial Tr. vol. 5, 779:1-7, March 18, 2013 (Villani Testimony). In fact, FDNY Assistant Chief Manahan testified that he did not know whether the five buses used for evacuation through this program during Hurricane Sandy were wheelchair-accessible. *See* Trial Tr. vol. 6, 950:13- 951:15, March 19, 2013 (Manahan Testimony).

34.     Sixth, the Homebound Evacuation Operation does not provide any guidance or training to responders on whether a person's medical equipment, such as their motorized wheelchair, should be evacuated with them. *See* Trial Tr. vol. 5, 777:14-25, March 18, 2013 (Villani Testimony).

35.     Seventh, the entirety of the Homebound Evacuation Operation during Hurricane Sandy consisted of one bus per borough and forty-five people working on the Incident Management Team that managed the Homebound Evacuation Operation. *See* Trial Tr. vol.6, 950:13-20, March 19, 2013 (Manahan Testimony).

36.     As a result, this program has had very limited impact historically. In Hurricane Irene, where the mandatory evacuation called for 370,000 residents to evacuate, the City only evacuated 200 people via the Homebound Evacuation Operation. *See* Office of Emergency

Management 2011 report at "Hurricane Irene: Evacuation" and "Healthcare and Homebound Evacuation," Tr. Ex. 154 at P001946.

37.     In Hurricane Sandy, the Homebound Evacuation Operation evacuated fewer than 100 people, even though the mandatory evacuation called for 375,000 residents to evacuate, *see* McKinney Depo. Vol. III at 18:12-16; Situation Report 10/29/12 0800 hrs, at CNY0022651, Tr. Ex. 79; City Press Release, Tr. Ex. 68.

***Local Ordinances***

38.     At trial, the City attempted to argue that certain City laws and codes address high rise evacuations, such as Local Law 26 and Code 404. However, both of those are extremely limited in their application and by no means create meaningful procedures for evacuating persons with disabilities, particularly on a large scale basis.

39.     Defendants' expert Elizabeth Davis agreed that Local Law 26 only requires a limited category of high rise buildings classified as "Group B" to have *some* kind of procedures for identifying building occupants with disabilities for providing assistance to them in emergencies. However, that law does not specify what the plans need to provide for in terms of evacuation, and thus is not in any way a meaningful evacuation plan. In addition, Local Law 26 does not apply to residential buildings, educational facilities, or nursing homes. Ms. Davis testified that she did not know whether Local Law 26 applies to group homes. *See* Trial Tr. vol. 6 at 898:14-899:6, March 19, 2013 (Davis Testimony).

40.     Furthermore, the City's witness regarding Fire Code Section 404 was admittedly not familiar with that code. FDNY Division Chief Villani testified that he is not familiar enough with the provision of the code to know whether it applied to residential buildings, businesses, educational building, group homes, or areas of assembly. He further testified that under 404, a building could have a plan that instructs people with disabilities to do a variety of things, such as

sheltering in place, relocating to another part of the building, or evacuating. *See* Villani Decl., Tr. Ex. 559 at ¶43, Trial Tr. vol. 5, 791:1-25, March 18, 2013 (Villani Testimony).

41.     Thus, under both the Fire Code and Local Law 26 people with disabilities could simply be told to stay where they are, rather than how to evacuate.

### Sandy Demonstrated The Deficiencies In The City's High Rise Planning For People With Disabilities

42.     The deficiencies in the City's high rise planning for people with disabilities were dramatically demonstrated during Sandy, when many people with disabilities could not get evacuation assistance to get out of multi-story buildings. For example, class member Joyce Delarosa, who uses a wheelchair and relies on oxygen due to restricted lung capacity, lives outside of Evacuation Zone A in a high rise building that lost power during Sandy. Yet, when she called 911 to get evacuation assistance, they told her that they would only evacuate her if she needed to go to the hospital for medical attention. As a result, she was forced to stay at home for three days with no electricity until she became so ill from oxygen deprivation that she had to call 911 to take her to the hospital. *See* Delarosa Decl., Tr. Ex. 533 at ¶¶38, 56, 61, and 64. Even though Ms. Delarosa testified that if she had been able to get out of her house the first time she tried to evacuate as Hurricane Sandy approached, she would have gone to a hospital, this was only because she had no other place to go. *See* Trial Tr. vol. 1, 85:3-7, 89:10-13, March 11, 2013 (Delarosa Testimony). She also testified that she had no choice but to misrepresent to first responders that her daughter needed to go to the hospital, because this was the only way she could get them to evacuate her daughter. *See* Trial Tr. vol. 1, 89:7-9, March 11, 2013 (Delarosa Testimony).

43.     Likewise, class member Melba Torres, a power wheelchair-user, who lives in Zone A in a New York City Housing Authority building was stuck in her bed in her apartment

for six and a half days with no power in the aftermath of Hurricane Sandy because she lived in a multi-story building. She only survived because she was fortunate enough to have personal aides who stayed with her instead of staying with their own families during Sandy. *See* Torres Decl., Tr. Ex. 553 at ¶¶61-66. Ms. Torres also testified that she could not continue to call the 311 line because her cell phone did not have batteries and she had no way to recharge. *See* Torres Decl., Tr. Ex. 553 at ¶¶74, 76.

44.     Occupy Sandy volunteer Anna Lekas Miller testified that she saw people who were elderly, physically frail, or had other disabilities besides using a wheelchair who were trapped in high rise buildings in the aftermath of Sandy. *See* Miller Depo at 164:2-13; 188:14-189:11.

45.     Several of Defendants' witnesses acknowledged that people with disabilities were stranded during Sandy in such multi-story building structures. OEM Special Needs Coordinator Aaron Belisle testified that although he was aware that people with disabilities were stranded in buildings during Sandy, he did not make an effort to find out how many. *See* Trial Tr. vol. 2, 310:23-311:6, March 12, 2013 (Belisle Testimony).

46.     MOPD Commissioner Calise was likewise aware of the fact that people with disabilities were stranded in high rises after Sandy. *See* Trial Tr. vol. 3, 444:15-18, March 13, 2013 (Calise Testimony). Nonetheless, prior to Hurricane Sandy, he did not receive any information about any options available to people with disabilities who might need to evacuate from high rise buildings. *See* Trial Tr. vol. 3, 442:12-17, March 13, 2013 (Calise Testimony). Further, OEM did not consult with MOPD Commissioner Calise about people being stuck in buildings during Sandy. Trial Tr. vol. 3,  445:3-5, March 13, 2013 (Calise Testimony). MOPD Commissioner Calise testified that he is not aware of any Advanced Warning System messages

that contained information about assisting people with disabilities in high rises during Hurricane Sandy. *See* Trial Tr. vol. 3, 512:9-13, March 13, 2013 (Calise Testimony).

47.     FDNY Assistant Chief Manahan testified that he was also aware that people were stranded in high rise buildings after Hurricane Sandy but that he did not know how many people were stranded. *See* Trial Tr. vol. 6, 947:9-22, 972:9-12, March 19, 2013 (Manahan Testimony).

### Areas for Improvement for Multi-Story Evacuation

48.     There are many measures the City could be taking to account for the needs of people with disabilities for evacuations from multi-story buildings, and any solution will likely be multi-faceted.[2] The Court heard unrebutted testimony about the value of a variety of available evacuation chairs that could assist people with disabilities to evacuate during an emergency, as one example of what the City could utilize to provide persons with disabilities with meaningful access to evacuation plans. For example, evacuation chairs saved lives during 9/11. Plaintiffs' experts Peter Blanck and June Kailes testified that people who had not even been trained in how to use stair chairs were able to use to them to help people with disabilities evacuate to safety during 9/11. *See* Blanck Decl., Tr. Ex. at  ¶¶63-69; Kailes Decl., Tr. Ex. 536 at ¶61-62; Wasserman Decl., Tr. Ex. 535 at ¶¶2, 15-22.

49.     As Plaintiffs' expert June Kailes testified, evacuation chairs are particularly valuable since "[i]n a mass evacuation, it may be impossible for fire personnel to get to the numbers of people who will need evacuation assistance, and responding fire personnel may not

---

[2] The Court addresses measures that the City could take, not to address remedy at this stage but rather to demonstrate the existence and feasibility of measures that could improve emergency planning in the City. When the Court reaches the remedy stage, it will have a number of means available to it to determine the precise remedy necessary in this case, including but not limited to appointment of a special master or independent expert who can develop appropriate relief. Upon a determination of liability, the Court may then choose from a wide range of procedural devices and remedies to bring the case to a conclusion. *Milliken v. Bradley*, 433 U.S. 267, 281 (1977) (finding the scope of a district court's equitable powers is broad).

be able to coordinate with ambulance services. Moreover, first responders may need to fight against the tide of people going down and out of the building in order to get this equipment to the correct location. Thus, having pre-positioned devices, with some training, is critical in ensuring that people with disabilities can get down from higher floors." *See* Kailes Decl., Tr. Ex. 536 at ¶61.

50.     Similarly, the National Council on Disability report authored by Defendant's expert Elizabeth Davis recommended additional measures, such as training people, either individually or as teams, who are willing to provide assistance in evacuation to people with disabilities, and designating elevators to be used for evacuating persons with disabilities. *See* Effective Emergency Management (NCD 2009), Tr. Ex. 65 at CNY020495.

51.     The signaling devices mentioned above could also provide a method for people to identify as needing assistance, and the City could implement a number of other plans for self-identification prior to and during an emergency. Plaintiff's expert June Kailes testified that "[f]or those not already identified as needing assistance, the City could also provide or identify a method for people to signal that they need assistance. This could include simple things, such as instructing people to put a light or flag at their window (it could be any light, flashlight or inexpensive signaling device) to indicate that they need assistance. There are many inexpensive signaling devices that the City could invest in and distribute to this population. The City could also establish a hotline for people stranded in their buildings. I saw evidence that the City created a hotline for people to report stranded pets. A similar method could be used so that people with disabilities who are stranded could identify themselves (if they have access to a working phone)…." *See* Kailes Decl., Tr. Ex. 536 at ¶97.

**Evacuation And Transportation**

*General Reliance on Public Transportation*

52. Mr. Belisle acknowledged that it is important for the City to provide transportation for people with disabilities in the event of a mass evacuation. *See* Trial Tr., vol. 2, 313-314, March 12, 2013 (Belisle Testimony).

53. However, the City's emergency plans operate under the assumption that people will use public transportation in order to evacuate. The City's emergency planning documents demonstrate that the City's plans for evacuation rely very heavily on public transportation in emergency evacuations, both for notice and no-notice emergencies. *See, e.g.,* Coastal Storm Evacuation Plan, Tr. Ex. 6 at CNY000111 ("During an evacuation, the City will work with transportation providers to maximize and optimize the use of trains, subways, and buses. Evacuees will use public transportation to travel to Evacuation Centers, friends, family, or hotels/motels within and outside the City, and to engage in storm-preparedness activities."); Area Evacuation Plan, Tr. Ex. 5 at CNY019244, ("Mass transit will be used to the greatest extent possible"). Revised Area Evacuation Plan, Tr. Ex. 245A at 25 ("The New York metropolitan area's public transportation network is the most efficient way to move large numbers of people. It will be a key component of many evacuation options, both for moving evacuees from the evacuation area, and for redistributing those displaced by the incident.")

54. Similarly, Defendants' expert Elizabeth Davis testified that, in an emergency, a person's first resort for evacuation is "whatever people normally use for transportation." *See* Trial Tr. vol. 6, 895:10-14, March 19, 2013 (Davis Testimony). Mr. Belisle testified that the City's emergency plans operate on the assumption that people will use existing transportation resources to evacuate in an emergency. *See* Trial Tr. vol. 2, 318:19-22, March 12, 2013 (Belisle Testimony).

55.     However, Plaintiffs presented substantial evidence that public transportation in New York City is exceptionally difficult for persons with disabilities to navigate. More than 98% of taxis and 80% of subway stations are inaccessible. *See, e.g., Noel v. New York City Taxi and Limousine Com'n*, 687 F.3d 63, 66 (2d Cir. 2012) (98.2% of taxis are inaccessible); and *compare* www.MTA.info "Facts and Figures" at P002126-2129, Tr. Ex. 157 *with* www.MTA.info "Accessibility," List of Accessible Subway Stations at P002130-2137 (showing only 77 of 468 subway stations are accessible).  Finally, buses in New York City only have 2 seats that can accommodate wheelchairs in a non-emergency situation and those seats are likely to be unavailable during an emergency. *See* Trial Tr. vol. 1, 187:10-23, March 11, 2013 (Kailes Testimony).

56.     MOPD Commissioner Calise confirmed in his testimony that public transportation in New York City presents challenges for people with disabilities. *See* Trial Tr. vol. 3, 461:8-11, March 13, 2013 (Calise Testimony).

57.     The City concedes that many of its transportation assets are not accessible to people with mobility impairments. The City's original Area Evacuation Plan identified "Intermodal Hubs" for Manhattan, which are hubs for subway, rail, ferries and/or buses, and included many that are not accessible to people with disabilities. *See* Area Evacuation Plan, Tr. Ex. 5, filed under seal at CNY019250-19251.

58.     A number of class members also testified to these public transportation barriers. For example, class member Jean Ryan, a power wheelchair-user, testified that on a daily basis, in non-emergency circumstances, she has only a very few options for traveling around the City. Ms. Ryan mainly relies on Access-A-Ride, which requires at least 24 hours advance notice and is a very time-consuming way to travel.  She sometimes can use a City bus, but only if she is going

to a destination on a bus route, the wheelchair-lift on the bus is working, and the bus is not so crowded that it prevents her from being able to board in her power wheelchair. There are no accessible subway stations within miles of her home in Bay Ridge, Brooklyn. *See* Ryan Decl., Tr. Ex. 549 at ¶¶18-24.

59.     Class member Valarie Buckner who has a vision impairment and arthritis in her foot also relies on Access-A-Ride to travel around the City. She lives on a very fixed income and is unable to afford a taxi. *See* Buckner Decl., Tr. Ex. 546 at ¶¶16-24. *See also* Morales Decl., Tr. Ex. 545 at ¶¶2, 28-30; Conner Decl., Tr. Ex. 538 at ¶¶15-17; Curry Decl., Tr. Ex. 548 at ¶¶27-31; Ryan Decl., Tr. Ex. 549 at ¶¶18-25; and Halbert Decl., Tr. Ex. 543 at ¶¶14-19 (detailing difficulties on a daily basis, in non-emergency circumstances, attempting to use public transit in New York City with a disability).

60.     Mr. Belisle testified that he was not aware of any survey that had been completed as to the sufficiency of accessible transportation in an emergency. *See* Trial Tr. vol. 2, 293:19-23, March 12,  2013 (Belisle Testimony). He also testified that there is no inventory of accessible transportation for evacuations. *See* Trial Tr. vol. 2, 315:19-316:1, March 12, 2013 (Belisle Testimony).

61.     Deputy Inspector Wahlig of the NYPD testified that he does not know how many of the preexisting transportation hubs are accessible to people who use wheelchairs. *See* Trial Tr. vol. 5, 743:4-6, March 18, 2013 (Wahlig Testimony). He also testified that he does not know how many paratransit vehicles would be available to the police department in an emergency. *See* Trial Tr. vol. 5, 743:1-3, March 18, 2013 (Wahlig Testimony).

62.     Although the City purports to rely on paratransit for evacuation options, there is no emergency transportation plan that includes a specific paratransit plan for the disability

community. *See* Trial Tr. vol. 5, 788:9-789:5, March 28, 2013 (Villani Testimony); Trial Tr. vol. 5, 743:1-3, March 18, 2013 (Wahlig Testimony). Plaintiffs' expert June Kailes testified that the lack of a specific plan creates a potential lag time involved in accessing transportation resources (if available) that could be life-endangering for people with disabilities. *See* Kailes Decl., Tr. Ex. 536 at ¶44. Mr. Belisle testified that he is not aware of any agreement with the paratransit provider regarding emergency response. *See* Trial Tr. vol. 2, 374:23-375:9, March 12, 2013 (Belisle Testimony).

***Coastal Storms***

63.     Other than the limited Homebound Evacuation Operation discussed above, the City's Coastal Storm Plan contains no information about provision of transportation to people with disabilities out of evacuation zones.

64.     Mr. Belisle testified that, during Sandy, OEM was not responsible for the transportation of people to evacuation centers.  Thus, except for the few people who could be evacuated by the Homebound Evacuation Operation, the City expected people to find their own way to evacuation centers. *See* Trial Tr. vol. 2, 318:23-319:3, March 12, 2013 (Belisle Testimony).

65.     Hurricane Sandy underscored the failures of the City's evacuation plans for persons with disabilities. Paratransit, which is essential for people with disabilities, shut down almost simultaneously with the 11:30 a.m. order for Zone A to evacuate on October 28, 2012. *See, e.g.,* MTA Website, Oct. 28, 2012, Tr. Ex. 160 at P003382; Situation Report, 10/29/12, Tr. Ex. 80 at CNY00022589. This gave people who rely on this service almost no chance to get out when ordered. Indeed, Defendants did not rebut testimony from multiple members of the Plaintiff class that paratransit requires a reservation at least 24 hours in advance. Several of

CIDNY's clients did not have time to get paratransit rides out of danger zones during Sandy. *See* Trapani Decl., Tr. Ex. 534, at ¶66-67.

66.     Class members faced life-threatening consequences because they were not otherwise able to get accessible transportation to evacuate during Sandy. For example, class member Kenneth Martinez, an amputee and wheelchair-user who lived in Zone A, tried to get on a bus to evacuate, but the busses were too full, and he could not get on. *See* Martinez Decl., Tr. Ex. 547 at ¶¶2, 34, 35. Plaintiffs' expert June Kailes had predicted that instances like this would happen in emergencies. *See* Trial Tr. vol. 1, 187:8-16, March 11, 2013 (Kailes Testimony). He waited as long as he could in the rain in his motorized wheelchair for a bus that had room for him, but ultimately had to return home before his wheelchair got so wet that it would likely short out and no longer function. Because Mr. Martinez could not evacuate, he was home alone when floodwaters rushed into his apartment. Mr. Martinez's life was likely saved only because a neighbor who heard him banging on the ceiling for help broke a window, swam inside, and rescued him as water reached the ceiling. *See* Martinez Decl., Tr. Ex. 547 at  ¶¶33-35.

67.     Class member Melba Torres, who lives alone on the 8th floor of New York City Housing Authority housing on the Lower East Side of Manhattan, sent her attendant to find out whether the buses that were evacuating people outside her building were accessible, but her attendant could not find accessible transportation. As a result of Ms. Torres not being able to evacuate, she was stuck in her unit when the power went out, and for the six and a half days that followed.  Because she relies on a power wheelchair that must be charged, she had to spend much of those days in bed. *See* Torres Decl., Tr. Ex. 553 at ¶66.

68.     Further, the information provided to people with disabilities regarding transportation during Sandy was quite limited. The MOPD website instructed people with

disabilities to call 311 to get information about the hurricane and whether they live in an evacuation zone. *See* Trial Tr. vol. 3, 455:3-7, March 13, 2013 (Calise Testimony); Tr. Ex. 351. The MOPD website also instructed people to visit MTA's website to find accessible transportation options. *See* Trial Tr. vol. 3, 455:8-11, March 13, 2013 (Calise Testimony). MTA's website only instructed people that outbound Access-A-Ride trips were scheduled until noon and that all other regularly scheduled trips would be cancelled but provided no other disability-related information. *See* MTA Weather Advisory Website, 10/28/12), Tr. Ex. 160 at P003382. The City also informed people that accessible vehicles were available at accessibledipatch.com, but this is a very limited program in that there are only 231 accessible vehicles, they only pick people up in Manhattan, and they are not specifically reserved for people with disabilities. *See* Trial Tr. vol. 3, 456:7-19, March 13, 2013 (Calise Testimony).

*Area Evacuation Plan*

69.     The City's Area Evacuation Plan is its plan for no-notice, catastrophic disasters, as opposed to coastal storms, which approach with advance warning. This includes large-scale spontaneous catastrophic incidents, which include things such as radiological incidents, major explosions, and terrorist attacks, in which hundreds of thousands of New Yorkers may need to evacuate an area of the City. *See* Trial Tr. vol. 5, 784:10-785:7, March 18, 2013 (Villani Testimony).

70.     At the time the complaint in this case was filed, and throughout most of the pendency of the case, the Area Evacuation Plan (8/26/05), Tr. Ex. 5, filed under seal was in effect, and this plan made virtually no provisions for people with disabilities. *See* Area Evacuation Plan, Tr. Ex. 5, filed under seal. One week before the trial in this case, the City adopted a revised Area Evacuation Plan, Tr. Ex. 245A. OEM's Special Needs Coordinator, Mr. Belisle, did not, however, participate in drafting the City's mass evacuation plan. *See* Trial Tr.

vol. 2, 285:4-5, March 12, 2013 (Belisle Testimony). The revised plan continues to fail to provide meaningful access to the City's evacuation planning.

71.     For example, this revised Plan co-opts the Homebound Evacuation Operation as currently written in the Coastal Storm Evacuation Plan. However, the Homebound Evacuation Operation was designed for use in emergencies for which there is advance notice. *See* Coastal Storm Shelter Plan, Tr. Ex. 7 at CNY000402-403; Coastal Storm Evacuation Plan, Tr. Ex. 6 at CNY000107-108; Trial Tr. vol. 5, 787:16-23, March 18, 2013 (Villani Testimony). There are obvious problems with this approach.

72.     As written, the Homebound Operation instructs that different events will happen at certain points in time, starting at 96 hours before the zero hour, and at points counting down to the zero hour when a coastal storm make landfall. *See* Coastal Storm Shelter Plan, Tr. Ex. 7 at CNY000402-403. In a spontaneous catastrophic incident, there would be no zero hour around which to time planning and preparation. *See* Trial Tr. vol. 5, 779:15-780:18, March 18, 2013 (Villani Testimony).

73.     In addition, the Homebound Evacuation Operation in the revised Area Evacuation Plan would not even begin until *after* the public transportation, life safety, and site management phases. *See* Revised Area Evacuation Plan, February 13, 2013, Tr. Ex. 245A at 12; Trial Tr. vol. 5, 787:4-15, March 18, 2013 (Villani Testimony).

74.     Ms. Kailes testified that she noted only "incremental improvements" in the 2013 Revised Area Evacuation Plan in that the plan did not completely ignore the needs of people with disabilities. *See* Trial Tr. vol. 1, 217:19-218:10; 227:17-23, March 11, 2013 (Kailes Testimony). However, she testified that the revised Area Evacuation Plan's incorporation of the Homebound Evacuation Operation is particularly problematic for people with disabilities in a number of

22

ways. See Kailes Decl, Tr. Ex. 536 at ¶41, fn. 1. For example, the revised plan still relies on 311 to handle all requests for evacuation assistance.  Thus, in a major event, where hundreds of thousands of people are evacuating, people with disabilities would be instructed to call 311 and wait. *See* Trial Tr. vol. 5, 786:2-10, March 18, 2013 (Villani Testimony).

75.     Plaintiffs' expert Peter Blanck testified that although the inclusion of the Homebound Evacuation Operation in the new Area Evacuation Plan is a positive first step, it is unclear how that will be further developed into the plan. *See* Trial Tr. vol. 3, 532:14-19, March 13, 2013 (Blanck Testimony). He testified that he is concerned about the effectiveness of the Homebound Operation as part of the Area Evacuation Plan, since the former was simply pasted into the plan, and both still contain major deficiencies. *See* Trial Tr. vol. 3, 534:6-535:1, March 13, 2013 (Blanck Testimony).

76.     More broadly, although the revised Area Evacuation Plan contains a "special needs operational strategy," (of which the Homebound Operation is a part) that strategy does not even begin until the end of the early phase of an incident, which could be hours after an incident, and begins *later* than the response for non-disabled residents. *See* Trial Tr. vol. 5, 787:4-15, March 18, 2013 (Villani Testimony). This is not a meaningful response for individuals with disabilities.

77.     Further, there is no directive about what agencies relevant to evacuation would do in terms of roles they would play and resources they would provide if this plan was activated. Rather, the revised Area Evacuation Plan states that in order to provide transportation support to people with disabilities or enhanced paratransit services in a spontaneous catastrophic event: (1) MTA *may* reroute paratransit vehicles to support special needs evacuations, (2) the TLC *may* request support from private ambulette operators through the Homebound Evacuation Operation,

and (3) MTA Paratransit *may* be asked to implement shuttle routes to hospitals or Evacuation

Staging Areas. *See* Area Evacuation Plan Tr. Ex. 245A at 28, 36. However, there is no absolute

directive or plan as to what the MTA, TLC, or MTA paratransit will do. *See* Trial Tr. vol. 5,

788:15-789:5, March 18, 2013 (Villani Testimony).

78.     As Ms. Kailes explained, the Plan identifies paratransit or enhanced paratransit as

a means of evacuating but with no specificity as to how this would actually occur or how it

constitutes a plan. *See* Kailes Decl., Tr. Ex. 536 at ¶44.

79.     As noted above, the City has no agreements with paratransit about the services it

would provide in an emergency.  Thus, for example, there is no agreement with MTA regarding

the accessible transportation resources it might provide in an emergency to people with

disabilities.  Instead, the City only agrees to make a request to MTA if and when they need to do

so. S*ee* Trial Tr. vol. 2, 374:23-375:9, March 12, 2013 (Belisle Testimony).

***Areas for Improvement for Evacuation/Transportation***

80.     As Plaintiffs' expert June Kailes testified, there are many measures the City could

be taking into account for the needs of people with disabilities with respect to evacuation and

transportation. For example, the City could provide designated transportation pickup points for

evacuations and communicate their locations in pre-storm emergencies, as the City of New

Orleans does. *See* Kailes Decl., Tr. Ex. 536 at ¶50. The City could also conduct an inventory of

accessible transportation for emergency evacuations and inform the public about these options.

*See* Kailes Decl., Tr. Ex. 536 at ¶51. The City could also include in its evacuation messaging

information about paratransit services, who to contact for transportation assistance, when

transportation services begin and end, transportation point locations and the accessibility of these

locations, frequency of pickups, and travel destinations (evacuation points). *See* Kailes Decl., Tr.

Ex. 536 at ¶51. Ms. Kailes further testified that to the extent the City relies on programs such as

the Homebound Evacuation Operation, the City must provide specific information about the program so that people with disabilities will know what to expect and what to ask for; general instructions to call 311 are insufficient. *See* Kailes Decl., Tr. Ex. 536 at ¶53.

**The Sheltering System**

81.     As Robert Van Pelt, OEM Director of Human Services, testified, "in a worst case scenario, the City's sheltering system would shelter more than 605,000 evacuees in more than 500 shelters. The plan also includes eight special medical needs shelters ("SMNS") reserved for individuals with medical needs that may not require hospitalization, but who may need an increased level of care from what can be provided in our regular shelters . . . Under the plan, the evacuation center is the initial point of entry for evacuees. After an initial triage at the evacuation center, an individual moves to either a shelter or a SMNS, depending on their situation and needs." *See* Van Pelt Decl., Tr. Ex. 561 at ¶¶12-15. Mr. Van Pelt also testified that the Coastal Storm Shelter Plan is an all-hazards shelter plan that could be used in various types of emergencies, including spontaneous catastrophic disasters that strike with no warning. *See* Trial Tr. vol. 5, 831:2-21, March 18, 2013 (Van Pelt Testimony).

82.     However, the evidence at trial demonstrated the existence of major barriers both with physical access to evacuation centers and shelters, as well as the supplies available at shelters.

*Sheltering is the Core of an Emergency Plan*

83.     Providing for the care of people with disabilities at shelters in a disaster is an important component of any emergency program, as Mr. Belisle testified. *See* Trial Tr. vol. 2, 319:5-9, March 12, 2013 (Belisle Testimony). Shelters are particularly important to people with disabilities, because, unlike people without disabilities, many people with disabilities are not able

to depend on friends, family and neighbors, because they may not have accessible homes or otherwise may not be able to accommodate their needs.

84.     For example, class member and power wheelchair-user Melba Torres testified that she does not know of anyone with whom she could stay during an emergency because she does not know anyone who could provide both an apartment that is wheelchair accessible and physical assistance with the various daily activities she needs assistance with like getting into and out of bed, getting dressed, toileting, and eating. *See* Torres Decl., Tr. Ex. 553 at ¶¶24-26. Joyce Delarosa, another power wheelchair-user, also testified that she does not have any friends or family that she could stay with during an emergency. *See* Delarosa Decl., Tr. Ex. 533 at ¶¶27-28. Other class members with mobility disabilities testified they also do not have friends and family with accessible homes where they could go in an emergency. *See, e.g.,* Ryan Decl., Tr. Ex. 549 at ¶25; Halbert Decl., Tr. Ex. 543 at ¶22.

85.     It is also important that people with disabilities know they can obtain access and services at shelters. Plaintiffs' and Defendants' experts agree that people with disabilities are likely to not evacuate to a shelter if they believe that their needs cannot be met. Defendants' expert Elizabeth Davis testified that the National Council on Disability Report that she authored concluded that some people with disabilities do not evacuate if they believe shelters are not ready for them. *See* Trial Tr. vol. 6,  904:9-18, March 19, 2013 (Davis Testimony). Plaintiffs' expert June Kailes testified that some people with disabilities "believe that if they evacuate without the things they need and cannot get what they need to survive and maintain their health, safety and independence once they get to a shelter, then they will be better off ignoring evacuation instructions." *See* Kailes Decl., Tr. Ex. 536 at ¶72.

***There is a Wealth of Evidence that Shelters are Not Accessible***

86.     The City's plans do not require shelters to be accessible, nor do they identify any particular level or scope of accessibility needed. *See, e.g.,* Coastal Storm Shelter Plan, Tr. Ex. 7. The only mention of accessible shelter and evacuation center layout in the City's Evacuation Center Field Guide and Hurricane Shelter Field Guide is an instruction that shelter operators should note which parts of the shelter or center are not accessible to people with disabilities. *See* Hurricane Shelter Field Guide, Tr. Ex. 16 at CNY001258; Evacuation Center Field Guide, Tr. Ex. 15 at CNY001119. However, there is no further explanation of what this means or how to determine it.

87.     While the City referenced the training shelter workers receive as touching on accessibility, such training is not mandatory for most shelter workers. *See* Maniotis Depo at 50:5-11. This training also does not tell shelter workers the scope or nature of accessibility required. *See generally* Coastal Storm Plan Training Advanced Hurricane Shelter Training for Operators v.2 (ADM1.2) Course Leader's Guide v.7/3/2008, Tr. Ex. 501; Just-in-Time Course 3: Hurricane Shelter Administration, Tr. Ex. 502; Just-in-Time Course 4: Hurricane Shelter Operations, Tr. Ex. 503.

88.     The City does not currently know which of its evacuation centers or shelters are accessible to people with disabilities. *See* Trial Tr. vol. 9, 902:7-9, March 19, 2013 (Davis Testimony); Trial Tr. vol. 2, 333:18-22, March 12, 2013 (Belisle Testimony); Maniotis Depo. at 88:6-19.

89.     There was evidence of substantial access problems in the sheltering system. For example, Susan Dooha, Executive Director of CIDNY, testified "I observed [during Sandy] that there were shelters where bathrooms were not accessible. I observed shelters where there was no back-up power, and where food, or cots were located up or down from the ground floor. Without

an elevator and power, the only way of getting to these critical services was by using a flight of stairs. I observed shelter materials that were not in an accessible format, and shelter staff who were not trained or prepared to deal with people with disabilities. The barriers at shelters that I observed were not just barriers to persons who used wheelchairs, but also barriers to persons who are blind, deaf, or who have cognitive impairments." *See* Dooha Decl., Tr. Ex. 540 at ¶58.

90.     Prior to Hurricane Sandy, the City had claimed that all evacuation centers are accessible to people with disabilities. *See* Email from Belisle, Aug. 25, 2012, Tr. Ex. 151.

91.     However, during Sandy, the City represented to the public that evacuation centers and shelters had only an accessible or "usable" entrance (i,e, not an accessible entrance under the ADA and Department of Justice standards).  The City made no representation that shelters had accessible restrooms, cots, food distribution areas or other internal facilities or services. *See* City Press Statement, Oct. 28, 2012, Tr. Ex. 69 at CNY00023748 (stating each shelter had "at least one entrance usable by wheelchairs"); Advance Warning System Email, Oct. 28, 2013, Tr. Ex. 61 ("All shelters have at least one wheelchair accessible entrance.").

92.     The Mayor and Mayor's Office for People with Disabilities have added to the confusion about inaccessible shelters. As MOPD Commissioner Calise testified, the City described shelter entrances as "usable." *See* Trial Tr. vol. 3, 438:17-21, March 13, 2013 (Calise Testimony); *see also* City Press Release, Tr. Ex. 68 at CNY00023744. MOPD Commissioner Calise testified that "usable" does not mean ADA compliant and also that a shelter with a usable entrance does not necessarily have an accessible bathroom. *See* Trial Tr. vol. 3, 439:3-5, 440:6-10, March 13, 2013 (Calise Testimony); Calise Decl., Tr. Ex. 539 at ¶18.

28

93.     Plaintiffs' expert June Kailes testified that even if it were the case that entrances to shelters were accessible, just having an accessible entrance at a shelter does not meet the needs of people with mobility impairments. *See* Kailes Decl., Tr. Ex. 536 at ¶79.

94.     Moreover, the evidence showed that shelters contain myriad accessibility barriers, including at entrances. A large number of the City's shelters are housed in public schools, which have multiple architectural barriers. *See* Trial Tr. vol. 3, 447:10-17, March 13, 2013 (Calise Testimony); Trial Tr. vol. 6, 902:7-17, March 19, 2013 (Davis Testimony).

95.     Notes and photographs from CIDNY's shelter visits during Hurricanes Irene and Sandy depict multiple access barriers. For instance, at Seward Park High School, there was a worn-down plywood ramp and accessible women's restroom signage at a restroom that was actually inaccessible. At PS 166, the ramp entrance was locked. At John Adams High School Evacuation Center, there was no signage to the accessible entrance. *See* Trapani Decl., Tr. Ex. 534 at ¶¶39, 41, 43, 53, 58, 61; CIDNY Irene Photos, Tr. Ex. 123; CIDNY Sandy Photos, Tr. Ex. 127.  These barriers render these facilities not just inaccessible, but actually dangerous. *See* Trapani Decl., Tr. Ex. 534 at ¶41. The Department of Education survey, compiled by Ms. Trapani, Tr. Ex. 146, indicates that the majority of Department of Education facilities used as shelters during Irene are considered inaccessible by the Department of Education. *See* Trapani Decl., Tr. Ex. 534 at ¶35; and Trial Tr. vol. 1, 148:14-149:19 (Trapani Testimony).

96.     Susan Dooha testified that one photograph, taken at one shelter, Tr. Ex. 123 at P000027 "depicts a ramp leading down to a narrow landing that would be too small for someone using a wheelchair or a scooter to sit on level ground while they attempted to pull a heavy door that opened out toward them. It would have required that they back up a steep ramp, while at the same time that they were opening a very heavy metal door towards them. And I noted that

because that would be virtually impossible for someone using a wheelchair to do." *See* Trial Tr. 500:15-501:8, vol. 3, March 13, 2013 (Dooha Testimony)

97.    She testified that another photograph, Tr. Ex. 123 at P00033 "is a picture of the rain soaked unsecured plywood ramp, without edging, or railings, that was dangerously steep. And that led to the supposedly accessible entrance at Seward Park. Again, you can see that the landing on this very steep insecure and dangerous ramp required that the door be opened out towards you as you were backing down the ramp. That would be a very dangerous thing to do." *See* Trial Tr. vol. 3, 502:8-16, March 13, 2013 (Dooha Testimony).

98.    In fact, MOPD Commissioner Calise visited the shelter at Seward Park during Sandy, and although he is a Paralympic athlete, he needed a police officer to assist him in using the plywood ramp because it was too steep. *See* Trial Tr. vol. 3, 449:5-6; 449:21-24; 450:11-18, March 13, 2013 (Calise Testimony); Calise Decl., Tr. Ex. 539 at ¶15.

99.    Some of the barriers present at the shelters open during Sandy, such as the dangerous plywood ramp at Seward High School, were also present when the same shelters opened during Irene, even though the City was told about these barriers. For example, Margi Trapani had warned the City (and Plaintiffs identified in their Complaint) the dangerous plywood ramp at Seward Park High School when she observed it during Hurricane Irene. During Irene, Ms. Trapani tried to assist a wheelchair-user in finding accessible shelter after this person encountered barriers at the shelter at Seward High School. Ms. Trapani called and emailed Aaron Belisle to report that Seward High School was not accessible to wheelchair-users. Mr. Belisle forwarded Ms. Trapani's email to his colleague, Rick Fernandez, who then advised Ms. Trapani to call 311 and be patient, and to call OEM if she could not get through to 311. Ms. Trapani is not aware of this individual ever finding accessible shelter during Irene. Despite having reported

the access barriers at Seward during Irene, when Ms. Trapani visited the school when it was again open as a shelter during Sandy, she found the same treacherous ramp. *See* Trapani Decl., Tr. Ex. 534 at ¶44-47.

100.    Class member Melba Torres testified that she evacuated to a shelter during Hurricane Irene, only to find that she could not access the bathroom. Each time she had to use this bathroom, she had to be carried to the toilet by her aides. As Ms. Torres testified, this was not only unsafe and frightening, but also humiliating. In order to avoid this experience, she ate and drank as little as possible throughout the storm. *See* Torres Decl., Tr. Ex. 553 at ¶¶38-40.

101.    In addition, Plaintiff Tania Morales who uses a power wheelchair was unable to get into an accessible shelter during Hurricane Irene because the accessible entrance was locked. *See* Morales Decl., Tr. Ex. 545 at ¶¶18-22. Thus, even though the City states that its policy is not to intentionally turn anyone away who shows up at a shelter instead of an evacuation center, it is not always possible for people with disabilities to get into shelters given the many barriers that exist.

102.    Class members Jen Halbert and Jean Ryan testified to their personal experiences of not being able to get into inaccessible public schools over the years. Ms. Ryan testified that when she went to get a swine flu shot at a public school in her neighborhood, she could not find an unlocked accessible entrance and had to rely on a stranger who was also in line to get a flu shot to find someone to find the key and unlock the accessible entrance. *See* Ryan Decl, Tr. Ex. 549 at ¶29. Ms. Halbert testified that she is aware of the "spotty wheelchair access" in the City's public schools from her day-to-day activities living in New York City for over a decade. She testified that she has personally seen numerous schools that do not have flat or ramped entrances.

She was originally assigned to vote at a school that was half a mile away from her home and not wheelchair-accessible. *See* Halbert Decl., Tr. Ex. 543 at ¶23.

103.    Class member Joyce Delarosa testified that given her experiences, she does not know of a trustworthy or definitive source for information about whether an evacuation center or shelter is in fact wheelchair accessible. As Hurricane Irene approached New York City, she went to the evacuation center in person to try to find out if it was accessible, but no one there could tell her whether it was accessible, and she was told that it was a school rule that she could not go into the building to look and see for herself. She then called 311, 911, the police department, and the fire department to ask whether the evacuation center, a high school near her home, was wheelchair accessible. She received inconsistent information from these four sources about whether or not the evacuation center was accessible. *See* Delarosa Decl., Tr. Ex. 533 at ¶¶29-33.

104.    Shelter managers during Hurricane Sandy, such as Erin Villari who managed two different shelters in Queens, did not have any responsibility for knowing or even inquiring about the accessibility of the shelters they managed. For instance, Ms. Villari testified that she did not personally inspect restrooms to see if they were accessible to people with disabilities. *See* Trial Tr. vol. 5, 808:19-25, 809:16-20, March 18, 2013 (Villari Testimony). She also testified that she was not aware of accessibility requirements for shelters. *See* Trial Tr. vol. 5, 809:10-15, March 18, 2013 (Villari Testimony).

### *The City's Recent Attempt to Obtain Shelter Data*

105.    It was clear at trial that the City does not know which, if any, of its shelters are accessible. For example, MOPD Commissioner Calise has never seen a list of which shelters have accessible restrooms besides the eight special medical needs shelters in the City, further underscoring the fact that the City does not have this information at present. *See* Trial Tr. vol. 3,

448:11-16, March 13, 2013 (Calise Testimony); Trial Tr. vol. 2, 328:23-329:1, March 12, 2013 (Belisle Testimony).

106.     Mr. Belisle testified that the City finalized a new shelter survey tool the week of October 22, 2012. This survey included some accessibility questions. *See* 2012 Facility Survey, Tr. Ex. 47. The City distributed the surveys through the Survey Monkey program to all 1,000 DOE facilities in the City. Mr. Belisle testified that most of the facility surveys have now been completed but the results have not been analyzed.  *See* Trial Tr. vol. 2, 328:13-25, March 12, 2013 (Belisle Testimony). Mr. Belisle also testified that the City has no current plan for what it will do with the information it gathers from these surveys. *See* Trial Tr. vol. 2, 333:23-334:10, March 12, 2013 (Belisle Testimony).

107.     As an initial matter, the fact that the City is just now surveying its shelters to identify accessible and inaccessible features is an admission that persons with disabilities do not have meaningful access to the sheltering system.

108.     Moreover, the shelter survey instrument distributed by the City late in 2012 admittedly has major flaws, again demonstrating a lack of expertise concerning emergency planning for people with disabilities. For example, the City's survey defines a bathroom as accessible if the bathroom is marked with a wheelchair symbol, rather than asking for any measurements. *See* Kailes Decl., Tr. Ex. 536 at ¶80; and Facility Survey, Tr. Ex. 47 at CNY019665. Witnesses agreed that it would be improper for the City to rely on the fact that a bathroom has a wheelchair symbol to deem it accessible. *See* Trial Tr. vol. 2, 333:9-14 March 12, 2013 (Belisle Testimony); (Davis Testimony). In fact, during Sandy, MOPD Commissioner Calise discovered an inaccessible women's restroom marked with the universal access sign when

he visited the shelter at Seward Park. *See* Trial Tr. vol. 3, 450:19-451:5, March 13, 2013 (Calise Testimony), *see also* CIDNY Shelter Photos (Sandy), Tr. Ex. 127 at P003332.

109.    In addition, the surveys are being completed by untrained school employees. *See* Trial Tr. vol. 2, 331:18-332:6, March 12, 2013 (Belisle Testimony).

110.    This approach to determining accessibility does not follow any standard procedure, and, *inter alia,* will lead the City to misclassify bathrooms as accessible, when in fact they may not be accessible, *see* Kailes Decl., Tr. Ex. 536 at ¶82, which in fact occurred at the bathroom MOPD Commissioner Calise acknowledged was inaccessible at the shelter at Seward Park High School during Sandy, *see* CIDNY Shelter Photos, Tr. Ex. 127 at P003332.

111.    As Plaintiffs' expert June Kailes testified, "this type of poorly constructed survey data is likely to lead surveyors and consequently the City to believe that many bathrooms are accessible, when in fact they may contain access barriers. Typically, an analysis of accessibility of bathrooms would involve measurements of door width, stall turning radius, grab bar placement, sink height, and sink and door hardware, among other elements. *See, e.g.,* U.S. Department of Justice, ADA Checklist for Emergency Shelters, Living at the Emergency Shelter: Restrooms and Showers (outlining numerous questions to determine accessibility of a restroom)." *See* Kailes Decl., Tr. Ex. 536 at ¶82.

112.    Even though the City admits that its survey instrument was flawed, the City did not present any evidence of when, or if, the survey would be revised and the City has made no commitment regarding how any accessibility information gathered through a revised survey will be used. *See* Trial Tr. vol. 2, 389:21-390:7, March 12, 2013 (Belisle Testimony).

113.    OEM does not have a budget to fix any access barriers, although the City is now seeking $10 million to fix access barriers at shelters. *See* McKinney Depo. Vol. 1 at 111:9-11;

Trial Tr. vol. 2, 333:23-334:10, March 12, 2013 (Belisle Testimony); Trial Tr. vol. 6, 902:7-17,

March 19, 2013 (Davis Testimony). However, this is currently only a request. The City did not

present evidence to explain how it arrived at this $10 million figure, whether it would be

sufficient, whether it in fact would be made available, or how exactly this money would be used.

114.    In addition to shelters, the City anticipates providing "refuges of last resort,"

which are supposed to shield people from a coastal storm if they are on the street and unable to

make it to a shelter before the storm hits. *See* Coastal Storm Evacuation Plan, Tr. Ex. 6 at

CNY000147. However, OEM Deputy Commissioner for Planning Kelly McKinney testified that

the City has no accessibility criteria whatsoever for "refuges of last resort." *See* McKinney Depo.

vol. I at 127:14-16. The City had not begun any survey of the schools used for refuges of last

resort until October 2012 when it used its flawed survey instrument. As a result, the City is now

only in the process of collecting accessibility data on the public schools that are used for refuges

of last resort through the same process it is using to survey the accessibility of public schools

used as shelters. *See* Trial Tr. vol. 2, 344:1-11, March 12, 2013 (Belisle Testimony).

### *Essential Disability Supplies At Shelters*

115.    The City has also failed to provide an emergency sheltering system which meets

the needs of residents with disabilities because it does not stockpile or reliably provide essential

supplies and, thus, does not provide meaningful access to these critical emergency supplies that

are available to the general public.

116.    The Coastal Storm Plan does not actually lay out what supplies shelters are

required to have. In supplemental documents, the City admits that many critical disability

supplies, including crutches, oxygen, accessible cots and diabetic testing kits, are only stockpiled

for "Special Medical Needs" shelters. *See* Shelter Stockpile Strategy: Response to FEMA, Tr.

Ex. 43 at CNY00023926; *see also* Maniotis Depo. at 95:3-96:14 and 98:7-99:20. Many items,

such as emergency power generators, power wheelchairs, chargers for power wheelchairs, ventilators, temporary ramps, and prescription medications other than antibiotics are not stockpiled at all. *See* Trial Tr. vol. 4, 619:3-24, March 14 2013 (Jenkins Testimony).

117.   However, the evidence showed that these supplies are also needed at general shelters. The Coastal Storm Plan Hurricane Shelter Operator training materials state that people with disabilities will go to general shelters. *See* Coastal Storm Plan Training, Advanced Hurricane Shelter Training, Tr. Ex. 501 at CNY014096 ("While you are working in an Evacuation Center or Hurricane Shelter it is likely that you will be working with staff or evacuees that have special needs"). Similarly, class member Christina Curry has arthritis in her knees and hips, which requires her to use a forearm crutch. She could easily need a replacement crutch if she were separated from her crutch or if her crutch were damaged in a disaster. *See* Curry Decl at ¶11, Tr. Ex. 548. Class member Jen Halbert testified that she would need a cot that was about the same height as her wheelchair seat in order to transfer between her wheelchair and the cot. Without an accessible cot, it would be very difficult if not impossible for her to safely lie down in a shelter. *See* Halbert Decl. at ¶24, Tr. Ex. 543. Class member Melba Torres also could not get an accessible cot when she was at a shelter during Hurricane Irene. See Torres Decl., Tr. Ex. 553 at ¶42.

118.   Further, to the extent the City stockpiles any disability related supplies, there is a significant delay – two days, or forty-eight hours – between the time when the City requests the stockpile and when it is delivered to shelters. *See* Trial Tr. vol. 4, 640:9-16, March 14, 2013 (Jenkins Testimony); Van Pelt Decl, Tr. Ex. 561 at ¶41. However, the City plans to use this system for all sheltering needs, including those that stem from spontaneous catastrophic

disasters.  Plaintiffs' expert June Kailes testified that many of these items need to be

prepositioned before a disaster strikes. *See* Kailes Decl, Tr. Ex. 536 at ¶76.

119.    Additionally, to the extent the City maintains any stockpile, it does so only for ten

to fifteen percent of the number of people it says it can shelter. *See* Trial Tr. vol. 4 , 618:18-24,

March 14, 2013 (Jenkins Testimony); Shelter Stockpile Strategy, Tr. Ex. 43, at CNY00023926

(indicating the City is only stockpiling for 70,000 people); and Coastal Storm Sheltering Plan

(stating the shelter system can accommodate up to 600,000 people), Tr. Ex. 7 at CNY000363.

120.    Although the City says it can obtain items on an as needed basis, there is no

evidence to show how long this would take, how it would be accomplished in a truly large scale

disaster, or whether that would provide meaningful access to people with disabilities. For

instance, Jonathan Jenkins testified that he does not know how long it would take to get items

such as power wheelchairs or generators through the City's search system. *See* Trial Tr. vol. 4,

619:3-622:12, March 14, 2013 (Jenkins Testimony). In addition, just to get a diabetic meal at an

emergency shelter might require going through at least three levels of bureaucracy, with no

guarantee of whether the meal will get there in time. *See* Maniotis Depo at 72:17-74:12.

121.    Failing to stockpile or otherwise ensure supplies in this manner is contrary to

federal guidance for emergency preparation from both FEMA and the U.S. Department of

Justice. For example, FEMA's "Consumable Medical Supplies Sample List" for *general* shelters

includes such things as: nutrition drinks for diabetics, colostomy supplies, hearing aid batteries,

wheelchair battery chargers. *See* Appendix 4, FEMA FNSS Guidance, Tr. Ex. 153 at P002077-

2082.

122.    Similarly, Plaintiffs' expert June Kailes testified that FEMA's "Durable Medical

Equipment Sample Supply List" for *general* shelters calls for inclusion of accessible cots,

wheelchairs, crutches and canes. *See* Appendix 3, FNSS Guidance at P002076, Tr. Ex. 153;

Kailes Decl., Tr. Ex. 536 at ¶74.

123.    Furthermore, the stockpile only helps individuals who have been able to safely

evacuate to shelters. Neither the stockpile nor the commodity distribution point plan provide life-

sustaining commodities to people who are trapped in their homes, as many people with

disabilities are in emergencies in which there is a power outage. *See* Trial Tr. vol. 4, 622:13-16;

627:24-628:3, March 14, 2013 (Jenkins Testimony).

***Backup Power in Shelters***

124.    The City's plans do not call for backup electricity or generation in its shelters. See

generally Coastal Storm Sheltering Plan, Tr. Ex. 7.

125.    Plaintiffs' expert June Kailes testified that "Another essential element that ensures

people with certain disabilities are included in general population shelters is the ability to access

power (when necessary via generators) for: charging power wheelchairs, scooters and other

essential devices, and refrigerating certain medications." *See* Kailes Decl., Tr. Ex. 536 at ¶70.

126.    However, the City does not require that shelters have backup generators, or

otherwise stockpile generators for shelter use. *See* Trial Tr. vol. 2, 340, March 12, 2013 (Belisle

Testimony); Maniotis Depo. at 99:10-15. Jonathan Jenkins testified that the City is looking to

increase the quantities of generators. See Trial Tr. vol. 4, 621-622, March 14, 2013.

127.    Erin Villari who worked as a shelter manager at Hillcrest and PS 217 during

Hurricane Sandy testified that she did not know whether these shelters had generators. *See* Trial

Tr. vol. 5, 808:16-18, 810: 25-811:4, March 18, 2013 (Villari Testimony).

128.    Although generator quick connects enable a shelter or facility to quickly connect

to a backup source generator source of electricity in a power outage, the City has only installed

quick connects at about five shelters. Currently, the City only has a proposal to expend funds to

install quick connects at more shelters. *See* Trial Tr. vol. 4, 626:1-3, March 14, 2013 (Jenkins Testimony). Mr. Jenkins also testified that he did not know how long it would take the City to get a generator that was not stockpiled. *See* Trial Tr. vol. 4, 622:6-12, March 14, 2013 (Jenkins Testimony). The City is also in the process of conducting a prime power assessment to help increase response time to power outages during emergencies, but this is an ongoing project that has not resulted in any changes. *See* Trial Tr. vol. 4, 623:11-627:9, March 14, 2013 (Jenkins Testimony).

129.    Again, this is contrary to FEMA guidance which states that for general shelters, "Plans should include strategies to provide power for services that require a back-up power system in an emergency or disaster. It is important to determine if a facility has a source of emergency power generation." FNSS Guidance, Tr. Ex. 153 at P001978.

### *Areas for Improvement in Sheltering*

130.    As Plaintiffs' expert June Kailes testified, the City can do a number of things to obtain accurate data about the accessibility of shelters to improve access for people with disabilities, and also utilize such data. These measures include but are by no means limited to using trained individuals to survey the City's shelters. From there, the City should determine how to make all of its shelters accessible to people with disabilities, giving priority to the essential elements of a shelter – entrances, bathrooms, paths of travel, food service and sleeping areas. *See* Kailes Decl, Tr. Ex. 536 at ¶86.

131.    Additionally, the City's stockpiling policies should be revised regarding the pre-positioning of medical equipment, cots, and other supplies necessary for people with disabilities at general shelters. *See* Kailes Decl., Tr. Ex. 536 at ¶76 (describing FEMA guidelines). For items that cannot be stockpiled, contract with vendors negotiated before an event can ensure that these

items are available promptly when needed. *See* Trial Tr. vol. 1, 209: 16:24, March 11, 2013

(Kailes Testimony).

**The City's Power Disruption Plans Ignore The Needs of Persons with Disabilities**

132.    New York City is vulnerable to power losses, but does not have a plan that

addresses the needs of extremely vulnerable people with disabilities in emergencies during which

there is a power outage. This is particularly dangerous in a disaster like Hurricane Sandy where

power outages are quite widespread or prolonged. For instance, as of October 30, 2012, the day

after Sandy made landfall, more than 700,000 people were without power in the City. *See*

Situation Report 12/2 at 1200 Hours, Tr. Ex. 81 at CNY00022469. As of December 2, 2012,

more than 12,400 people still had no power. *See* Tr. Ex. 110 at CNY00023294.

133.    Power outages are likely to occur in conjunction with various other types of

emergencies, such as in summer months when air conditioners are running and power usage is at

its peak, or in storms or other equipment failures. *See Id.* at CNY001665.

134.    Margi Trapani testified to the importance of generators for people with disabilities

who "rely on electricity daily to power their wheelchairs, run life sustaining equipment like

oxygen concentrators, and keep temperature sensitive medicines cool." *See* Trapani Decl., Tr.

Ex. 534 at ¶27.

135.    Mr. Belisle, OEM's Special Needs Coordinator and Rule 30(b)(6) witness, was

unable to testify about any details of the City's Power Disruption Plan to say whether it had

specific provisions for the needs of people with disabilities. *See* Trial Tr. vol. 2, 305:4-7, March

12, 2013 (Belisle Testimony). He also testified that there is nothing in the City's written

emergency plans that addresses the issue of providing power for people who use medical devices

powered by electricity. *See* Trial Tr. vol. 2, 340:11-15, March 12, 2013 (Belisle Testimony).

136.    Ryan Murray, who was proffered as the City's witness for serving people in high rises that lost power during Sandy, nonetheless testified that he was not familiar with the specifics of any City plans with respect to the needs of people with disabilities in power outages. *See* Trial Tr. vol. 5, 678:7-12, March 18, 2013 (Murray Testimony).

137.    With one limited exception, the Power Disruption Plan contains no information about either what people with disabilities should do in disasters, or what the City will do to help them. *See* Power Disruption Plan, Tr. Ex. 19 at CNY001693-1694. The exception is Con Edison's notification plan for a very small subset of disabled people who rely on certain "life sustaining equipment." This does not include the wide range of people who are frail, elderly, use wheelchairs, or would otherwise be stranded. *See* Con Ed. Life Sustaining Devices, Tr. Ex. 112; Trial Tr. vol. 5, 744:8-19, March 18, 2013 (Wahlig Testimony).

138.    Thus, other than for the small number of people Con Edison has on a list, the City does not have any plan to warn people with disabilities about or assist them during power outages. *See* Power Disruption Plan, Tr. Ex. 19 at CNY001693-1694.  So, for instance, the New York City Police Department does not have a list of people who use power wheelchairs and might need someone to check on and assist them in a power outage. *See* Trial Tr. vol. 5, 744:13-19, March 18, 2013 (Wahlig Testimony). Furthermore, FDNY Division Chief Villani testified that there is no Fire Department procedure regarding what to do to get people with disabilities out of buildings in power outages. See Trial Tr. vol. 5, 792:20-23, March 18, 2013 (Villani Testimony).

139.    Plaintiffs' expert June Kailes testified that she had not seen evidence of agreements between the City and ConEd regarding how to address "the timing of the power outage or notification to residents. This has significant health and safety consequences for people

with disabilities. I saw no information provided to people with disabilities about where to go or who to call if they had power related needs, whether there would be power charging centers (such as mobile charging vehicles or power-charging resources at libraries), no information about priority power-charging access for people using life-support and mobility equipment, and no information about whether people who were not in Evacuation Zone A could go to shelters if they had power related needs." *See* Kailes Decl., Tr. Ex. 536 at ¶¶66-67.

140.    During Hurricane Sandy, the City's failure to notify people with disabilities that the power would go out and its failure to have a plan for a prolonged, widespread power outage had dire consequences. Daniel Kass testified that "[t]he number of buildings that remained without power and electricity was not entirely known, and we had deep concern that as time went on, that there may be people who couldn't get out because of that and who would not have water, because water requires power to rise in a high-rise building." See Trial Tr. vol. 5, 723-724, March 18, 2013 (Kass Testimony).

141.    Class member Joyce Delarosa, who uses a power wheelchair and lives in Zone B, testified that she tried to use even those limited avenues identified in the City's plan, but to no avail. She has notified Con Edison that she uses an oxygen machine and that she must have it functioning in order to survive. However, she is not aware of any action that Con Edison has ever taken in response to the information she gave them about her medical survival needs. She has called Con Edison at least ten times over the past four or five years with questions about their plan for a power outage for people like her who rely on oxygen. For example, she asked them whether they supply emergency generators, battery backpacks or any other kind of emergency supplies. They told her that they do not. *See* Delarosa Decl, Tr. Ex. 533 at ¶¶20-21. As Sandy approached, Ms. Delarosa heard on the media that the utility company was planning on turning

off the power, but received no official notice from Con Edison or the City. *See* Delarosa Decl. ¶40, Tr. Ex. 533. Before Hurricane Sandy, Ms. Delarosa called 311 asking for information about anyone who could deliver oxygen or a generator to her, but they had no information. They recommended she call MOPD, but they never answered her calls. After her power went out, she spent three days unable to use her oxygen concentrator. The lack of oxygen caused her health to deteriorate, and caused her serious pain. By the third day she needed to be evacuated to get medical attention resulting from oxygen deprivation. *See* Delarosa Decl., Tr. Ex. 533 at ¶63.

142.    Class member Melba Torres requires electricity to charge her power wheelchair and operate the lift to get her into and out of her bed, and to keep her bed inflated. Without power in the immediate aftermath of Sandy, Ms. Torres was in severe pain because of these limitations. *See* Torres Decl., Tr. Ex. 553 at ¶¶85-86.

143.    MOPD Commissioner Calise was aware of people who had problems because their medical equipment ran out of power in the aftermath of Sandy. Trial Tr. vol. 3, 445:11-14, March 13, 2013 (Calise Testimony). However, he also testified that he does not necessarily think it is the City's responsibility to have back-up batteries for essential medical equipment. *See* Trial Tr. vol. 3, 446:21-447:5, March 13, 2013 (Calise Testimony).

144.    The City's problems regarding response to power outages, most recently during Sandy, are well documented. For example, the City Council convened a hearing on January 16, 2013 that addressed some of the City's deficiencies in providing emergency generators. Deputy Mayor Cas Holloway testified that the City was not prepared to meet the demand for generators and boilers that it experienced during Sandy. The City had to source generators from as far away as Texas. And as of November 14th – more than two weeks after Sandy hit – heat and elevator service had not been restored in New York City Housing Authority ("NYCHA") buildings. The

City also had no plans to supply generators to facilities, such as hospitals, whose backup generators failed during Sandy. *See* City Council Transcript, January 16, 2013,  Tr. Ex. 116 at 57-58.

### *Areas for Improvement in Power Disruption*

145.    There are many measures the City could be taking to provide meaningful access for people with disabilities to the City's Power Disruption Plans. Plaintiffs' expert June Kailes testified that the City could provide information to people with disabilities about where they could go or who they could contact if they needed assistance related to electricity during an emergency. *See* Kailes Decl, Tr. Ex. 536 at ¶67. They City could also have agreements with ConEd regarding how to address the needs of electricity-dependent people with disabilities who are not included on ConEd's very limited list of people with certain disabilities. *See* Kailes Decl., Tr. Ex. 536 at ¶66. Ms. Kailes also testified that the City could develop a priority system for people who need electricity at shelters, or even guarantee the shelters had electricity by providing the sites pre-identified as shelters with backup power generators. *See* Kailes Decl., Tr. Ex. 536 at ¶68. The City could also designate charging stations for people with disabilities who depend on electricity and provide signaling mechanism like those discussed above. *See* Kailes Decl., Tr. Ex. 536 at ¶¶65, 66.

### The City's Failure to Plan for Persons with Disabilities During Period of No Assistance

146.    The City's emergency plans assume that people can and will provide for themselves, without help, for three days. *See* "Ready New York," Tr. Ex. 1 at CNY000033 ("Every New Yorker should plan to be self-sufficient for several days.").

147.    Sandy demonstrated that this period of being left on your own after an emergency is in fact likely to be much longer. *See* Blanck Decl. ¶86, Kailes Decl. ¶89; Peters Decl. ¶¶60, 66 (BCID's advocacy on behalf of stranded people).

148.     Ms. Kailes testified that, while the 72 hour (or even longer) period of no

assistance may be an appropriate guideline for those without special needs, people with

disabilities often live "closer to the plug" and should not be held to the same standards for

surviving without assistance. People with disabilities, she stated, often do not have batteries that

will last 72 hours, need the help of personal assistants who cannot reach them for a day or more,

or require medicine that runs out during this three day period. This makes people with disabilities

more vulnerable during and immediately after emergencies, and should make them a top priority

in post-disaster evacuation plans—far before the suggested "period of no assistance" has ended.

*See* Trial Tr. vol. 1, 212:1-12, March 11, 2013 (Kailes Testimony) As Ms. Kailes testified, some

people simply cannot survive unassisted for 72 hours, even with the best personal preparedness

measures, and so this "guidance" must be accompanied by reliable methods for help—for

example, back-up generators, food, or evacuation—that people with disabilities can call upon

before it is too late. *See* Trial Tr. vol. 1, 212:18-213:6, March 11, 2013 (Kailes Testimony)

149.     While Plaintiffs have not questioned the search and rescue efforts of first

responders that occur in the immediate aftermath of emergencies (i.e. those that respond to

immediate life threatening emergencies such as people trapped by rising water or debris),

Plaintiffs have demonstrated that the City has no plans for this period of no assistance to aid

people with disabilities who need assistance, services, or supplies in the days and weeks after an

event. As a result, Plaintiffs have presented evidence that the door-to-door canvassing efforts to

check on people who had gone without power, water, heat, and essential disability related items

(such as medication) for days or weeks began much too late in the aftermath of Hurricane Sandy.

150.     The City eventually engaged in such checks after Sandy but the response was

seriously delayed and not conducted pursuant to any plan. In the aftermath of Hurricane Sandy,

the City waited until November 9 – ten days after Sandy struck – to conduct systemic door-to-door efforts with the National Guard to reach residents in high-rise buildings in Far Rockaway and Coney Island. *See* City Press Release, Nov. 9, 2012, Tr. Ex. 74; Situation Report 11/9/12 1530 hrs, Tr. Ex. 95 at CNY22037; Situation Report 11/6/12 1400 hrs, Tr. Ex. 105 at CNY22960. Mr. Murray testified that the City's canvassing operation was deployed to the field on November 3, five days after Sandy hit New York City. *See* Trial Tr. vol. 5, 703:13-14, March 18, 2013 (Murray Testimony). However, this November 3 effort was limited. It was only six days later that the larger systemic effort occurred. *See* Trial Tr. vol. 5, 715:1-4, March 18, 2013 (Kass Testimony). This is despite the fact that, as Daniel Kass testified, it is "foreseeable that a person with a mobility issue could be trapped in a high-rise building if the electricity went out." *See* Trial Tr. vol. 5, 715:23-716:1, March 18, 2013 (Kass Testimony).

151.    These door-to-door searches that began on November 9 were *not* part of the City's planning pre-Sandy, but instead developed after the fact. *See* McKinney Depo. Vol. III at 22:4-17. They were in fact conducted pursuant to a high-rise canvassing guide (Tr. Ex. 519) that the City did not even begin drafting until around November 6 or 7, over a week after Sandy hit New York City and just a few days before the canvassing effort began. *See* Trial Tr. vol. 5, 714:22-25, March 18, 2013 (Kass Testimony). This canvassing effort involved hundreds of people working together for the first time to report a "general sense of building status and needs, not to record detailed information." *See* Trial Tr. vol. 5, 715:4-12, March 18, 2013 (Kass Testimony).

152.    Moreover, the canvassers completed tallying reports but they were not always filled out accurately and were sometimes unreliable because different people used different methods to fill in certain information on the forms. *See* Trial Tr. vol. 5, 718:2-18, March 18,

2013 (Kass Testimony). Daniel Kass, who served in a command role for the canvassing effort, testified that the effort might have missed some people and there was no systematic way to be assured that a building had been reached. *See* Trial Tr. vol. 5, 719, 720, March 18, 2013 (Kass Testimony). Furthermore, the City did not know where volunteers from earlier canvassing efforts had already been or even have a means of reaching out to these volunteers to get more information. *See* Trial Tr. vol. 5, 720:12-23, March 18, 2013 (Kass Testimony).

153.     Prior to the City's systematic door-to-door canvassing effort, Occupy Sandy volunteer Anna Lekas Miller went door-to-door in a multi-story building at 711 Seagirt in Queens on November 2, 2012, when she encountered people with disabilities who had not been able to evacuate. *See* Miller Depo. at 35:4-5, 13-14, 16-24; 38:4-18; 54:10-24; 58:18-24; 134:9-21.

154.     Despite door-to-door canvassing, the City still has no data on how many individuals with disabilities were stranded without power after Hurricane Sandy in high-rise buildings. *See* Trial Tr. vol. 5, 721:8-16, March 18, 2013 (Kass Testimony).

155.     Furthermore, the City waited until November 24, 2012, almost a month after Sandy hit, to begin its door to door efforts for single family homes, termed "Support to Residents in their Homes," in which it sent people door to door to find people that did not have heat and then only to hand them information pamphlets advising them of the rapid repair program. *See* Trial Tr. vol. 5, March 18, 2013 (Manahan Testimony).

**NYCHA**

156.     Among those not served by the City's plans during this period after Sandy were some of the City's most vulnerable residents - New York City Housing Authority tenants with disabilities. *See* Torres Decl., Tr. Ex. 553 at ¶19.

157.     The City admits that New York City Housing Authority tenants with disabilities have to be covered by the City's emergency plans, yet failed to address their needs in the context of Sandy. In fact, Mr. Belisle testified that he could not speak to whether the City or OEM had contracts or memoranda of understanding with NYCHA. *See* Trial Tr. vol. 2, 312:19-313:3, March 12, 2013 (Belisle Testimony).

158.     Prior to Sandy, the Hurricane Irene After-Action Report highlighted that the City's Coastal Storm Plan failed to include evacuation plans for New York City Housing Authority buildings.  The report recommended that "NYCHA, in coordination with OEM and NYPD, should develop evacuation policy and plans for all at-risk facilities." *See* Irene After-Action Report, June 25, 2012, Tr. Ex. 45 at CNY007487.

159.     Nonetheless, there was no evidence of any plan for NYCHA during or after Sandy. For example, the City had no agreements regarding emergency response with the Housing Authority before or in the aftermath of Sandy. *See* McKinney Depo. Vol. III at 58:9-12.

*Areas for Improvement in the Period of No Assistance*

160.     There are many measures the City could be taking to account for the needs of people with disabilities in the period during which people are on their own. For example, Ms. Kailes testified that "[w]hat the City can do in terms of planning is begin systemic life/safety/wellness checks on individuals, especially those in multi-story buildings as soon as possible and certainly no later than three days after the incident. In the context of its planning, the City can pre-identify labor pools capable of conducting such checks. This might include the National Guard, public health workers, CERTs, nongovernmental organizations (who can realistically commit to assisting in visits/searches), and mail carriers. Further, there should be systematic life-safety checks in affected areas, with priority given to the most vulnerable clusters of the population (seniors, public housing), and including the use of GPS mapping technology

48

for thoroughness and coverage. Life-safety checks should evaluate needs and provide assistance in obtaining essential items, and not just medical needs. This would include water, food, medical, medications, supplies, equipment, power (batteries, etc.), waste disposal supplies, home health, and personal assistant services. These visits may also result in evacuation and transportation if warranted. This transportation might be round-trip short-term (i.e. to facilitate transportation to life-sustaining treatments such as dialysis, chemotherapy and other infusion therapies, or accessible warming or cooling centers) or for a longer stay at an emergency shelter." *See* Kailes Decl, Tr. Ex. 536 at 96.

161.     The City can also provide information regarding what resources people with disabilities can call upon during this period of time. *See* Kailes Decl., Tr. Ex. 536, at ¶90. Ms. Kailes further testified that "the City should have a specific plan for a major landlord such as NYCHA, that both has a large number of tenants and a high proportion of people with disabilities. While NYCHA will have overlapping obligations in the emergency context, such a major and concentrated source of housing should not be ignored in the City's plans. The most straightforward method for dealing with this would be for the City to develop an agreement with NYCHA authorities that lays out what the emergency plan is for these buildings and what are the obligations of NYCHA and the City for each action called for in the emergency plan. As with all planning, the City's emergency plan for NYCHA should incorporate community input" Kailes Decl. Tr. Ex. 536 at ¶98.

**Communication Systems**

162.     The problems with the City's communication systems for reaching persons with disabilities concerning emergencies relate to (1) the content of its messaging for people with disabilities, (2) the reliability of communication methods, and (3) accessibility of communication methods.

***Failure to Provide Relevant and Helpful Information to People with Disabilities***

163.    With respect to the content, the City either provides insufficient information or information likely to deter people with disabilities from seeking the assistance of the City's emergency services.

164.    For example, the City deters people with disabilities from going to shelters by telling them *not* to expect to be provided with items they need for survival.  *See* "Ready New York for Seniors and People with Disabilities," Tr. Ex. 1 at CNY000041, ("Shelters DO NOT have special equipment (e.g., oxygen, mobility aids, batteries)"); Hurricane Irene 311 Script at CNY0019658 ("Centers are not equipped to provide food for special diets. If you have special dietary needs, bring the food you need with you to the center"); Hurricane Sandy 311 Script at CNY00025366 ("Refrigeration for medication will NOT be provided at evacuation centers."). Defendants' expert Elizabeth Davis testified that these are examples of OEM education and outreach materials that Defendants share with the public. *See* Trial Tr. vol. 6, March 19, 2013 (Davis Testimony).

165.    As Plaintiffs' expert June Kailes testified, based on this information, many residents with disabilities may choose to take their chances at home. Kailes testified that "[t]his information demonstrates that the City's plans anticipate that shelters will not have or be able to obtain basic durable medical equipment or consumable medical supplies. At a minimum, this approach is likely to convey the impression that the City is not equipped for persons with disabilities, which is very problematic for people with disabilities. For many people, it is unrealistic that they will be able to bring with them the equipment or supplies they need to stay independent and healthy." *See* Kailes Decl, Tr. Ex. 536 at ¶75.

166.    The National Council on Disability report, authored by Defendants' expert, warns that "shelters might not be ready to receive people with disabilities or those at risk might not

50

believe shelters are ready; both conditions can deter evacuation by those at risk." *See* Effective

Emergency Management (citing van Willigen et al. 2002), Tr. Ex. 65 at CNY020257.

167.    The City also admits that its emergency plans are not public, and that it does not

share its written plans with the disability community – not even with the City's Special Needs

Advisory Group. *See* McKinney Vol. II Depo. 68:8-16. As Kelly McKinney testified, the City

does not generally hold public hearings on its emergency plans to get input. *See* McKinney

Depo. Vol. II at 112:4-13

168.    The City's Advance Warning System ("AWS"), the centerpiece of the City's

efforts to communicate with people with disabilities, omits the most critical information that

residents need in order to make life and death decisions as to whether to evacuate, and if so, how.

*See* Trapani Decl., Tr. Ex. 534 at ¶76; and Special Needs Advanced Warning System Plan, Tr.

Ex. 18. Margi Trapani testified that CIDNY did not know what to tell consumers because AWS

notifications did not have the correct information. *See* Trapani Decl., Tr. Ex. 534 at ¶¶76-79.

169.    Mr. Belisle testified that there has been no effort to evaluate whether these

agencies can actually reach their clients. *See* Trial Tr. vol. 2, , 295:14-17, March 12, 2013

(Belisle Testimony).

170.    As a result of the above, many people with disabilities are unaware of what the

City's plans, if any, are for them in emergency situations. For example, class member Mary

Conner testified that based on the information the City provides, she has not seen information

from the City about what she should do to have the best chance at getting transportation or

navigating a brand new environment when she cannot see her way around in a disaster. *See also*

Conner Decl., Tr. Ex. 538 at ¶12, Bell Decl., Tr. Ex. 544 at ¶¶17-19; Morales Decl., Tr. Ex. 545

at ¶¶10-12; Halbert Decl, Tr. Ex. 543 at ¶9.

**Failure to Have Reliable Communication Methods and Failure to Assess Reliability**

171.    Further, the main methods the City provides for people with disabilities to obtain

information and seek assistance are utilized without assessment to ensure their capacity, and

have demonstrated their unreliability in major emergencies. For example, the City directs people

with disabilities to call 311 or 911 if they need help in an emergency, despite the fact that 311

and 911 systems, which serve all 8 million New Yorkers, have been overwhelmed in major

emergencies. *See* Mayor's Office for People with Disabilities (hereafter sometimes "MOPD")

website, Nov. 1, 2012, Tr. Ex. 167 at P003436. For instance, when Sandy arrived on October 29,

911 received 20,000 calls per hour, and the 1,400 City 911 dispatchers were overwhelmed. The

911 system typically handles 30,000 calls a *day*. *See* City Council Report, Tr. Ex. 115 at

P003664-3665 (discussing delays, busy signals and recorded messages at 911).  On October 31,

311 received 244,290 calls and as of 11:20 p.m. people were waiting 26 minutes for an operator.

*See* Situation Report 11/1/12, 800 hrs, Tr. Ex. 84 at CNY022409.

172.    The City Council Sandy Report stated that "the 3-1-1 system experienced a very

high volume of calls before, during and after the hurricane that resulted in call takers being

overwhelmed and unable to respond to the calls . . . One news report stated that around 1 p.m. on

Sunday, October 28, a day before the storm hit, calls to 3-1-1 went unanswered or rang busy."

*See* City Council Report, Tr. Ex. 115 at P003666.

173.    Furthermore, 311 is the City's nonemergency line, so it is counter-intuitive for

people with disabilities to use it during an emergency.

174.    During Sandy, class member Kenneth Martinez was referred back and forth

between 911 and 311, trying to get accessible transportation so he could evacuate his home

before it ultimately flooded, but got no response from either. *See* Martinez Decl., Tr. Ex. 547 at

¶¶37-41.

175.    Class member Melba Torres and her attendant called 311 to ask about evacuation and shelter assistance, but 311 never answered. She also called the Mayor's Office for People with Disabilities on Friday, October 26 to ask how she should evacuate and where she could find accessible shelter, but no one took her call. *See* Torres Decl., Tr. Ex. 553 at ¶¶52, 58, 60, 74.

176.    Blind class member Mary Conner called 311 multiple times after Sandy hit, but either no one answered the phone, or she got a busy signal. See Conner Decl., Tr. Ex. 538 at ¶12.

177.    Others, such as class member Joyce Delarosa also could not afford to waste precious cell phone batteries waiting on hold for 311, particularly when they were unsure of what assistance they might get. *See* Delarosa Decl., Tr. Ex. 533 at ¶48.

178.    Further, the City's AWS system has never been evaluated for its capacity and the effectiveness of its ability to reach people with disabilities, and it is clear that it can only be effective in a limited way. Although Mr. Belisle testified that he believed that NYCHA was one of OEM's planning partners, he could not answer any questions regarding NYCHA's responsibilities in emergencies. 342 (Belisle Testimony). Mr. Belisle testified that he was not involved in the City's response to NYCHA after Sandy. *See* Trial Tr. vol. 2, March 12, 2013 (Belisle Testimony). Plaintiffs' expert June Kailes testified that the City does not know the capacity or effectiveness of AWS, which are basic elements of planning. *See* Kailes Decl. Tr. Ex. 536 at ¶109. AWS partners, many of which are nonprofits, are not provided any resources or training by the City. For example, Margi Trapani testified that CIDNY did not receive any resources to serve as an AWS agency, *see* Trapani Decl., Tr. Ex. 534 at ¶¶74-75, and did not have resources to get the message out during Sandy.

***Failure To Provide Communications In Accessible Formats***

179.    The City also has major gaps in its planning regarding the accessibility of information provided. For example, the City relied heavily during both Irene and Sandy on paper

flyers instructing people to evacuate. Blind class member Mary Conner, who lives in Evacuation Zone A in Far Rockaway, Queens received a paper notice instructing her to evacuate just before Irene hit, that she would not have been able to read had her daughter not happened to be there at the time it arrived to read it to her. *See* Conner Decl., Tr. Ex. 538 at ¶14. Class member Christina Curry, who is deaf and low vision, and Gregory Bell, who is blind, also testified that they must have emergency notices and information in accessible formats in order to read them. *See* Curry Decl., Tr. Ex. 548 at ¶18; Bell Decl., Tr. Ex. 544 at 24.

180. The FDNY does not have policies regarding "on the ground" communication, such as the use of audio or visual cues to assist those with sensory disabilities. *See* Villani Depo. at 72:5-12.

181. Even though during Sandy, the Mayor had a sign language interpreter, there was no such interpreter during press conferences regarding Irene, and the City's plans do not require interpreters at press conferences. *See* McKinney Depo. Vol. III at 64:2-5. Mr. Belisle testified that the City did not have a sign language interpreter at the Mayor's Hurricane Irene press conference. *See* Trial Tr. vol. 2, , 296:9-11, March 12, 2013 (Belisle Testimony).

***Areas for Improvement***

182. There are many measures the City could be taking to account for the communication needs of people with disabilities. For example, Plaintiffs' expert June Kailes testified that the City relies on the overloaded 311 system as a way for people with disabilities to call for help, even though it has identified this as a problem in the Hurricane Irene After Action Report. *See* Kailes Decl., Tr. Ex. 536 at ¶105. She testified that "Among other things, the City should ensure that it has both the hardware and personnel capacity to handle high volume emergency situations in these call centers and that the information being provided is vetted and meaningful. Moreover, the more proactive planning that the City engages in (e.g., by providing

information to the public regarding the location and availability of accessible transportation options and other details of the transportation plan) the less the reliance there will be on individual requests for assistance through these 311 or 911." *See* Kailes Decl., Tr. Ex. 536 at ¶105.

183.    The City should be providing more relevant information, in multiple accessible formats, and creating policies regarding how to notify people with a variety of disabilities.

**Recovery Plans**

184.    The City lacks plans to address the needs of people with disabilities regarding housing, debris removal, and the distribution of essential commodities such as food and water after an emergency, in the recovery phase after an emergency.

*Housing*

185.    The City has no plan that addresses the provision of accessible post-disaster housing for people with disabilities. This is despite the fact that Brad Gair, the Director of Housing Recovery Operations for Hurricane Sandy admits that it is important to plan for the needs of people with disabilities in advance. See Trial Tr. vol. 5, 764:21-765:19, March 18, 2013 (Gair Testimony).

186.    The City has made some efforts to provide housing within preexisting structures (i.e. hotels and apartments) after Sandy. However, these efforts were the result of discrete actions taken after the Hurricane, and not pursuant to any larger housing plan. For instance, the City did not appoint a Director of Housing Recovery Operations for the City of New York (Mr. Gair) until November 5, 2012, after Sandy hit New York City. *See* Gair Decl., Tr. Ex. 560 at ¶1; Trial Tr. vol. 5, 761:3-21, March 18 2013 (Gair Testimony). Similarly, actions related to short-term housing in hotels undertaken in connection with Sandy were taken in response to the hurricane;

they were not taken in connection with any preexisting plan. *See* Trial Tr. vol. 2, 345:3-12, March 12, 2013 (Belisle Testimony).

187.   Mr. Gair supervised the development of the Housing Recovery Operations Concept of Operations, Tr. Ex. 258. However, Mr. Gair did not base this operational strategy on any pre-existing plan and he admitted that he started drafting this strategy after Sandy hit. See Trial Tr. vol. 5, 764:1-3, March 18, 2013 (Gair Testimony). Moreover, Mr. Gair admitted that he is not familiar with OEM planning documents. He also does not know how data is being tracked for people with disabilities in Sandy recovery efforts. *See* Trial Tr. vol. 5, 767:9-19, March 18, 2013 (Gair Testimony).

188.   There is no plan of which Mr. Gair is aware of to incorporate his work that is specific to Sandy into as any kind of permanent post-disaster housing plan for the City. *See* Trial Tr. vol. 5, 762:5-9, 764:4-20, March 18, 2013 (Gair Testimony) and Trial Tr. vol. 2, 345:8-12, March 12, 2013 (Belisle Testimony).

189.   The City also does not have any plans for developing / constructing temporary housing after emergencies, for people who are displaced from their homes due to emergencies and require accessible temporary housing units.

190.   The City has only "specifications" for temporary housing units, even though the City began developing these plans five years ago. *See* "Design Standards and Performance Specification for Interim Housing Units," Tr. Ex. 37 at CNY006994-7010; Trial Tr. vol. 2, 345:13-21, March 12, 2013 (Belisle Testimony).

191.   No housing units have yet been built pursuant to these specifications, even though there is a dearth of accessible housing in New York City that could be used for relocation. *See* McKinney Vol. I Depo. at 122:23-123:18.

***Debris Removal***

192.     The National Council on Disability 2009 report, authored by Defendants' expert, states that in the short-term recovery, "it is necessary to clear roads so fire, police, ambulance, and utility crews can conduct life-saving measures." Further, "[i]f recovery crews know where large numbers of people with disabilities are located, debris removal can be prioritized." *See* Effective Emergency Management (NCD 2009), Tr. Ex. 65 at CNY020369-20370.

193.     However, the City's plans for removing debris after an emergency do not account for the needs of people with disabilities. Instead of having a system for prioritizing removal of debris to ensure that disabled  people can move around after a disaster, the City only has a cursory mention of people with disabilities in the Debris Management Plan, stating that coordinating the needs of people with disabilities is one task that "the Human Services Emergency Support Function Coordinator will consider." *See* Debris Management Plan, Tr. Ex. 17 at CNY000745. This kind of vague statement does not provide meaningful access to this disaster plan.

194.     Mr. Belisle testified that he is not familiar with the City's debris plans and does not have any responsibility for debris removal. *See* Trial Tr. vol. 2, 344:16-22, March 12, 2013 (Belisle Testimony).

195.     Plaintiff Gregory Bell, who is blind, testified that emergencies that cause debris and impact the environment have the effect of turning a vision disability into a mobility disability. *See* Bell Decl., Tr. Ex. 544 at ¶26.

196.     Class member and power wheelchair-user Jean Ryan testified after the blizzard that happened in December a few years ago, she was stuck in her house between the December blizzard and Valentine's Day in February except for one time she successfully got out of her house and to her destination. Ploughs came around and pushed extra snow onto the street corner

by her house, but the pile got higher and higher. She tried to contact her city councilman and the sanitation department to get it shoveled but she could not get anyone to help. She tried two other times, without success, to get out of her house and to her destination during this time period, but could not due to the snow. One of these times, she left her house to check if the sidewalks were clear, and got stuck in the snow bank at the end of her driveway. She sat in the cold until someone came along and pushed her out. She testified that if her wheelchair gets stuck in the snow, she is worse off than if she had stayed home in the first place. *See, e.g.,* Ryan Decl., Tr. Ex. 549 at ¶32.

197.     Class member and wheelchair-user Jen Halbert testified that her experience during this same blizzard in December of 2010 makes her extremely concerned about the City's response to clearing streets and sidewalks in future emergencies or disasters. In the blizzard of 2010, no one plowed or shoveled the significant snow and ice that accumulated on the sidewalks on 4th Avenue where Ms. Halbert lives. Since her wheelchair cannot roll through the snow and ice, she could not leave her apartment building for one week. She had to wait three weeks before enough snow and ice was cleared so that she could leave her block. During that time, she had no choice but to rely on her husband to go out and get food and other essentials. *See* Halbert Decl., Tr. Ex. 543 at ¶21.

***Access to Essential Commodities***

198.     Similarly, the City sets up commodity distribution points that provide basic food, water, and other supplies after an emergency. However, the City's Commodity Distribution Point Plan does not require commodity distribution points that provide food, water, and other essentials to be accessible to people with disabilities. *See generally* Commodities Distribution Point Plan, Tr. Ex. 24. OEM Deputy Commissioner McKinney testified that he does not know

whether accessibility is a criteria for commodity distribution points but assumes they would be accessible. *See* McKinney Vol. I Depo. 124:19-125:10

### Areas for Improvement in Recovery

199.    Plaintiffs' expert June Kailes testified that the City should create plans for providing accessible temporary housing. Ms. Kailes further testified that the City should develop a system, specifically prioritizing debris removal to provide access to people with disabilities. *See* Kailes Decl. Tr. Ex. 536 at ¶110-116.

200.    Ms. Kailes similarly explained that the City should develop plans to ensure that commodities distribution points are set up in a manner that will be accessible to people with disabilities and that people with disabilities who need assistance once they are at commodities distribution points can get this assistance. Ms. Kailes also testified that the City should address the needs of people with disabilities who cannot even get to distribution points in the first place. *See* Kailes Decl. Tr. Ex. 536 at ¶110-116; *see also supra* regarding lack of aid to people stranded in buildings.

### Lack of Advance Planning

201.    Many of these problems appear to stem from a lack of advance planning on these issues.[3] Ad hoc planning is contrary to the recognized guidance.  Plaintiffs' expert Peter Blanck testified that in order to implement the principles of emergency planning, there must be "coordination among public authorities and agencies in the lines of authority for decision making, response, and follow-up in numerous areas. For example, planners must consider people with disabilities who need assistance in evacuation from their homes, whether from standalone

---

[3] The Court here provides some examples but the problems identified in the following sections are demonstrated by the entirety of the Court's analysis.

residences or high rise structures. Emergency planners need to consider the nature of and demand for accessible forms of transportation to reach shelters and to evacuate in the event of a mass evacuation. Planners need to ensure that their personnel have appropriate training and expertise to assist individuals with disabilities in evacuating their homes and other locations where they may be located during an emergency. Planners must appropriately maximize the use of available transportation resources that are accessible to people with disabilities, which requires the identification and assessment of accessible public and private local transportation systems, and other service vehicles." *See* Blanck Decl, Tr. Ex. 542 at ¶42.

202.    However, instead of pre-planning, the City has largely taken the position that it can coordinate services at the time of an event. As such, the City is often overly reliant on ad hoc decision-making at the time of an incident.

203.    One example of this lack of planning is evident in the City's evacuation plans. The FDNY and NYPD do not use evacuation plans, but make many of these determinations at the time and onsite. *See* Trial Tr. vol. 5, 731:8-732:1, 732:17-20, March 18, 2013 (Wahlig Testimony). FDNY Division Chief Villani testified that there is no particular procedure for FDNY for evacuation in a blackout. *See* Villani Depo. at 69:17-70:10; Blanck Decl., Tr. Ex. 542 at ¶61. The NYPD also has no written policy about moving medical equipment for people with disabilities who might need it, nor does it have any policy with respect to the evacuation of people with disabilities from high rises, but it is rather done on a case-by-case basis. *See* Trial Tr. vol. 5, 731:8-16, 745:6-746:16, March 18, 2013 (Wahlig Testimony)

204.    The City's decision to wait ten days after Sandy to begin searching for trapped people and the shutdown of paratransit almost immediately after the City gave evacuation orders also demonstrate a lack of planning.

**Lack of Coordination Amongst City Agencies and with Outside Agencies**

205.     Similarly, OEM – despite being the coordinating body for large scale emergency response for the City – has no authority to make sure that the various roles and responsibilities assigned to City agencies by emergency plans are in fact followed through on. *See* McKinney Depo. Vol. I at 34:18-21. This has a significant impact on people with disabilities who require particularized assistance.

206.     The key players OEM needs to coordinate with include the Mayor's Office for People with Disabilities, the Metropolitan Transit Authority, Fire Department, Police Department, and those entities whose work inherently impacts emergency responses such as utility companies, and the New York City Housing Authority. However, there are no agreements between the City and NYCHA, the power companies, or MTA regarding emergency planning. *See, e.g.,* McKinney Depo. Vol. III 58:9-12 (no agreement with NYCHA regarding emergency plans).

207.     Mr. Belisle testified that these entities do not coordinate with each other about the specific needs of disabled people and that he was not in touch with the Fire Department, Police Department, nor MOPD Commissioner Calise during Hurricane Sandy. See Trial Tr. vol. 2, 342:12-16, March 12, 2013 (Belisle Tesitmony). Neither the New York Fire or New York Police Departments have ADA coordinators. Trial Tr. vol. 2, 341:9-16, March 12, 2013 (Belisle Testimony); Villani Depo. at 12:17-21. OEM Assistant Commissioner Dina Maniotis testified that OEM has not assessed the capabilities of the police and fire departments. *See* Maniotis Depo. at 35:6-9, 12-22.

208.     MOPD Commissioner Calise testified that he was not consulted about MTA's shutdown of paratransit in advance of Sandy and was not aware of what time paratransit shut

down on October 28. *See* Trial Tr. vol. 3, 452:5-7; 453:7-13, March 13, 2013 (Calise Testimony).

**Lack of Clear Decision-maker with Authority on Disability Issues**

209.    Neither the Mayor's Office for People with Disabilities nor the special needs coordinator at OEM have any decision-making authority regarding the City's plans. OEM's "special needs" coordinator is on the lowest rung of the OEM's organizational chart. *See* OEM Organizational Chart, Tr. Ex. 44.

210.    Moreover, as Mr. Belisle testified, this position has no staff, and it is not even currently filled with a full-time employee. Mr. Belisle, who formerly filled this role, testified that he moved to a different position at OEM in August of 2012, and OEM has not hired a replacement. He was the "acting" special needs coordinator during Sandy, but he worked only on shelters – not disability issues – during Sandy, as part of his new position. *See* Trial Tr. vol. 5, 825:17-23, March 18, 2013 (Van Pelt Testimony), Trial Tr. vol. 2, 282:5-24, March 12, 2013 (Belisle Testimony).

211.    As Plaintiffs' expert June Kailes testified, Mr. Belisle, as Special Needs Coordinator, demonstrates an "alarming lack of depth of involvement, understanding and situational awareness of issues regarding people with access and functional needs in emergency planning, response and recovery," revealing that the "position of Special Needs Coordinator is tokenistic and serves more for appearances than a true City commitment to and involvement with these critical and diverse functional needs issues." *See* Kailes Decl., Tr. Ex. 536 at ¶121.

212.    Similarly, MOPD Commissioner Calise testified that he is not involved in the City's disaster plans.  In fact, his office was actually closed during the weekend when Sandy approached, and he was not in charge of Sandy response.  *See* Trial Tr. vol. 3, 437:15-438:9, 442:18-20, March 13, 2013 (Calise Testimony).

213.    New York City Police Department Deputy Inspector James Wahlig, who serves as the Police Department's liaison to OEM, testified that no one at NYPD has the specific job of understanding the needs of persons with disabilities in emergencies; and the NYPD does not have a disability coordinator, 504 coordinator, or self-evaluation plan. The NYPD also deals with persons with disabilities in the event of an emergency on a case-by-case basis. *See* Trial Tr. vol. 5, 729:16-20, 730:2-8, 732:17-20, March 18, 2013 (Wahlig Testimony).

214.    MOPD Commissioner Calise testified that having a point person for accessibility issues is critical for making sure that accessibility in fact exists. *See* Trial Tr. vol. 3, 462:6-12 March 13, 2013 (Calise Testimony).

215.    While the City proffered MOPD Commissioner Calise in support of their case, it was clear that OEM does not in any way meaningfully incorporate MOPD into its emergency plans, even though many persons with disabilities are likely to contact MOPD in the event of an emergency given the absence of any other viable options. Indeed, MOPD was not aware that they would be needed during Sandy, and no one was at MOPD's office to receive phone calls on the Saturday or Sunday leading up to Sandy making landfall in New York City. *See* Trial Tr. vol. 3, 443:4-17, March 13, 2013 (Calise Testimony).

216.    MOPD Commissioner Calise was not aware of any training he or his staff received from OEM prior to Sandy about how to handle requests for evacuation. He also did not receive any information about options that might be available to someone who might need to evacuate from a high rise building. *See* Trial Tr. vol. 3, 442:4-17, March 13, 2013 (Calise Testimony).

## CONCLUSIONS OF LAW

217.    Plaintiffs bring this action for declaratory and injunctive relief pursuant to Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794, *et seq.,* Title II of

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.,* and the New York

City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §8-101 *et seq.*

218.    Under all three of these statutes, Plaintiffs have a right to meaningful access to

government programs, activities, and services, and to receive the benefits afforded by public

entities. *See* 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity"); 29 U.S.C. §

794(a); N.Y.C. Admin. Code§ 8-107(4)(a); *Henrietta D. v. Bloomberg,* 331 F.3d 261, 273 (2d

Cir. 2003)

219.    Plaintiffs state a claim under the ADA and Section 504 if they show: (1) they are

"qualified individuals" with a disability; (2) that Defendants are subject to these laws; and (3)

that plaintiffs were excluded from participation in or denied the benefits of the services,

programs, or activities of the public entity, or were subjected to discrimination by the entity. *See*

42 U.S.C. §12132; and *Henrietta D.*, 331 F.3d at 272.

220.    The standards adopted by Title II of the ADA for State and local government

services are generally the same as those required under section 504. *See Henrietta D.*, 331 F.3d

at 272. While in certain areas, such as housing and education, there may be differences between

the two statutes, none of those differences are relevant to the instant action.

221.    The ADA applies to everything a public entity does. *See, e.g., Innovative Health

Systems, Inc. v. City of White Plains,* 117 F.3d 37 (2d Cir. 1997) superseded on other grounds

*Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 171 n. 7 (2d Cir.2001), citing 28 C.F.R. pt. 35, app A

at 456 (1996); *see also Johnson v. Saline,* 151 F.3d 564, 569 (6th Cir. 1998); *Barden v.*

*Sacramento*, 292 F.3d 1073 (9th Cir. 2002). Thus, the City's emergency planning and preparedness are covered activities.

222.     There is no dispute as to the first and second prongs in this matter. Thus, the trial in this matter addresses the third prong.

223.     Defendants have not pled or argued the available affirmative defenses in this matter of undue burden or fundamental alteration, and thus have waived those defenses. *See* Def's Answer to Amended Complaint, Filed 7/16/12 (Dckt. No. 33); and *National Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 526 (2d Cir. 2004).

224.     Regarding the third prong, a public entity discriminates on the basis of disability if it fails to provide *meaningful access* to its services, programs, or activities for persons with disabilities. *Henrietta D.*, 331 F.3d at 272. Plaintiffs have made their case under this third prong.

225.     Under key precedent, public entities have a duty to ensure that individuals with disabilities are provided with "meaningful access to the benefit that the [entity] offers" and to this end "reasonable accommodations in the [entity's] program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see also Civic Ass'n of the Deaf of New York City, Inc. v. City of New York,* No. 95 Civ. 8591, 2011 WL 5995182, at *9 (S.D.N.Y. Nov. 29, 2011).

226.     Defendants rely on cases that pre-dated *Henrietta D.* – which clarified the framework for analyzing meaningful access in the Second Circuit – to erroneously argue that because the meaningful access standard under the ADA is not an "equal access" standard, that somehow people with disabilities are entitled to something *less* than the rest of the public. Rather, courts have made abundantly clear that meaningful access is *different* than equal access – not necessarily a lesser standard.

227.    The Second Circuit explained in *Henrietta D.* meaningful access may require the provision of *additional* accommodations to people with disabilities to allow them to access generally available programs. The Court in *Henrietta D.* noted that the Second Circuit has "specifically embraced the view that the Rehabilitation Act requires affirmative accommodations to ensure that facially neutral rules do not in practice discriminate against individuals with disabilities." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 274-75 (2d Cir. 2003).

228.    In other words, meaningful access is different than "equal opportunity" because often something *more or different* must often be done to ensure that people with disabilities have access to the benefits of a program: "*It is not enough to open the door for the handicapped ...; a ramp must be built so the door can be reached.*" *Id.* at 275 (emphasis in original) (quoting *Dopico v. Goldschmidt,* 687 F.2d 644, 652 (2d Cir.1982)).

229.    Thus, the question is "whether the plaintiffs with disabilities could achieve meaningful access, and not whether the access the plaintiffs had (absent a remedy) was *less* meaningful than what was enjoyed by others." *Id.* (emphasis in original). As a result, in *Henrietta D.,* the plaintiffs, who were people with HIV and AIDS who were attempting to access public benefits, were entitled to assistance in the form of case workers and other accommodations in order to allow them to access those benefits.  Importantly, the Court in *Henrietta D.* squarely rejected the defendants' argument that Plaintiffs were not denied meaningful access because they were allegedly faring no worse than people without disabilities. *Henrietta D.,* 311 F.3d at 282.

230.    *Lincoln CERCPAC v. Health and Hosps. Corp.,* cited by Defendants is unavailing. Like *Henrietta D., Lincoln* simply held that people with disabilities "must be provided with meaningful access to the benefit that the grantee offers…. *[But] the benefit itself*

*cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled*; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." 147 F.3d 165, 167 (2d Cir. 1998) (emphasis added).

231.     The court in *Lincoln* denied the plaintiffs' claims because there was "no allegation that any of the children are being denied any care available to children without disabilities, or that in being provided with such care, they have been denied…a reasonable accommodation of the child's disability." 147 F.3d 165, 168 (2d Cir. 1998). In contrast, here there are services and programs being offered to the non-disabled population that are not similarly available to people with disabilities and, to the extent they are available, those services fail to provide reasonable accommodations.

232.     Similarly in *Wright v. Giuliani*, the question before the Court was whether plaintiffs were seeking reasonable accommodations or additional substantive benefits. *Wright,* 230 F.3d 543, 548 (2d Cir. 2000). What the Court explained was that people with disabilities are entitled only to reasonable accommodations to allow them to access the programs and benefits already provided, rather than new substantive benefits. *Id.* Here, Plaintiffs seek access to the benefits provided to the general population by the City's emergency planning and preparedness program – evacuation, sheltering, etc. – not additional substantive benefits.

233.     Defendants have also dramatically misinterpreted the *CALIF* case in this matter. The City of Los Angeles in that matter by no means admitted the failings in its plans. Rather it had summary judgment granted against it. *See Communities Actively Living Independent and Free v. City of Los Angeles ("CALIF")*, 2011 WL 4595993 at *3. Moreover, the Court in *CALIF*

explicitly laid out its expectations for what an emergency plan would require. *See CALIF*, 2011 WL 4595993 at *3.

234.    In *CALIF,* the Court found a number of deficiencies that are precisely on point with the type of deficiencies in the instant matter. For example, the Court found that the City had a responsibility to provide shelter to residents displaced by an emergency. However, the City of Los Angeles had conducted full disability compliance surveys for only a fraction of its shelter sites, and "of the surveyed sites, few—if any—of the shelters meet all requirements mandated by the ADA." *CALIF* at *3. Here, the City does not know the level of accessibility of its shelters, and has just begun its survey process.

235.    Similarly in *CALIF*, despite relying on another agency – the Red Cross – for sheltering, the Court found the plans insufficient as a matter of law because the City of Los Angeles had no agreement with the American Red Cross setting forth any specific responsibilities of that agency with respect to individuals with disabilities. *CALIF* at *3. Here, despite relying on numerous other agencies – such as NYCHA and MTA/paratransit – the City has no agreements setting forth any specific responsibility of those agencies with respect to individuals with disabilities.

236.    Further, the Court in *CALIF* found that the individual City departments that were delegated the responsibility of assisting individuals with disabilities have no plans for addressing the needs of individuals with disabilities in the event of an emergency or disaster. *CALIF* at *2. Here, the individual City departments – such as the FDNY and NYPD – which are delegated the responsibility of assisting individuals with disabilities have no plans for addressing the needs of individuals with disabilities in the event of an emergency or disaster, as outlined above.

237.    Thus, *CALIF* provides a roadmap for the types of planning failings that result in violations of the law.

238.    Here, the City is offering a governmental program – its emergency preparedness and planning program – which provides benefits, such as shelter and evacuation, to the general public to mitigate the effects of a disaster. The City has failed to properly address the needs of men, women and children with disabilities in myriad areas of these plans, including high-rise evacuation, evacuation and transportation, shelters, power outages, and others. These major planning gaps deny Plaintiffs the benefits of the City's emergency planning program.

239.    The lack of critical centralized emergency plans for people with disabilities places them at risk for damage to their health, catastrophic injury or death. Persons with disabilities cannot derive the same benefits as others from the program in its current form because of their unique needs and the City's failure to address those needs.

240.    Plaintiffs need not identify a "comparison class" of "similarly situated individuals given preferential treatment" to bring a case under this theory. *Henrietta D.* at 273; *see also McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004) (*citing Olmstead v. Zimring*, 527 U.S. 581, 598 (1999)). Moreover, Plaintiffs need not show that the City provides certain accommodations to the general public. *See Henrietta D.* at 283.

241.    Rather, Plaintiffs need only demonstrate that the City failed to take the affirmative steps needed to ensure meaningful access to its emergency planning and preparedness program for people with disabilities, and they have done so here.

242.    The U.S. Department of Justice ("DOJ") regulations implementing the ADA further illustrate the types of discrimination prohibited in this matter. *See generally* 28 C.F.R. Part 35.

243.     The DOJ regulations broadly prohibit public entities from discriminating in *any* activity in which they engage. Thus, a public entity may not "directly or through contractual, licensing or other arrangements, on the basis of disability…[d]eny a qualified individual with a disability the opportunity to participate in or benefit from" the public entities program. 28 C.F.R. § 25.130(b)(1)(i).

244.     Likewise, a public entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 25.130(b)(1)(ii). Lastly, a public entity must take steps to provide qualified individuals with disabilities with "an equal opportunity to obtain the same results, [or] gain the same benefit . . . As that provided to others." 28 C.F.R. § 35.130(b)(1)(iii); *see also* 28 C.F.R. §§ 35.150, 151 (must ensure that physical barriers do not deny people with disabilities access to the program); and § 35.160(a)(1) (must ensure effective communication with people with disabilities). Under the plain meaning of these regulations public entities have an affirmative duty to ensure that individuals are not discriminated against due to any actions, whether direct, indirect, or via contract, taken by that public entity.

245.     Here, the City of New York has failed in its emergency planning and likewise is in violation of these anti-discrimination laws, by failing to provide the benefit of its emergency planning to people with disabilities.

**The City's Justifications**

246.     The City has asserted no legally cognizable affirmative defenses in this matter. Instead, it has advanced several excuses for its failure to properly pre-plan and several assertions that their planning is adequate despite overwhelming evidence to the contrary.

247.     First, the City relies on personal preparedness arguing that people with disabilities are responsible for their own  safety. However, personal preparedness is no substitute for the

City's duty to plan for people with disabilities. *See CALIF v. City of Los Angeles, et al.* Order at *15 ("Although it is certainly important for all of the City's residents to prepare for an emergency, it is the City's emergency preparedness program that is at issue in this action. . . . It is irrelevant for purposes of this action whether individuals should also personally plan and prepare for emergencies and/or disasters.").

248.     Second, the City argues that it can wait until a disaster strikes to strategize about response. At this point, however, it is often too late and unnecessarily puts the life and health of disabled people at risk. As the court in *CALIF* stated "[t]he purpose of the City's emergency preparedness program is to anticipate the needs of its residents in the event of an emergency and to minimize the very type of last-minute, individualized request for assistance. . . particularly when the City's infrastructure may be substantially compromised or strained by an imminent or ongoing emergency or disaster." *See CALIF v. City of Los Angeles, et al.* Order at *14.

249.     Third, the City tries to rely on volunteer organizations to fill gaps that arise in its disaster response. However, they are by no means sufficient to fill gaps in the City's plans. The City cannot rely on the efforts of volunteers to fulfill the basic duties of emergency response, particularly when the City has not entered into any prior agreement with them.

250.     The City also argues that it has taken a number of steps since the complaint was filed that address these issues. As demonstrated above, in the Court's findings of fact, the City continues to be deficient in its emergency planning, and the City's post-complaint mitigation efforts have not been successful in addressing Plaintiffs' claims.[4]

---

[4] Even if the Court were to find that any of the City's mitigation efforts are successful such that they address certain of Plaintiffs' claims, the proper course is for the Court to protect the civil rights of people with disabilities by ordering Defendants to formally implement programs that incorporate these efforts, while also ordering the City to remedy those areas not addressed by

251.    Moreover, voluntary acts undertaken by defendants after the filing of a lawsuit do not extinguish liability unless the defendant can show that "subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC), Inc.,* 528 U.S. 167, 189 (2000) (emphasis added); *see also Seidemann v. Bowen,* 499 F.3d 119, 128 (2d Cir.2007).

252.    As the Supreme Court has recognized: a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends. Given this concern, the cases have explained that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *All Ready LLC v. Nike,* 133 S.Ct.721, 184 (2013) (internal citations omitted); *see also Adar and Constructors v. Slater,* 528 U.S. 216, 222 (2000) (quoting *United States v. Concentrated Phosphate Export Assn.,* Inc., 393 U.S. 199, 203 (1968)).

253.    Moreover, the City cannot simply state that it has changed its ways and avoid liability. As the Second Circuit has held, "a general disclaimer of intention to revive allegedly unlawful conduct does not suffice by itself to meet defendants' heavy burden in order to render the case moot." *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 106 (2d Cir.1989) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897 (1953)). Good intentions or assumptions about how future programs will be administered are not enough. *Id.* Rather, "the

---

post-complaint mitigation efforts.

burden on the defendant to prove that the conduct will not recur is heavy." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000).

254.    Defendants' cases cited on this point are unavailing. Defendants liken the City's emergency plans to something that could fixed and mooted as easily at two bridges at a zoo in *Meagley v. City of Little Rock* 09 Civ. 226 (DPM), 2010 U.S. Dist. LEXIS 84011 (E.D. Ark.) (affd, 639 F.3d 384 (8th Cir. 2011)). However, as the record reveals, there is no comparison between ameliorating widespread deficiencies in the City's emergency plans and fixing the slope of two bridges at zoo.

255.    Defendants' citation *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50 (2d Cir. 1992) is similarly inapposite. Defendants ignore the fact that *Harrison* also held that a "defendant bears a heavy burden when it seeks to have a case dismissed as moot, *W.T. Grant*, 345 U.S. at 633, 73 S.Ct. at 897, whether it should be dismissed or not lies within the sound discretion of the district court, and "a strong showing of abuse must be made to reverse it." *Id.* at 633, 73 S.Ct. at 898; *accord Aherns v. Bowen*, 852 F,2d 49, 53 (2d Cir. 1998)." Defendants have not met their heavy burden in the instant case for the reasons articulated in the Court's findings of fact.

256.    For the reasons set forth above Defendants have violated the ADA, Section 504, and the New York City Human Rights Law by failing to provide meaningful access to its large scale emergency planning. The Court will issue a separate order directing a briefing schedule on remedy.

Dated:                                        IT IS SO ORDERED


_____
Hon. Jesse M. Furman

73