```
┌──────────────────────────────────────┐
│ USDC SDNY                             │
│ DOCUMENT                              │
│ ELECTRONICALLY FILED                  │
│ DOC #:_____                 │
│ DATE FILED:  10/15/2014               │
└──────────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

BROOKLYN CENTER FOR INDEPENDENCE OF
THE DISABLED, a nonprofit organization, CENTER
FOR INDEPENDENCE OF THE DISABLED NEW
YORK, a nonprofit organization, GREGORY D. BELL,
and TANIA MORALES,

                                        Plaintiffs,

                    -against-

BILL DE BLASIO, in his official capacity as Mayor of
the City of New York, and the CITY OF NEW YORK,

                                        Defendants.

---------------------------------------------------------------------- x

**STIPULATION OF
SETTLEMENT AND
[PROPOSED] REMEDIAL
ORDER**

11 Civ. 6690 (JMF)(FM)

 

**WHEREAS** Plaintiffs commenced the instant lawsuit on September 26, 2011, alleging

that Defendants violated federal, state, and city law by failing to account for the needs of persons

with disabilities in the City's emergency preparedness program;

**WHEREAS**, on November 14, 2012, the Court certified the following class: "All people

with disabilities, as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102,

who are within the City of New York and the jurisdiction served by the City of New York's

emergency preparedness programs and services" ("the Class");

**WHEREAS** the Honorable Jesse M. Furman issued an Opinion and Order dated

November 7, 2013, following a trial on issues of liability (Dkt. No. 159);

**WHEREAS** Defendants have stated their intention to comply with the Opinion and

Order; and

**WHEREAS** the parties have met and conferred over the course of several months and have agreed upon a proposed remedial plan to remedy the violations found in Judge Furman's Opinion and Order;

**NOW, THEREFORE, IT IS HEREBY STIPULATED**, by and between the undersigned, that the parties have reached agreement on the following terms and conditions, and submit the attached agreed-upon remedial plan to the Court to be "so ordered":

## SECTION 1: DEFINITIONS

1.  "Effective Date" means the date this Stipulation of Settlement and Remedial Order ("Order") is entered as an order of the Court.

2.  "Effective Period" means the period of time from the Effective Date until the termination of the Court's continuing jurisdiction over this action.

## SECTION 2:  THE PARTIES' RIGHTS AND OBLIGATIONS

3.  Defendants' obligations with respect to Sheltering, Canvassing, Accessible Transportation, Emergency Communications, and Power Outages are set forth in the individual Memoranda of Understanding ("MOU") attached hereto as Exhibits A through E and are incorporated herein by reference. Defendants shall comply with their obligations as set forth in Exhibits A through E within three years after the Effective Date.

4.  Defendants' obligations with respect to the hiring of a Disability and Access and Functional Needs Coordinator and the creation of a Disability Advisory Community Panel ("Coordinator/Panel") are set forth in the MOU attached hereto as Exhibit F and are incorporated herein by reference.

5.      Defendants' obligations with respect to High Rise Evacuation are set forth in the

individual MOU attached hereto as Exhibit G and are incorporated herein by reference.

Defendants shall comply with their obligations as set forth in Exhibit G within four years

after the Effective Date.

## SECTION 3: MODIFICATION

6.      If, at any time, Plaintiffs or Defendants desire to modify the Agreement for any reason,

the Party that seeks such modification shall notify the other Party, in writing, of the

proposed modification and the reasons therefor. If the parties reach agreement on the

requested modification, it shall be reduced to writing, signed, and filed with the Court for

approval. To the extent the parties cannot agree on the modification, replacement, or

removal of a remedial item, the dispute resolution procedures in Section 5 will apply.

## SECTION 4: MONITORING

7.      Defendants shall produce written reports to reflect the current status of the progress of

implementing the MOUs. The reports will be provided to Plaintiffs' counsel and filed

with the Court every six months. The first report shall be due to Plaintiffs and the Court

six months following the Effective Date.

8.      Defendants shall, three years following the Effective Date, provide Plaintiffs' counsel

and file with the Court a final report regarding the implementation of the Sheltering,

Canvassing, Accessible Transportation, Emergency Communications, and Power Outages

MOUs.

9.      Defendants shall, four years following the Effective Date, provide Plaintiffs' counsel and

file with the Court a final report regarding the implementation of the High Rise

Evacuation MOU.

10.     Defendants shall, four years following the Effective Date, provide Plaintiffs' counsel and file with the Court a final report regarding the implementation of the Coordinator/Panel MOU.

11.     The reports shall describe:

   a.   Progress of the implementation of the Order in each of the remedial areas;

   b.   Any anticipated delays in meeting deadlines; and

   c.   Any barriers to implementation of the Order.

12.     Within 30 days of receiving the report, Plaintiffs may submit comments, questions, and requests for additional information to the City. Defendants agree to respond to Plaintiffs' comments and questions, and provide additional responsive information and documentation, if any, within 15 days of receipt, or within 30 days (should this responsive period overlap with an emergency activation). Defendants reserve the right to object to any requests that they believe are unduly burdensome, irrelevant, or overbroad.

## SECTION 5: JURISDICTION AND ENFORCEMENT

13.     The provisions of this Stipulation shall not take effect unless and until this Stipulation is entered as an order of the Court, at which time it shall become effective.

14.     All claims raised by the named individual plaintiffs on their own behalf and on behalf of the Class in the Complaint shall be dismissed with prejudice at such time as the Court endorses this Order after a Fairness Hearing, or after the issuance of a modified Order, if any.

15.     As of the Effective Date, the remedies enforceable in this action are limited to the provisions of this Stipulation and the individual MOUs.

16.     As of the Effective Date, the jurisdiction of this Court shall terminate for all purposes except that the Court shall maintain continuing jurisdiction over this action for the

purpose of (a) conducting a Fairness Hearing to consider class member objections, if any, and modifying the Order if the Court finds necessary after such hearing and (b) construing, enforcing, and administering the terms of this Order as described in paragraphs 20, 21, 23, 24, and 25 below, including the award of attorneys' fees and costs.

17. The Effective Period of the Court's jurisdiction with respect to the Sheltering, Canvassing, Accessible Transportation, Emergency Communications, and Power Outages MOUs shall end three years and 60 days following the Effective date, at which point all rights and claims arising under the provisions of this Stipulation and the attached MOUs shall terminate, subject to the rights of the parties set forth in paragraphs 23 and 24 below.

18. The Effective Period of the Court's jurisdiction with respect to the Coordinator/Panel and High Rise Evacuation MOUs shall end four years and 60 days following the Effective date, at which point all rights and claims arising under the provisions of this Stipulation and the attached MOUs shall terminate, subject to the rights of the parties set forth in paragraphs 20, 24, and 25 below.

19. If Plaintiffs move pursuant to paragraphs 23 and 24 of this Stipulation, jurisdiction shall continue until (a) the motion is decided; (b) if the motion is decided favorably for Plaintiffs, until such time as directed by the Court; or (c) such time as may be extended by the Court in a modification of this Order. At the time of termination of jurisdiction, any right to enforce the terms of this Stipulation shall terminate.

20. During the period of time the Court retains jurisdiction as described above in paragraphs 17 and 18, if Plaintiffs believe that the Defendants are in non-compliance with the substantive requirements of the Order, Plaintiffs may move for contempt or enforcement.

Plaintiffs' counsel shall first notify Defendants' counsel in writing of the nature and specifics of the alleged failure to comply, including reference to any reports submitted pursuant to Section 4 above, upon which such a belief is based, at least 30 days before any motion is made for enforcement of this Order or for contempt against the noncompliant Defendant. Unless otherwise resolved, the parties' counsel shall meet within the 30 day period following notice to Defendants' counsel in an attempt to arrive at a resolution of the claims. If no resolution is reached within 30 days from the date of notice, Plaintiffs may move this Court for an order for all appropriate relief against the noncompliant Defendant.

21. In the event of any motion based upon Defendants' alleged non-compliance with the substantive requirements of the Order, Defendants shall be considered to be in "compliance" therewith unless Plaintiffs establish that Defendants' failures or omissions to meet the terms of the Order were not minimal or isolated, but were substantial and sufficiently frequent or widespread as to be systemic, such that it constitutes a material violation of the Order.

22. Fees and costs incurred in the resolution of any disputes shall be awarded in accordance with applicable law.

## SECTION 6: EXTENSION OF THE TERM OF THE STIPULATION

23. If, after review of the final reports described in Sections 7, 8, 9, 10, and 11 above, Plaintiffs believe that Defendants have failed to comply with the terms of these MOUs, Plaintiffs shall have a period of 60 days after the filing of each final report to meet and confer with Defendants and, if necessary, to submit applications to the Court for

enforcement of the Order or extension of the Court's jurisdiction, as described in Section 5.

24. In the event that Plaintiffs move to extend the jurisdiction of this Court of this Order, Plaintiffs will seek an extension of time that is reasonable and appropriate for Defendants to achieve compliance. Prior to the expiration of any period of extended jurisdiction of this Order Plaintiffs may also move for a further extension of the jurisdiction of the Court beyond any extension granted pursuant to a motion made in accordance with paragraph 23 of this Order. No motion for extension of the Court's jurisdiction made pursuant to this Section shall be made prior to six months before the expiration of the Court's jurisdiction.

## SECTION 7: GENERAL PROVISIONS

25. Defendants agree that Plaintiffs are entitled to attorneys' fees and costs as prevailing parties. The parties agree to attempt to negotiate the amount of such attorneys' fees and costs. If they are unable to agree on an amount within one hundred twenty (120) days of the Effective Date, Plaintiffs may submit an application for attorneys' fees and costs to the Court, and Defendants reserve the right to respond to such an application in a manner that is consistent with this paragraph, the Federal Rules of Civil Procedure, and all applicable caselaw and statutes except that they will not dispute Plaintiffs' entitlement to attorneys' fees and costs as prevailing parties. Plaintiffs reserve the right to seek attorneys' fees and costs incurred in monitoring compliance with this Order.

26. All written notifications sent pursuant to this Stipulation and all other correspondence concerning this Stipulation shall be sent by electronic mail or facsimile to the following

addresses, or to such other address as the recipients named below shall specify by notice

in writing:

To Plaintiffs' counsel:

Sid Wolinsky
Christine Chuang
Julia Pinover
Rebecca Williford
Disability Rights Advocates
2001 Center Street, 4th Floor
Berkeley, CA 94704-1204
Fax: (510) 665-8511
swolinsky@dralegal.org
cchuang@dralegal.org
jpinover@dralegal.org
rwilliford@dralegal.org

Dan Brown
Sheppard Mullin Richter & Hampton LLP
30 Rockefeller Plaza
New York, NY 10112-0015
Fax: (212) 655-1768
dlbrown@sheppardmullin.com

To Defendants' counsel:

Mark G. Toews
Carolyn E. Kruk
New York City Law Department
100 Church Street
New York, New York 10007
Fax: (212) 356-0871
mtoews@law.nyc.gov
ckruk@law.nyc.gov

27.     This Stipulation and Remedial Order is final and binding upon the parties, their

successors, and their assigns.

Dated:       New York, New York
             September 30, 2014

Sid Wolinsky                              ZACHARY W. CARTER
Christine Chuang                          Corporation Counsel of the
Julia Pinover                                City of New York
Rebecca Williford                         *Attorney for Defendants*
Disability Rights Advocates               100 Church Street
*Attorney for Plaintiffs*                 New York, New York 10007
2001 Center Street, 4th Floor             (212) 356-0871
Berkeley, CA 94704-1204
(510) 665-8644

By: _____              By: _____
       Christine Chuang                          Mark G. Toews
                                                 Carolyn E. Kruk


**SO ORDERED:**


Dated: October 15 , 2014
                                          _____
                                          Hon. Jesse M. Furman
                                          United States District Judge


Per the Court's Memorandum and Opinion dated October 2, 2014 (Docket No. 199), this Order
is adopted subject to modification - or rejection - following notice to class members and the
fairness hearing to be held pursuant to a separate order to be entered today.

# EXHIBIT A

# MEMORANDUM OF UNDERSTANDING

## Sheltering

### *Brooklyn Center for Independence of the Disabled v. City of New York*

### 11-cv-6690

This Memorandum of Understanding (MOU) is an interim document intended to

memorialize the agreement in principle of the parties regarding a remedial plan to accommodate

people with disabilities in the City's emergency sheltering system. The parties intend to submit

this MOU with the negotiated Stipulation of Settlement that will be so-ordered by the Court and

over which the Court will retain jurisdiction. The parties executed this MOU on February 27,

2014 and all dates that run from "execution of this agreement" shall run from the February 27

date. The parties have finalized and re-executed this MOU for purposes of submission to the

Court.

Once specific implementation timetables have been developed with the City agencies

responsible for the various elements of the plan, they will be provided to Plaintiffs' counsel as

they are developed.

## I.   DEFINITIONS

### Accessible

"Accessible" for the purposes of an evacuation center or emergency shelter covered under this
agreement means that the physical features of those areas within an existing facility that are
being used for emergency sheltering and for the provision of services therein will comply with
the applicable provisions of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-
12134 and its implementing regulation, 28 C.F.R. pt. 35, such that they allow a person with a
disability meaningful access to the emergency sheltering services offered at that facility. Where
construction is performed to make a facility suitable for use as an evacuation center or
emergency shelter, alteration of the sites will comply with the 2010 ADA Standards for
Accessible Design, 28 C.F.R. § 35.151 and 36 C.F.R. pt. 1191, App. B and D ("2010
Standards"). Temporary modifications (either physical or programmatic) during an emergency
activation of a facility will be considered appropriate when they effectively address barriers to
the use of a facility as an accessible evacuation center or emergency shelter. Existing facilities
designated for use for emergency sheltering will be reviewed to assess the level of physical

accessibility of the path leading to an entrance and of all areas within the site that will be utilized for the evacuation center or emergency shelter operations. Survey and analysis of the level of accessibility will be conducted by utilizing, among other tools, the Department of Justice ADA Toolkit for emergency shelters ("DOJ Toolkit") and FEMA's Guidance on Planning for Integration of Functional Needs Support Services in General Population Shelters, as is applicable.

### Evacuation Centers

Evacuation Centers are the primary entry point for evacuees going to shelters. Individuals are triaged at Evacuation Centers and transported to appropriate shelters. Evacuation Centers also serve as the command element for their specific shelter solar system. Many Evacuation Centers have co-located Hurricane Shelters (discussed in greater detail *infra*).

### Hurricane Shelters

Hurricane Shelters are safe facilities out of the evacuation zones that offer basic services to provide for the health and safety of evacuees for approximately 1-5 days.

### Special Medical Needs Shelters

A Special Medical Needs (SMN) Shelter is a temporary emergency facility capable of providing care to residents whose medical condition exceeds the capabilities of a Hurricane Shelter, but is not severe enough to require hospitalization or nursing home care.

### Long Term Shelters

Pre-selected facilities that will continue to provide emergency transitional shelter to those who need it, should the sheltering operation continue for longer than five days.

## II.     COMMITMENT TO SHELTERING ACCESSIBILITY

### A.     Minimum of 60 Accessible Facilities

1.     Within 30 days of the execution of this agreement, Defendants agree to begin the process of implementing the steps described in this MOU, that will result in New York City ("City") having a minimum of 60 accessible facilities by the end of September 2017. All Evacuation Centers that have co-located shelters will be made accessible or a new accessible facility will be selected to serve as an Evacuation Center with a co-located shelter.[1] The minimum of 60 accessible facilities will be distributed throughout all five boroughs; they will be capable of sheltering approximately 120,000 people with disabilities in the event of an

---

[1] The City currently operates 64 Evacuation Centers, the vast majority of which have co-located shelters. If, as a result of the Hurricane Evacuation Study, the City determines that it will reduce the number of Evacuation Centers, all Evacuation Centers with co-located shelters will be made accessible and, if that number is less than 60, an additional number of Hurricane Shelters, sufficient to reach 60 facilities, will also be made accessible and be distributed through the five boroughs.

emergency. These 60 facilities are general needs facilities and do not include the 8 Special Medical Needs Facilities currently maintained by the City, although some may be co-located with Special Medical Needs Facilities.

2.      The implementation period for the City to provide this level of accessible sheltering shall commence within 30 days of the date of execution of this agreement. Defendants, together with the vendor engaged to complete the surveys and the responsible City agencies, will develop an implementation timetable, consistent with the phased approach described below. The timetable and updates on implementation will be provided to Plaintiffs' counsel.

3.      Defendants shall also conduct a formal survey of a sufficient number of facilities to develop a minimum of 60 accessible facilities with a combined capacity to shelter approximately 120,000 people by the end of September 2017. All facilities that will be used as evacuation centers with co-located shelters will be surveyed. These may be current facilities or newly selected facilities. Survey and analysis of the level of accessibility will be conducted by utilizing, among other tools, the Department of Justice ADA Toolkit for emergency shelters ("DOJ Toolkit") and FEMA's Guidance on Planning for Integration of Functional Needs Support Services in General Population Shelters, as is applicable.
The results of the surveys will be used to determine what modifications, if any, are necessary to make 60 facilities fully accessible by the end of September 2017 when they are used as an emergency shelter. *See* Section IV for more details on surveys.

4.      In addition to conducting such surveys and ensuring that a minimum of 60 accessible facilities, including all Evacuation Centers with co-located shelters, are available for use by the end of September 2017, Defendants will also take steps to provide adequate accessible transportation to transport people with disabilities from an Evacuation Center to an available accessible shelter facility.

5.      Defendants will take steps to publicly disseminate information, through multiple means and formats, about the location of Evacuation Centers with accessible co-located shelters.

6.      Defendants will develop and provide various types of training for all levels of shelter staff regarding best practices and procedures to provide meaningful access and support to people with disabilities who seek shelter in City facilities during an emergency. Defendants will provide copies of various training to Plaintiffs' counsel for their review and comment. Plaintiffs' counsel will provide comments within five business days of receipt, so as to allow for Defendants to move forward expeditiously.

B.      **Phased-In Transition to Accessibility**

1.      Defendants will make no fewer than 8 to 14 co-located Evacuation Centers and shelter facilities accessible by October 15, 2014. Defendants shall provide documentation confirming the accessibility of these facilities to Plaintiffs within 10 days of this date. These 8 to 14 accessible facilities will have an estimated capacity of 10,000 to 17,000 people. This is more accessible shelter space than was needed for all individuals seeking shelter during either Hurricane Irene (approximately 9,500 people) or Hurricane Sandy (approximately 6,000 people).

2.      Notwithstanding any other provision of this agreement, Defendants will make a minimum of 60 facilities, including all Evacuation Centers with co-located shelters, accessible by September 30, 2017. These facilities, in total, will be able to provide emergency shelter to approximately 120,000 individuals.

3.      The parties agree to discuss further the extent to which future, additional co-located Evacuation Centers and shelters will be placed in accessible facilities.

4.      As the phase-in of such accessible facilities is occurring, people with disabilities will be given priority for space in existing accessible shelters. Defendants will also ensure that people with disabilities are provided transportation from an Evacuation Center to an available accessible facility in the event they arrive at an Evacuation Center during an emergency that is full, unable to support their needs, or both.

C.      **Shelter Needs Analysis**

1.      Defendants will, at the outset of the implementation period, conduct a Shelter Needs Analysis to determine the capacity and geographic distribution sufficient to meet the anticipated need for meaningful access to the emergency shelter system for people with disabilities. The results and conclusions of this Shelter Needs Analysis will be shared with Plaintiffs and Plaintiffs' Counsel. The parties agree to discuss further the results and conclusions of the Shelter Needs Analysis.

III.    **SURVEYING**

A.      **Survey of Facilities for Use as Hurricane Shelters**

1.      Defendants will survey the barriers and accessibility features of a sufficient number of facilities to be able to develop 60 accessible sites, including all sites where Evacuation Centers have co-located shelters. Facilities selected for surveying may be from City's existing portfolio of emergency shelters or other facilities that may be deemed more suitable for the purpose of an accessible emergency shelter. The results of the surveys will be analyzed and modifications, where necessary, will be made so that by September 30, 2017, the City has a minimum of 60 facilities accessible to people with disabilities.

2.      The City will utilize a qualified firm with experience in architectural accessibility for people with disabilities to conduct any surveys of the selected sites the City proposes to use as Evacuation Centers with co-located shelters and emergency shelters that it has not already surveyed as of the date of execution of this agreement. Defendants will consult with and seek the agreement of Plaintiffs' counsel as to the specific firm selected on or before October 3, 2014. Plaintiffs will not unreasonably withhold their agreement to the selection.

3.      Shelter accessibility surveys will be conducted in accordance with the guidance provided in the existing DOJ Toolkit, as applicable. Defendants shall apply the DOJ Toolkit, as applicable, to any surveys it has already conducted. Defendants will share the results of all surveys they conduct during the implementation period with Plaintiffs' Counsel.

4.      If the Shelter Needs Analysis indicates a need for more than 60 accessible facilities, Defendants may need to conduct further surveys of additional facilities during the implementation period to ensure there are a sufficient number of accessible facilities.

## IV.      PROVISIONS IN EVACUATION CENTERS AND SHELTERS

### A.      Accessible Entrances

1.      Every accessible facility provided by Defendants will have an accessible entrance. That entrance will be used as the main entrance to that accessible facility. Signage and other appropriate measures will be positioned to indicate where this accessible entrance is located when that facility is being used as an Evacuation Center and/or shelter.

### B.      Amenities

1.      Every accessible Evacuation Center and/or shelter provided by Defendants will have the capability to store medication requiring refrigeration and be equipped with power strips (for charging or using mobility and medical devices).

2.      Provisions for providing back-up power (i.e. quick connect installation) will require a longer implementation timetable than that proposed for shelter accessibility surveying and construction. Defendants will assess the current back-up power capabilities during the site survey process, and for facilities deemed accessible or selected for construction to become accessible, Defendants will develop a separate timetable for back-up power implementation and installation at these sites. Defendants will report this timetable to Plaintiffs' counsel.

3.      Defendants' reserve supplies shall include sufficient numbers of raised toilet seats, accessible cots, mobility aids (canes, crutches, manual wheelchairs), basic medical supplies, and multi-plug extension cords, so that any person with a disability staying in one of Defendants' Evacuation Centers and/or shelters may access basic facilities for hygiene and personal maintenance. Defendants agree to assess the need for other supplies, such as handheld showers, accessible medical equipment (accessible examination tables at SMN shelters), and different types of communication boards, such as electronic communication boards.

4.      Every accessible Evacuation Center and shelter facility will be provided with a "way finding kit" to assist people with disabilities in utilizing that facility. Way finding kits will be piloted in accessible shelters during the initial phase of implementation in order to determine the most efficient method of assisting shelterees in locating the various areas of the emergency shelter.

5.      Defendants will provide either CART (remote translation services) or ASL interpretation services for every accessible facility.

6.      Defendants' shelter staffing plans will provide that in every co-located Evacuation Center and shelter facility an Access and Functional Needs Coordinator ("AFNC") will oversee

all accessibility-related concerns and programs at that facility. All AFNCs will receive training so that they will be able to work to accommodate people with disabilities at facilities during emergency sheltering. During the implementation period AFNCs will initially be assigned to accessible facilities. Defendants will work with partner agencies to develop a reporting structure for AFNCs so that they can work effectively.

7.     Defendants will develop training for AFNCs and share it with Plaintiffs' counsel for their review and comment. Plaintiffs' counsel will provide comments within five business days of receipt, so as to allow for Defendants to move forward expeditiously.

**C.     Signage**

1.     Every accessible co-located Evacuation Center and shelter facility will provide accessible signage regarding the layout of the facility and the location of amenities such as drop off locations, restrooms, food, entrances, exits, and sleeping facilities in readily noticeable locations, including signage in six languages, Braille, and display pictograms.

**D.     Standard Operating Procedure Checklist**

1.     Defendants will create, provide, and utilize a checklist at each of their emergency Evacuation Centers and shelters that provides standard set-up and operating procedures for staff and volunteers in assisting people with disabilities utilizing such facilities. Defendants will provide that checklist to Plaintiffs' counsel for their review and comment. Plaintiffs will provide comments within 5 business days. Should any updates be made to the checklist during the implementation period, the updates will be provided to the Plaintiffs' counsel.

## V.     TRANSPORTATION, OUTREACH, AND TRAINING

**A.     Transportation**

1.     Prior to the conclusion of the implementation period, while Defendants are still working to make 100% of their Evacuation Centers with co-located shelters accessible, Defendants will provide accessible transportation to transport people with disabilities from the Evacuation Center they arrive at to an available accessible facility, in the event they arrive at a facility that is either full, unable to support their needs, or both.

**B.     Providing Information Regarding Accessible Shelters**

1.     Defendants will disseminate information via accessible means to the public regarding the locations of all accessible Evacuation Centers with co-located shelters.

2.     Defendants will keep a database of information regarding the accessible features at facilities that have been surveyed. Architectural issues that may create a barrier to accessibility at a particular shelter will be noted in the database.

3.      Information about which Evacuation Centers are accessible will be made available to the public. Appropriate shelter staff will be able to determine which shelters and Evacuation Centers in their solar system are accessible.

4.      Defendants will continue to develop and implement a range of training regarding providing meaningful access for people with disabilities in emergency shelters for all staff and volunteers working at their emergency Evacuation Center and shelter facilities. Copies of relevant training will be shared with Plaintiffs' counsel for their review and comment. Plaintiffs' counsel will provide comments within five days of receipt, so as to allow for Defendants to move forward expeditiously.

## VI.      IMPLEMENTATION REPORTING TO PLAINTIFFS' COUNSEL

A.      This MOU encompasses the relevant agreements reached by the parties as of the date of its execution. Defendants will provide progress reports during implementation to Plaintiffs' counsel on an agreed upon schedule as to the policies, practices, and procedures that are developed to provide meaningful access to their emergency shelter program for people with disabilities. Defendants will provide any documents relevant to the progress of implementation including results of the accessibility surveys, report on the incorporation of survey results into the City's database, relevant checklists, protocols, and training to Plaintiffs' counsel for their review and comment. The parties will develop a time frame for the provision of Plaintiffs' comments to Defendants.

B.      As noted in the opening paragraph of this Agreement, this document represents an interim agreement on a remedial plan for the City's emergency sheltering system. The Stipulation of Settlement will provide for the continuing jurisdiction of the Court to enforce the terms of this agreement.

C.      Defendants agree to produce periodic reports in an agreed upon format, time frame, and frequency to Plaintiffs as reflected in the negotiated Stipulation of Settlement.

## VII.      GOOD FAITH

A.      The parties agree to execute the terms of this MOU in good faith.

B.      The parties further agree that they will make best efforts to resolve any disagreements arising from this MOU.

DATE: September 25, 2014

Undersigned:

By: _____
    Christine Chuang
    DISABILITY RIGHTS ADVOCATES
    Attorneys for Plaintiffs

By: _____
    Mark Toews
    Senior Counsel
    Attorney for Defendants

On behalf of:
ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-106
New York, New York 10007
(212) 356-0871

# EXHIBIT B

**MEMORANDUM OF UNDERSTANDING**

***Brooklyn Center for Independence of the Disabled v. City of New York***

**11-cv-6690**

**Post-Emergency Canvassing Operational Plan**

This Memorandum of Understanding (MOU) is an interim document intended to memorialize the agreement in principle of the parties regarding the establishment of a Post-Emergency Canvassing Operation (PECO) plan that would rapidly survey populations after a disaster to determine critical needs and refer those needs to appropriate partners for resolution. The parties intend to submit this MOU with the negotiated Stipulation of Settlement that will be so-ordered by the Court and over which the Court will retain jurisdiction. The parties executed this MOU on August 8, 2014 and all dates that run from "execution of this agreement" shall run from the August 8 date. The parties have finalized and re-executed this MOU for purposes of submission to the Court.

Once specific implementation timetables have been developed with the City agencies responsible for the various elements of the plan, they will be provided to Plaintiffs' counsel as they are developed.

The parties agree on the following definition of "canvassing":

*Canvassing is an operation meant to rapidly survey populations after a disaster to determine critical needs (i.e. for water, food, evacuation, power, and medical care) and refer those needs to appropriate partners for resolution.*

*The canvassing and referral to appropriate partners will provide access to services that the City provides post-emergency to, among others, individuals who are unable or who have difficulty, because of their disability, to access services the City is coordinating.*

1.    **CREATION OF POST-EMERGENCY CANVASSING OPERATION (PECO) PLAN**

    a.    Defendants will create a canvassing operation staffed and led by employees from multiple City agencies. This is the *Post-Emergency Canvassing Operation* or PECO. This canvassing operation will facilitate evacuation when requested and survey for critical needs such as water, food, power, and medical care. PECO is intended for disasters that significantly impact more than 5,000 households for over 48 hours.

    b.    In situations where the impact of the emergency is less significant or for fewer households, Defendants will employ or initiate its standard protocols to provide assistance to people with disabilities.

    c.    The PECO plan will detail the specific operational steps to be taken by the City agencies in the event of an emergency requiring this canvassing operation. The PECO plan will define roles and responsibilities of various agencies tasked with responsibilities under the plan and establish time frames. Plaintiffs will be provided with an opportunity to comment on the plan within 15 days of receipt. Defendants agree to meaningfully consider Plaintiffs' comments, incorporate them where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

2.    **CANVASSING SERVICES FOR PEOPLE WITH DISABILITIES**

This section describes the services Defendants agree to provide for people with disabilities after a disaster.

    a.    The canvassing plan will have a three-year development cycle, which will begin 30 days from the execution of this agreement. Defendants will set milestones and benchmarks during that development cycle that can be used to assess the progress of plan development. These milestones will also articulate which portions of this plan are possible to implement prior to the end of the development cycle.

    b.    This canvassing operation is targeted at those who did not evacuate and may need assistance to maintain their independence in a post-disaster scenario.

    c.    This canvassing operation will begin in an area affected by the disaster after search and rescue operations in that area have concluded.

    d.    In an emergency event that significantly impacts more than 5,000 households for over 48 hours, Defendants will mobilize an executive level Needs Assessment Interagency Task Force immediately upon declaring a

disaster to oversee implementation of the outreach plan.  Defendants will develop guidance and identify membership for the senior executives that will make up the Needs Assessment Interagency Task Force, including triggers to convene that group, operations, and information gathering activities they would undertake to locate and serve people with disabilities and access and functional needs. Disability literacy training will be provided for members of the Task Force as detailed in section 4 below.

e.      The Needs Assessment Interagency Task Force will determine the mobilization parameters and duration for these and related efforts to locate people with disabilities. The Task Force is an executive level task force that will include the Disability and Access and Functional Needs (DAFN)/Settlement Coordinator or another person with disability expertise and with similar knowledge and authority.

f.      The Needs Assessment Interagency Task Force will be involved in the implementation of PECO, including but not limited to those steps described in this MOU. The Task Force shall have the necessary protocols, tools, and training in place in advance that will require activation based on planning triggers.

g.      Defendants will create an incident management team of City staff to provide ground-level tactical management of widespread canvassing operations. This group will receive training in disability literacy, communications, and the accommodations available to people with disabilities during an emergency as detailed in section 4 below.

h.      Defendants will create an Operational Plan for Outreach to People with Disabilities and Access and Functional Needs, including canvassing operations, to describe triggers and strategies needed to complete this operation. The Needs Assessment Interagency Task Force and Plaintiffs will review and provide input on the Operational Plan. Defendants agree to meaningfully consider Plaintiffs' comments, incorporate them where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

i.      Defendants will agree on a sector-based organization of the City in order to coordinate outreach efforts, based on police precincts, community boards, zip codes, or similar mechanisms.

j.      Canvassers will have a mobile survey tool to input service requests relating to issues arising from: lack of food; lack of water; lack of electricity; the need for medical care, consumable medical supplies, prescriptions, or durable medical equipment; the need for relocation to a cooled or heated environment; the need for transportation to critical care

3

or sheltering facilities; or the need for the assistance of a social worker. Defendants will create an approved canvassing survey with participation by the DAFN/Settlement Coordinator and input from Plaintiffs. The plan will articulate the data with regards to needs that will be included and will articulate how the data collected can be used most efficiently.

k.      Canvassers will collect data that will be integrated at a central data center for referral purposes. EMS will be available to assist at canvassing sites to meet urgent medical needs. Defendants will build planning relationships with community organizations that have different resources and skill sets that may be requested during emergencies. These planning relationships will be detailed in the Operational Plan for Canvassing as they are developed.

l.      Defendants will create an Operational Plan for a Data Task Force that will integrate data collected from canvassing efforts. Data collected will include disability data, preferably the 6 American Community Survey questions. The plan will articulate additional data to be collected and tracked by this Task Force and will also articulate ways in which the data collected may inform emergency responses.

m.      Defendants will staff and train canvassing teams made up of staff from City agencies based on agreements with each Agency Commissioner. These canvassing teams will receive training in disability literacy, effective communication, and the accommodations available during disasters as detailed in section 4 below. Pre-written requests for surge support from outside entities (e.g. New York State) will also be formalized for additional staffing and resources in certain types of disasters, which will include provisions for disability literacy training, effective communications, and accommodations for additional staff.

**3.      TARGETED OUTREACH TO PEOPLE WITH DISABILITIES DURING CANVASSING OPERATIONS**

a.      Defendants will conduct outreach to people with disabilities via service providers using an enhanced Advance Warning System ("AWS") or similar functionality that allows for bidirectional communication and that includes information specific to people with disabilities related to sheltering in place, evacuation, shelter, transportation, power, and other emergency needs.

b.      Following the first implementation of the enhanced AWS, Defendants will conduct an assessment of AWS to determine whether additional enhancements or improvements are necessary. As part of this assessment, Defendants will make clear through messaging the role of AWS to service providers, assess the effectiveness of AWS, and review and assess the

content of the communication, with the goal of improving AWS to provide meaningful access for people with disabilities.  Defendants will also assess the capacity of the organizations involved in AWS to individually reach people with disabilities.

c.    Plaintiffs will be provided with the opportunity to comment on the content of pre-incident templates for AWS messages and on any proposed enhancements or improvements identified as a result of the assessment conducted pursuant to section 3(b) above, within 15 days of receipt. Defendants agree to meaningfully consider Plaintiffs' comments, incorporate them where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

d.    Because many people with disabilities are not tied to specific programs, Defendants will also undertake broader efforts to locate and address their needs, such as the below.

e.    Defendants will create a method to compile information at the time of an incident concerning populations of people with disabilities from various known datasets of contracted City service providers and national payer datasets (such as Medicare) (in compliance with HIPAA privacy laws as applicable) in order to target efforts more effectively with the most current data after a disaster based on specific conditions such as type of disability and geography.

f.    Defendants will develop mechanisms to enhance providers' ability to reach out to their known lists of clients through phone, email, and text-based mechanisms. Defendants will consult with Plaintiffs regarding mechanisms that will enhance providers' ability to conduct such outreach.

g.    Defendants will develop the capability to support outreach to lists of vulnerable populations through phone banks or other methods to locate people with disabilities and access and functional needs and to facilitate responses to requests for evacuation assistance or determine whether someone has a need for food, water, power, medical services or other need. Defendants will take steps to provide accessible communications through this supportive outreach. Defendants will use best efforts to maintain confidentiality.

h.    Defendants will develop the capability to maintain a list of building-level service and occupancy status for non-red-tagged multi-unit residential buildings to inform prioritization of unit-level canvassing efforts, referrals to emergency services, relocation to shelters, and public and building owner outreach. This list will be updated on an annual basis and will

5

remain confidential, to be used solely by Defendants for the purposes of emergency planning and response.

i.     Defendants will work with Plaintiffs to develop other methods of targeted outreach to people with disabilities and access and functional needs, such as through mapping/GIS systems.

j.     Defendants will create a Residential Building Assessment program that will maintain and update a list of multi-unit residential buildings that are potentially affected by loss of essential building services post-disaster. This program is intended to assess the post-disaster state of buildings with respect to building safety and services (e.g. power, water, heat) in order to determine whether buildings are safe for habitation after a disaster.

k.     Defendants will create a network of Neighborhood Canvassing Assembly Points for canvassing people with disabilities. These Canvassing Assembly Points will serve as bases for joint City and community canvassing operations and are intended as meeting points for handing out canvassing assignments to community groups, not as a place for receipt of services by the public.

## 4.     TRAINING

a.     Training for City employees who will take part in PECO will include training on the needs of people with disabilities and on disability literacy, including communication with people with disabilities. Once the training is developed, it will be shared with Plaintiffs for review and comment. Plaintiffs will provide comments within 15 days unless the parties agree otherwise. Defendants agree to meaningfully consider Plaintiffs' comments, incorporate them where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

b.     There are many types of volunteer groups involved in canvassing operations. Known groups of volunteers who participate in City emergency planning will be offered training similar to that offered to City employees on a recurring basis. "Just-In-Time" training will be developed and delivered at time of incident to other volunteer groups who spontaneously decide to assist.

c.     Defendants will develop this "Just-in-Time" training for spontaneous groups to partner in canvassing efforts, depending on scale, by checking in at a neighborhood hub for canvassing and receiving defined mission assignments that fit into the City's sector-based canvassing. This training will include disability literacy, asking and answering disability-related questions, identifying the needs of people with disabilities, and the

6

accommodations available during emergency situations for people with disabilities. A priority will be given, to the extent possible, to pairing untrained canvassers with trained canvassers during an emergency. Once this training is developed, a copy with be shared with Plaintiffs for their review and comment. Plaintiffs will provide comments within 15 days of receipt, unless the parties agree otherwise. Defendants agree to meaningfully consider Plaintiffs' comments, incorporate those where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

**5.      PHASED IMPLEMENTATION**

Although the project as a whole will begin with the execution of this agreement, not all tasks listed below can start at that time because of project dependencies. These deadlines are subject to revision with the agreement by both parties and will be finalized in a subsequent stipulation of settlement.

a.      Within 30 days of the execution of this agreement, Defendants agree to begin the process of implementing the steps described in this MOU, that will result in the City having increased ability by Summer 2017 to reach out to people with disabilities after a disaster, including canvassing operations. Defendants, together with the responsible City agencies, will develop an implementation timetable for the development of the items set forth in this MOU, consistent with the phased approach described below. The timetable and updates on implementation will be provided to Plaintiffs' counsel.

b.      Defendants will begin developing an Operational Plan for small-scale canvassing. This will be finalized by March 1, 2015.

c.      Defendants will begin working to create a City agreement for City staff participation in canvassing and an Incident Management Team, which shall include the identifying, interviewing, and hiring of additional staff as needed. This will be finalized by April 30, 2015.

d.      Defendants will begin developing an initial training for City staff for canvassing and Incident Management Teams by Coastal Storm season 2015. This will be finalized in time to administer training by the August 2015.

e.      Defendants will start to create an electronic platform for citywide canvassing. This platform will be in place by August 2015. Defendants will start to create an Operational Plan for Residential Building Assessment by Coastal Storm Season 2015. This plan will be in place by August 2015.

f.       Defendants will start to create a sector-based hub system that partners with community groups for canvassing. This sector-based hub system will be in place to be utilized by August 2016.

g.       Defendants will have the ability to query and report on known populations of people with disabilities and access and functional needs by August 2016.

h.       Based on implementation of this agreement, Defendants will have a fully functional Incident Management Team and Staffing capacity for large-scale canvassing by August 2017.

i.       Defendants will have exercises to test components of the fully completed plan with City staff and community groups serving and representing people with disabilities by August 2017.

DATE: September 2 5 2014

Undersigned:


By: _____
    Christine Chuang
    DISABILITY RIGHTS ADVOCATES
    Attorneys for Plaintiffs


By: _____
    Mark Toews
    Senior Counsel
    Attorney for Defendants

On behalf of:
ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-106
New York, New York 10007
(212) 356-0871

# EXHIBIT C

**MEMORANDUM OF UNDERSTANDING**

***Brooklyn Center for Independence of the Disabled v. City of New York***

**11-cv-6690**

**Accessible Transportation**

This Memorandum of Understanding (MOU) is an interim document intended to memorialize the agreement in principle of the parties regarding a remedial plan to provide accessible transportation during evacuations. The parties intend to submit this MOU with the negotiated Stipulation of Settlement that will be so-ordered by the Court and over which the Court will retain jurisdiction. The parties executed this MOU on August 8, 2014 and all dates that run from "execution of this agreement" shall run from the August 8 date. The parties have finalized and re-executed this MOU for purposes of submission to the Court.

Once specific implementation timetables have been developed with the City Agencies responsible for the various elements of the plan, they will be provided to Plaintiffs' counsel.

**I.    IDENTIFY RESOURCES AND NEED**

Prior to further developing its plans for accessible transportation, the City will develop an inventory of accessible vehicles and conduct a needs analysis.

**A.   Inventory of Accessible Vehicles For Use in Emergencies**

1.   The City will develop an inventory of vehicles with accessible features that may be available for use in an emergency through various agencies. Information will include the number of vehicles, the capacity of the vehicles for individuals using wheel chairs, and the number of appropriately licensed drivers. Information will also include whether the vehicles are owned by the agencies or are available through existing contracts. The provisions of this Section will be completed by August 1, 2015 (i.e., the 2015 hurricane season).

a.   By November 30, 2014, the City shall compile a complete list of agencies and transportation providers to contact in order to develop the inventory. The list will include mayoral agencies, Department of Citywide Administrative Services (DCAS), the Department of Education (DOE), Metropolitan Transportation Authority (MTA), MTA Access-a-Ride, and Taxi and Limousine Commission (TLC). The City will provide this list to Plaintiffs within 5 days of completion.

b.   By January 31, 2015, the City will create a list of defined terms to be used in compiling the information gathered from the various agencies and transportation providers. The City will provide this list to Plaintiffs within 5 days of completion and agrees to consider the input of Plaintiffs in the creation of the defined terms. Plaintiffs will provide such input within 5 days of receipt. The City agrees to

meaningfully consider Plaintiffs' input, incorporate those suggestions where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

2.   The City will update the Citywide Asset Logistics Management system with the number of vehicles with accessible features that could support evacuation for people with disabilities once the inventory is complete. Thereafter, the City will annually update this database.

## B.  Needs Analysis

1.   The City will conduct a needs analysis that includes estimating the demand for City-provided accessible evacuation services. This needs analysis includes collecting aggregate information on the numbers of people with disabilities that affect their ability to use public transportation and areas where they live, in order to assess the potential need so transportation resources can be effectively allocated during the evacuation phase of the emergency event. An aggregation and review of data reflecting paratransit ridership will be one of the bases, among others, for the analysis. The City agrees to consult with Plaintiffs regarding the process and form of the needs analysis on or before January 31, 2015, including sources of existing information that might be useful in assessing the transportation needs of people with disabilities. The City agrees to meaningfully consider Plaintiffs' comments, incorporate those suggestions where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

  a.   If the City determines that the hiring of a vendor to complete the needs analysis is necessary, by August 1, 2015, the City will submit Requests of Proposals for vendors to complete this needs analysis. The City will continue to update the Plaintiffs on the status of the bidding process and the vendor that is ultimately selected.

2.   The City agrees to work with City agencies and community based organizations to identify pockets of individuals likely to have functional needs in areas of the City that may be harder to identify.

3.   The City agrees to share the results of the needs analysis on or before August 1, 2016, and to consider Plaintiffs' suggestions and comments. Within 14 days of receiving the results of the needs analysis, Plaintiffs will provide such input and the City agrees to meaningfully consider Plaintiffs' comments, incorporate those suggestions where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

4.   Consistent with the results of the needs analysis, and to the extent that need exists, the City will work to solicit bids or RFPs to establish additional contracts with private companies, including private ambulette companies, livery, and other transportation companies, and/or establish intergovernmental agreements to support the plans and needs that have been identified for accessible emergency transport. The revised accessible transportation plan will include provisions for qualified operators of the vehicles and wheelchair lifts.

5.   Existing federal and state legislated resource request processes, including the interstate Emergency Management Assistance Compact ("EMAC") and the New York State Intrastate Mutual Aid Program ("IMAP"), provides the City with access to additional accessible transportation resources and trained responders when necessary.

## II.   TRAINING OF CITY PERSONNEL IN TRANSPORTING PEOPLE WITH DISABILITIES

City personnel directly involved in accessible transportation during pre-storm or forewarned evacuations will be trained on disability literacy, communicating with individuals with sensory and cognitive disabilities, the proper operation of wheelchair lifts, and the proper handling of durable medical equipment. The training will be conducted consistent with and within the parameters of existing civil service (and other applicable) laws and rules. *See also* High-Rise Evacuation MOU for additional guidance with respect to training relevant to evacuations. The City agrees to provide the training materials to Plaintiffs for input. Plaintiffs agree to provide such input within 14 days. The City agrees to meaningfully consider Plaintiffs' comments, incorporate those suggestions where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

## III.   COMMUNICATION REGARDING ACCESSIBLE TRANSPORTATION

A.   The City will develop clear and accurate messaging to the disability community about accessible transportation options available during pre-storm or forewarned evacuations, and how and where to access them. These options may include paratransit, MTA, buses, accessible taxis, and ambulettes (depending on the degree of cooperation and the feasibility of working with private entities that provide ambulette service). The City will work with the MTA to reinforce MTA's messaging concerning prioritization of accessible seats for people with disabilities on MTA buses. After an emergency, the City will work with the MTA to clearly communicate what transportation systems are resumed and extent to which each is accessible.

B.   The City will make best efforts to ensure that information conveyed by 311 is accurate and contains information regarding evacuation for persons with disabilities, including where and how to access accessible transportation options during pre-storm or forewarned evacuations. Plaintiffs will have an opportunity to review and comment on the content that 311 caller representatives utilize to provide the above information. Comments will be provided to a yet-to-be designated City contact person within 5 days of receipt. The comment period will occur on or around January 15, 2015.

1.   The City will train 311 operators to identify calls relating to emergency requests for evacuation for people with disabilities, including evaluating call takers on call handling procedures with regard to such calls, and will reinforce such training in emergencies to ensure that 311 operators will collaborate with 911 operators to evaluate the caller's needs in accordance with criteria established by OEM, NYPD, and FDNY in determining the appropriate transfer of the call.

**IV.     PARTNER AGENCIES AND PLANNING PARTNERS**

A.  The City agrees to work with planning partners, such as MTA and TLC, to collaboratively develop the City's accessible transportation plans for pre-storm or forewarned evacuations. The City agrees to share any plans with Plaintiffs and to consider Plaintiffs' comments. The City agrees to meaningfully consider Plaintiffs' comments, incorporate those suggestions where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why. The accessible transportation plans will define roles and responsibilities when the plans are activated. If the planning partners deem it necessary for the effective and efficient deployment of accessible transportation, the partner agencies will enter into contracts.

B.  The City agrees to work with MTA to develop standardized triggers for modifying Access-A-Ride (AAR) services during pre-storm or forewarned evacuations. Depending on the scope and location of the evacuation, this may include suspending the reservation system to permit subscribers in an evacuation zone to order AAR vehicles in order to evacuate or diverting AAR vehicles to specific locations to support evacuation efforts. This may also include establishing specific plans for public communication regarding time-frames for service modifications so as to make clear when AAR service will be available to subscribers to use for personalized trips and when AAR will focus only on transport to evacuation centers. The parties will discuss additional policies and procedures relating to the provision of paratransit services during an emergency, including training for dispatchers. Once the City develops such plans, the City will request MTA's approval to share these plans with Plaintiffs, who will have an opportunity to comment within 14 days should that request be granted by MTA.

1.  The City agrees to make plans to train City personnel to be able to operate accessible transportation vehicles.

2.  The City will request MTA to increase staffing for paratransit dispatching during emergencies.

3.  City-contracted paratransit dispatchers will be given accurate information about the incident or emergency.

C.  The City agrees to work with TLC to determine the number, type, and ownership of accessible taxis that are registered with them. The City will work with TLC with respect to outreach to the fleet owners and potential partnerships with fleet owners.

D.  The City agrees to work with the New York City Housing Authority (NYCHA) to collaboratively develop transportation and evacuation plans that address the needs of NYCHA residents. These plans will be aligned with the City's other emergency plans, such as high-rise evacuation. The City agrees to share any plans developed with NYCHA with Plaintiffs and to consider Plaintiffs' comments. Plaintiffs will provide any comments within 14 days. The City agrees to meaningfully consider Plaintiffs' comments, incorporate those suggestions where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

E.  City agencies tasked with evacuating individuals will work with the Disability and Access and Functional Needs Coordinator and/or other appropriate City personnel to identify the appropriate form of transportation or vehicle to be used to evacuate durable medical equipment and service animals when the pre-storm or forewarned evacuation of a person with a disability is necessary. The individuals at the above City agencies tasked with such duties will have disability literacy training as detailed in Section II. In a situation where it is not practicable to evacuate durable medical equipment, the City agrees to stock and supply certain appropriate durable equipment such as various types of wheelchairs and other mobility aids, or request certain other durable equipment that support daily living activities through the logistical request process or through existing contracts.

## V.    PLANS RELATING TO TRANSPORTATION DURING EVACUATIONS

A.  Using the resources and needs analysis described above, the City will develop plans for the effective deployment of accessible vehicles during notice and no-notice events, which shall be completed on or before August 1, 2017.

B.  In notice events, in addition to the planning steps described above, the City and its planning partners will consider and develop various strategies for deployment of accessible vehicles. As with all of the City's emergency plans, the planning documents will define roles and responsibilities and include strategies for decision-making and criteria for implementation, including identifying areas of high need and which agencies will supply accessible vehicles. The plans will be flexible and scalable so that they can be quickly adapted to the scope and location of the emergency. These strategies may include:

1.  Whether, and under what circumstances, accessible vehicles may be deployed to pre-determined locations to support evacuation efforts.

2.  Specific strategies for the effective use of paratransit vehicles as noted above.

3.  Strategies for deployment of accessible vehicles during a no-notice event. Such strategies may include staging of accessible transportation at meeting locations, diversion of paratransit and accessible taxis to support evacuation, and institution of shuttle routes.

4.  To the extent practicable, staging areas for accessible transportation will be in accessible locations. Note these locations are likely to be outdoor gathering places and are not expected to have restroom facilities or other amenities.

5.  Communicating in advance of an evacuation notice to people with disabilities and access and functional needs certain emergency-related information in order to accommodate their needs.

C.  Working with partner agencies to allow for accessible transportation services, such as MTA Access-A-Ride, to be resumed as soon as possible after an emergency.

D.  To the extent there are frozen zones after a disaster and it is safe to do so, the City will develop plans to relocate people with disabilities who have not evacuated. Such a plan will

include a mechanism for accessible vehicles to reach the individuals in the frozen zone. *See also* the PECO/Canvassing plan.

     E.   To the extent possible during a pre-event evacuation, the City will use best efforts:

        1.   not to separate people with disabilities from their caregivers, mobility devices, other durable medical equipment and/or service animals during an evacuation; and

        2.   to reunite people with disabilities with their durable medical equipment, mobility devices, and service animals should they become separated during an emergency.

     F.   The City will review and revise the Homebound Evacuation Operation ("HEO") to integrate all steps and provisions set forth and agreed upon by the parties in this and other plans discussed in settlement. All changes to HEO or any similar program will be shared with Plaintiffs, who will provide comments within 14 days. The City agrees to meaningfully consider Plaintiffs' comments, incorporate those suggestions where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why.

DATE: September 24 2014

Undersigned:

By: _____
    Christine Chuang
    DISABILITY RIGHTS ADVOCATES
    Attorneys for Plaintiffs

By: _____
    Mark Toews
    Senior Counsel
    Attorney for Defendants

On behalf of:
ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-106
New York, New York 10007
(212) 356-0871

# EXHIBIT D

**MEMORANDUM OF UNDERSTANDING**

*Brooklyn Center for Independence of the Disabled v. City of New York*

**11-cv-6690**

**Emergency Communications**

This Memorandum of Understanding (MOU) is an interim document intended to memorialize the agreement of the parties regarding additional steps to be taken for people with disabilities to participate in and benefit from the City's emergency communications programs and activities as set forth in its plans. The parties intend to submit this MOU with the negotiated Stipulation of Settlement that will be so-ordered by the Court and over which the Court will retain jurisdiction.

**I.   ACCESSIBLE COMMUNICATION AT RESOURCE CENTERS**

    A.   The City will revise the relevant portions of its emergency plans to reflect the following procedures relating to accessible communication at Disaster Assistance Service Centers (DASC):

        1.   Procedure for requesting and guidelines for creating alternative formats (Braille, large print, audio tape) of certain City-generated written materials provided at DASCs;

        2.   Procedure for requesting and guidelines for providing the services of a Sign Language interpreter and a Certified Deaf Interpreter (CDI). [DASCs will provide Sign Language interpretation services by providing on-site interpretation services or interpretation services via laptop (or other device) using Skype (or similar program) when appropriate];

        3.   Provision of signage concerning the availability of reasonable accommodations and auxiliary aids and services, and how to request one, including identification of the DASC Manager on-site.

    B.   The City will modify its "Universal Intake Form" used at DASCs to include questions that allow DASC staff to assess the type of assistance and/or accommodation that a person with a disability desires and/or requires. The City will allow Plaintiffs the opportunity to comment (within 14 days of receipt) on the City's proposed disability-related questions.

      C.     The City will offer training for DASC staff regarding disability literacy and effective communication with people with disabilities.

DATE: October 14, 2014

Undersigned:


By: _____
     Christine Chuang
     DISABILITY RIGHTS ADVOCATES
     Attorneys for Plaintiffs


By: _____
     Mark Toews
     Senior Counsel
     Attorney for Defendants

On behalf of:
ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-106
New York, New York 10007
(212) 356-0871

# EXHIBIT E

## MEMORANDUM OF UNDERSTANDING

### *Brooklyn Center for Independence of the Disabled v. City of New York*

### 11-cv-6690

### Power Outages

This Memorandum of Understanding (MOU) is an interim document intended to memorialize the agreement of the parties regarding additional steps to be taken for people with disabilities to participate in and benefit from the City's power usage and outage services and activities as set forth in its plans. The parties intend to submit this MOU with the negotiated Stipulation of Settlement that will be so-ordered by the Court and over which the Court will retain jurisdiction.

## I.    POWER-RELATED NEEDS

A.    All City-operated DASCs will be equipped with power strips that can be used by DASC clients for charging. People with disabilities who need to charge equipment shall be given priority for use. Should circumstances require provision of additional power strips, the City will request them through the standard requisition process.

B.    The City will disseminate information to AWS service providers and the Disability Community Advisory Panel regarding how to enroll in Notify NYC and Con Edison's LSE and Medical Hardship programs.

C.    The City will work with the Con Edison representative present during an EOC activation to (1) maintain situational awareness concerning the status of ConEd's activation and implementation of its LSE and Medical Hardship program; (2) facilitate ConEd messaging regarding power usage; and (3) assess the power-related needs of critical facilities.

D.    The City will relay public messaging (through all appropriate media including Notify NYC and websites) from utility companies related to potential large scale electricity outages associated with preemptive, network-level shut downs as soon as possible upon receipt. The City will provide such messaging in situations when the City receives that information from the utility company at least 60 minutes in advance of the outage (in order to allow the City sufficient time to relay the message). The City will continue to disseminate through already existing communication channels, including AWS, messaging concerning what power-outage related precautions to take in advance of a potential power outage.

DATE: October 14, 2014

Undersigned:


By: _____
    Christine Chuang
    DISABILITY RIGHTS ADVOCATES
    Attorneys for Plaintiffs


By: _____
    Mark Toews
    Senior Counsel
    Attorney for Defendants

On behalf of:
ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-106
New York, New York 10007
(212) 356-0871

# EXHIBIT F

**MEMORANDUM OF UNDERSTANDING**

***Brooklyn Center for Independence of the Disabled v. City of New York***

**11-cv-6690**

**Disability and Access and Functional Needs Coordinator and Disability Community
Advisory Panel**

This Memorandum of Understanding (MOU) is an interim document intended to
memorialize the agreement of the parties with regard to the hiring of a Disability and Access and
Functional Needs (DAFN) Coordinator and the creation of a Disability Community Panel. The
parties intend to submit this MOU with the negotiated Stipulation of Settlement that will be so-
ordered by the Court and over which the Court will retain jurisdiction. The parties executed this
MOU on August 8, 2014 and all dates that run from "execution of this agreement" shall run from
the August 8 date. The parties have finalized and re-executed this MOU for purposes of
submission to the Court.

I.     <u>Disability and Access & Functional Needs /Settlement Coordinator</u>

    A.  The City will hire an individual who will serve as the City's Disability and Access
    and Functional Needs (DAFN) Coordinator and the City's Settlement Coordinator
    (the "Coordinator").

        1.  The Coordinator will work at OEM alongside of and in coordination
        with the OEM Deputy Commissioner for Planning, and will report to a
        high ranking City official, to be determined by Commissioner Esposito,
        and shall be the lead City employee responsible for seeing that the City's
        emergency plans meet the needs of people with disabilities and access
        and functional needs so as to comply with federal and state law.

        2.  The Coordinator shall have the necessary authority, staff, and resources
        to carry out his or her duties, including the authority to work directly and
        coordinate with other agencies and personnel in the City responsible for
        all aspects of emergency planning, response, and recovery.

        3.  The Coordinator will receive training on Emergency Operations Center
        (EOC) protocols, Emergency Support Functions. Within these protocols
        and functions, the Coordinator will be the Point of Contact for disability
        and access and functional needs matters that arise during a major
        emergency and the recovery phase. Should this individual be

temporarily unavailable at any time during a major emergency event or during the recovery phase after an emergency event, he/she shall designate a Point of Contact in his/her absence.

B.  The duties of the Coordinator will include:

    1.  Responsibility for the implementation of the Stipulation of Settlement, including but not limited to:

        a)  Seeing that deadlines set forth by the parties in the Settlement are met;

        b)  Creation and implementation of agreed-upon protocols, policies, and procedures regarding the terms of the Stipulation of Settlement;

        c)  Conducting appropriate site inspections, reviewing documents, and meeting with both City personnel and community organizations; and

        d)  Completing and submitting reports on the progress made by the City in implementing the terms of the Stipulation of Settlement to Plaintiffs as further discussed in its Reporting provisions.

    2.  Participating in both the review of existing emergency plans with respect to integrating the needs of people with disabilities and access and functional needs and the development, as necessary, of any new emergency plans with respect to integrating the needs of people with disabilities and access and functional needs.

    3.  Outreach to the disability community, including serving on the Disability Community Advisory Panel and chairing the quarterly meetings of the Panel.

    4.  Reporting to the Law Department on the progress of the Settlement implementation.

    5.  Overseeing the implementation of disability-related plans during activation of the EOC, or whatever equivalent operation command center is in place during an emergency activation.

    6.  Coordinating with a designated point person at key relevant agencies in the EOC.

C.  Where the scope of the activation requires it, the City agrees to have present in the EOC, during emergency activations, a designated liaison who will have the

training and knowledge about current plans relating to people with disabilities whose duties will include:

1. Obtaining the necessary disability-related resources to the extent possible through existing EOC logistics protocols;

2. Working with the Coordinator to ensure that disability-related needs are met during response and recovery operations.

D. Upon the execution of the Stipulation of Settlement, OEM will take steps to hire the Coordinator as expeditiously as possible and will apprise Plaintiffs' counsel of the anticipated time frame for doing so. OEM will solicit and consider recommendations from Plaintiffs' counsel for the position and will solicit comments from Plaintiffs regarding potential candidates for the position. However, OEM will have the final decision regarding the Coordinator, and to the extent City Hall requires such, final approval of the candidate.

E. Commencing sixty days after execution of this agreement, OEM will begin the process of hiring additional DAFN Coordinator (DAFNC) staff or staffers for its agency who, in tandem with existing OEM personnel and the Coordinator will:

1. Support the Coordinator towards seeing that the coordinated emergency planning of the City meets the needs of persons with disabilities and access and functional needs;

2. Work to revise relevant portions of emergency plans, and work directly with and coordinate with other City agency DAFNC staff on all aspects of emergency planning, before, during, and after activation of the EOC.

F. (Phased Implementation): The City will begin working to create DAFNC positions at key City agencies whose programs and support are integral to an emergency response, so as to provide for the needs of people with disabilities pre- and post-disaster. The City will provide Plaintiffs' counsel with implementation timetables as they are developed. These personnel will:

1. Train on EOC's processes and the role of their agency in emergency response.

2. Participate in both the review of existing emergency plans with respect to integrating the needs of people with disabilities and access and functional needs and the development, as necessary, of any new emergency plans with respect to integrating the needs of people with disabilities and access and functional needs into their agency planning, relevant to their agencies' mission and response, and in coordination with OEM.

3

## II.    DISABILITY COMMUNITY ADVISORY PANEL

A.    The City will enhance and improve its Special Needs Advisory Committee through the creation of a Disability Community Advisory Panel, which is intended as a collaborative entity through which the City can gather expertise, input, and feedback from disability community organizations and members of the disability community regarding accessibility issues arising from current or future proposals related to enhancing emergency planning as it impacts people with disabilities.

B.    It is the intent of the parties that the input of the Disability Community Advisory Panel will be shared amongst relevant City agencies and that best efforts will be made to incorporate, to the extent possible, recommendations and feedback in the City's emergency planning programs and initiatives. The City has every intention that the Disability Community Advisory Panel, or a similar successor entity, will continue to operate after the Court's jurisdiction has ended.

C.    The Panel:

1.    Will include representatives from both government and non-government agencies and organizations that have an interest in, advocate for, and/or provide services to people with disabilities, as well as individuals with disabilities. Individuals will disabilities shall have significant representation on the Panel. The Panel will work towards integration of disability and access and functional needs issues in the City's emergency proposals and related programs and policies. Disability community members will have input regarding who represents them on the Panel.

2.    Will meet on a quarterly basis.

3.    Will address emerging issues, challenges, and solutions related to disability and other access and functional needs in emergency planning.

4.    Will support the work of the Coordinator, his or her designee or future advisory Panel leads, review relevant portions of the City's emergency plans and proposals that impact the disability community, and provide advice to the City on disability and other access and functional needs issues as they pertain to the City's management of emergencies and on the pertinent requirements of state and federal law.

5.    Will make recommendations and participate in enhancing the City's public education and outreach program to people with disabilities, which include but are not limited to:

    a) Providing information so people with disabilities know what to expect and what not to expect from the City in the event of an emergency; and

    b) Working with the City to provide accurate messaging of emergency-related issues as they impact people with disabilities.

6. Will work cooperatively with the City, providing practical input and suggestions on emergency plans and proposals that impact the disability community; the goal of which will be to support the City in implementation of the terms of the Stipulation of Settlement.

7. Will review and provide recommendations relating to portions of the City's emergency plans and proposals or revisions of plans that impact people with disabilities prior to final approval by the City of any such new or revised plans.

    a) The City agrees to provide reasonably necessary information for the evaluation of future plans, proposals, and revisions.

    b) As necessary, the City will request the Panel's feedback on time-sensitive proposals that the City believes implicate urgent disability and other access and functional needs issues. The Panel will provide such feedback within a unified document that reflects a majority view from the Panel within 5 business days of receiving such request, unless the City and the Panel agree otherwise.

    c) The DAFN Coordinator will report to the Panel at each quarterly meeting on the status of the recommendations.

D. The parties agree to discuss further specific internal processes related to the functioning of the Panel, including but not limited to:

1. Convening a special meeting of the Panel to determine representation of the disability community on the Panel, as set forth in Section C.1 supra.

2. Reviewing and soliciting feedback on existing processes for gathering input and feedback from the disability community before the Disability Community Advisory Panel is fully functioning.

3. Soliciting input regarding the selection of the DAFN Coordinator.

4. A procedure for appointing Panel members.

5. Which groups or individuals will initially be included in the Panel.

6. Process for decision-making within the Panel.

E. To the extent that the terms of the Order call for input from or collaboration with the disability community, this will be coordinated through the Panel.

F. Panel members will be offered and expected to take a basic Incident Command Structure Course ("ICS") to better understand the integration of disability needs into emergency response. Panel members will also be expected to attend training on disability literacy and Americans with Disabilities Act requirements relating to emergency preparedness issues.

G. The City will hold an annual forum open to the public on issues relating to emergency planning for persons with disabilities. The City will work with the Panel to notify organizations regarding the date and location of the forum.

DATE: September 25, 2014

Undersigned:

By: _____
   Christine Chuang
   DISABILITY RIGHTS ADVOCATES
   Attorneys for Plaintiffs

By: _____
   Mark Toews
   Senior Counsel
   Attorney for Defendants

On behalf of:
ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-106
New York, New York 10007
(212) 356-0871

6

# EXHIBIT G

**MEMORANDUM OF UNDERSTANDING**

**HIGH RISE BUILDING EVACUATION FOR PEOPLE WITH DISABILITIES**

**COMMITMENT TO ENHANCING EVACUATION PLANNING TO ACCOMMODATE THE NEEDS OF PEOPLE WITH DISABILITIES WITH RESPECT TO HIGH RISE BUILDING EVACUATION:**

**I.     NYC/ADA HIGH RISE BUILDING EVACUATION TASK FORCE**

A NYC/ADA High Rise Building Evacuation Task Force will be assembled and tasked with the responsibility of creating a Work Plan containing reasonable and achievable recommendations to address the evacuation of people with disabilities from high rise buildings in New York City.

The Task Force will consist of a committee of stakeholders with participation from relevant City agencies, in addition to outside experts with subject matter expertise in emergency preparedness and response as they pertain to meeting the needs of people with disabilities. The Task Force will be led by the Fire Department (FDNY), which will coordinate with and receive input from the subject matter experts (SMEs) and the other task force members and stakeholders identified below. The assignment will last 12 months, at the end of which a Work Plan will be created, which will have an implementation period of 3 years.

A.     <u>Task Force Membership</u>

The principal Task Force members will include, but shall not be limited to, the stakeholders listed under Tier 1 below. Other members may be asked to join the Task Force meetings in order to address specific topic areas.

<u>Tier I</u> – The internal core planning group will include representatives from:

- FDNY
    - One assigned lead who reports directly to the Fire Commissioner or his designee.
    - Representatives from FDNY, as determined by the assigned project lead above.
- Office of Emergency Management (OEM)
    - Disability and Access and Functional Needs (DAFN)/Settlement Coordinator and/or;
    - The DAFN Coordinator's designee who shall have knowledge and expertise relating to evacuation of people with disabilities.
- Mayor's Office for People with Disabilities (MOPD)
- Experts with subject matter expertise in emergency preparedness and response as they pertain to meeting the needs of people with disabilities and in high rise building evacuation of people with disabilities

- Plaintiffs and Defendants will each assign one subject matter expert to sit as a principal member of the Task Force. The SMEs shall have the knowledge, skills, and experience necessary to meaningfully contribute to the work of the Task Force. The SMEs shall regularly participate in the Task Force meetings, either in-person or telephonically, as appropriate. Plaintiffs' chosen SME may provide Plaintiffs' counsel with drafts of documents for comment throughout the Task Force process.

Tier II – Members who will be engaged at specific points, to be determined based upon the topic areas being discussed at a given meeting, and may include the following, but shall not be limited to:

- Deputy Mayor, or his/her designee
- Other agencies/entities with relevant responsibilities:
  - Department of Buildings (DOB)
  - Department of Health and Mental Hygiene (DOHMH)
  - New York City Housing Authority (NYCHA)
  - Department of Housing Preservation & Development (HPD)
  - New York City Police Department (NYPD)
  - 311/DoITT
- Disability and other stakeholders, including but not limited to representatives from the following disability organizations:
  - Center for Independence of the Disabled, New York (CIDNY), Brooklyn Center for Independence of the Disabled (BCID), National Council on Independent Living (NCIL), Independent Living Network of New York, and New York Association on Independent Living (NYAIL)

Other groups that will likely provide input

- NFPA, ANSI, RESNA – other code standards groups covering area of effort
- BOMA, NYC Co-Op & Condo Association, REBNY, etc.
- United States Access Board, National Institute of Standards and Technology (NIST)

B.    Additional Considerations

1. FDNY, as the agency with the primary subject matter expertise in this area will take the lead in this process, and will coordinate with and receive input from the subject matter experts (SMEs) and the other task force members and stakeholders identified above.

2. The review and planning process will be documented; templates will be created for documenting the Task Force's efforts and for reporting to the Court.

3. The Task Force will meet on a bi-weekly basis.

4.  Task Force members must have the requisite knowledge and authority to speak on behalf of their respective agency/organization.

## II.   TASK FORCE DELIVERABLES

The Task Force will work to meet 3 distinct deliverables: (1) Gap/Situational Analysis, (2) Recommendations, and (3) Work Plan.  The Analysis and Recommendations will be completed at the end of the 12 month period.

A.   <u>Gap/Situational Analysis</u>

1.  Conduct a thorough review and analysis of the identified deficiencies with respect to high rise evacuation in the Court's November 7, 2013 Opinion and Order, existing NYC-based and national high-rise building evacuation, plans, codes, regulations, practices, procedures, and guidance, and recent research in the field of disability and evacuation.

2.  Identify practices used by relevant agencies in other large metropolitan jurisdictions that may be replicable, in whole or in part, relating to high rise building evacuation.

3.  Identify different high rise building occupancies in NYC and how the building occupancy impacts policy/procedure/regulation relating to high rise building evacuation.

4.  Identify gaps that require policy, procedure, and/or regulatory remedy.

B.   <u>Recommendations</u>

1.  <u>Issues</u>

Using the Gap/Situational Analysis above, the Task Force will develop a set of recommendations to address the existing gaps in NYC's high rise building evacuation plans and protocols that the Court found in its Opinion, and the City agrees to implement all such recommendations that are reasonable and achievable. Recommendations will take into account and consider the following non-exhaustive list of issues, among others identified through the above-described tiered meeting process:

- Scalability of plans/procedures
- Building occupancy type and features (usage, age, etc.)
- Disability Community education and engagement
- Education and Involvement of building owners (REBNY, HPD, and NYCHA)
- First Responder Training
- Movement of durable medical equipment and service animals

- Effective Communications
- Local Law 98/2013, and any other relevant local laws
- Signaling Devices
- The City's current inventory of evacuation devices
- Placement of Evacuation Devices for people with disabilities in public and private buildings
- Drafting & passage of local regulations, codes and/or orders to support goals
- Creation of single-building evacuation protocols, such as evacuation assistants or areas of refuge or rescue
- The feasibility of elevator evacuations
- An assessment of the capacity and effectiveness of 311 (including the upgrades discussed below) to address the evacuation needs of people with disabilities during a large scale emergency, through the use of call representatives, texting, and online inquiries/responses, and the feasibility of connecting to the designated pool of agents discussed below via text or online.

- City-Owned and Operated Evacuation Devices

The Task Force will assess the estimated demand for City-provided accessible evacuation services in order to develop a recommendation concerning whether its current inventory of evacuation devices are sufficient to meet the estimated demand. Dependent upon the results of the needs analysis, the City agrees to work to create an appropriate logistics and purchase plan for the purchase of additional evacuation devices/stair chairs used by FDNY and the repositioning of the equipment, should the Task Force so recommend.

- Signaling Devices

The Task Force will work to form a consensus on the most appropriate form of a standardized, low-cost signaling device or devices to be used by people with disabilities as a method for signaling for assistance evacuating (for instance, in the event a person cannot reach 311 for evacuation assistance). The Task Force will determine how to best publicize the use of the device(s), as well as methods of distribution, which may include distributing the device(s) at the annual forum open to persons with disabilities (*see* Coordinator/Community Panel MOU), outreach events, through service providers that are part of AWS, and/or through a City website, if appropriate. First responders will receive training about how to recognize the above signaling. The Task Force shall develop their recommendations on this issue within 4 months from the time the Stipulation of Settlement is entered as a Court order and the City will begin to implement these recommendations when it receives the recommendations.

2.  Drills, Training, Outreach and Education

a.  Drills

The City will create and implement High Rise Evacuation Drills--consistent with the Task Force's recommendations--with building owners, managers, superintendents, occupants, and relevant City agencies. Drills will include the participation of people with disabilities. The

4

City will conduct an after-action assessment of each drill after it is conducted. The timeframe for this will be detailed as part of the Work Plan discussed in section C below.

### b.  Training

The Task Force will create new training materials and education guidelines for first responders based on the Task Force's recommendations. Training topics may include communicating with individuals with disabilities, proper protocols for evacuation of persons with disabilities understanding the correct method of transporting durable medical equipment, and review of protocols regarding evacuation of service animals, and educating building owners on a protocol to give priority to persons with disabilities.

### c.  Outreach and Education

Based on the recommendations of the Task Force, the City will create a more robust pre-emergency planning Outreach and Education program for building owners and occupants with an emphasis on high rise evacuation of persons with disabilities. The timeframe for this will be detailed as part of the Work Plan discussed in section C below. Dependent on the recommendations of the Task Force, this revised program may include, but will not necessarily be limited to the following:

- Updating the FDNY's Fire and Emergency Preparedness Guide—which will be distributed to every occupant of a multiple dwelling building in New York City— to include advice and recommendations to promote safety for individuals with disabilities during an emergency, sources of available resources, important contact information, pertinent websites and other sources of information, and any relevant Task Force recommendations, including the appropriate uses and types of low-cost signaling devices;
- Information concerning the upgraded 311 system;
- Other Task Force recommendations that are ultimately implemented by the City.

The City will also update the OEM website on an as needed basis to reflect the recommendations as required by the recently enacted Local Law 98/2013, which amended the administrative code of the City of New York respecting emergency preparedness recommendations for owners of residential and commercial buildings and the posting of emergency information in certain residential buildings.

Consistent with and dependent upon the recommendations of the Task Force, the City will address through rulemaking issues associated with persons with disabilities by incorporating information and guidance in the fire and emergency preparedness guide and notices required by New York City Fire Code Chapter 4 (see FC401.6).  Depending on the recommendations of the Task Force, this may include information about evacuation planning, use of signaling devices, and procedures for marking apartments where individuals have already evacuated or where individuals remain. The amended guides and notices would address both fire and non-fire emergencies.

All materials distributed by the City as part of its Outreach and Education program will be available in alternate formats (including Braille, large print, audio tape). The City agrees to include in the materials specific information about how to obtain a guide in any alternate format.

C.     Work Plan

The Task Force will create a 3 year implementation Work Plan that includes delivery dates and an oversight structure. The City will report on the progress of implementing the Work Plan pursuant to its reporting obligation as set forth in the Stipulation of Settlement.

## III.     HOMEBOUND EVACUATION/311 UPGRADE

311 has upgraded its hardware to a natural language IVR system where 311 callers are now asked to describe what information they seek, and the system then repeats back to the customer what it believes the customer is seeking and asks that the caller confirm such before directing the caller to the appropriate information or representative. During a Citywide emergency situation the City will use the natural language IVR in concert with a designated pool of agents to receive and handle calls from people with disabilities requesting assistance evacuating through the Homebound Evacuation Operation. The natural language IVR would allow a customer to speak "disability evacuation" or "homebound evacuation operation" or any other combination of designated words, and the caller would be routed to a pool of dedicated specialists (who have training with respect to working with people with disabilities and evacuation protocols). The chosen combination of words would be communicated through appropriate and agreed upon channels and timeframes.

Plaintiffs will be able to review the chosen words and the content developed for use by the trained specialists. The City will provide the chosen words and content to Plaintiffs within 15 days of completion. The City agrees to meaningfully consider Plaintiffs' comments, incorporate them where practical and consistent with the goals of this MOU, and report back to Plaintiffs regarding which comments were accepted or rejected, and the reasons why. 311 intends to expand its hardware and increase the number of licenses for additional ports to be added to the natural language IVR system in order to provide access to additional callers to the system.

These enhancements to the 311 system will be complete within 4 months of the Effective Date of the Stipulation of Settlement.

DATE: September 24 2014

Undersigned:

By: _____
     Christine Chuang
     DISABILITY RIGHTS ADVOCATES
     Attorneys for Plaintiffs

6

By: _____

    Mark Toews
    Senior Counsel
    Attorney for Defendants

On behalf of:
ZACHARY W. CARTER
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street, Room 2-106
New York, New York 10007
(212) 356-0871

7